# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

|  |  |  |
|---|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Consol. Ct. No.  21-00077 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | **NON-CONFIDENTIAL VERSION** |
| and | ) ) | |
| BGH EDELSTAHL SIEGEN GMBH, | ) ) | |
| Defendant-Intervenor. | ) ) ) ) | Business Proprietary Information Removed From Brackets on Pages 9-11, 13, 27-28, 32-36. |

## BRIEF OF PLAINTIFFS ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Myles S. Getlan
Jack A. Levy
Thomas M. Beline
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2313
Fax: (202) 567-2301

Dated:  Aug. 9, 2021

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

**Table of Contents**

                                                                                                Page

STATEMENT PURSUANT TO RULE 56.2 .................................................................... 4

I.    Administrative Determination Under Review .................................................... 4

II.   Issues Presented ................................................................................................. 4

III.  Statement of Facts ............................................................................................. 5

      A.   Commerce Conducted an Antidumping Investigation of FEB Imports from
           Germany ................................................................................................... 5

      B.   Despite Stating an Intent to Verify, Commerce Failed to Conduct Any
           Verification of Factual Information Submitted by BGH .......................... 7

      C.   Commerce's *Final Determination* Relied Upon BGH's Unreconciled (and
           Unverified) Cost Information ................................................................... 9

SUMMARY OF ARGUMENT ..................................................................................... 13

ARGUMENT ................................................................................................................. 14

I.    Standard of Review ......................................................................................... 14

II.   Commerce Acted Unlawfully by Failing to Verify Data Before Using Such Data in
      the Dumping Calculation ................................................................................ 15

      A.   Because Commerce Failed to Conduct a Verification and Issue a Verification
           Report, Commerce's *Final Determination* Is Unlawful .......................... 17

      B.   Even if the Unconditional Mandates of the Statute, the SAA, and Commerce's
           Regulations Were to Permit Some Flexibility, Commerce's Procedures In This
           Investigation Are Not Entitled to Deference Because Commerce Failed to
           Follow Procedural Requirements and Otherwise Jettisoned Established Practice ....... 22

      C.   Even Assuming *Arguendo* That Commerce's "Verification" Procedures Were
           Lawful, It's "Verification" Findings Were Not Because They Were
           Unsupported by Substantial Evidence ................................................... 26

III.  Commerce's *Final Determination* Was Unlawful Because Commerce Relied on
      BGH's Unreconciled Cost Data ...................................................................... 30

CONCLUSION ............................................................................................................. 36

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1516a(b)(1)(B) ..............................................................................14

19 U.S.C. § 1677b(f)(1)(A) ........................................................................ *passim*

19 U.S.C. § 1677e(a) ......................................................................................15

19 U.S.C. § 1677m(i) .................................................................................. *passim*

19 U.S.C. § 3512(d) ........................................................................................18


Regulations

19 C.F.R. § 351.301(c)(1)(v) ...........................................................................23

19 C.F.R. § 351.307 ..............................................................................4, 19, 22

19 C.F.R. § 351.307(b)(1)(i) ............................................................................18

19 C.F.R. § 351.307(c) ..........................................................................15, 19, 21

19 C.F.R. § 351.307(d) ................................................................................15, 18

Court Decisions

*Al-Tech Specialty Steel Corp. v. United States*, 745 F.2d 632 (Fed. Cir. 1984) ..........................21

*Auer v. Robbins*, 519 U.S. 452 (1997) ...........................................................25

*Bomont Industries v. United States*, 733 F. Supp. 1507 (Ct. Int'l Trade 1990) ........................................................................................................26

*Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011) ................................25

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).......................................................................... *passim*

*Christopher v. SmithKline Beecham*, 567 U.S. 142 (2012) .........................25

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)..............................14

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F. Supp. 2d 1305 (Ct. Int'l Trade 2001) ........................................................................16

*Hyundai Elec. & Energy Sys. Co. v. United States*, 466 F. Supp. 3d 1303 (Ct. Int'l Trade 2020) .....................................................................................31

*Industrial Quimica Del Nalon, S.A. v. United States*, 729 F. Supp. 103 (Ct. Int'l Trade 1989) .........................................................................................20

*Ipsco, Inc. v. United States*, 899 F.2d 1192 (Fed. Cir. 1990) ........................24

*Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) .................................................................................................................15

*Micron Tech. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) .......................... *passim*

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..........................................................................................15

*Myland Indus., Ltd. v. United States*, 31 C.I.T. 1696 (2007) ................................. *passim*

*New American Keg, d/b/a American Keg Company v. United States*, Slip Op. 21-30 (Ct. Int'l Trade Mar. 23, 2021) ...................................................................22, 25

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) .........................25

*Rubberflex Sdn. Bhd. v. United States*, 59 F. Supp. 2d 1338 (Ct. Int'l Trade 1999) .................................................................................................16, 24

*Smith Corona Corp. v. United States*, 771 F. Supp. 389 (Ct. Int'l Trade 1991) ................... 22-23

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) ...........................25

*Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d 1322 (Ct. Int'l Trade 2010) .................................................................................................14

*Timken Co. v. United States*, 852 F. Supp. 1122 (Ct. Int'l Trade 1994) ......................21

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) .................................24

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ......................................25

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .............................14

*Wheatland Tube Corp. v. United States*, 841 F. Supp. 1222 (Ct. Int'l Trade 1993) .................................................................................................16, 24

Administrative Determinations

*Brake Rotors from the People's Republic of China: Rescission of Second New Shipper Review and Final Results and Partial Rescission of First Antidumping Duty Administrative Review*, 64 Fed. Reg. 61,581 (Nov. 12, 1999) ................................................................................................20

*Carbon and Alloy Steel Wire Rod from the United Kingdom: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 83 Fed. Reg. 13,252 (Mar. 28, 2018) ....................................................20

*Certain Tool Chests and Cabinets from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 15,361 (Apr. 10, 2018) ................................................................................................................20

*Forged Steel Fluid End Blocks from the Federal Republic of Germany and Italy: Amended Final Antidumping Duty Determination for the Federal Republic of Germany and Antidumping Orders*, 86 Fed. Reg. 7,528 (Jan. 29, 2021) ................................4, 12

*Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value, 85 Fed. Reg. 80,018 (Dec. 11, 2020)*................................... passim

*Forged Steel Fluid End Blocks the Federal Republic of Germany: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures, 85 Fed. Reg. 44,513 (Jul. 23, 2020)* ..........................6, 7, 11

*Forged Steel Fluid End Blocks from the Federal Republic of Germany, India, and Italy: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 2,394 (Jan. 15, 2020) ...............5

*Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar from Italy*, 67 Fed. Reg. 3155 (Jan. 23, 2002) ..............................................................................19

*Notice of Final Determination of Sales at Less Than Fair Value, and Negative Final Determination of Critical Circumstances: Certain Lined Paper Products from India,* 71 Fed. Reg. 45,012 (Aug. 8, 2006) ..........................................................................................31

*Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Prestressed Concrete Steel Wire Strand from Mexico*, 68 Fed. Reg. 68,350 (Dec. 8, 2003) ..........................................................................31

*Notice of Final Results of Antidumping Duty Administrative Review: Steel Concrete Reinforcing Bars from Latvia*, 71 Fed. Reg. 74,900 (Dec. 13, 2006) ..........................................32

*Polyethylene Terephthalate Resin from Pakistan: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 48,281 (Sep. 24, 2018) .......................................................19

NON-CONFIDENTIAL VERSION

Other Administrative Materials

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (May 19, 1997) .....................19

Statement of Administrative Action Accompanying the Uruguay Round
Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) ............................................................ *passim*

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, ) ) ) ) ) | |
| Plaintiffs, ) | |
| v. ) | Consol. Ct. No.  21-00077 |
| ) | |
| UNITED STATES, ) | **NON-CONFIDENTIAL VERSION** |
| ) | |
| Defendant, ) | |
| and ) | |
| ) | |
| BGH EDELSTAHL SIEGEN GMBH, ) | |
| ) | Business Proprietary Information |
| Defendant-Intervenor. ) | Removed From Brackets on Pages |
| ) | 9-11, 13, 27-28, 32-36. |
| ) | |

BRIEF OF PLAINTIFFS IN SUPPORT OF THEIR RULE 56.2 MOTION
FOR JUDGMENT ON THE AGENCY RECORD

Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons (collectively, "Plaintiffs" or "Petitioners") are domestic producers of forged steel fluid end blocks ("FEBs") — a key upstream input for domestic drilling and fracking activity — that petitioned the U.S. Department of Commerce ("Commerce") to impose antidumping duties to remedy injurious dumping of FEBs by producers in Germany, among other country sources.  Battered by unfairly traded imports, Plaintiffs filed these cases with the promise that affirmative relief would remedy injury to the domestic industry and allow Plaintiffs to reinvest in their domestic production activities, save and create American jobs, and help strengthen America's energy independence across the supply chain.

1

But just months after the petitions were filed, the United States largely shut down because of the COVID-19 pandemic.  And the injury to domestic producers caused by subject imports was further exacerbated when oil quickly began trading at negative prices.

Having already grabbed U.S. market share through its unfair trade practices, BGH Edelstahl Siegen GmbH ("BGH") leveraged the COVID-19 shutdown of government offices in Washington, D.C. as an opportunity to shirk its responsibility to provide accurate and verifiable data by submitting to Commerce sales databases that were riddled with errors and a cost database that BGH could not reconcile to its audited financial statements.  But these lapses could escape scrutiny only if Commerce did something it had never done before: abrogate its statutory directive to verify factual information before using it in an original investigation.

Incredibly, Commerce did not conduct an on-site, or even a virtual, verification.  Nor did Commerce issue any verification report or verification findings.  As a result of Commerce's failure to follow the law, BGH escaped the investigation without the proper measure of accountability required under U.S. law.  In particular, the dumping margin Commerce calculated for BGH was a fraction of what data in the Petition demonstrated it should be, a result that was purely a function of COVID-19's apparent impact on Commerce's operations.  But such operational challenges do not excuse Commerce from acting in accordance with law.  Plaintiffs' appeal seeks to redress Commerce's failures in this regard.

Plaintiffs appeal Commerce's failure to verify the factual information submitted by BGH as well as Commerce's reliance on BGH's reported costs of production, which BGH could not reconcile to its audited financial records. Plaintiffs hereby request that this Court remand the challenged determination to Commerce with instructions for Commerce to verify BGH's factual information as is required by law, reject cost data that is unreconciled to BGH's financial

NON-CONFIDENTIAL VERSION

records, and otherwise render findings supported by substantial evidence and in accordance with law.[1]

---

[1] In accordance with Section (d) of Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden (Rev'd Feb. 17, 2021), this brief cites the Bates numbers corresponding to the confidential version of the joint appendix, but omit "PR" and "CR" style references.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The administrative determination under review is the final determination of the U.S. Department of Commerce and the resulting antidumping duty order in *Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,018 (Dec. 11, 2020) ("*Final Determination*") (Appx084045-084047), and accompanying unpublished Issues and Decision Memorandum ("Final IDM") (Appx083987-084044), as amended by *Forged Steel Fluid End Blocks From the Federal Republic of Germany and Italy: Amended Final Antidumping Duty Determination for the Federal Republic of Germany and Antidumping Orders*, 86 Fed. Reg. 7,528 (Jan. 29, 2021) ("*Amended Final Determination and AD Order*") (Appx084048-084051).

### II.  Issues Presented

A.   Commerce is required by statute to "verify all information relied upon in making a final determination in an investigation."  19 U.S.C. § 1677m(i).  Insofar as Commerce admits that it did not conduct a verification, did Commerce act unlawfully? (Argument Section II.A)

B.   Commerce's discretion in developing its verification procedures is not unlimited. Commerce must perform an on-site verification and subsequently issue a verification report.  *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) ("SAA") at 868; 19 C.F.R. § 351.307. When Commerce itself disclaimed any pretense that it conducted a verification or any analogue thereto, and otherwise failed to issue a verification report, is Commerce's *Final Determination* lawful?  (Argument Section II.B)

C.  To the extent Commerce sought to treat its questionnaire "in lieu of verification" as a valid verification exercise, did Commerce err as a matter of law by failing to support its conclusions with substantial evidence when it concluded that significant gaps and omissions revealed by BGH in response to Commerce's "questionnaire in lieu of verification" were "minor clerical issues" and not "indicative of a systematic reporting issue"?  (Argument Section II.C)

D.  Under the statute, Commerce is separately required to ensure that BGH's reported costs "reasonably reflect the costs associated with the production and sale of the merchandise."  *See* 19 U.S.C. § 1677b(f)(1)(A).   Did Commerce err as a matter of law and fail to support its conclusions with substantial evidence when it relied on BGH's reported costs of production, which BGH failed to reconcile to its audited financial records? (Argument Section III).

### III.  Statement of Facts

#### A.  Commerce Conducted an Antidumping Investigation of FEB Imports from Germany

In the face of injurious unfair trade practices, Plaintiffs, along with the Forging Industry Association and the FEB Fair Trade Coalition, filed a Petition with Commerce on December 19, 2019, alleging, *inter alia*, that FEBs from Germany were being sold in the United States at less than fair value.  *See Forged Steel Fluid End Blocks From the Federal Republic of Germany, India, and Italy: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 2,394 (Jan. 15, 2020) (Appx080000-080005).  Commerce initiated an investigation of FEBs imports from Germany on January 8, 2020.  *See id.* (Appx080000-080005).   Commerce initially selected two mandatory respondents to investigate, BGH Edelstahl Siegen GmbH ("BGH") and Schmiedewerke Gröditz GmbH ("SWG"), but ultimately calculated an adverse facts available

("AFA") margin for SWG, due to its failure to timely respond to Commerce's inquiries.  *See Forged Steel Fluid End Blocks the Federal Republic of Germany: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 44,513 (Jul. 23, 2020) ("*Preliminary Determination*") (Appx083284-0832987), and accompanying IDM ("Prelim IDM") (Appx082875-082897).

Relevant to this appeal, on February 10, 2020, Commerce sent its initial antidumping duty questionnaire to BGH.  *See* Commerce Letter to BGH (Feb. 10, 2020) (Appx080006-080157).  After obtaining multiple extensions of time, BGH submitted questionnaire responses concerning its production activities in Germany, home market sales, U.S. sales, and its costs to produce FEBs, *i.e.*, the merchandise under consideration ("MUC").  *See* "Response to Section A of the Antidumping Duty Questionnaire" (Mar. 10, 2020) (Appx080158-080764); "Response to Section B of the Antidumping Duty Questionnaire" (Apr. 15, 2020) ("BGH Section B Questionnaire Response") (Appx080783-080916); "Response to Section C of the Antidumping Duty Questionnaire" (Apr. 20, 2020) (Appx080917-081019); "Response to Section D Questionnaire" (Apr. 27, 2020) ("BGH Section D Questionnaire Response – Part 1") (Appx081020-081141); "Revised Section B & C Sales Files" (Apr. 28, 2020) (Appx081142-081175); "Response to Sections III.B & C of the Section D Questionnaire" (May 4, 2020) ("BGH Section D Questionnaire Response – Part 2") (Appx081181-081289).  Plaintiffs identified various deficiencies in BGH's responses including, *inter alia*, BGH's failure to provide an accurate and complete cost reconciliation.  *See* "Deficiency Comments on Section A Questionnaire Response of BGH Edelstahl Siegen GmbH" (Mar. 26, 2020) (Appx080158-080764); "Deficiency Comments on Section D Questionnaire Response of BGH Edelstahl

Siegen GmbH" (May 12, 2020) (Appx081290-081316); "Deficiency Comments on Sections B &

C Questionnaire Responses of BGH Edelstahl Siegen GmbH" (May 27, 2020) (Appx081317-

081342).  Commerce issued multiple rounds of supplemental questionnaires to BGH to address

these and other deficiencies.  *See* Commerce Letter to BGH (May 1, 2020) (Appx081176-

081180); Commerce Letter to BGH (Jun. 2, 2020) (Appx081343-081356); Commerce Letter to

BGH (Jun. 4, 2020) (Appx081357-081365); Commerce Letter to BGH (Jul. 27, 2020)

(Appx083297-083300).  After being granted extraordinary extensions of time to respond to

Commerce's questionnaires, BGH responded, in part.[2]  However, BGH consistently failed to

provide a complete and accurate reconciliation of its costs.  *See* Petitioners' Pre-Prelim

Comments at 7-10 (Appx082813-082816).

On July 23, 2020, and without addressing Plaintiffs' pre-preliminary arguments

concerning the accuracy of the data supplied by BGH, *see generally* Petitioners' Pre-Prelim

Comments (Appx082807-082864), Commerce calculated a preliminary estimated weighted-

average dumping margin that was below *de minimis* for BGH.  *See Preliminary Determination*

(Appx083288), and accompanying Prelim IDM (Appx082875-082897).

### B.   Despite Stating an Intent to Verify, Commerce Failed to Conduct Any Verification of Factual Information Submitted by BGH

In the *Preliminary Determination*, Commerce clearly stated its intent to comply with the

antidumping statute: "{a}s provided in section 782(i)(1) of the Act, Commerce intends to verify

the information relied upon in making its final determination."  *Preliminary Determination*, 85

Fed. Reg. at 44,515 (Appx083290).  However, on October 16, 2020, Commerce notified counsel

---

[2] By the time of Commerce's preliminary determination, BGH had already received no less than 11 extensions with generous allotments of time.  *See* "Petitioners' Comments in Advance of Commerce's Preliminary Determination" at 2 (Jun. 29, 2020) ("Petitioners' Pre-Prelim Comments") (Appx082808).

for BGH that it would instead "be issuing a questionnaire to BGH Siegen in lieu of performing

an on-site verification."  *See* Commerce Memorandum, "Less-Than-Fair-Value Investigation of

Forged Steel Fluid End Blocks from the Federal Republic of Germany: Telephone Notification

to BGH Siegen Regarding Issuance of Questionnaire in Lieu of Verification" (Oct. 19, 2020)

(Appx083327).  Commerce subsequently issued this "questionnaire in lieu of performing an on-

site verification" to BGH on October 20, 2020.  *See* Letter from Commerce to BGH (Oct. 20,

2020) ("BGH Questionnaire in Lieu of Verification") (Appx083328-083333).  In issuing the

questionnaire, Commerce stated: "The purpose of this questionnaire is to probe information that

you have already submitted - not to obtain new information." *Id*. at 1 (Appx083328).  Commerce

also notified parties that:

> …after an on-site verification, parties do not have an opportunity to submit factual
> information rebutting information collected by Commerce at verification.
> Accordingly, Commerce will not accept factual information from other interested
> parties to rebut your questionnaire responses. Interested parties should address the
> information submitted in response to this request, in case and rebuttal briefs.

*Id.* at 2 (Appx083329).  Commerce made no other statement about verification or the reasons for

issuing a questionnaire instead of following its customary verification procedures.

Despite analogizing the process related to the questionnaire to a verification, and

indicating that "the questions {on this questionnaire} are similar to those that {Commerce}

would normally ask during an on-site verification," *id*. at 1 (Appx083328), Commerce ultimately

acknowledged that the single questionnaire was not a "verification" as contemplated under the

statute.  Specifically, in the *Final Determination*, Commerce stated that "it was unable to

conduct on-site verification of the information relied upon in making its final determination in

this investigation as provided for in section 782(i) of the Tariff Act of 1930, as amended {19

U.S.C. § 1677m(i)}." *Final Determination* at 80,018 (Appx084045).  At no point did Commerce

provide a rationale of its decision not to conduct a verification or explain how its single

"questionnaire in lieu of verification" complied with the requirements of 19 U.S.C. § 1677m(i).

Notably, Commerce also did not issue a verification report, as required under both the SAA and

its own regulations.  And by the time case briefs were filed on November 9, 2020 the lack of

verification was already a *fait accompli*, as reflected in the framing of the October 20, 2020

questionnaire as a questionnaire "in lieu of" verification.

To make matters worse, Commerce failed to critically examine BGH's responses which

raised additional significant concerns about the validity of BGH's cost and sales reporting.  BGH

not only again failed to provide a complete and accurate cost reconciliation, *see* Section III.C

*infra*, but was also unable to provide documentation verifying the product characteristics it

reported for half of the sample transactions included in Commerce's questionnaire "audit," *see*

"Response to Questionnaire in Lieu of Performing On-Site Verification" (Oct. 28, 2020) ("BGH

Response to Questionnaire in Lieu of Verification") at 1-2 (Appx083336-083337).  In their case

brief, Plaintiffs raised concerns about the validity of BGH's sales reporting, particularly as these

claimed "errors" [                                                        ].  *See* "Petitioner's

Case Brief" (Nov. 9, 2020) ("Plaintiffs' Administrative CB") at 18-19 (Appx083838-083839).

In the final determination Commerce summarily concluded that "{n}one of the reported

corrections appear to be indicative of a systematic reporting issue," without examining any

additional sample sales or otherwise validating BGH's sales database.  *See* Final IDM at 43

(Appx084029).

C.   **Commerce's *Final Determination* Relied Upon BGH's Unreconciled (and Unverified) Cost Information**

Commerce's initial Section D questionnaire provided detailed instructions on how – and

the standard format in which – BGH should provide a cost reconciliation to substantiate its

reported costs.  *See* Commerce Letter to BGH (Feb. 10, 2020) at D-11-14 (Questions III.A-B)

(Appx080107-080110).  In its initial Section D response, BGH ignored these instructions and instead provided an incomplete reconciliation that failed to provide the requisite detail and failed to comply with the standard format requested by Commerce.  *See* BGH Section D Questionnaire Response – Part 2 at App'x D-17 (Appx081252).  In particular, BGH's partial reconciliation only showed how its total cost of manufacture for all merchandise reconciled to its financial statement.  *Id*. at 3, App'x D-17 (Appx081189, Appx081252).   It did not quantify any reconciling differences or otherwise explain its assertion that [      ] percent of the total actual costs reflected in its financial statements were attributable to merchandise under consideration ("MUC").  *Id.* (Appx081252).

Given these deficiencies, Commerce's first supplemental Section D questionnaire asked BGH to revise its cost reconciliation to follow Commerce's standard format and include the detail originally requested in Commerce's initial questionnaire, including an explanation of its method of allocating actual costs between MUC and non-MUC.  *See* Letter from Commerce (Jun. 2, 2020) at 7-8 (Appx081349-081350).  In its first supplemental Section D response, BGH [                 ] MUC and non-MUC ratios, alleging that [      ] percent of its total actual costs related to MUC, while [      ] percent related to non-MUC.  *See* "Response to Section D Supplemental Questionnaire" (Jun. 19, 2020) ("BGH Response to D Supp. Questionnaire – Part 2") at App'x SD-15 (Appx081593-081594).  BGH also explained that it derived these ratios of MUC and non-MUC costs by allocating total costs between these two categories based on their respective proportions of BGH's *standard* costs.  *Id.* (Appx081593-081594).  BGH explained its standard costs are *estimated* cost figures that do not account for significant elements of BGH's manufacturing costs and are not part of the company's audited financial records.  *See* BGH Questionnaire in Lieu of Verification at 6 (Appx083349); *see also* BGH Response to D Supp.

Questionnaire – Part 2 at App'x SD-15 (PDF 228) (Appx081593); BGH Section D Questionnaire

Response – Part 2 at App'x D-17 (PDF 73) (Appx081253); "Response to Second Section D

Supplemental Questionnaire" (Aug. 3, 2020) ("BGH Response to 2nd Supp. D Questionnaire") at

3-4 (Appx083309-083310); BGH Section D Questionnaire Response – Part 1 at 15

(Appx081040).  Yet BGH failed to either (1) corroborate the accuracy of the standard cost ratios

it used or (2) otherwise demonstrate that the standard cost ratio was a reasonable tool for

allocating actual costs.

Notably, BGH did not rely on the same standard cost allocation methodology used in its

flawed cost reconciliation when deriving product-specific costs.  For those, BGH utilized

"product-specific standard pricing-calculations."  *See* BGH Section D Questionnaire Response –

Part 1 at 30 (Appx081055); BGH Response to 2nd Supp. D Questionnaire at 3-4 (Appx083309-

083310).  Unsurprisingly, the "reconciliation" in BGH's first supplemental questionnaire

response showed an unreconciled difference of [        ] percent between the MUC costs

reported in its cost database (*i.e.*, [                ]) and the MUC costs from its financial

accounting system (*i.e.*, [                ]).  *See* BGH Response to D Supp. Questionnaire – Part

2 at App'x SD-14 (Appx081589).

After issuing the preliminary results, Commerce again requested that BGH reconcile its

reported costs.  *See* Letter from Commerce (Jul. 27, 2020) at 3 (Appx083299).  While BGH was

able to reduce the reconciliation difference due to "revisions in the variance calculations," a

[     ] percent reconciling difference remained. *See* "Response to Petitioner's Comments in

Advance of Preliminary Determination" (Jul. 9, 2020) at 4 n.1 (Appx082868); BGH Response to

2nd Supp. D Questionnaire at 2 (Appx083308).  BGH claimed that the [           ]

reconciliation difference was acceptable because the variance was "favorable" (*i.e.,* because its

reported costs for MUC in its cost database exceeded what BGH designated as MUC costs in its financial records.  *See* BGH Response to 2nd Supp. D Questionnaire at 2-4 (Appx083308-083310).

Finally, in its "questionnaire in lieu of on-site verification" Commerce again asked BGH to validate its reported costs by asking BGH to provide details on its allocation between MUC and non-MUC for specific products and provide documentation to support its standard cost allocation methodology.  *See* BGH Questionnaire in Lieu of Verification at 5-6 (Appx083332-083333).  In response, BGH noted simply that its standard cost build-up was based on standard cost rates employed for valuing monthly finished goods inventory.  BGH Response to Questionnaire in Lieu of Verification at 5-13 (Appx083348-083356).  However, BGH did not explain how such records tied to its audited, GAAP-compliant financial statement.  *See id.* (Appx083348-083356).  BGH also failed to comply with Commerce's request that it provide an inventory valuation list for 2019 to substantiate its standard cost reporting.  *See id.* at 5 and Exhibit VE-7 (Appx083348, Appx083744-083754).

Despite these failures, in the *Final Determination* Commerce concluded that BGH had provided Commerce with an adequate cost reconciliation and thereby demonstrated that BGH's "reported costs reasonably reflect the costs associated with the production and sale of the merchandise as required by the statute."  *See* Final IDM at 38 (Appx084024).

\* \* \*

By ignoring or minimizing the major issues with BGH's sales and cost reporting and relying on incomplete and unverified data, Commerce calculated a weighted-average dumping margin of 4.79 percent for BGH.  *See* Amended Final Determination and AD Order at 7,530 (Appx084050).   As a result, the materially injured domestic FEB industry has not received the

12

relief from dumped FEBs from Germany promised by the antidumping statute because Commerce acted unlawfully in conducting this investigation and otherwise made findings unsupported by substantial record evidence.

This appeal ensued.

## SUMMARY OF ARGUMENT

Commerce's failure to verify information relied upon in the *Final Determination* is contrary to law and its reliance on flawed data provided by BGH in response to the questionnaire in lieu of verification was not based on substantial evidence.

Under *Chevron* step one, Commerce did not have a legal basis to forego conducting a verification of BGH's data before using those data in the *Final Determination*.  The statute is clear — Commerce must conduct a verification.  Having failed to conduct a verification, this Court should remand the *Final Determination* to Commerce to conduct a verification in accordance with the statute's mandate, and consistent with the SAA and Commerce's regulations.

Even under a *Chevron* step two analysis, Commerce has not provided a reasonable basis for this Court to accept its "questionnaire in lieu of verification" because Commerce itself disclaimed any similarity between the questionnaire and a standard verification exercise, Commerce did not create an adequate analogue to the on-site verification required by the SAA and its regulations, and Commerce did not issue a verification report as required by the SAA and its regulations.  This too justifies remand.

Moreover, even assuming *arguendo* that Commerce's questionnaire "in lieu of verification" was a lawful verification exercise, Commerce's conclusion that BGH's [

] errors in its sales reporting did not "appear to be indicative of a systematic reporting issue," *see* Final IDM at 43 (Appx084029), was wholly unsupported by the record.  Put simply,

the fact that such errors affected half of the transactions covered by Commerce's audit itself evidences a systemic flaw in BGH's reporting.  Moreover, Commerce had no basis to claim otherwise because it conducted no additional inquiry into the validity of BGH's data once apprised of these errors.

Commerce's *Final Determination* is also not based on substantial evidence or in accordance with law because Commerce relied on BGH's reported costs of production, which patently did not reconcile to BGH's audited financial records.  In so doing, Commerce failed to explain how BGH's reported production costs "reasonably reflect the costs associated with the production and sale of the merchandise" as required by the statute.  *See* 19 U.S.C. § 1677b(f)(1)(A).   Commerce's decision to nonetheless rely on BGH's unreconciled and unverified costs was unreasonable and unsupported by substantial evidence.

## ARGUMENT

### I.   <u>Standard of Review</u>

This Court will "hold unlawful any determination, finding, or conclusion found…to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

To determine whether Commerce's decision is supported by substantial evidence, the court examines whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla" and "must into account whatever in the record fairly detracts from its weight."  *Id*. at 477, 488.  The substantial evidence standard also requires Commerce to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d

14

1322, 1328 (Ct. Int'l Trade 2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, (1983)).  In sum, substantial evidence review requires the court to determine whether the evidence and reasonable, evidence-based inferences support Commerce's findings.  *See Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

To determine whether Commerce's interpretation of a statue is "in accordance with law," courts apply the two-step framework laid out by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  Under the *Chevron* framework, a reviewing court must first examine "whether Congress has directly spoken to the precise question at issue."  *Id.* at 842.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguous expressed intent of Congress." *Id*. at 842-43.   If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id*. at 843.

## II. <u>Commerce Acted Unlawfully by Failing to Verify Data Before Using Such Data in the Dumping Calculation</u>

The statute unambiguously requires that Commerce conduct a verification, 19 U.S.C. § 1677m(i), and prohibits Commerce from relying on unverified information, *id.* § 1677e(a).  The SAA and Commerce's regulations require that Commerce observe certain procedures attendant to a verification, *see* SAA at 868; 19 C.F.R. § 351.307(d) ("The Secretary will notify the government of the affected country that employees of the Department will visit with the persons listed below in order to verify the accuracy and completeness of submitted factual information."), and furthermore require the issuance of a verification report prior to the promulgation of a final determination, SAA at 868; 19 C.F.R. § 351.307(c) ("The Secretary will

report the methods, procedures, and results of a verification under this section prior to making a

final determination in an investigation….").  Aside from these unconditional requirements, the

statute does not articulate the precise requirements for what constitutes a lawful verification.

Thus, when conducting verification, Commerce generally has the latitude to "derive {its}

verification procedures *ad hoc*" and the court reviews these procedures for abuse of discretion.[3]

*Micron Tech. v. United States*, 117 F.3d 1386, 1395-96 (Fed. Cir. 1997).

 However, this discretion is not absolute.  *See generally Rubberflex Sdn. Bhd. v. United

States*, 59 F. Supp. 2d 1338, 1346 (Ct. Int'l Trade 1999) ("In spite of, or perhaps because of, the

wide latitude given Commerce in conducting reviews and verifications, however, 'the Court

must be ever vigilant of abuse of discretion by the agency.'") (quoting *Wheatland Tube Corp. v.

United States*, 841 F. Supp. 1222, 1227 (Ct. Int'l Trade 1993)).  As made clear by the Supreme

Court, an agency's interpretation of an ambiguous statute is only entitled to deference where it is

reasonable and "based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 842-

43; *see also Micron Tech*, 117 F.3d at 1397 (noting that Commerce's verification process must

"comport{} with a permissible interpretation of the statutory requirement").  Here, this was not

the case.

---

[3] The "abuse of discretion" standard is "not {} a discrete or more stringent standard," but rather "another guise of the statutorily-mandated substantial evidence/in-accordance-with-law test." *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F. Supp. 2d 1305, 1314 (Ct. Int'l Trade 2001).  In other words, in evaluating Commerce's chosen verification methodology for abuse of discretion, the Court ensures Commerce's methodology is both: (1) not arbitrary and capricious (*i.e.*, that its decision-making is supported by substantial evidence) and (2) a reasonable effectuation of Congress's statutory purpose (*i.e.*, that it is "in accordance with law"). *See id*. at 1313-14.

A.   **Because Commerce Failed to Conduct a Verification and Issue a Verification Report, Commerce's *Final Determination* Is Unlawful**

The statute unambiguously requires Commerce to "verify all information relied upon in making a final determination in an investigation," 19 U.S.C. § 1677m(i), but Commerce plainly admits it did not conduct a verification.  *See Final Determination* at 80,018 (Appx084045) ("Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation as provided for in section 782(i) or the Tariff Act of 1930, as amended (the Act).")  This, *ipso facto*, renders Commerce's *Final Determination* unlawful under the first prong of *Chevron* scrutiny, which requires Commerce, and this Court, to "give effect to the unambiguous expressed intent of Congress."  *Chevron*, 467 U.S. at 842-43.

As recounted in the Statement of Facts, *supra*, Commerce acknowledged in its *Final Determination* that pursuant to 19 U.S.C. § 1677m(i) Congress "provided for" (*i.e.*, intended) Commerce to conduct an "on-site verification of the information relied upon in making its final determination." *Final Determination* at 80,018 (Appx084045).   As "the intent of Congress {was} clear" to Commerce, under the first step of *Chevron* that should have been "the end of the matter."  *Chevron*, 467 U.S. at 842.  However, rather than finding a way to comply with its statutory obligations, Commerce instead chose to rely on unverified information submitted by BGH in making its final determination, essentially treating the statutory verification mandate as an optional undertaking.   Such an interpretation is flatly contradicted by the plain text of the statute and the SAA, and not entitled to deference.  *Chevron*, 467 U.S. at 842-43.  This Court should accordingly remand the *Final Determination* to Commerce to conduct a verification in accordance with applicable law.  If remanded on this basis, the Court need not reach the specifics of Commerce's *non-verification* actions — *i.e.*, Commerce's questionnaires "in lieu of"

verification — because a "verif{ication}" is what the statute, the SAA, and Commerce's regulations require, 19 U.S.C. § 1677m(i).[4]

While the statute does not explicitly delineate what a "verification" entails, the accompanying SAA provides direction.  *See generally* 19 U.S.C. § 3512(d) (requiring that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of…{the} Act in any judicial proceeding in which a question arises concerning such interpretation or application.").  In particular, the SAA stipulates that "Commerce will verify information in a foreign country" after obtaining the consent of the respondent and notifying the foreign government concerned.  SAA at 868.  In compliance with this mandate, Commerce's regulations make clear that Commerce "will verify factual information upon which {it} relies in a final determination in a{n}…antidumping investigation," and, as part of this verification, "will notify the government of the affected country that employees of the Department will visit the persons listed below {*i.e.*, the relevant foreign producers, exporters, importers, affiliates and/or unaffiliated purchasers submitting factual information in the proceeding} in order to verify the accuracy and completeness of submitted factual information." 19 C.F.R. §§ 351.307(b)(1)(i), (d); *see also Myland Indus., Ltd. v. United States*, 31 C.I.T. 1696, 1704 (2007) (noting that the Court, like Commerce, "interprets {the term 'verification'} to mean 'on-site' verification").

In addition to confirming the necessity of "on-site" verification, the SAA further specifies that Commerce must "report the methods, procedures, and results of the verification prior to making its final determination in an investigation."  SAA at 868.  As with the "on site"

---

[4] The Court should, nevertheless, reach a determination on whether Commerce's reliance on BGH's unreconciled cost data was supported by substantial evidence.  *See* Argument Section III.

requirement, this mandate was similarly incorporated into Commerce's regulations, which state that Commerce "will report the methods, procedures, and results of a verification under this section prior to making a final determination in an investigation or issuing final results in a review."  19 C.F.R. § 351.307(c).

Although possible impediments to these requirements — such as armed conflict, political instability, administrative resource constraints, and domestic or international health crises — were readily foreseeable, neither the statute nor the SAA provide an exception to these mandates for extenuating circumstances.  *See generally* 19 U.S.C. § 1677m(i); SAA at 868 (providing only that Commerce may decline to undertake verification where the subject government and/or respondent refuse to participate).  Commerce's regulations similarly do not contemplate any circumstances where a verification and/or the release of a verification report are not required. *See generally* 19 C.F.R. § 351.307.  Indeed, the Preamble to Commerce's regulations makes clear that the verification report constitutes a critical piece of "evidence on the record that the Department must consider in making its final determination."  *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,337 (May 19, 1997).  This is why Commerce has, in the past, found a way to conduct verification, even under exceptional circumstances.  *See, e.g., Polyethylene Terephthalate Resin From Pakistan: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 48,281 (Sep. 24, 2018) (conducting a verification using "standard verification procedures, including an examination of relevant accounting and production records, and original source documents" with representatives of a Pakistani company in Washington, D.C. when Commerce determined that travel in Pakistan was not possible due to a State Department travel advisory); *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar From Italy*, 67 Fed. Reg. 3,155 (Jan. 23, 2002) (tolling the final determination

19

deadline in this and companion investigations of SSB from Germany, France, the United

Kingdom, and Korea in order to conduct a modified verification that "met the {verification}

standard" in the wake of "security concerns and logistical difficulties brought about by the events

of September 11 {2001}"); *Brake Rotors From the People's Republic of China: Rescission of*

*Second New Shipper Review and Final Results and Partial Rescission of First Antidumping Duty*

*Administrative Review*, 64 Fed. Reg. 61,581 (Nov. 12, 1999) (conducting an off-site verification

at a Beijing hotel rather than on-site verification at the respondent's production facilities due to

security concerns associated with travel in China following a NATO bombing of the Chinese

Embassy in Belgrade, Yugoslavia).

Further, where Commerce could not verify, it has applied adverse facts available, *see,*

*e.g., Carbon and Alloy Steel Wire Rod from the United Kingdom: Final Affirmative*

*Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical*

*Circumstances*, 83 Fed. Reg. 13,252 (Mar. 28, 2018); *Certain Tool Chests and Cabinets from the*

*Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair*

*Value*, 83 Fed. Reg. 15,361 (Apr. 10, 2018).

This is also why, under an earlier version of the statute,[5] the Court remanded

Commerce's final determination for failure to conduct a verification.  *See Industrial Quimica Del*

*Nalon, S.A. v. United States*, 729 F. Supp. 103, 109 (Ct. Int'l Trade 1989) (surveying the

---

[5] The statutory mandate to conduct a verification predated the 1994 Uruguay Round Agreements
Act ("URAA").  *See* SAA at 868 (describing the "general requirement that Commerce verify
information" as having been "move{d}" "from section 776(b) of the Act to new section 782(i),"
*i.e.*, 19 U.S.C. § 1677m(i)).  Prior to 1994, the most recent substantive modification to the
verification subsection was effectuated by the Trade and Tariff Act of 1984, Pub. L. 98-573 §
618, 98 Stat. 2948, 3037, which provided, in relevant part, that "The administering authority
shall verify all information relied upon in making—(1) a final determination in an
investigation…"  This language was reproduced verbatim in 19 U.S.C. § 1677m(i).

legislative history underlying the verification requirement and concluding that "the Court can

find no alternatives to requiring ITA to comply with the clear language of the statute.  The

government's action in failing to verify was not in accordance with the law."); *see also Al-Tech

Specialty Steel Corp. v. United States*, 745 F.2d 632, 636-640 (Fed. Cir. 1984) (concluding that

Commerce was required to conduct verifications in administrative reviews as well as in

investigations); *cf. Timken Co. v. United States*, 852 F. Supp. 1122, 1130 (Ct. Int'l Trade 1994)

("Clearly, if Commerce were conducting its third consecutive administrative review without yet

making verification and an interested party had made a timely request for

verification…Commerce would be required to do so.").

Notably, Commerce did not even attempt to justify its procedures in this investigation as

a stand-in for the type of procedures required under law.  *See Final Determination* at 80,018

(Appx084045).  Commerce characterized its supplemental questionnaire as "additional steps in

lieu of on-site verification{, *i.e.*,} request{ing} additional documentation and information."  *Id.*

(Appx084045).  However, at no point did Commerce explain how these "additional steps"

constituted a lawful substitute for an on-site verification.  Stated differently, Commerce openly

admitted that it did not conduct a verification within the meaning of 19 U.S.C. § 1677m(i).  *See

id.* (Appx084045) ("Commerce was unable to conduct onsite verification of the information

relied upon in making its final determination in this investigation as provided for in section

782(i) of the Tariff Act of 1930, as amended (the Act).").  Contrary to the requirements of the

SAA and Commerce's own regulations, Commerce also did not issue a verification report

containing its verification procedures and findings, *see* SAA at 868; 19 C.F.R. § 351.307(c), and

offered no explanation for this failure.  Such failures to comply with the law governing

antidumping investigations, individually or collectively, necessitate a remand so that Commerce

may undertake a proper verification, issue a verification report, and issue a final determination

that complies with the unambiguous, unconditional requirements of the statute.

> **B.    Even if the Unconditional Mandates of the Statute, the SAA, and Commerce's Regulations Were to Permit Some Flexibility In This Investigation Are Not Entitled to Deference Because Commerce Failed to Follow Procedural Requirements and Otherwise Jettisoned Established Practice**

Assuming *arguendo* that the statute's and SAA's plain language do not necessitate a

remand order for Commerce to verify the data relied upon (it does), when considering

Commerce's compliance with this statutory mandate to verify factual information, the Court of

Appeals for the Federal Circuit ("CAFC") directs a reviewing court to examine the lawfulness of

both (1) Commerce's chosen verification methodology and (2) the results derived from that

methodology.  *See Micron Tech. v. United States*, 117 F.3d 1386, 1394 (Fed. Cir. 1997).

Here, neither Commerce's methodology nor its results pass muster under the law.  *First*,

with respect to Commerce's procedures, both the SAA and Commerce's regulations make clear

that such verification must be on-site and a report must furthermore be generated for comment

by interested parties prior to Commerce's final determination.  *See* SAA at 868; 19 C.F.R. §

351.307.  The procedures employed by Commerce did not satisfy either requirement.  *Second*,

even to the extent Commerce's decision to ignore the law and its own regulations were a reaction

to the challenges posed by the global coronavirus pandemic, Commerce's procedures were

nonetheless unlawful because they were arbitrary and an unlawful departure from past practice.

Verification is a "critical aspect of Commerce's antidumping investigation."  *New*

*American Keg v. United States*, Ct. No. 20-00008, Slip Op. 21-30 at *6 (Ct. Int'l Trade Mar. 23,

2021) ("*American Keg*").  Commerce's decision to rely on the unverified factual submissions of

BGH in the *Final Determination* thus clearly breached Commerce's "statutory obligation to

properly verify those facts which it finds dispositive."  *See Smith Corona Corp. v. United States*,

771 F. Supp. 389, 399 (Ct. Int'l Trade 1991).  Even to the extent this Court were to conclude that the ongoing coronavirus pandemic were to warrant some flexibility — within the confines of the law — it does not provide Commerce with *carte blanche* to ignore the law and its past practice completely.  In issuing nothing more than a supplemental questionnaire (with no opportunity for factual rebuttal), and without providing a verification report, Commerce failed to satisfy even the most basic and essential of its verification requirements.

Commerce additionally failed to explain why alternative mechanisms of the type previously employed, or that more closely approximated on-site verification, were not possible. Indeed, Commerce actually acknowledged flaws in using yet another questionnaire "in lieu of verification," noting that the questionnaire it issued represented only "a subset of what is typically requested in a verification outline," did not involve the types of "impromptu questions that Commerce verifiers ask during the course of verification," and, unlike a true on-site verification, "pertain{ed} {only} to information BGH-Siegen already provided on the record." Letter from Commerce to BGH (Oct. 22, 2020) at 1-2 (Appx083334-083335).  In fact, the questionnaire that Commerce issued "in lieu of verification" was no more than another supplemental questionnaire — except that Plaintiffs were stripped of the regulatory right to submit clarifying or rebuttal information under 19 C.F.R. § 351.301(c)(1)(v).  *See* BGH Questionnaire in Lieu of Verification at 2 (Appx083329).

Commerce could have, for example, arranged a virtual "on-site" verification visit with BGH, given Commerce's extensive use of videoconferencing during the pandemic.  Indeed, Commerce held the hearing via videoconference.  *See* Final IDM at 2 (Appx083988); *see also* Transcript of Public Hearing (Nov. 24, 2020) at 1 (Appx083893).  Such an approach would have allowed Commerce to at least approximate verification insofar as it could have interviewed

company officials, observed the operation of the sales and financial systems of BGH to better understand the process they used to report data to Commerce and to instruct company officials to conduct particularized probes of those systems in real time, issued follow-up requests for information with time-limited response deadlines, and conducted other additional verification exercises routinely used to assess the *credibility* of a respondent's submitted data.

As noted above, Commerce abuses its administrative discretion where, as here, its verification procedures "contravene{} statutory objectives." *Ipsco, Inc. v. United States*, 899 F.2d 1192, 1195 (Fed. Cir. 1990); *see also Wheatland Tube*, 841 F. Supp. at 1227 ("This Court has noted that it will not allow the agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute."); *Rubberflex*, 59 F. Supp. 2d at 1346 ("{W}hile Commerce generally has discretion to schedule a review and allocate resources to a review as it sees fit, it must do so within the confines of its statutory mandates. When its actions compromise the accuracy of dumping margins, then it has abused its discretion."). Commerce itself disavowed any notion that its questionnaire in lieu of verification was intended to approximate verification. Thus, Commerce abused its administrative discretion when it relied on a questionnaire in lieu of verification that contravened the statute's objectives.

Commerce's administrative discretion is additionally curtailed where, as here, Commerce has "restricted itself by clarifying the verification requirement" in its regulations. *See Micron Tech*. 117 F.3d at 1396. In such instances, the proper role of the court "is to determine…if Commerce fulfilled its own self-imposed obligations." *Id*. at 1396; *see also Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996) (citations omitted) ("Commerce, like other agencies, must follow its own regulations."). A reviewing court will generally view an agency's interpretation of its own regulation as controlling unless plainly erroneous or inconsistent with

24

the regulation.  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989); *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances")).  An agency's interpretation will not be considered controlling when "there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'"  *Christopher v. SmithKline Beecham*, 567 U.S. 142, 143-44 (2012) (quoting *Auer*, 519 U.S. at 462 and citing *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 209 (2011)).  "This might occur when the agency's interpretation conflicts with a prior interpretation. . . ." *Id.* (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)).  Commerce's failure to follow its regulations requiring it to conduct a meaningful verification and issue a verification report is unreasonable in this investigation because Commerce had ample tools at its disposal to approximate on-site verification and issue a verification report or a reasonable substitute for it.

In sum, even if, *arguendo*, the verification mandate is more flexible than its plain text appears to indicate, Commerce needed to do more to comply with the law, including the mandates of the SAA and its own regulations.  Despite the availability of alternative techniques that would more closely approximate the mandated on-site verification, Commerce relied on a mere supplemental questionnaire while prohibiting the domestic industry from submitting rebuttal factual information.  This is inadequate under the law.  *Cf. American Keg*, Slip Op. 21-30 at *41 (remanding to Commerce after concluding that "Commerce unreasonably failed to verify those corrections {submitted by the respondent after the preliminary determination} and thereby abused its discretion").

It is, furthermore, unlawful for Commerce to have never issued a verification report of any kind.  At an absolute minimum, Commerce deprived the parties of a full explanation of (1) the reasons it was unable to conduct a verification, (2) why Commerce believed the alternate procedures it undertook were satisfactory, and (3) Commerce's own findings based on a critical analysis of the information derived from BGH's questionnaire responses, which would have been subject to comment and argument in the form of case and rebuttal briefs.  Because Commerce ignored a statutory mandate and its regulations, its *Final Determination* is not entitled to deference, and this Court should therefore remand the determination to Commerce so that it may verify the information submitted by BGH and reach new findings where appropriate.

**C.   Even Assuming *Arguendo* That Commerce's "Verification" Procedures Were Lawful, It's "Verification" Findings Were Not Because They Were Unsupported by Substantial Evidence**

Pursuant to the analytical framework established by CAFC in *Micron Tech*, after examining whether Commerce's chosen verification methodology is lawful, the Court must next determine "whether {Commerce's} verification results themselves are supported by substantial evidence."  *Micron Tech.*, 117 F.3d. at 1397.  Here the Court applies its traditional substantial evidence standard, examining "whether a reasonable mind might accept the relevant evidence in the record as adequate to support the results of Commerce's verification."  *Id.* (citations omitted). In other words, even if this Court determines that Commerce's verification procedures complied with Commerce's statutory duty under 19 U.S.C. § 1677m(i), it must still examine whether the conclusions Commerce reached after applying those procedures were reasonable.  Here, this was not the case.

As this Court has previously explained, "verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness."  *Bomont Industries v. United States,* 733 F.Supp. 1507, 1508 (Ct. Int'l Trade 1990).  In its questionnaire

"in lieu of verification," Commerce asked BGH to provide complete sales trace information including, among other documents, mill and inspection certificates, for four individual transactions, SEQH [      ], SEQH [      ], SEQU [      ], and SEQU [      ].  BGH Questionnaire in Lieu of Verification at 3-4 (Appx083330-083331).  As in an audit, the purpose of this request was to verify the accuracy of the information provided in BGH's home market and U.S. sales databases, including relevant product characteristics.  Such testing of sample transactions is necessary to confirm the integrity of BGH's internal data gathering and reporting process.  The accuracy of reported product characteristics is particularly critical as such information is the basis for identifying MUC and non-MUC and thus the universe of reported home market and U.S. sales.

In its response to Commerce's supplemental questionnaire in lieu of verification, BGH provided documentation indicating that the variables for minimum specified tensile strength (STRENGTHH), number of bores (BORESH), and days between end of production and shipment (INVDAYSH) were incorrectly reported for SEQH [      ], and the length of block (LENGTHMMU) was incorrectly reported for SEQU [      ].  BGH Response to Questionnaire in Lieu of Verification at 1-2 (Appx083336-083337).   In other words, BGH incorrectly reported product characteristics (*e.g.*, strength, boreholes, length) in <u>half</u> of the sample transactions subject to Commerce's "verification" audit.  While such findings raise clear concerns about the integrity of BGH's broader product characteristic reporting, Commerce made no attempt to follow up with additional questions to BGH or to examine additional BGH sales to determine the extent of the reporting issues.

Instead, in the *Final Determination*, Commerce simply concluded that BGH's corrections did not "appear to be indicative of a systematic reporting issue" and were rather "minor clerical

errors which Commerce would normally accept at verification."  Final IDM at 43 (Appx084029).

However, this was not a normal verification, and, in any event, such findings were unsupported

by substantial evidence on the record.  As the record makes clear, the errors in question were far

from "minor."  In particular, BGH's incorrect reporting of product characteristics for the home

market sale reported in SEQH [      ] changed the relevant CONNUM from [

                                        ] to [                                                          ],which in turn [

                                        ].  *See* BGH Response to Questionnaire in Lieu of

Verification at 1-2 (Appx083336-083337); *see also* Plaintiffs' Administrative CB at 18-19

(Appx083838-083839).   When this change was implemented in Commerce's margin calculation

program, it [                    ] BGH's overall margin and its highest transaction-specific margin.

*See* Plaintiffs' Administrative CB at 18-19 (Appx083838-083839).   This significant reporting

flaw thus indicates that BGH either [

                                        ] or utilized a reporting process that was inherently

unreliable for the purpose of calculating accurate dumping margins.

    These concerns are compounded by other relevant facts including: (1) that Commerce

had already explicitly requested that BGH "confirm that STRENGTHH is correctly reported for

each of BGH Siegen's home market sales," including SEQH [      ], *see* Letter from Commerce

(Jun. 4, 2020) at 5 (Appx081361), (2) that BGH was unable to provide a [              ] mill test

certificate for SEQH [      ] to validate its physical characteristic reporting, and (3) that the errors

did not come to light until Commerce asked BGH to provide documentation verifying the

validity of its physical characteristic reporting, *see* Plaintiffs' Administrative CB at 18-21

(Appx083838-083841).

In its attempt to minimize the significance of BGH's reporting errors, Commerce emphasized the fact that the errors were limited to "one home market sale" and "one U.S. sale." Final IDM at 43 (Appx084029).   However, Commerce neglected to mention that these two sales accounted for <u>half</u> of the four sales that Commerce selected for its sample audit, a fact which – absent further inquiry – reasonably calls into question the validity of BGH's other, unaudited sales reporting.

Commerce's contention that it was reasonable to accept BGH's corrections because "Commerce would normally accept {such corrections} at verification" is also without merit. *See id.* (Appx084029).   As Commerce itself acknowledged, in a normal verification, its verifiers would have the opportunity to ask "impromptu" follow-up questions or otherwise validate the accuracy of BGH's revisions. *See generally* Letter from Commerce to BGH (Oct. 22, 2020) at 1 (Appx083334).  By contrast, in this instance Commerce did not request, and BGH did not voluntarily supply, any documentation validating the remainder of BGH's sales reporting. Commerce accordingly had no way of knowing whether the errors identified in the sample transactions were limited to those sales or reflected a more "systematic reporting issue." *See* Final IDM at 43 (Appx084029).   Commerce's related conclusion that BGH's corrections "do not implicate the reporting of any other sales information" is similarly without merit, as Commerce did not further investigate any additional sales and does not know whether further investigation would have "brought to light other reporting errors and deficiencies." *See id*. at 44 (Appx084030).

Finally, Commerce's assertion that BGH's reporting was accurate because BGH provided a "plausible explanation why these errors occurred," *id*. at 43 (Appx084029), is similarly unsupported by substantial evidence.   As noted above, the only reporting errors that BGH

identified in its questionnaire in lieu of verification concerned the four sample sales that

Commerce selected for its audit and BGH's explanations were similarly limited to these specific

sales.  It strains credulity to believe that the only reporting errors BGH made in its sales

databases were in the limited number of sample transactions that Commerce selected for audit.

Critically, BGH did not provide, nor did Commerce require, any documentation evidencing that

non-tested sales in its database were accurately reported.   Commerce simply took BGH's bare

assertion that these were isolated instances on faith rather than on the substantial evidence that

the law requires.

       In sum, even if this Court determines that Commerce's procedures "in lieu of"

verification were lawful in this instance, it must still examine Commerce's quasi-verification

findings to ensure they are supported by substantial evidence.  *See Micron Tech.*, 117 F.3d. at

1397.  Here, this is not the case as no "reasonable mind" could conclude that the errors revealed

in BGH's response to the questionnaire in lieu of verification were not "indicative of a

systematic reporting issue," *see* Final IDM at 43 (Appx 084029), without further scrutiny of

BGH's sales reporting.  *See generally Micron Tech.*, 117 F.3d. at 1397 (noting that in

determining whether Commerce's verification findings are supported by substantial evidence a

reviewing court examines "whether a reasonable mind might accept the relevant evidence in the

record as adequate to support the results of Commerce's verification") (citations omitted).

Accordingly, the Court should remand to Commerce for further consideration and fact-finding

through lawful verification procedures.

    **III.**  **Commerce's *Final Determination* Was Unlawful Because Commerce Relied on BGH's Unreconciled Cost Data**

       The statute stipulates that Commerce must ensure that a respondent's costs "reasonably

reflect the costs associated with the production and sale of the merchandise" under consideration.

*See* 19 U.S.C. § 1677b(f)(1)(A).  Accordingly, "{b}efore Commerce uses a respondent's cost allocation methodology, Commerce must ensure that the reported costs capture all of the costs incurred by the respondent in producing the subject merchandise." *Myland Indus.*, 31 C.I.T. at 1703 (citing *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Prestressed Concrete Steel Wire Strand from Mexico*, 68 Fed. Reg. 68,350 (Dec. 8, 2003), IDM at Comment 6).

To fulfill this statutory mandate, Commerce requires the respondent to provide a cost reconciliation which ties the sum of the product-specific costs for the merchandise under consideration ("MUC") reported in the cost database to the actual MUC costs reported in the respondent's audited financial statements.  *See, e.g.*, *Hyundai Elec. & Energy Sys. Co. v. United States*, 466 F. Supp. 3d 1303, 1310 at n. 7 (Ct. Int'l Trade 2020) ("Cost-reconciliation information refers to cost of production information that Commerce requires a party to provide to reconcile the reported costs to the company's audited financial statements.").   The cost reconciliation is critical as it "'assures {Commerce} that the respondent has accounted for all costs before allocating those costs to individual products' and thus serves as the starting point for verifying the accuracy of the respondent's reported costs."  *Myland Indus.*, 31 C.I.T. at 1703 (quoting *Notice of Final Determination of Sales at Less Than Fair Value, and Negative Final Determination of Critical Circumstances: Certain Lined Paper Products from India*, 71 Fed. Reg. 45,012 (Aug. 8, 2006), IDM at Comment 14).  As this Court has recently recognized, "{a}bsent reliably and fully supported cost data, Commerce cannot rely on the reported per-unit {cost of production} or perform the dumping calculations."  *Hyundai*, 466 F. Supp at 1310. Indeed, "{b}ecause of its importance, Commerce has applied total adverse facts available when a proper cost reconciliation is not provided."  *Myland Indus.,* 31 C.I.T. at 1703

Despite repeated requests by Commerce, BGH failed to provide an accurate and complete cost reconciliation in the underlying investigation. *See generally* Plaintiffs' Administrative CB at 12-17 (Appx083832-083837) (detailing BGH's failure to provide a complete and accurate cost reconciliation despite repeated requests by Commerce). Indeed, even in BGH's final "revised cost reconciliation" there was still a [     ] percent difference between the sum of the product-specific total cost of manufacture ("TOTCOM") that BGH reported in its cost database and the estimated total MUC costs derived from its financial statements. *See* BGH Response to 2nd Supp. D Questionnaire at 2-4 (Appx083308-083310). This unreconciled net difference [                    ] that which Commerce had previously found acceptable. *See, e.g., Notice of Final Results of Antidumping Duty Administrative Review: Steel Concrete Reinforcing Bars from Latvia*, 71 Fed. Reg. 74,900 (Dec. 13, 2006), IDM at Comment 1 (finding that respondent had provided an adequate cost reconciliation where "{t}he TOTCOM from the cost accounting system reconciles to within .0005% of the TOTCOM from the database").

Despite this significant discrepancy, Commerce baselessly concluded that BGH's "reported costs fully reconcile to the company's financial statement costs." Final IDM at 40 (Appx084026). Commerce claimed that the apparent [     ] percent discrepancy was merely due to BGH's "fail{ure} to account for the fact that more costs were allocated to MUC {in the cost database} through BGH's efforts to calculate product-specific costs for Commerce than if it had simply relied on normal standard costs." *Id*. (Appx084026). This statement is nonsensical. First, Commerce's requirement that reported costs reconcile to audited financial statements is not obviated by a respondent asserting that it overstated reported costs. Second, Commerce's finding completely ignores the fact that BGH's standard costs are estimates that [

] and thus cannot reasonably be used to allocate total costs recorded in BGH's financial records between MUC and non-MUC.

Critically, BGH's standard costs (and thus the derived MUC and non-MUC standard cost ratios) were not part of BGH's audited financial statements and BGH failed to provide any evidence corroborating their accuracy or demonstrating that the ratios were a reasonable and accurate tool for allocating actual costs. Instead, the record strongly indicates that BGH's standard costs are an unreliable basis on which to allocate costs between MUC and non-MUC. *First*, BGH itself confirmed that its "standard material cost rates do not reflect the actual costs of production during the POI according to BGH's normal books and records" and that the standard rates were "not used in valuing the year-end finished goods inventory." *See* "Response to Section D Supplemental Questionnaire" (Jun. 16, 2020) ("BGH Response to D Supp. Questionnaire – Part 1") at 2-3 (Appx084064-084065). Instead, these standard costs were taken from an internal, unaudited Excel file, known as "the [            ] list," which was "named after the BGH employee who prepares the valuation of the monthly finished goods inventory." BGH Response to Questionnaire in Lieu of Verification at 5 (Appx083348). BGH thus uses these standard cost figures in its own internal records "only to value monthly finished goods inventories falling into four very broad product types," which do not precisely align with MUC and non-MUC. BGH Response to D Supp. Questionnaire – Part 1 at 2-3 (Appx084064-084065). This is significant because if the standard material costs assigned to MUC and non-MUC "do not reflect the actual costs of production during the POI," *see id*. (Appx084064-084065), then the ratio of these figures is *ipso facto* an inaccurate and unreliable method of allocating actual costs to MUC and non-MUC.

33

*Second*, the record establishes that BGH's total standard costs capture [

                                                                                              ].

In its revised cost reconciliation, BGH reported a total POI standard cost of [                    ]

while it's total POI cost at actual (derived from its audited financial statements) was

[                                                          ]).  *See* BGH Response to 2nd

Supp. D Questionnaire at App'x SD-45 (PDF 14-15) (Appx083314-083315).  BGH's

submissions further indicate that the [

                                                            ]. *See* BGH Section D Questionnaire

Response – Part 2 at App'x D-17 (PDF 73) (Appx081253).   That is, the standard costs BGH

used to allocate MUC and non-MUC production costs [

                                                                       ].  These problems render the standard cost ratio

used by BGH to allocate actual costs between MUC and non-MUC inherently inaccurate and

unreliable.  Stated differently, even if one were to accept that BGH has properly divided its

standard costs between MUC and non-MUC, there is no way of knowing how the [

              ].

*Third*, the inaccuracy and unreasonableness of BGH's standard MUC to non-MUC cost

ratio is further underscored by the fact that BGH [                                    ] without

explanation during the course of the proceeding.  In its initial response BGH indicated that,

based on its standard cost ratio, it had determined that [        ] percent of its total actual costs

related to MUC.  BGH Section D Questionnaire Response – Part 2 at App'x D-17 (PDF 72)

(Appx081252).  In its subsequent responses, BGH [

34

], without explaining why [                                    ].  *See* BGH Response to D Supp.

Questionnaire at App'x SD-15 (PDF 229) (Appx081594); BGH Response to 2nd Supp. D

Questionnaire at Appendix SD-45 (PDF 14-15) (Appx083314-083315).

The reasonableness of the standard costs BGH used to calculate its MUC/non-MUC

standard cost ratio is similarly suspect.  In particular, BGH initially reported [

] that

strains credulity.  *See* BGH Response to D Supp. Questionnaire at App'x SD-15 (PDF 229)

(Appx081594).   While BGH [

], further calling

its MUC/non-MUC standard cost ratio into question.  *See* BGH Response to 2nd Supp. D

Questionnaire at App'x SD-45 (PDF 15) (Appx083315).

In sum, the cost reconciliation BGH provided to Commerce was wholly unusable and

provided no basis for Commerce's conclusion that BGH's reported costs "reasonably reflect the

costs associated with the production and sale of the merchandise," as required under the statute.

*See* 19 U.S.C. § 1677b(f)(1)(A).  While BGH may have begun with the total actual costs of

production based on its audited financial accounting, it immediately departed, allocating those

costs between MUC and non-MUC using distorted ratios based on standard costs that are

themselves unaudited and [                                    ].  BGH then

compared this contrived "estimate" of total "actual" MUC costs to its antidumping cost database,

arguing that because the latter was greater than the former, its failure to reconcile its cost

database to its financial accounting system should be excused.  But BGH's point of comparison

is meaningless; BGH's so-called "actual" MUC costs are, at best, a crude estimate of the true

costs associated with the production and sale of MUC.  Any attempted "reconciliation" of BGH's cost database to this figure validates nothing.  Further, even taking BGH's "actual" MUC cost figure at face value, the fact remains that it does not reconcile to the MUC costs BGH reported in its antidumping cost database.  Despite multiple attempts by BGH—and multiple requests by Commerce—the two figures continue to differ by [      ] percent.  Commerce's contention that this difference is immaterial because it is "favorable," *see* Final IDM at 39 (Appx084025), is wholly without merit because, as explained above, what BGH purports to be "actual" MUC costs remain unsubstantiated and untethered to BGH's audited financial statements.

Given these deficiencies, Commerce's conclusion that BGH had "not failed" to reconcile its costs, and Commerce's subsequent decision to rely on those unreconciled costs, was unreasonable and unsupported by substantial evidence.  *See* Final IDM at 39, 41 (Appx084025, Appx084027).  Absent a valid cost reconciliation, Commerce's conclusion that BGH's reported costs "reasonably reflect the costs associated with the production and sale of the merchandise" is unsupported by substantial evidence and contrary to the law.  *See* 19 U.S.C. § 1677b(f)(1)(A).

## CONCLUSION

As discussed, *supra*, Commerce acted unlawfully by failing to conduct a verification as required under the statute and by failing to support its conclusions with substantial evidence. Accordingly, this Court should remand the determination to Commerce with instructions that Commerce verify BGH's responses and re-consider its reliance on BGH's unreconciled costs of production.

NON-CONFIDENTIAL VERSION

Respectfully submitted,

/s/ Myles S. Getlan
Myles S. Getlan
Jack A. Levy
Thomas M. Beline
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2313
Fax: (202) 567-2301
*mgetlan@cassidylevy.com*

*Counsel to Ellwood City Forge Company, Ellwood
National Steel Company, Ellwood Quality Steels
Company, and A. Finkl & Sons*

**<u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>**

The undersigned hereby certifies that the foregoing brief contains 10,255 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:     <u>/s/ Myles S. Getlan   </u>
         Myles S. Getlan