UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Stephen Alexander Vaden, Judge

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, *et. al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Consol. Ct. No. 21-00077 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| BGH EDELSTAHL SIEGEN GMBH, ) | |
| ) | |
| Defendant-Intervenor. ) | |

**BGH EDELSTAHL SIEGEN GMBH**
**MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, BGH Edelstahl Siegen GmbH ("BGH"), defendant-intervenor and plaintiff in the companion case BGH Edelstahl Siegen GmbH v. United States, Court No. 21-00079 (CIT), respectfully moves this Court for an order granting movant judgment on the agency record against Defendant, the United States (representing the U.S. Department of Commerce ("Commerce")), including, but not limited to the following relief:

- Remand to Commerce to reconsider the cost-based particular market situation ("PMS") adjustment for BGH's electricity and ferrochrome inputs;

- Remand to Commerce to reconsider the application of the differential pricing methodology to BGH in this investigation;

- Remand to Commerce to recalculate the weighted-average dumping margin assigned to BGH in this investigation;

- Granting BGH such other relief as the Court may deem appropriate.

A memorandum of points and authorities in support of this motion is being filed contemporaneously with this motion.

WHEREFORE, for the reasons described in this motion and the accompanying memorandum in support thereof, BGH respectfully requests that the Court enter judgment in its favor.  A proposed order is submitted with this motion for the Court's consideration.

Respectfully submitted,

/s/ *Marc E. Montalbine*
Marc E. Montalbine*
J. Kevin Horgan
Gregory S. Menegaz
Alexandra H. Salzman**
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
Email:  montalbine@dhlaw.de

Date: August 9, 2021          *Counsel to BGH Edelstahl Siegen GmbH*

_____

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

** Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Stephen Alexander Vaden, Judge

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, *et. al.*, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>UNITED STATES, )<br>)<br>Defendant, )<br>)<br>and )<br>)<br>BGH EDELSTAHL SIEGEN GMBH, )<br>)<br>Defendant-Intervenor. )<br>) | Consol. Ct. No. 21-00077 |

## **<u>ORDER</u>**

Upon consideration of the Rule 56.2 Memorandum in support of its Motion for Judgment upon the Agency Record filed by BGH Edelstahl Siegen GmbH, defendant-intervenor and plaintiff in the companion case <u>BGH Edelstahl Siegen GmbH v. United States</u>, Court No. 21-00079 (CIT), and all other papers and proceedings had herein, it is hereby

ORDERED that said motion is GRANTED, and it is further

ORDERED that this case is remanded to the U.S. Department of Commerce, with instructions that Commerce redetermine aspects of its final determination as instructed by this Court in its accompanying slip opinion.

SO ORDERED.


Date: _____, 2021                    _____
     New York, New York                               Stephen Alexander Vaden, Judge

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Stephen Alexander Vaden, Judge

| | | |
|---|---|---|
| ELLWOOD CITY FORGE COMPANY, *et. al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | Consol. Ct. No. 21-00077 |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | **PUBLIC VERSION** |
| | ) | |
| BGH EDELSTAHL SIEGEN GMBH, | ) | Confidential information deleted |
| | ) | from Appendix 1 |
| Defendant-Intervenor. | ) | |

**BGH EDELSTAHL SIEGEN GMBH**
**RULE 56.2 MEMORANDUM IN SUPPORT OF**
**<u>MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>**

Marc E. Montalbine
J. Kevin Horgan
Gregory S. Menegaz
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel: (202) 783-6900
email: montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

Dated: August 9, 2021

**TABLE OF CONTENTS**

I.      RULE 56.2 STATEMENT ................................................................................. 1

        A.      Administrative Determinations Sought to be Reviewed ...................................... 1

        B.      Issues Presented ................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................ 2

III.    SUMMARY OF ARGUMENT ........................................................................... 3

IV.     ARGUMENT ........................................................................................... 5

        A.      Commerce Erred in Making PMS Adjustments to BGH's Reported Cost
                of Manufacture ..................................................................................... 5

                1.      Commerce's Cost-Based PMS Adjustments Are Contrary To Law .......... 5

                2.      Commerce's Cost-Based PMS Adjustments Are Not Supported by
                        Substantial Evidence on the Administrative Record ............................... 7

                        a.      Electricity Costs ......................................................................... 8

                                i.      No Significant Distortions ................................................ 8

                                ii.     Proper Comparison of Normal Value with
                                        Export Price .......................................................... 11

                                iii.    Calculation Errors ......................................................... 12

                        b.      Ferrochrome Costs ...................................................................... 14

                                i.      No Significant Distortions ................................................ 14

                                ii.     Proper Comparison of Normal Value with
                                        Export Price .......................................................... 17

                                iii.    Calculation Errors ......................................................... 18

        B.      Commerce Erred in Its Application of the Differential Pricing Methodology .... 19

V.      CONCLUSION AND PRAYER FOR RELIEF ......................................................... 22

i

# TABLE OF AUTHORITIES

**Cases**

Beck v. Prupis,
 529 U.S. 494 (2000) ............................................................................................. 21

Borusan Mannesmann Boru Sanayi Ve Ticaret A.S .v. United States,
 426 F. Supp. 3d 1395 (2020) ............................................................................... 5

Consol. Edison Co. v. NLRB,
 305 U.S. 197 (1938) ........................................................................................... 8-9

Dong-A Steel Co. v. United States,
 475 F. Supp. 3d 1317 (2020) ............................................................................... 5

Dongbu Steel Co. v. United States,
 635 F.3d 1363 (Fed. Cir. 2011) ........................................................................... 19

Hyundai Steel Co. v. United States,
 483 F. Supp. 3d 1273 (CIT 2019) ...................................................................... 4-5

Husteel Co. v. United States,
 426 F. Supp. 3d 1376 (2020) ....................................................................... *passim*

Husteel Co. v. United States,
 476 F. Supp. 3d 1363 (2020) ............................................................................ 5-6

Maracich v. Spears,
 570 U.S. 48 (2013) .............................................................................................. 21

Saha Thai Steel Pipe Pub. Co. v. United States,
 422 F. Supp. 3d 1363 (2019) ............................................................................... 5

Saha Thai Steel Pipe Pub. Co. v. United States,
 476 F. Supp. 3d 1378 (2020) ............................................................................... 6

Suramerica de Aleaciones Laminadas, C.A. v. United States,
 44 F.3d 978 (Fed. Cir. 1994) ............................................................................. 8-9

Timex V.I., Inc. v. United States,
 157 F.3d 879 (Fed. Cir. 1998) ............................................................................ 21

Vicentin S.A.I.C. v. United States
 404 F. Supp. 3d 1323 (2019) ............................................................................. 12

**Statutes**

19 U.S.C. § 1677b(a) ........................................................................................ 7

19 U.S.C. § 1677b(e) ........................................................................................ 6

19 U.S.C. § 1677f-1(d)(1)(A) ........................................................................ 19

19 U.S.C. § 1677f-1(d)(1)(B) .................................................................... 19-21

**Administrative Determinations**

Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value, 85 Fed. Reg. 80018 (Dec. 11, 2020) ......................................... 10

Forged Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination, 85 Fed. Reg. 31454 (May 26, 2020) .................................... 14

**Other Authorities**

Implementation of the Findings of the WTO Panel in US-Zeroing (EC): Notice of Determinations Under Section 129 of the Uruguay Round Agreements Act and Revocations and Partial Revocations of Certain Antidumping Duty Orders, 72 Fed. Reg. 25261 (2007) ...... 19

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994) reprinted in 1994 U.S.C.C.A.N 4040 ................................................ 8, 20

Statement by President Trump on the Paris Climate Accord (June 1, 2017) ............................ 10

I.      **RULE 56.2 STATEMENT**

Pursuant to Rule 56.2(c)(1) of the Rules of this Court, BGH Edelstahl Siegen GmbH ("BGH"), defendant-intervenor and plaintiff in the companion case <u>BGH Edelstahl Siegen GmbH v. United States</u>, Court No. 21-00079 (CIT), hereby states the administrative decision sought to be reviewed and the issues of law presented:

**A.  Administrative Determinations Sought to be Reviewed**

The U.S. Department of Commerce ("Commerce") published its contested final determination in the *Federal Register* on December 11, 2020.  <u>Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value</u>, 85 Fed. Reg. 80018 (Dec. 11, 2020) ("<u>Final Determination</u>"); *see also* accompanying Issues and Decision Memorandum (Dec. 7, 2020) ("<u>IDM</u>").  The final determination was amended by notice published in the *Federal Register* on January 29, 2021.  <u>Forged Steel Fluid End Blocks from the Federal Republic of Germany and Italy: Amended Final Antidumping Duty Determination for the Federal Republic of Germany and Antidumping Duty Orders</u>, 86 Fed. Reg. 7528 (Jan. 29, 2021) ("<u>Amended Final Determination</u>").  The weighted-average dumping margin assigned to BGH was 4.79%.

**B.  Issues Presented**

1.      <u>Issue One</u>:  Whether Commerce's cost-based particular market situation ("PMS") adjustment for BGH's electricity and ferrochrome inputs is supported by substantial evidence on the administrative record and otherwise in accordance with law?

2.      <u>Issue Two</u>:  Whether Commerce's application of its differential pricing methodology to BGH in this investigation is supported by substantial evidence on the administrative record and otherwise in accordance with law?

1

## II.      STATEMENT OF FACTS

On January 15, 2020, Commerce published a notice of initiation of less-than-fair value

investigations on forged steel fluid end blocks from the Federal Republic of Germany, India and

Italy in the *Federal Register*.  85 Fed. Reg. 2394 (Jan. 15, 2020).  In the investigation concerning

Germany, BGH was chosen as one of two mandatory respondents and was sent a questionnaire

dated February 10, 2020.  BGH provided full, accurate and timely responses to all of

Commerce's requests for information, submitting several thousand pages of responses,

documents and English translations.

On July 23, 2020, Commerce published notice of its preliminary determination in the

*Federal Register*.  85 Fed. Reg. 44513 (July 23, 2020).  In this preliminary determination, BGH

was assigned an estimated weighted-average dumping margin of 0.00%.

After having extended the deadline for petitioner to file particular market situation

("PMS") allegations on several occasions, Commerce issued a post-preliminary determination

memorandum with respect to petitioner's allegations on October 15, 2020.  This memorandum

found that a PMS existed with respect to German electricity and ferrochrome costs.  The finding

with respect to electricity costs was based entirely upon the preliminary determination in the

companion countervailing duty investigation.

On November 9, 2020, interested parties, including BGH, submitted case briefs.  On

November 18, 2020, interested parties, including BGH, submitted rebuttal briefs.  Because

Commerce's PMS adjustment with respect to German electricity costs was based entirely upon

the preliminary determination in the companion countervailing duty investigation, BGH cited to

information from that countervailing duty investigation in its case and rebuttal briefs.  On

November 20, 2020, Commerce rejected BGH's case brief and required BGH to file a redacted

version of the brief removing the references to information from the countervailing duty

investigation.  On November 23, 2020, Commerce also rejected BGH's rebuttal brief and required BGH to file a redacted version of the brief removing the references to information from the countervailing duty investigation.

On November 24, 2020, Commerce held a virtual public hearing.

On December 11, 2020, Commerce published notice of its final determination in the *Federal Register*.  85 Fed. Reg. 80018 (Dec. 11, 2020).  In this final determination, BGH was assigned an estimated weighted-average dumping margin of 3.82%.  In its final determination, Commerce applied its differential pricing methodology to BGH and disregarded the negative margins on non-dumped sales, a practice known as "zeroing."  Commerce even zeroed the negative margins on CONNUMs that did not have any dumped transactions.  Had Commerce applied its normal average-to-average method to calculate BGH's dumping margin or zeroed only CONNUMs with dumped transactions, BGH's dumping margin would have been 0.00%.

On January 29, 2021, Commerce published notice of an amended final determination relating to the calculation of BGH's antidumping duty rate in the *Federal Register*.  86 Fed. Reg. 7528 (Jan. 29, 2021).  In this amended final determination, BGH was assigned an estimated weighted-average dumping margin of 4.79%.

## III.   SUMMARY OF ARGUMENT

In its final determination, Commerce made a cost-based particular market situation ("PMS") adjustment for BGH's electricity and ferrochrome inputs.  This adjustment had the effect of increasing BGH's total costs of manufacturing by almost 10% and caused the final weighted-average dumping margin calculated for BGH to more than double in amount.  This cost-based PMS adjustment is contrary to the clear and consistent precedent of this Court, stating that the antidumping statute does not authorize a particular market situation adjustment to the

3

cost of production when Commerce applies the sales-below-cost test to determine which home market sales to exclude from the calculation of normal value.  *See, e.g.*, Hyundai Steel Co. v. United States, 483 F. Supp. 3d 1273, 1279 (CIT 2019).  The PMS adjustment also fails to meet the other necessary requirements of the antidumping statute and is not supported by substantial evidence on the administrative record.  Namely, Commerce has failed to establish that there are distortions present in the German electricity and ferrochrome markets or that the alleged distortions prevent a proper comparison of normal value with export price or constructed export price as required by statute.  There are also numerous errors in Commerce's calculation of the PMS adjustment.

In addition, Commerce's standard method of calculating dumping margins in an antidumping investigation is to compare the weighted-average of the normal values to the weighted-average of the export prices without applying zeroing.  Commerce may only deviate from this standard methodology when the requirements of the exception for targeted dumping in 19 U.S.C. § 1677f-1(d)(1)(B) are met.  This exception requires significant price differences in export prices for the same product among purchasers, regions or time periods.  Price differences between different products are normal and do not give rise to the exception for targeted dumping under the statute.  It is therefore unlawful for Commerce to apply inter-product zeroing under the guise of applying the exception in section 1677f-1(d)(1)(B).  Commerce cannot zero out the margins for CONNUMs that have no dumped transactions.  Where a CONNUM has no dumped transactions, the average-to-average methodology cannot mask targeted dumping because there is no dumping.

## IV.     ARGUMENT

### A.     Commerce Erred in Making PMS Adjustments to BGH's Reported Cost of Manufacture

In its final determination, Commerce made a cost-based particular market situation ("PMS") adjustment for BGH's electricity and ferrochrome inputs.  <u>Final Margin Calculation Memorandum</u>, 2 (Appx002886, Appx086444).  This adjustment had the effect of increasing BGH's total costs of manufacturing by almost 10% and caused the final weighted-average dumping margin calculated for BGH to more than double in amount.  <u>Id</u>.  This cost-based PMS adjustment is contrary to the clear and consistent precedent of this Court, stating that the antidumping statute does not authorize a particular market situation adjustment to the cost of production when Commerce applies the sales-below-cost test to determine which home market sales to exclude from the calculation of normal value.  *See, e.g.*, <u>Hyundai Steel Co. v. United States</u>, 483 F. Supp. 3d 1273, 1279 (CIT 2019).  The adjustment also fails to meet the other necessary requirements of the antidumping statute and is not supported by substantial evidence on the administrative record.

### 1.     Commerce's Cost-Based PMS Adjustments Are Contrary To Law

As this Court explained in *Hyundai Steel*, the Court has held repeatedly that the antidumping statute does not authorize a particular market situation adjustment to the cost of production when Commerce applies the sales-below-cost test to determine which home market sales to exclude from the calculation of normal value.  <u>Hyundai Steel Co.</u>, 483 F. Supp. 3d at 1279 (citing <u>Saha Thai Steel Pipe Pub. Co. v. United States</u>, 422 F. Supp. 3d 1363, 1368-70 (2019); <u>Husteel Co. v. United States</u>, 426 F. Supp. 3d 1376, 1383-89 (2020); <u>Borusan Mannesmann Boru Sanayi Ve Ticaret A.S .v. United States</u>, 426 F. Supp. 3d 1395, 1411-12 (2020); <u>Dong-A Steel Co. v. United States</u>, 475 F. Supp. 3d 1317, 1337-41 (2020); <u>Husteel Co.</u>

v. United States, 476 F. Supp. 3d 1363, 1370-73 (2020); Saha Thai Steel Pipe Pub. Co. v. United

States, 476 F. Supp. 3d 1378, 1382-86 (2020)).  In the Issues and Decision Memorandum to its

final determination, Commerce "acknowledge{s} the CIT decisions on this point" but

nevertheless imposes a cost-based PMS adjustment for BGH's electricity and ferrochrome in

complete disregard of this Court's consistent precedent.  Issues & Decision Memorandum for

Final Determination, 16 (Dec. 7, 2020) (hereinafter, "IDM") (Appx002293).  In doing so,

Commerce simply repeats the same legal arguments that have already been considered and

rejected by this Court on numerous occasions.  Accordingly, the Court must again reject the cost-

based PMS adjustments made in this case as contrary to the clear wording of the statute.

In its numerous decisions concerning Commerce's attempts to impose cost-based PMS

adjustments, this Court has provided a lengthy and detailed analysis of the applicable statutory

provisions and has always come to the conclusion that the statute cannot support the cost-based

PMS adjustments made by Commerce.  A good example of this detailed analysis is *Husteel*.  In

that case, the Court's analysis stretches over six pages of the *F. Supp. 3d* version of the decision

and carefully considers each aspect of the relevant statutory provisions.  *See* Husteel, 426 F.

Supp. 3d at 1383-89.

In its detailed analysis in *Husteel*, the Court explained that, in imposing a cost-based

PMS adjustment,:

> Commerce chose a path not permitted by the statutory scheme.  Commerce
> misappropriated the language of 19 U.S.C. § 1677b(e), which provides that when
> using constructed value, Commerce may use any reasonable calculation
> methodology if it finds a PMS affected the COP. . . .
>
> {T}here is nothing in the statutory scheme which can be read to grant Commerce
> the authority to modify the below cost sales test to account for a PMS.  Indeed,
> the statute precludes a PMS adjustment to COP for the below cost sales analysis
> because it specifically lists the method of calculation and the adjustments to be
> made, and there is no ambiguity in this portion of the statute.

Husteel, 426 F. Supp. 3d at 1387 (citations omitted).  The Court further concluded:

> Ultimately, Commerce's argument hinges upon a view that when Congress amended the statute in 2015 to add the PMS language to the constructed value section of the statute that it also amended the below cost sales test to allow Commerce to calculate the COP to account for a PMS.  **Undeniably Congress did not amend either section 1677b(b)(1) (below costs sales) or section 1677b(f) (calculation of a cost of production) to allow for a PMS adjustment. . . .**  The words of the statute cannot support the adjustment made here by Commerce.

Husteel, 426 F. Supp. 3d at 1389 (emphasis added, footnote omitted).

While Commerce "acknowledge{s} the CIT decisions on this point," it makes no attempt to raise any new arguments or differentiate this Court's prior precedent.  In fact, Commerce's entire discussion of whether a cost-based PMS adjustment is permitted by statute consists of only two paragraphs in which it simply repeats the same legal arguments that have already been considered and rejected by this Court on numerous occasions.  *See* IDM at 16 (Appx002293).  Accordingly, based upon this Court's prior precedent, the cost-based PMS adjustments made in this case must be rejected as contrary to the clear wording of the statute.

### 2.    Commerce's Cost-Based PMS Adjustments Are Not Supported by Substantial Evidence on the Administrative Record

In addition to being contrary to the clear wording of the statute, Commerce's cost-based PMS adjustments fail to meet the other necessary requirements of the antidumping statute and are not supported by substantial evidence on the administrative record.

As the Court stated in *Husteel*,:

> To establish the existence of a PMS, Commerce must demonstrate **both** that there are distortions present in the market and that those distortions prevent a proper comparison of normal value with export price or constructed export price.  *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(III), (C)(iii) (stating that home market or third market prices that Commerce determines are affected by a PMS which prevents a proper comparison with export price or constructed price cannot be used to calculate normal value).  Those determinations must be supported by substantial evidence.

The evidence must be sufficient that a reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence. *See* Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938); *see also* Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994).

Husteel, 426 F. Supp. 3d at 1390 (emphasis added).

Thus, according to *Husteel*, in order for Commerce to establish the existence of a PMS, it must demonstrate **both**:

(1)     that there are distortions present in the market and

(2)     that those distortions prevent a proper comparison of normal value with export price or constructed export price.

The statute does not define "particular market situation," but the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") provides examples of significant distortions in the foreign home market that would "prevent a proper comparison" between home market and U.S. prices.  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 822 (1994) reprinted in 1994 U.S.C.C.A.N 4040, 4162 ("SAA").

a.     **Electricity Costs**

i.     **No Significant Distortions**

Commerce's determination that a particular market situation exists with respect to the German electricity market is not supported by substantial evidence on the administrative record of the antidumping proceeding.  In fact, the only "evidence" cited by Commerce in support of its determination was the final determination in the concurrent countervailing duty investigation on forged steel fluid end blocks.  *See* IDM at 20-22 (Appx002297-002299).  The only item from the countervailing duty investigation that Commerce placed on the record of the antidumping

8

investigation was the one-page benefit calculation.  *See* <u>Final Margin Calculation Memorandum</u>, Attachment V (Appx002895, Appx086810).  Commerce refused to place any other part of the record of the countervailing duty investigation on the record of the antidumping investigation despite BGH's specific request for Commerce to do so.

> For example, in its case brief, BGH specifically requested:

> To the extent that Commerce bases its decision on the countervailing duty rate, it must place the documents from the countervailing duty investigation, including those referenced in this paragraph, on the record of this antidumping duty investigation.  Respondents must be given an opportunity to challenge the basis of the countervailing duty rate within this investigation and any subsequent judicial appeals.

BGH Case Br. at 12 (Appx002852).  Not only did Commerce refuse this request, it required BGH to redact all references to information from the record of the countervailing duty investigation in its case brief and rebuttal brief.  *See* <u>Commerce Case Brief NFI Rejection Letter</u> (Nov. 20, 2020) (Appx002832-002833); <u>Commerce Rebuttal Brief 2nd NFI Rejection Letter</u> (Nov. 23, 2020) (Appx002856-002857).

Thus, contrary to its statutory obligations, Commerce refused to consider contradictory evidence in making its determination.  *See* <u>Husteel</u>, 426 F. Supp. 3d at 1390 (stating that evidence supporting Commerce's determination "must be sufficient that a reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence") (citing <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938); <u>Suramerica de Aleaciones Laminadas, C.A. v. United States</u>, 44 F.3d 978, 985 (Fed. Cir. 1994)).  BGH has also brought an action before this Court challenging Commerce's countervailing duty determination.  *See* <u>BGH Edelstahl Siegen GmbH v. United States</u>, Ct. No. 21-00080 (CIT).

Commerce therefore erred in treating the countervailing duty determination as conclusive and irrebuttable evidence of a particular market situation. When all evidence is objectively considered, it is clear that no significant market distortions exist with respect to the German electricity market. None of the programs that Commerce determined to be countervailable in its countervailing duty determination provide German companies with any advantage with respect to electricity costs as compared to the United States and other industrialized countries. *See*, BGH Response to PMS Allegation, 2-4 & Attachments 4-5 (Jul. 24, 2020) (showing that German electricity prices were far above those in the United States and other industrialized countries) (Appx002521-002523, Appx002544-002554 & Appx002593-002603). Rather, these programs represent additional taxes, surcharges and other costs that have been imposed upon German companies in order to reduce the emission of greenhouse gases and meet the targets agreed to in the Paris Agreement on the mitigation of greenhouse gas emissions. *See* Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination, 85 Fed. Reg. 80011 (Dec. 11, 2020) and accompanying Issues & Decision Memorandum.

These environmental measures in no way provide any benefit to companies but rather substantially increase a company's production costs.[1] This is supported by the factual information that BGH submitted with its response to petitioner's particular market situation allegations. This factual information shows that electricity costs in Germany were far above those in the United States and other industrialized countries. *See*, BGH Response to PMS

---

[1] In fact, the burden on U.S. manufacturers, including specifically the U.S. iron and steel industry, was the stated reason for the United States' withdrawal from the Paris Climate Accord. *See* Statement by President Trump on the Paris Climate Accord (June 1, 2017).

Allegation, 2-4 & Attachment 5 (Jul. 24, 2020).  This factual information was never disputed by

Commerce or the petition.

Accordingly, because electricity costs in Germany are far above those in the United

States and other industrialized countries, there is no factual basis to make a cost-based PMS

adjustment to BGH electricity costs.

**ii.    Proper Comparison of Normal Value with Export Price**

As explained above, the Court in *Husteel* found that, in order for Commerce to establish

the existence of a PMS, it must demonstrate **both** (1) that there are distortions present in the

market and (2) that those distortions prevent a proper comparison of normal value with export

price or constructed export price.  Husteel, 426 F. Supp. 3d at 1390.  Thus, even if the Court

were to find that Commerce's finding of distortions were supported, it would still have to reject

the PMS adjustment to electricity costs because Commerce has completely failed to explain how

these distortions prevent a proper comparison of normal value with export price.

As the Court noted in *Husteel*,:

> A PMS that affects costs of production would presumably affect prices for
> domestic sales and export sales so there would be no reason to adjust only the
> home market prices.

Husteel, 426 F. Supp. 3d at 1388.  Discussing the facts presented in *Husteel*, the Court further

explained:

> Chinese overcapacity may affect the COP by lowering the price of HRC,
> however, it is unclear how that finding alone would support the determination that
> the home market price and export price (or constructed export price) cannot be
> compared because Commerce does not address whether costs would be lowered
> on both sides of the less than fair value equation.  Therefore, Commerce's PMS
> finding is unsupported by substantial evidence.

Id. at 1391-92 (citation omitted).

11

In the present case, it is beyond dispute that there is no difference in electricity costs for the production of subject merchandise for domestic and export sale.  The same electricity is used to manufacture all products and the environmental measures discussed above do not vary in any way between domestic and export sales.  Accordingly, Commerce has failed to substantiate that the claimed distortions in electricity costs prevent a proper comparison of normal value with export price or constructed export price, and the cost-based PMS adjustment on electricity must therefore be rejected.

### iii.    Calculation Errors

Commerce's calculation of the cost-based PMS adjustment on electricity also suffers from several problems.  First, Commerce simply attempts to apply the full *ad valorem* countervailing duty rates calculated in the countervailing duty investigation without explaining why the countervailing duties imposed in the CVD investigation do not already remedy the alleged distortion in electricity costs.  As the Court found in *Vicentin*, Commerce cannot simply apply countervailing duty rates in an antidumping investigation as a cost-based PMS adjustment without first explaining how the "CVD investigation and the resulting CVDs have not remedied the distortion."  Vicentin S.A.I.C. v. United States, 404 F. Supp. 3d 1323, 1340 (2019).  In the absence of such an explanation, Commerce's PMS adjustment must be rejected as unsupported by substantial evidence.  Id. (stating that "{u}nless and until Commerce explains why its CVD investigation does not remedy the distortion found here, its determination that a PMS warrants rejection of Argentine soybean prices is unsupported by substantial evidence").

In the present case, Commerce has again failed to explain how the CVD investigation on fluid end blocks and the resulting CVDs have not remedied the alleged distortion in electricity costs.  Rather, Commerce simply takes the full *ad valorem* countervailing duty rates calculated in

the countervailing duty investigation and uses them to increase the costs reported in the antidumping investigation by the exact same amount, thereby increasing the antidumping duties for the alleged countervailable benefit that is already being remedied by the countervailing duties.  Accordingly, as with the PMS adjustment in *Vicentin*, Commerce's PMS adjustment on electricity must be rejected as not supported by substantial evidence.

A second problem is that Commerce fails to adequately explain its calculation of the cost-based PMS adjustment to electricity costs.  In its original calculation of the PMS adjustment, Commerce's overall adjustment to total costs of manufacture ("COM") was less than 2%, with the amount applicable to electricity being less than 0.5%.  *See* PMS Cost Adjustment Calculation, Attachment 1 (Oct. 14, 2020) (Appx086340).  However, in Commerce's final determination, the overall adjustment to COM shot up to nearly 10%, with the amount applicable to electricity being almost 7%.  Final Margin Calculation Memorandum, Attachment IV (Dec. 8, 2020) (Appx086811).

In its calculation memorandum, Commerce explains that it is trying to adjust the benefit in the countervailing duty investigation to the period of investigation ("POI") of the antidumping case and adjust the countervailing duty rate from a percentage of total sales to a percentage of COM.  Id. at Attachment III (Appx002892, Appx086807).  However, the result is nonsensical. According to Commerce's calculations, the benefit to be added to the actual electricity costs is more than the costs themselves.  Id. at Attachment IV (Appx086811) (compare POI Total Electricity-Related Benefit (EUR) with Total Electricity Cost Per Trial Balance - POI (EUR)). In essence, Commerce is claiming that a non-distorted cost of electricity in the German market should have additional environmental taxes, fees and surcharges of more than 100% of the actual costs of electricity, and this despite the fact that German electricity costs are already far above

those in the United States and other industrialized countries.  *See*, <u>BGH Response to PMS</u> <u>Allegation</u>, 2-4 & Attachments 4-5 (Jul. 24, 2020) (Appx002521-002523, Appx002544-002554 & Appx002593-002603).  Such a result strains all credibility and is clearly unreasonable.

A third problem is that Commerce includes programs in its benefit calculation that have nothing to do with electricity.  For example, Commerce includes alleged benefits from sections 51, 54 and 55 of the Energy Tax Act even though the Energy Tax Act does not cover electricity but rather is limited to other energy products such as heating oil and natural gas.  *See* <u>Forged</u> <u>Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary Affirmative</u> <u>Countervailing Duty Determination, and Alignment of Final Determination with Final</u> <u>Antidumping Duty Determination</u>, 85 Fed. Reg. 31454 (May 26, 2020) and accompanying <u>Preliminary Decision Memorandum</u> at 21.  Commerce's calculations also include alleged benefits to a related company, RPS, that does not produce subject merchandise.

For all of these reasons, Commerce's PMS adjustment on electricity must be rejected as not supported by substantial evidence on the administrative record.

     **b.**    **Ferrochrome Costs**

         **i.**    **No Significant Distortions**

Commerce's determination that a particular market situation exists with respect to ferrochrome in Germany is not supported by substantial evidence on the administrative record of the antidumping proceeding.  Commerce's determination is based solely upon information that ferrochrome from Kazakhstan is imported into Germany and that the Kazakh producer Kazachrome is state-controlled.  *See* <u>IDM</u> at 24-25 (Appx002301-002302).

However, data on imports of ferrochrome into industrialized countries show that the unit values for ferrochrome imported into Germany are consistent with the unit values for

ferrochrome imported into other industrialized G20 countries.  <u>BGH Response to PMS Allegation</u>, 7-10 & Attachments 4 & 6 (Jul. 24, 2020) (Appx002526-002529, Appx002544-002546 & Appx002634-002658).  Additionally, data on exports of ferrochrome from Kazakhstan shows that unit values for exports to Germany are consistent with the unit values for exports of ferrochrome from Kazakhstan to other countries.  <u>Id</u>.

Commerce simply ignores this international data and uses only the "benchmark USGS price" based on U.S. import prices.  *See* <u>IDM</u> at 24-25 (Appx002301-002302).  Thereby, Commerce seems to impose an irrebuttable presumption that input prices in a foreign market that are lower than U.S. input prices represent *per se* a particular market situation.  No such *per se* rule exists in the antidumping statute, and the statute was never intended to impose U.S. input prices throughout the world.  Rather, Commerce must give due weight to the entirety of the evidence and consider evidence of prices in other countries.  This evidence shows that German ferrochrome prices are on a par with prices in other G20 countries.  As such, German prices cannot be seen as "particular."

Moreover, BGH submitted full invoices for all purchases of ferrochrome during five months of the POI selected by Commerce.  <u>BGH Response to Section D Supplemental Questionnaire</u>, at App. SD-2 (Jun. 16, 2020) (Appx084083-084171).  These invoices show that all of the ferrochrome purchased by BGH was purchased from private companies in the EU or Switzerland.  BGH did not purchase any ferrochrome directly from Kazakhstan.  These invoices also show that almost all the ferrochrome purchased by BGH came from countries other than Kazakhstan.  Thus, BGH's purchases of ferrochrome represented arm's length transactions with private European companies in the ordinary course of trade. These transactions therefore do not meet the definition of a particular market situation.

15

While Commerce acknowledges that the information submitted by BGH shows that BGH "did not purchase any ferrochrome directly from Kazakhstan, and that almost all the ferrochrome it purchased came from countries other than Kazakhstan," Commerce then completely ignores this evidence, stating categorically that "PMS findings are market-based and not respondent-specific." IDM at 24 (Appx002301). Commerce cites to no authority for this statement, and it is incorrect that PMS findings are categorically always market-based and cannot consider respondent-specific information. As the Court explained in *Husteel*, Commerce has made both market-based and respondent-specific PMS findings depending upon the facts presented in each case. Husteel, 426 F. Supp. 3d at 1392 n.20 (citations omitted). Commerce's discretion in determining its methodology cannot be exercised in an arbitrary and unlawful manner. Id. In this present case, BGH has presented extensive and uncontroverted evidence that it purchases no significant amounts of ferrochrome originating in Kazakhstan. Commerce cannot simply ignore this record evidence.

In addition, Commerce's exclusive reliance on the information supplied by petitioners is unsupportable. Petitioners' estimates concerning German ferrochrome requirements sourced from imports, the percentage of total ferrochrome imports from Kazakhstan and the alleged undervaluation of Kazakh ferrochrome prices are wildly inaccurate. First, petitioners ignore that the European Union is a customs union where all goods produced in or imported into any Member State can be freely circulated in any EU country. Therefore, calculations of ferrochrome consumption and imports with respect to Germany alone do not accurately portray the market for ferrochrome to which German companies have free access. Moreover, because Germany has large seaports, much of the ferrochrome imported into Germany is not destined for consumption in Germany but for circulation within the European Union. BGH Case Br. at 14

16

(Appx002854).  While Commerce acknowledges BGH's comments regarding the European

Union in its Issues & Decision memorandum, it provides no response to these comments.  *See*

IDM at 23-25 (Appx002300-002302).  Rather, Commerce simply continues to state that

"Kazakhstan is Germany's largest source of ferrochrome imports," completely disregarding that

ferrochrome imported into German seaports does not remain in Germany but circulates freely

throughout the European Union.  IDM at 24 (Appx002301).

> Accordingly, Commerce's determination that a particular market situation exists with

respect to ferrochrome in Germany is not supported by substantial evidence on the administrative

record.

### ii.        Proper Comparison Of Normal Value With Export Price

> Commerce has also failed to show that any alleged distortions with respect to

ferrochrome would prevent a proper comparison of normal value with export price or

constructed export price as required by statute.  *See* Husteel, 426 F. Supp. 3d at 1390.  As with

electricity discussed above, ferrochrome is used without distinction in the production of subject

merchandise for both domestic and export sale, and Commerce has made no claim that costs

would not be similarly impacted on both sides of the less than fair value equation.  Id. at 1388

(stating that a "PMS that affects costs of production would presumably affect prices for domestic

sales and export sales so there would be no reason to adjust only the home market prices").

Accordingly, Commerce has failed to substantiate that the claimed distortions in ferrochrome

costs prevent a proper comparison of normal value with export price or constructed export price,

and the cost-based PMS adjustment on ferrochrome must therefore be rejected.

### iii.      Calculation Errors

Commerce's calculation of the cost-based PMS adjustment on ferrochrome also suffers from several problems.  First, the source referenced by Commerce in its calculations for BGH's POI Ferrochrome Purchases Value (EUR) and BGH's POI Ferrochrome Purchases Quantity (KG) is "Exhibit D-3" to BGH's April 27, 2020 Section D questionnaire response.  <u>Final Margin Calculation Memorandum</u>, Attachment IV (Appx086811).  However, neither of the figures listed in Commerce's calculations can be found in Appendix D-3 to that questionnaire response. *Compare* <u>Final Margin Calculation Memorandum</u>, Attachment IV (Appx086811) *with* BGH Section D Response at App. D-3 (Apr. 27, 2020) (Appx081070-081072).

Second, Commerce compares BGH actual purchases of ferrochrome with the general "Ferrochromium" figure listed by the U.S. Geological Survey ("USGS").  <u>Final Margin Calculation Memorandum</u>, Attachment IV (Appx086811).  However, the USGS figure does not list any identifying information about the product or sales covered.  *See* <u>Petitioner's PMS Allegations</u>, Ex. 48 (June 15, 2020) (Appx003633-003635).  As shown by BGH's purchasing documentation, ferrochrome varies in chromium and carbon content, and the relative content of these and other materials affects the purchase price.  Delivery terms (*e.g.*, EXW, DDP, *etc.*) will also affect the product's end price.  *See* <u>BGH Response to Section D Supplemental Questionnaire</u>, at App. SD-2 (Appx084083-084171).  Commerce's PMS calculation makes no account for these price differences.  Comparing actual prices of specific grades to a general average of non-descript grades will always result in a difference.

Third, Commerce's calculation is based exclusively on the USGS price of general ferrochrome in the United States, and Commerce has rejected without explanation other evidence on world ferrochrome prices placed on the record by BGH and the other mandatory respondent,

Schmiedewerke Gröditz GmbH ("SWG").  *See* BGH Response to PMS Allegation, 7-10 &

Attachments 4 & 6 (Appx002526-002529, Appx002544-002546 & Appx002634-002658); SWG

PMS Rebuttal Comments, 6-7 & Ex. 10 (Jul. 24, 2020) (Appx002667-002668).  As discussed

above, Commerce must give due weight to the entirety of the evidence and consider evidence of

prices in other countries.  There is no requirement in the antidumping statute that input prices in

a foreign market may not be lower than U.S. input prices.

　　　　For all of these reasons, Commerce's PMS adjustment on ferrochrome must be rejected

as not supported by substantial evidence on the administrative record.

### B.　　　Commerce Erred in Its Application of the Differential Pricing Methodology

　　　　In its final determination, Commerce applied its differential pricing methodology to BGH

and disregarded the negative margins on non-dumped sales, a practice known as "zeroing."

Commerce even zeroed the negative margins on CONNUMs that did not have any dumped

transactions.  Had Commerce applied its normal average-to-average method to calculate BGH's

dumping margin or zeroed only CONNUMs with dumped transactions, BGH's dumping margin

would have been 0.00%.

　　　　Commerce's standard method of calculating dumping margins in an antidumping

investigation is to compare the weighted-average of the normal values to the weighted-average

of the export prices without applying zeroing (average-to-average comparison method (A-A

method)).  *See* 19 U.S.C. § 1677f-1(d)(1)(A); *see also* Implementation of the Findings of the

WTO Panel in US-Zeroing (EC): Notice of Determinations Under Section 129 of the Uruguay

Round Agreements Act and Revocations and Partial Revocations of Certain Antidumping Duty

Orders, 72 Fed. Reg. 25261 (2007); Dongbu Steel Co. v. United States, 635 F.3d 1363, 1371-73

(Fed. Cir. 2011) (finding that it was unreasonable for Commerce to continue the practice of

zeroing in administrative reviews once Commerce decided to stop using zeroing in antidumping duty investigations to comply with WTO treaty obligations).  Zeroing is the practice of disregarding the negative margins on non-dumped sales in calculating the antidumping duty rate.

The differential pricing methodology is Commerce's attempt to comply with the statutory provisions of 19 U.S.C. § 1677f-1(d)(1)(B).  This statutory provision is expressly listed as an "EXCEPTION" to the normal rule of using the average-to-average comparison method in calculating antidumping duties and permits Commerce to calculate antidumping duties by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions (average-to-transaction comparison method (A-T method)) if the following two requirements are fulfilled:

> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

> (ii) {Commerce} explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).[2]

19 U.S.C. § 1677f-1(d)(1)(B)(i) & (ii).

The current text of this section was added by Section 229 of the 1994 Uruguay Round Agreements Act, which added new section 777A(d) to the Tariff Act of 1930.  As explained by the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), this statutory provision was based upon a concern that the average-to-average methodology could conceal "targeted dumping," and the SAA refers to this provision as the "exception for targeted dumping."  *See* <u>SAA</u>, H.R. Doc. No. 103-316, vol. 1, at 843, 1994 U.S.C.C.A.N. at 4177-78.

---

[2] Paragraph (1)(A)(i) relates to the standard average-to-average comparison method.  Paragraph (1)(A)(ii) relates to the transaction-to-transaction comparison method (T-T method).

According to fundamental principles of statutory construction, an agency's interpretation of a statute must comport with the plain meaning of the statute's text. *See* <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998). Moreover, the "terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous." <u>Beck v. Prupis</u>, 529 U.S. 494, 506 (2000). It is also a general rule of statutory interpretation that an "exception to a general statement of policy is usually read . . . narrowly in order to preserve the primary operation of the provision." <u>Maracich v. Spears</u>, 570 U.S. 48, 60 (2013) (internal quotation marks omitted).

By its explicit terms, the exception in section 1677f-1(d)(1)(B) applies only to a pattern of export prices that differ significantly among purchasers, regions, or periods of time for "comparable merchandise." Accordingly, the exception in section 1677f-1(d)(1)(B) is concerned with significant price differences for the same product among purchasers, regions or time periods. Price differences between different products are normal and do not give rise to the exception for targeted dumping under the statute.

Therefore, the fact that an exporter may sell certain products below normal value and other products above normal value does not trigger the exception in section 1677f-1(d)(1)(B) and does not permit Commerce to deviate from its standard A-A method without zeroing. It is therefore unlawful for Commerce to apply inter-product zeroing under the guise of applying the exception in section 1677f-1(d)(1)(B). Therefore, Commerce cannot zero out the margins for CONNUMs that have no dumped transactions. By definition, these CONNUMs cannot involve targeted dumping because none of the transactions were dumped.

As shown by the table in Appendix 1 to this brief, two of BGH's U.S. CONNUMs had no dumping at all. In fact, one of these CONNUMs represented the single largest number of

transactions in the U.S. market (*i.e.*, nearly 50 transactions), and not one of these transactions was dumped.  Because these two CONNUMs had no dumped transactions, they do not trigger the targeted dumping exception in section 1677f-1(d)(1)(B).  That exception applies only to significant price differences within a CONNUM, which can mask targeted dumping under the average-to-average methodology.  Where a CONNUM has no dumped transactions, the average-to-average methodology cannot mask targeted dumping because there is no dumping.  The narrow exception in the average-to-average methodology carved out by section 1677f-1(d)(1)(B) does not permit inter-product zeroing (*i.e.*, zeroing of negative margins on CONNUMs having no dumped transactions).  For the same reason, these CONNUMs should not be treated as transactions passing the Cohen's *d* test.

## V.     Conclusion and Prayer for Relief

For the reasons stated above, Commerce's Final Determination is not supported by substantial evidence on the administrative record or in accordance with the law or other applicable legal standards.  We therefore respectfully request that the Court remand this case to Commerce for redetermination with instructions consistent with the arguments set forth above and grant BGH such other further relief as the Court may deem appropriate.

Respectfully submitted,

/s/ *Marc E. Montalbine*
Marc E. Montalbine*
J. Kevin Horgan
Gregory S. Menegaz
Alexandra H. Salzman**
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909

email:  montalbine@dhlaw.de
Date: August 9, 2021                         *Counsel to BGH Edelstahl Siegen GmbH*

_____

\* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

\*\* Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

**Appendix 1**

**Antidumping Margin by CONNUM**

PUBLIC VERSION
Proprietary Information Deleted



| CONNUMU | TRANSACTIONS Per CONNUM | TOTAL POSITIVE DUMPING | TOTAL NEGATIVE DUMPING | TOTAL NET DUMPING | TOTAL Dumping without inter-product zeroing | Total Net US Sales Value | AD Rate without Zeroing | AD Rate zeroing all CONNUMs | AD Rate zeroing only CONNUMs with dumping |
|---|---|---|---|---|---|---|---|---|---|
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| [ | | | | | | | | | ] |
| TOTAL: | [ | | | | | ] | -6.81% | 4.79% | -5.67% |

Source:  DOC Margin Program

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2013 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court, the undersigned certifies that this brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains **6,399** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.


 /s/ *Marc E. Montalbine*
Marc E. Montalbine*
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email:  montalbine@dhlaw.de
Date: August 9, 2021          *Counsel to BGH Edelstahl Siegen GmbH*

_____

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

26