**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, <br><br> Plaintiffs and Consolidated Defendant-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br> and <br><br> BGH EDELSTAHL SIEGEN GMBH, <br><br><br> Defendant-Intervenor and Consolidated Plaintiff. | Consol. Ct. No.  21-00077 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> Business Proprietary Information Removed from Brackets on Pages 5-7, 17, 29, and 36. |

**ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS' RESPONSE BRIEF IN OPPOSITION TO BGH EDELSTAHL SIEGEN GMBH'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Myles S. Getlan
Jack A. Levy
Thomas M. Beline
James E. Ransdell
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
900 19th Street NW
Suite 400
Washington, DC 20006
(202) 567-2300

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

December 17, 2021

# Table of Contents

Page

I.      STATEMENT OF THE ISSUES ..................................................................2

II.     STATEMENT OF THE FACTS ..................................................................3

        A.    Commerce's PMS Determination...................................................3

              1.    Administrative Proceedings ................................................3

              2.    Intervening Judicial Development .....................................7

        B.    Commerce's Application of the Differential Pricing Methodology......................8

III.    SUMMARY OF THE ARGUMENT ...........................................................9

IV.     ARGUMENT ..............................................................................................11

        A.    Standard of Review ......................................................................11

        B.    Commerce's Findings that the German Ferrochrome and Electricity
              Markets Are Distorted by a PMS Were Supported by Substantial
              Evidence .......................................................................................13

              1.    Substantial Record Evidence Supports Commerce's Finding
                    that the Low, Non-Market Price of Kazakh Ferrochrome
                    Created a PMS in Germany..................................................13

                    a.    Commerce reasonably determined that German
                          ferrochrome market prices are distorted because a
                          significant portion is sourced from the Kazakh state-
                          controlled producer, which does not make market-based
                          pricing decisions..........................................................14

                    b.    Commerce reasonably used USGS data as a price
                          benchmark, because they are based on U.S. import prices
                          largely from countries other than Kazakhstan..........................16

                    c.    BGH's claims that it purchased "no significant amounts"
                          of Kazakh ferrochrome are unsupported by the record and
                          irrelevant to a market-based PMS finding................................16

                    d.    There is no record evidence to support BGH's additional
                          claims............................................................................18

              2.    Substantial Record Evidence Supports Commerce's Finding
                    that Government Electricity Price Control Created a PMS in
                    Germany ..............................................................................19

                    a.    BGH had opportunity challenge Commerce's CVD
                          finding and to timely place related factual information on
                          the record of this proceeding .....................................20

|   |   | b. | In concluding that the German electricity market is distorted, Commerce reasonably relied on record evidence of rampant government subsidies | 22 |
|---|---|---|---|---|
|   |   | c. | BGH's additional arguments are unfounded or irrelevant to a market-based PMS finding | 23 |
|   | C. | As a PMS Distorted BGH's Production Costs, the Law Permits Commerce to Adjust BGH's Reported Costs; Substantial Evidence Supports Commerce's Adjustment Calculations | | 24 |
|   |   | 1. | The Law Permits Commerce's PMS Adjustments | 25 |
|   |   | 2. | Commerce's PMS Adjustment for Ferrochrome was Supported by Substantial Evidence | 29 |
|   |   | 3. | Commerce's PMS Adjustment for Electricity Costs was Supported by Substantial Evidence | 31 |
|   | D. | Commerce Lawfully Applied its Differential Pricing Methodology to Identify a Pattern of Prices for Comparable Merchandise that Differ Significantly | | 34 |
| V. | | CONCLUSION | | 38 |

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § (a)(1)(B)(i)...........................................................................26

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................11

19 U.S.C. § 1677(15)(C)......................................................................3, 28

19 U.S.C. § 1677(5)..........................................................................22-23

19 U.S.C. § 1677b(a)......................................................................10, 26

19 U.S.C. § 1677b(a)(1)(C)(iii) ....................................................10, 24, 26

19 U.S.C. § 1677b(a)(1)(B)(i).....................................................................3

19 U.S.C. § 1677b(b) ................................................................... 10, 25-26

19 U.S.C. § 1677b(e) ............................................................................ *passim*

19 U.S.C. § 1677b(f)(1)(A)................................................................ *passim*

19 U.S.C. § 1677f-1(d)(1)(A) ............................................................8, 34

19 U.S.C. § 1677f-1(d)(1)(B) ............................................................ *passim*

19 U.S.C. § 1677f-1(d)(B)(i).....................................................................10

28 U.S.C. § 2639(a)(1).............................................................................11

Regulations

19 C.F.R. § 351.302(d) .............................................................................21

Court Decisions

*AG der Dillinger Hüttenwerke v. United States,* Consol. Ct. No. 17-00158,
Slip Op. 2021-102 (Ct. Int'l Trade 2021) .................................................37

*Altx, Inc. v. United States,* 370 F.3d 1108 (Fed. Cir. 2004)......................12

*Am. Silicon Techs. v. United States,* 334 F.3d 1033 (Fed. Cir. 2003).....................12

*Am. Tubular Prods., LLC v. United States,* 847 F.3d 1354 (Fed. Cir. 2017) .........................37

*Apex Frozen Foods Private Ltd. v. United States,* 862 F.3d 1322 (Fed. Cir. 2017)........ *passim*

*Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034 (Fed. Cir. 2016) ...............................11

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992) ...........................................................................12

*Calgon Carbon Corp. v. United States*, 443 F. Supp. 1334 (Ct. Int'l Trade 2020)................21

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ......12

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ........................................................11

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (2010) .............................................................30

*France v. United States*, 981 F.3d 1318 (Fed. Cir. 2020)......................................................27

*Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034 (Fed. Cir. 1996)..........................................11

*Husteel Co. v. United States*, 426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) ....................17, 23

*Hyundai Steel v. United States* (CAFC Case No. 21-1748)............................................. *passim*

*Intercargo Ins. Co. v. United States*, 83 F.3d 391 (Fed. Cir. 1996).......................................29

*IPSCO, Inc. v. United States*, 965 F.2d 1056 (Fed. Cir. 1992) ...............................................12

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) ...........................................34

*LG Chem, Ltd. v. United States*, Ct. No. 20-00096, Slip Op. 2021-99
(Ct. Int'l Trade 2021)........................................................................................................ 27-28

*Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927 (Fed. Cir. 1984)........................11

*Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662 (Fed. Cir. 2019) ...............35

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001)...................11

*Nippon Steel Corp. v. United States,* 458 F.3d 1345 (Fed. Cir. 2006)......................... 11-12, 15

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372 (Fed. Cir. 2001)...............12

*QVD Food Co., Ltd. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011)............................18, 21

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021)..................................................37

*Timken Company v. United States,* 179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016) .........8, 10, 34

*Union Steel v. United States,* 713 F.3d 1101 (Fed. Cir. 2010)..........................................11, 38

*United States v. Eurodif S.A.,* 555 U.S. 305, 316 n.6 (2009).............................................. 11-12

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .......................................................11

*Vicentin S.A.I.C. v. United States,* 404 F. Supp. 3d. 1323 (Ct. Int'l Trade 2019) ..............5, 32

*Vicentin S.A.I.C. v. United States, 503 F. Supp. 3d 1255* (Ct. Int'l Trade 2021) ...................32

Administrative Determinations

*Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative
Countervailing Duty Determination,* 85 Fed. Reg. 80011 (Dec. 11, 2020)...................... 20-21

*Forged Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary
Affirmative Countervailing Duty Determination, and Alignment of Final Determination with
Final Antidumping Duty Determination,* 85 Fed. Reg. 31454 (May 26, 2020)................ 20-21

*Forged Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary
Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final
Determination, and Extension of Provisional Measures,* 85 Fed. Reg. 44513
(Jul. 23, 2020) ..............................................................................................................................32

*Forged Steel Fluid End Blocks From the Federal Republic of Germany and Italy: Amended
Final Antidumping Duty Determination for the Federal Republic of Germany and
Antidumping Orders,* 86 Fed. Reg. 7,528 (Jan. 29, 2021) ........................................................6

*Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Determination
of Sales at Less Than Fair Value,* 85 Fed. Reg. 80,018 (Dec. 11, 2020)........................ *passim*

*Welded Carbon Steel Standard Pipes and Tubes from India: Final Results of Antidumping
Duty Administrative Review; 2017-2018,* 85 Fed. Reg. 2715 (Jan. 16, 2020)........................14

*Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping
Duty Administrative Review; 2016-2017,* 83 Fed. Reg. 51927 (Oct. 15, 2018) .....................14

Other Legislative Materials

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
H.R. Doc. 103-316, Vol. 1 (1994) ............................................................................................23

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs and Consolidated Defendant-Intervenors, | ) ) | Consol. Ct. No.  21-00077 |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | **NON-CONFIDENTIAL VERSION** |
| | ) | |
| Defendant, | ) | |
| and | ) | Business Proprietary Information Removed from Brackets on Pages 5-7, 17, 29, and 36. |
| BGH EDELSTAHL SIEGEN GMBH, | ) ) | |
| | ) | |
| Defendant-Intervenor and Consolidated Plaintiff. | ) ) | |
| | ) | |

<u>**ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS RESPONSE BRIEF IN OPPOSITION TO BGH EDELSTAHL SIEGEN GMBH'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Ellwood

City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company,

and A. Finkl & Sons (collectively, "Petitioners" or "Consolidated Defendant-Intervenors")

respectfully submit this response brief in opposition to BGH Edelstahl Siegen GmbH's

("BGH's") August 9, 2021, motion for judgment on the agency record and memorandum of

law ("BGH Br.").[1]  BGH challenges the following aspects of Commerce's final

determination in the antidumping duty investigation of forged steel fluid end blocks

---

[1] Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons are the Plaintiffs in CIT Ct. No.  21-00077 and the Consolidated Defendant-Intervenors in CIT Ct. No. 21-00079.  Both actions were consolidated into Consol. Ct. No. 21-00077 for the purposes of judicial review.  *See* Consolidation Order, ECF No. 18 (May 7, 2021).

("FEBs") from Germany: (1) Commerce's conclusion that particular market situations ("PMS") existed in the German ferrochrome and electricity markets, which distorted the input costs of German FEB producers during the period of investigation ("POI"); (2) Commerce's adjustment of BGH's input costs to account for such distortions; and (3) Commerce's application of its court-approved differential pricing methodology to determine whether BGH's U.S. sales exhibited a pattern of export prices that differs significantly among purchasers, regions, or time periods, and thus, where targeted dumping may be occurring.  As detailed below, BGH's claims are unavailing.  Commerce's antidumping calculations were lawful and supported by substantial evidence.[2]

## I.    STATEMENT OF THE ISSUES

A. When Commerce identified administrative record evidence establishing the distortive effect of low-priced Kazakh ferrochrome in the German market and the price-distorting impact of German government electricity market controls, were Commerce's PMS findings based on substantial evidence and otherwise in accordance with law?

B. Having found a PMS in Germany that distorts prices paid by German FEB producers for the key ferrochrome and electricity inputs, does the statute provide any means by which Commerce might account for such distortions when determining which home market sales prices should be included in normal value?

C. Did Commerce lawfully apply its judicially affirmed differential pricing methodology to identify a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time? Having identified such a pattern, and explained why the alternative methodologies

---

[2] In accordance with Section (d) of "Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden" (Rev'd Feb. 17, 2021), this brief cites Bates numbers corresponding to the confidential joint appendix, but omits "P.R." and "C.R." references.

could not account for such differences, did Commerce lawfully calculate a margin for

BGH by comparing the weighted average of normal values to the export prices (or

constructed export prices) of individual transactions for comparable merchandise in

accordance with 19 U.S.C. § 1677f-1(d)(1)(B)?

## II.     STATEMENT OF THE FACTS

### A.  Commerce's PMS Determination

#### 1.  Administrative Proceedings

The antidumping statute identifies a PMS as a form of market distortion.  *See* 19

U.S.C. §§ 1677b(e), 1677(15)(C), 1677b(a)(1)(B)(i).  During the course of this investigation,

Petitioners timely alleged the existence of a PMS in Germany that, *inter alia*, distorted the

costs of ferrochrome and electricity, two key inputs in the production of FEBs.  *See* Letter

from Petitioners, "Petitioner's Particular Market Situation Allegation" (Jun. 15, 2020) ("PMS

Allegation") at 3 (Appx084422).  To support these allegations, Petitioners provided evidence

demonstrating: (a) distorted ferrochrome pricing from Kazakhstan, Germany's primary

source market, *see id*. at 42-53 (Appx084461-084472) and Exhibits 18-48 (Appx084698-

085249), and (b) extensive government price controls distorting German steelmakers'

electricity costs, *see id*. at 38-42 (Appx084457-084461) and Exhibit 17 (Appx084694-

084697).

After considering this evidence, Commerce determined that Petitioners' PMS

allegations were timely and sufficiently supported to warrant further analysis.  *See* Commerce

Memorandum, "The Petitioner's Allegations of a Particular Market Situation in the Less-

Than-Fair-Value Investigation of Forged Steel Fluid End Blocks from Germany" (Jul. 1,

2020) ("Commerce July 1 Memo") (Appx087124-087126).  Commerce accordingly

established a schedule for interested parties to submit factual information to rebut, clarify, or

correct the information in the Petitioners' PMS allegations.  *Id*. at 2-3 (Appx087125-087126).

On July 24, BGH and the other mandatory respondent, Schmiedewerke Gröditz GmbH ("SWG"), filed rebuttal PMS comments. *See* Letter from BGH, "Response to PMS Allegation" (Jul. 24, 2020) ("BGH PMS Rebuttal") (Appx086064-086219); Letter from SWG, "Particular Market Situation Rebuttal Comments" (Jul. 24, 2020) ("SWG PMS Rebuttal") (Appx086220-086321). That same day, Petitioners filed comments clarifying aspects of the PMS allegation. *See* Letter from Petitioners, "Factual Information to Clarify Petitioner's Particular Market Situation Allegation" (Jul. 24, 2020) ("PMS Clarification") (Appx087127-087597). This submission included additional evidence related to ferrochrome price distortions in Germany, *see id*. at 7-9 (Appx087133-087135) and Exhibits 5-7 (Appx087210-087522), and German electricity market distortion, *see id*. at 10-11 (Appx087136-087137) and Exhibit 9 (Appx087535-087597).

Based on these submissions, Commerce issued a Post-Preliminary Determination concluding that "sufficient evidence exists to find that German electricity and ferrochrome markets are distorted and, therefore, a cost-based PMS existed during the POI." Commerce Memorandum, "Post-Preliminary Decision Memorandum on Particular Market Situation Allegations" (Oct. 14, 2020) ("PMS Memo") at 2 (Appx086323). Commerce also detailed its proposed adjustments to correct for these distortions. *See id*. at 18 (Appx086339).

With respect to the German ferrochrome market, Commerce identified record evidence demonstrating that Kazakhstan's state-owned ferrochrome producer, Kazchrome, "does not make pricing decisions solely based on commercial considerations" and that U.S. Geological Survey (USGS) data indicated the U.S. unit value for ferrochrome was 127 percent higher than the price of ferrochrome sold by Kazchrome. PMS Memo at 14 (Appx086335). As Kazakhstan is Germany's largest source of ferrochrome, Commerce determined that "low-priced imports of ferrochrome from Kazakhstan affected prices for this input in the German market" and thus "the German ferrochrome market is distorted" by a

cost-based PMS.  *Id*. at 11, 14 (Appx086332, Appx086335).   To correct for such distortions in Germany's ferrochrome market, Commerce adjusted BGH's cost of manufacture ("COM") upwards by [      ] percent.[3]  *Id*. at 18 (Appx086339).

As for the German electricity market, Commerce's preliminary determination in the companion countervailing duty ("CVD") investigation found countervailable electricity subsidies, concluding "that the German government includes electricity in its own industrial policy" and provides tax rebates to certain companies, including metal producers.  PMS Memo at 10-11 (Appx086331-086332).   Consistent with the Statement of Administrative Action accompanying the price-based PMS provision and past practice, Commerce found that government control over electricity prices constituted a market distortion giving rise to a PMS.  *Id*. (Appx086331-086332).   Commerce further noted that in adjusting for this input cost distortion, it was not applying a double remedy because its antidumping ("AD") and CVD proceedings, although conducted concurrently, are two separate proceedings and, as this Court has previously found, imposition of a PMS adjustment and countervailing duties is not "precluded as a matter of law."  *Id*. at 11 (Appx086331) (quoting *Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d. 1323, 1337 (Ct. Int'l Trade 2019) ("*Vicentin I*")). To correct for German electricity market distortions, Commerce multiplied the preliminary countervailing duty rate calculated for BGH in the companion CVD investigation (5.20 percent) by the portion of BGH's COM attributable to electricity ([          ]).  PMS Memo at 18 (Appx086339).  Based on this calculation, Commerce adjusted BGH's electricity costs upwards by [      ] percent.  *Id*. (Appx086339).

---

[3] To calculate this adjustment, Commerce multiplied the (conservatively) estimated percentage of German ferrochrome sourced from imports (65.8 percent) by the estimated percentage of imports sourced from Kazakhstan (34.5 percent).   Commerce then multiplied this figure by 127 percent, *i.e.* the degree to which Kazakh ferrochrome prices are undervalued when compared to U.S. ferrochrome prices, and applied the resulting figure to the portion of BGH's COM attributable to ferrochrome ([          ]).  Post-Prelim PMS Memo at 18 (Appx086339).

Commerce's Final Determination carried forward these PMS findings after considering and addressing arguments presented in the case and rebuttal briefs filed by the Petitioners, BGH, and SWG.  *See Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,018 (Dec. 11, 2020) ("Final Determination") (Appx084045-084047), and accompanying unpublished Issues and Decision Memorandum ("Final IDM") at 15-25 (Appx084001-084011).[4]

However, Commerce identified errors in its initial PMS adjustment calculations and revised its final PMS adjustment calculations accordingly.  *See* Final IDM at 22, 25 (Appx084008, Appx084011).  Specifically, Commerce determined that its initial adjustment for distortions in the German ferrochrome market "did not accurately adjust BGH's ferrochrome prices to reflect market prices" because it "relied on Kazchrome's reported high-carbon ferrochrome sales prices for 2018 instead of the ferrochrome purchase prices paid by BGH during the POI."  Commerce Memorandum, "Final Determination Margin Calculation for BGH Edelstahl Siegen GmbH" (Dec. 7, 2020) ("Final Margin Calc. Memo") at Attachment III (Appx086807).  Thus, for the Final Determination, Commerce instead compared BGH's POI ferrochrome average purchase price to a POI benchmark USGS purchase price and then applied the difference to the percentage of BGH's COM represented by ferrochrome.  *Id.* (Appx086807).  This yielded an upwards adjustment of [     ] percent to BGH's reported per-unit COM.  *Id.* (Appx086807).

Commerce also determined that its initial adjustment to BGH's electricity prices was erroneous as it had incorrectly "applied the percentage electricity represented of COM to the

---

[4] Commerce's PMS determination was unchanged in its Amended Final Determination.  *See Forged Steel Fluid End Blocks From the Federal Republic of Germany and Italy: Amended Final Antidumping Duty Determination for the Federal Republic of Germany and Antidumping Orders*, 86 Fed. Reg. 7,528 (Jan. 29, 2021) ("*Amended Final Determination and AD Order*") (Appx084048-084051).

German countervailing duty (CVD) subsidy rate, which understated the adjustment amount"
and because it "relied on electricity-related CVD rates as calculated in the companion CVD
investigation which are not contemporaneous with the POI and are calculated using sales as
the denominator instead of COM."   Final Margin Calc. Memo at Attachment III
(Appx086807).  To correct these errors, Commerce "revised the electricity adjustment based
on the total electricity-related subsidies (*i.e.,* benefit) for 2018 calculated in the final
determination of the companion CVD investigation, equalized to the POI" and then "applied
the subsidy attributable to the POI as a percentage of COM." *Id*. (Appx086807).   This
resulted in an upward adjustment of [      ] percent to BGH's reported per-unit COM. *Id.*
(Appx086807).

Finally, to determine which home market sales prices could be used as normal value,
Commerce conducted the sales below cost test, utilizing BGH's costs of production, as
adjusted for the PMS distortions. Final IDM at 16 (Appx084002).

**2.  Intervening Judicial Development**

In December 2021, well after Commerce issued its Final Determination, the Federal
Circuit issued its opinion in *Hyundai Steel,* in which it held Commerce could not rely on 19
U.S.C. § 1677b(e) to justify PMS adjustments to a respondent's costs for purposes of
conducting the sales below cost test.  *See Hyundai Steel Co. v. United States*, Fed. Cir. Ct.
No. 21-1748, 2021 U.S. App. LEXIS 36442 (Fed. Cir. Dec. 10, 2021) ("*Hyundai Steel*") at 3
(precedential opinion not yet published in the Federal Reporter).  Nevertheless, as detailed
below, the Federal Circuit left open the possibility that Commerce may be authorized under
other statutory provisions to similarly account for the existence of a PMS when comparing
home market sales prices and production costs. *See id.* at 16-19.

**B.  Commerce's Application of the Differential Pricing Methodology**

The antidumping statute provides Commerce with three alternative methodologies to calculate a dumping margin.  Specifically, 19 U.S.C. § 1677f-1(d)(1)(A) instructs Commerce normally to calculate dumping margins by comparing either: (a) the weighted average normal value ("NV") to the weighted average export price ("EP") or constructed export price ("CEP")  (the "A-to-A method") or (b) the NV of individual home or third country transactions to the EP/CEP of individual U.S. sales transactions (the "T-to-T method").  19 U.S.C. § 1677f-1(d)(1)(A).  However, the statute also includes an "exception" to this general rule which allows Commerce to use the alternative average-to-transaction method (the "A-to-T method") where: (a) Commerce determines that there exists a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or time periods and (b) Commerce explains why either the A-to-A method or the T-to-T method cannot account for such differences.  19 U.S.C. § 1677f-1(d)(1)(B).

To determine which method to use in this case, Commerce employed its standard differential pricing analysis, which this Court has previously determined "lawfully identifies a pattern of export prices that differ significantly."  *See Timken Company v. United States*, 179 F. Supp. 3d 1168, 1179 (Ct. Int'l Trade 2016) ("*Timken*").  Under this differential pricing analysis, Commerce first used the Cohen's *d* and ratio tests to examine BGH's U.S. sales and determined that there was a pattern of prices that differed significantly among purchasers, regions, or time periods and then explained why the A-to-A method, which produced different margins, could not account for these differences.  Final IDM at 9-14 (Appx083995-084000).  Commerce accordingly used the A-to-T methodology to calculate BGH's margin.  *Id.* at 12 (Appx083998).  The specifics of Commerce's differential pricing analysis and findings are discussed in the Argument section, *infra*.

## III.    SUMMARY OF THE ARGUMENT

BGH's opening brief argues that Commerce's PMS findings were unsupported by substantial evidence and, further, that Commerce's subsequent PMS adjustments to correct for distortions in the German electricity and ferrochrome markets were unsupported by substantial evidence and contrary to the antidumping statute.  BGH additionally claims that Commerce's application of its Court-approved differential pricing methodology was contrary to the law.  Such arguments are without merit.

In its *Final Determination*, Commerce carefully weighed the record evidence and determined that during the POI the significant presence of low- and uncompetitively-priced ferrochrome from Kazakhstan distorted prices in the German ferrochrome market and that a widespread German government price-setting regime distorted electricity costs for FEB producers.  With respect to ferrochrome, Commerce found that Kazchrome, Kazakhstan's state-controlled producer of ferrochrome, does not base pricing decisions solely on commercial considerations, noting record evidence concerning Kazchrome's ownership, non-commercial cost structure, and implication in criminal investigations.  Commerce also observed that Kazchrome's German prices were significantly lower than an undistorted USGS benchmark.  Commerce reasonably concluded that the presence of such low-priced ferrochrome distorted prices in the German market, as Kazakhstan is by far Germany's largest source of ferrochrome.  With respect to electricity, Commerce found a German government price-setting scheme, as manifested in multiple electricity-related subsidy programs found to benefit FEB producers in the companion CVD investigation.  Commerce appropriately found these distortions, which were affecting prices for two key FEB inputs, created one or more particular market situations such that German FEB producers' input costs did not accurately reflect their cost of production ("COP") in the ordinary course of trade.

To ensure the statutorily mandated "fair comparison" between NV and EP/CEP, *see* 19 U.S.C. § 1677b(a), Commerce relied on 19 U.S.C. § 1677b(e) to adjust BGH's reported production costs upwards when performing the sales below cost test.  This ensured that, pursuant to 19 U.S.C. § 1677b(b), the calculation of NV included only sales made below BGH's *undistorted* cost of production.  While the Federal Circuit rejected Commerce's reliance on 19 U.S.C. § 1677b(e) to adjust for a PMS in its sales below cost test, the Federal Circuit has expressly left open the possibility that Commerce might legally rely on 19 U.S.C. § 1677b(f)(1)(A) or 19 U.S.C. § 1677b(a)(1)(C)(iii) to make materially identical adjustments. *See Hyundai Steel* at 16-19. Thus, even if remand were ordered in light of *Hyundai Steel*, Commerce must be afforded broad discretion to consider alternative legal justifications.  In any event, Commerce's PMS adjustments were themselves fully supported by substantial evidence.

In its *Final Determination*, Commerce also correctly and lawfully applied its differential pricing methodology, which this Court has found "lawfully identifies a pattern of export prices that differ significantly" for the purposes of 19 U.S.C. § 1677f-1(d)(B)(i).  *See Timken*, 179 F. Supp. 3d at 1179.  Under this methodology, Commerce first used the Cohen's *d* and ratio tests to identify a pattern of export prices that differed significantly among purchasers, regions, or time periods for comparable merchandise (*i.e.* merchandise within the same product control number or CONNUM) and then explained why these differences could not be accounted for by the standard average-to-average margin calculation methodology. Having made such a finding, Commerce appropriately used the average-to-transaction margin calculation methodology and associated zeroing, which the Federal Circuit has repeatedly affirmed is "an important part of the A-T methodology, with the policy aim of addressing targeted dumping."  *See Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1322,

1337 (Fed. Cir. 2017) ("*Apex*") (citing *Union Steel v. United States*, 713 F.3d 1101, 1109

(Fed. Cir. 2010) ("*Union Steel*")).

## IV.    ARGUMENT

### A.  Standard of Review

In appeals of antidumping duty determinations, Commerce's "decision…is presumed

to be correct.  The burden of proving otherwise shall rest upon the party challenging such

decision."  28 U.S.C. § 2639(a)(1).  The Court must therefore sustain "any determination,

finding, or conclusion" by Commerce unless it is "unsupported by substantial evidence on

the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Fujitsu*

*Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996); *see also United States v.*

*Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) ("*Eurodif*").

The substantial evidence standard is a deferential standard which tests whether a

determination is supported by "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477

(1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also*

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). "A party

challenging the {agency's} determination under the substantial evidence standard 'has

chosen a course with a high barrier to reversal.'" *Nippon Steel Corp. v. United States*, 458

F.3d 1345, 1352 (Fed. Cir. 2006) ("*Nippon Steel*") (quoting *Mitsubishi Heavy Indus., Ltd. v.*

*United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)).

Substantial evidence review "is not to review whether {a} losing position was also

supported by substantial evidence or to weigh the relative strength of {the losing position's}

evidence against {the winning position's} evidence."  *Apple Inc. v. Samsung Elecs. Co., Ltd.*,

839 F.3d 1034, 1052 (Fed. Cir. 2016).  Rather, Commerce's determination may be supported

by substantial evidence "even if it is possible to draw two inconsistent conclusions from

evidence in the record." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed. Cir. 2003).  Thus, a reviewing Court must affirm Commerce's determination "if it is reasonable and supported by the record as a whole, even if some evidence detracts from the {agency's} conclusion." *See Nippon Steel*, 458 F.3d at 1352 (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).  Succinctly stated, a reviewing court "should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence." *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992).  Likewise, it is reversible error for the Court to "assess{} credibility and reweigh{} the evidence," as "it is the role of the expert factfinder…to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359.

ln reviewing the lawfulness of Commerce's construction of the antidumping statute, a reviewing court is constrained by the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–3 (1984) ("*Chevron*"); *see also, e.g., Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001) (extending *Chevron* deference to "statutory interpretations articulated by Commerce during its…proceedings").  Under this doctrine, when Congress has not provided clear guidance on an issue of statutory administration, the court will defer to Commerce's interpretation of the statute so long as that interpretation is reasonable. *Chevron*, 467 U.S. at 843–44; *see also Eurodif*, 555 U.S. at 316 (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").  If *Chevron* deference is warranted, a court errs by substituting "its own construction of a statutory provision for a reasonable interpretation made by {Commerce}." *IPSCO, Inc. v. United States*, 965 F.2d 1056, 1061 (Fed. Cir. 1992) (quoting *Chevron*, 467 U.S. at 844).

**B.  Commerce's Findings that the German Ferrochrome and Electricity Markets Are Distorted by a PMS Were Supported by Substantial Evidence**

Substantial evidence on the administrative record supports Commerce's PMS findings of distortions in the German ferrochrome and electricity markets.  Record evidence demonstrates: (a) the German ferrochrome market is distorted by the significant presence of low-cost ferrochrome from Kazakhstan, pricing of which is not based on competitive market forces, and (b) the German government employs a price-setting regime that distorts electricity prices for FEB producers.  In making its final determination, Commerce also considered and addressed all arguments made by Respondents and rendered findings consistent with Commerce's analysis of particular market situations in other proceedings. Accordingly, this Court should uphold Commerce's PMS findings, which were supported by substantial record evidence.

**1.  Substantial Record Evidence Supports Commerce's Finding that the Low, Non-Market Price of Kazakh Ferrochrome Created a PMS in Germany**

Commerce reasonably concluded that the significant presence of low-priced ferrochrome from Kazakhstan distorts German market prices for this input, creating a PMS. *See* Final IDM at 24-25 (Appx084010-084011).  Commerce pointed to substantial record evidence demonstrating: (1) Kazakhstan is Germany's largest source of ferrochrome imports, *see id.* at 24 (Appx084010) (citing PMS Memo at 14 (Appx086335) and PMS Allegation at Exhibit 18 (Appx084698-084720)); *see also* PMS Allegation at Exhibit 21 (Appx084725-084730), (2) Kazchrome, the state-controlled producer of ferrochrome in Kazakhstan, "does not make pricing decisions solely based on commercial considerations," Final IDM at 24 (Appx084010); *see also* PMS Memo at 14 (Appx086335) (citing PMS Allegation at 44-45 (Appx084463-084464), 49-51 (Appx084468-084470), and Exhibits 22 (Appx084731-084749), 29 (Appx084989-084991), and 43 (Appx085218-085220)), and (3) the price of ferrochrome sold by Kazchrome is significantly less than a benchmark market price

- 13 -

Consol. Ct. No.  21-00077

published by USGS, *see* Final IDM at 24 (Appx084010); *see also* PMS Memo at 14

(Appx086335) (citing PMS Allegation at 52-53 (Appx084471-084472) and Exhibits 25

(Appx084770-084863), 27 (Appx084867-084985), 48 (Appx085237-085249)).  Based on

this evidence, and consistent with its analysis in other proceedings, Commerce thus found

that uncompetitively low-priced Kazakh ferrochrome distorted prices in the German

ferrochrome market.  *See* Final IDM at 24-25 (Appx084010-084011) (citing *Welded Carbon*

*Steel Standard Pipes and Tubes from India: Final Results of Antidumping Duty*

*Administrative Review; 2017-2018*, 85 Fed. Reg. 2715 (Jan. 16, 2020), and accompanying

IDM at Comment 1; *Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final*

*Results of Antidumping Duty Administrative Review; 2016-2017,* 83 Fed. Reg. 51927 (Oct.

15, 2018), and accompanying IDM at Comment 3).

        BGH nonetheless asserts that Commerce's PMS finding with respect to the German

ferrochrome market is unsupported by substantial evidence.  BGH Br. at 14.   In particular,

BGH argues that Commerce failed to adequately justify its determination, relied on

inappropriate price benchmarks, ignored evidence of BGH's specific purchasing behavior in

favor of a market-wide determination, and relied on "unsupportable" information supplied by

the petitioners.  BGH Br. at 14-17.  These arguments are erroneous, contradict unrefuted

evidence on the administrative record, and should thus be rejected by this Court.

> a.  <u>Commerce reasonably determined that German ferrochrome market prices
> are distorted because a significant portion is sourced from the Kazakh state-
> controlled producer, which does not make market-based pricing decisions</u>

        In BGH's telling, Commerce based its determination "solely upon information that

ferrochrome from Kazakhstan is imported into Germany and that the Kazakh producer

Kazachrome {sic} is state-controlled."  BGH Br. at 14.  BGH's assertions are unfounded.

Rather, as Commerce explained, it relied upon unrefuted record evidence demonstrating that

Kazchrome, Kazakhstan's state-controlled producer of ferrochrome, "does not make pricing

decisions solely based on commercial considerations."  Final IDM at 24 (Appx084010).  This included evidence on Kazchrome's ownership, its non-commercial cost structure (including support from the Kazakh Government), and its involvement in criminal investigations conducted by foreign governments.  *Id*.; *see also* PMS Allegation at 42-53 (Appx084461-084472) and Exhibits 18-48 (Appx084698-085249); PMS Clarification at 7-9 (Appx087133-087135) and Exhibits 5-7 (Appx087210-087522).  Record evidence also established that Kazakhstan is a top source of ferrochrome in Germany, *see* Final IDM at 24 (Appx084010); *see also* PMS Allegation at 43 (Appx084462) and Exhibit 21 (Appx084725-084728) (establishing that Kazakhstan is by far Germany's largest source of ferrochrome imports), and that Kazchrome's uncommercially priced ferrochrome was priced lower than a benchmark USGS price, which was itself based on U.S. import prices free of any significant influence from Kazakh imports.  Final IDM at 24 (Appx084010); *see also* PMS Allegation at 52-53 (Appx084471-084471) and Exhibits 25 (Appx084770-084863) and 47-48 (Appx085230-085249).

Based on this record evidence, Commerce reasonably concluded that the significant presence of low- and non-commercially priced Kazakh ferrochrome affected prices in the German market (*i.e.* by driving down ferrochrome prices in the German market writ-large, regardless of source).  *See* Final IDM at 24-25 (Appx084010-084011); *see also* PMS Memo at 14 (Appx086335).  This evidentiary basis is not only significantly broader than BGH claims, but also entirely sufficient to meet the substantial evidence standard under which a reviewing Court must affirm Commerce's determination "if it is reasonable and supported by the record as a whole, even if some evidence detracts from the {agency's} conclusion."  *See Nippon Steel*, 458 F.3d at 1352.

      b.  <u>Commerce reasonably used USGS data as a price benchmark, because they are based on U.S. import prices largely from countries other than Kazakhstan</u>

As noted, Commerce found German ferrochrome prices were distortedly low relative to a market-based benchmark.  BGH claims that Commerce erred in relying on USGS data as a price benchmark and improperly "impose{d} an irrebuttable presumption that input prices in a foreign market that are lower than U.S. input prices represent *per se* a particular market situation."  BGH Br. at 15.  These claims too are erroneous.  Commerce determined the German ferrochrome market was distorted based on the significant presence of Kazakh ferrochrome imports, which record evidence demonstrates was not commercially priced.  *See* Final IDM at 24 (Appx084010).  *After* identifying this distortion, Commerce explained why USGS data provided a reasonable benchmark for a PMS-adjustment in this instance. Commerce stated that USGS prices are "based on U.S. import prices largely from countries other than Kazakhstan" and given the lack of significant head-to-head competition with low-priced Kazakh imports, the U.S. market price was free from such distortions.  *See id*. (Appx084010).  Thus, BGH is simply wrong in suggesting Commerce created an irrebuttable presumption that a PMS exists wherever foreign market input prices are lower than U.S. input prices.  Rather, Commerce reasonably identified USGS prices as an appropriate benchmark *in this instance* because they are insulated from the particular distortion at issue.

      c.  <u>BGH's claims that it purchased "no significant amounts" of Kazakh ferrochrome are unsupported by the record and irrelevant to a market-based PMS finding</u>

BGH also claims that Commerce erred because invoices BGH provided on the record "show that almost all the ferrochrome purchased by BGH came from countries other than Kazakhstan."  BGH Br. at 15; *see also id*. (claiming that BGH "purchases no significant amounts of ferrochrome originating in Kazakhstan").  Such claims are belied by the evidentiary record.  Indeed, review of the invoices referenced by BGH, see BGH Br. at 15

(citing Letter from BGH, "BGH Response to Section D Supplemental Questionnaire" (Jun.

16, 2020) ("BGH Supp. DQR") at Appendix SD-2 (Appx084083-084171), [



].[5]   BGH's plainly erroneous statements before both Commerce and this Court

are notable and concerning.

     Moreover, whether BGH purchased Kazakh-sourced ferrochrome is ultimately

irrelevant to Commerce's findings.  In particular, Commerce found a market-wide PMS

wherein ferrochrome commodity prices are distorted across the German market, regardless of

source.  Thus, all that is relevant in BGH's sales documentation is that BGH purchased

ferrochrome in the distorted market, *i.e.*, Germany.  This Court has found that Commerce

may reasonably and lawfully make "both market-based or respondent-specific PMS findings

depending on the facts presented in each case."  BGH Br. at 16 (citing *Husteel Co. v. United

States*, 426 F. Supp. 3d 1376, 1392 n.20 (Ct. Int'l Trade 2020) ("*Husteel*")).  Here,

Commerce explained its market-based PMS analysis, stating the "relevant fact is the

importance of Kazakhstan as a source of ferrochrome in the German market and the distortive

impact Kazakh pricing may have on the German ferrochrome market as a result."  *Id.*

---

[5] Appendix SD-2 of the BGH Supp. DQR contains both: (a) invoices [
                ], *see, e.g.,* Appx084085-084086, and (b) [        ]
invoices [                              ],
*see, e.g.,* Appx084087-084088.  These [   ] invoices show that [

        ].  *See* Appx084087-084088, Appx084091, Appx084094-084095,
Appx084098-084099, Appx084102-084103.  [

       ].  *See* Appx084083-
084171.  Additionally, invoices [

       ].  *See* Appx084114, Appx084118, Appx084144-084145,
Appx084148, Appx084163. The invoices included in this Appendix thus do not support
BGH's claim that "almost all of the ferrochrome purchased by BGH came from countries
other than Kazakhstan." *See* BGH Br. at 15.

(Appx084010).   This is a simple function of supply and demand economics: when Kazakh ferrochrome—which represents a significant portion of the German market—is priced unfairly low, other suppliers of this commodity product must either reduce their own prices or lose market share.  As a buyer of commodity ferrochrome in the German market, BGH reported costs impacted by these artificially low prices, whether the ferrochrome it bought was sourced from Kazakhstan or another country.

### d.   There is no record evidence to support BGH's additional claims

Finally, BGH contends that Commerce's "exclusive reliance on the information supplied by petitioners is unsupportable," BGH Br. at 16, yet BGH fails to provide any record evidence of its own to justify its competing claims.  For example, in its brief, BGH claims Commerce's decision was in error because "much of the ferrochrome imported into Germany is not destined for consumption in Germany but for circulation within the European Union."  *See* BGH Br. at 16.  As "support" for this assertion BGH cites to page 14 of its administrative case brief, which, while it makes the same assertion, but cites no supporting evidence on the record of the administrative proceeding.  *See* Letter from BGH, "Resubmission of Redacted Case Brief" (Nov. 23, 2020) ("BGH Admin Br.") at 14 (Appx086412).  By contrast, data provided by Petitioners contradict BGH's unsupported statements: during 2018-19, Germany imported approximately 365 million kgs of ferrochromium, while exporting only 50 million kgs (approximately 13.7% of imports).  *See* PMS Allegation at Exhibit 21 (Appx084726-084728).  BGH had—and used—an opportunity to submit factual information to rebut Petitioners' PMS Allegation.  *See generally* BGH PMS Rebuttal (Appx086064-086219).  Its failure to adequately support its factual assertions is no basis to remand Commerce's determination.  *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("It is the responsibility of the interested parties—not Commerce—to build the factual record supporting its position.").

**2.    Substantial Record Evidence Supports Commerce's Finding that Government Electricity Price Control Created a PMS in Germany**

Commerce also reasonably concluded that significant Government intervention in the German electricity market distorts the actual cost of electricity for producers of FEBs, creating a PMS.  *See* Final IDM at 20-22 (Appx084006-084008).  Commerce justified its determination by citing to evidence on the record of this proceeding detailing an extensive German government regulatory regime that distorts the costs of electricity and controls prices in relevant market segments.  *See id.* at 20 (Appx084006) (citing PMS Allegation at 39-41 (Appx084458-084460)).  This evidence shows that the German government created a "price-setting regime that distorts the actual cost of electricity for producers of fluid end blocks." *See* Final IDM at 20 (Appx084006).  In particular, the German government controls pricing at multiple levels, creating a price floor for all electricity produced by renewable sources, a segment that constitutes well over a third of the German electricity market, and then, consistent with its industrial policy goals, implements an even lower price floor for high-volume industrial users.  *See* PMS Allegation at 39-41 (Appx084458-084460).  The German government also provides various forms of electricity-related tax relief to the German steelmaking industry, further distorting prices.  *Id.* at 41 (Appx084460).  Based on this evidence, Commerce reasonably concluded that this "regulatory regime distorts the costs of electricity in the German market such that a PMS exists."  Final IDM at 20 (Appx084006).  Commerce also noted that its findings of countervailable subsidies in the companion CVD investigation provided further independent support for this determination and provided a reasonable means of calculating a PMS-adjustment.  *See id.* at 20-22 (Appx084006-084008).

BGH argues that Commerce failed to support its determination with substantial evidence because it failed to place relevant evidence from the companion countervailing duty investigation on the record of this proceeding, erred in treating its CVD determination as "conclusive and irrebuttable evidence" of a PMS, and erroneously found that German

electricity costs are distorted despite the fact that German companies receive no benefit and

face electricity costs that are "far above" those in the United States.  BGH Br. at 8-11.  As

discussed further below, each of these arguments is unavailing and this Court should uphold

Commerce's PMS determination.

        a.   <u>BGH had opportunity challenge Commerce's CVD finding and to timely</u>
<u>place related factual information on the record of this proceeding</u>

BGH first alleges that Commerce erred because it failed to support its conclusions

with evidence on the administrative record of the antidumping proceeding and instead relied

"only" on evidence from the concurrent CVD investigation.  BGH Br. at 8.  This, BGH

claims, deprived BGH of an opportunity to challenge Commerce's CVD determination.  *Id*.

Such arguments are belied by the record.  As an initial matter, Commerce supported its PMS

finding with reference to the Petitioners' PMS Allegation, which was filed in the antidumping

proceeding.  *See* IDM at 20, n.95 (Appx084006) (citing Petitioner's PMS Allegation at 39-41

(Appx084458-084460) in support of Commerce's finding that the German regulatory regime,

and associated distortion in electricity costs, created a PMS).  Moreover both the PMS

Allegation and Commerce's subsequent memoranda appropriately referenced Commerce's

preliminary factual findings in the CVD investigation, which were: (1) published by

Commerce in the Federal Register, *see Forged Steel Fluid End Blocks from the Federal*

*Republic of Germany: Preliminary Affirmative Countervailing Duty Determination, and*

*Alignment of Final Determination with Final Antidumping Duty Determination*, 85 Fed. Reg.

31454 (May 26, 2020) ("*FEB Germany CVD Prelim.*"), and accompanying preliminary

decision memorandum ("FEB Germany CVD PDM"); and (2) did not change in Commerce's

CVD final determination, *see* Final IDM at 20 (Appx084006) ("These findings {of

countervailable electricity subsidies} have not changed in the CVD final determination.");

*see also Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final*

*Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80011 (Dec. 11, 2020) ("FEB Germany CVD Final"), and accompanying IDM ("FEB Germany CVD Final IDM").

In its submissions in this AD proceeding, BGH was similarly free to cite to Commerce's conclusions in *FEB Germany CVD Prelim.*, as well as those in any other Commerce preliminary or final determination published in the *Federal Register*.  BGH was also provided an opportunity to place additional relevant rebuttal information —including any of its submissions in the CVD proceeding—on the record of the antidumping duty proceeding.  *See* Commerce July 1 Memo at 2-3 (Appx087125-087126) (establishing July 24, 2020—two months after the CVD preliminary determination—as the "deadline for interested parties to submit factual information to rebut, clarify, or correct the information in the petitioner's allegations").  Indeed, BGH availed itself of this opportunity to place rebuttal information on the record.  *See* BGH PMS Rebuttal (Appx086064-086219).  That BGH failed to place on the record all the information that it later wished to reference in its case and rebuttal briefs was its own error, not that of Commerce.  *See, e.g., Calgon Carbon Corp. v. United States*, 443 F. Supp. 1334, 1344 (Ct. Int'l Trade 2020) (citing *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)) ("It is the responsibility of the interested parties—not Commerce—to build the factual record supporting its position.").  Thus, contrary to BGH's assertions, *see* BGH Br. at 9, Commerce acted appropriately and consistently with its regulations when it rejected BGH's subsequent, untimely attempts to reference such documents, *see generally* 19 C.F.R. § 351.302(d) (Commerce will not consider or retain in the official record of the proceeding any untimely filed factual information).

BGH's related contention that it "must be given an opportunity to challenge the basis of the countervailing duty rate within this {antidumping duty} investigation," BGH Br. at 9, is also without merit.  BGH already had a full opportunity to challenge the basis of the

countervailing duty rate in the CVD proceeding, and, indeed, it does not claim otherwise.

Instead, BGH simply seeks to relitigate Commerce's conclusion that the programs in question

provided a benefit to German companies, which is one of the requirements of a

countervailable subsidy under the statute, *see generally* 19 U.S.C. § 1677(5).  But Commerce

explained that it already fully considered BGH's arguments in the CVD proceeding and,

based on the full evidentiary record, determined a benefit exists.  *See* IDM at 20

(Appx084006); *see also* FEB Germany CVD PDM at 19-27; FEB Germany CVD Final IDM

at 9-11.  Notably, BGH has pointed to no additional evidence in the antidumping duty

proceeding that would diminish the relevance of Commerce's subsidy findings in the CVD

proceeding to Commerce's PMS finding in the AD proceeding.

      b.  <u>In concluding that the German electricity market is distorted, Commerce<br>reasonably relied on record evidence of rampant government subsidies</u>

BGH next claims that Commerce erred in treating its CVD determination as

"conclusive and irrebuttable evidence" of a PMS.  BGH Br. at 10.  This argument too is

without merit.  Indeed, BGH fundamentally misunderstands the function of Commerce's

PMS analysis which, unlike in a CVD investigation, is not to determine whether a respondent

received a countervailable electricity subsidy, but rather whether a situation exists such that

prices in the electricity market, as a whole, are distorted and therefore unreliable for

calculating the costs of production.  Commerce thus did not treat its CVD investigation

findings as irrebuttable evidence of a PMS, rather Commerce considered these findings—

which were based on a full and fair proceeding and a comprehensive administrative record—

to be conclusive evidence of trade distorting subsidization.  Commerce explained that it was

not the existence of any single subsidy but rather the "sheer number and extent of {subsidy}

programs" that Commerce found in the CVD proceeding that "demonstrate the efforts

undertaken by the German government to control the German market for electricity, thereby

creating a PMS."  *See* IDM at 20-21 (Appx084006-084007).  Such evidence of subsidization

and control of the German electricity market further corroborates the evidence of government intervention that the petitioner presented in its PMS allegation and that Commerce cited to as support for its PMS finding.

 c.   <u>BGH's additional arguments are unfounded or irrelevant to a market-based PMS finding</u>

Finally, BGH argues that no distortions—and thus no PMS—exist in the German electricity market because the referenced subsidies either: (a) did not confer a benefit on BGH or (b) did not result in lower electricity prices than in the United States.  *See* BGH Br. at 10.  As an initial matter, and as discussed above with respect to ferrochrome, a PMS may be either market- or respondent-based, depending on the facts of the particular case.  *See Husteel*, 426 F. Supp. 3d at 1392 n.20.  Here, Commerce reviewed all relevant facts in the CVD investigation, considered BGH's arguments, and found that BGH individually benefited from multiple electricity-related government subsidy programs that meet the statutory requirements of a countervailable subsidy.  *See* FEB Germany CVD Final IDM at 5-9; FEB Germany CVD PDM at 19-27; *see also* 19 U.S.C. § 1677(5) (noting that to be countervailable a government subsidy must provide a financial contribution to a specific recipient or industry and the respondent must benefit).

With respect to BGH's second argument, whether German electricity costs are higher or lower than those in the United States (or any other country) is simply irrelevant to whether distortion exists in the German electricity market. Commerce found that record evidence demonstrated that the German government controlled the electricity market to such an extent that prices cannot be considered to be based on competitive, market-based forces.  *See* IDM at 20-21 (Appx084006-084007).  As made clear by the language of the Statement of Administrative Action, this conclusion necessarily establishes the existence of a PMS.  *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) at 822 (noting that a PMS exists "where there is

government control over pricing to such an extent that home market prices cannot be considered to be competitively set").  As discussed further below, Commerce then corrected for this distortion using the amount of electricity subsidies that BGH received, which it explained was the "best information available" to quantify and adjust for the PMS distortion. *See* IDM at 21 (Appx084007).  The adjusted electricity prices thus reasonably approximate the prices that BGH would have faced in a competitive German electricity market free from government price controls.  The price of electricity in the United States, or any other market, simply has no bearing on this PMS finding or the calculation of a PMS-adjustment.

### C.  As a PMS Distorted BGH's Production Costs, the Law Permits Commerce to Adjust BGH's Reported Costs; Substantial Evidence Supports Commerce's Adjustment Calculations

Having identified a PMS affecting German market prices for these two key FEB inputs, Commerce reasonably adjusted BGH's reported production costs to account for such distortions.  This, in turn, enabled Commerce to compare BGH's home market sales prices to *undistorted* production costs and exclude any sales prices below these *undistorted* costs from normal value.  Recently, the Federal Circuit concluded that Commerce cannot rely on 19 U.S.C. § 1677b(e) to make such an adjustment for purposes of the sales below cost test, a narrow holding that did not find such adjustments *per se* unlawful, as *Hyundai Steel* expressly reserved alternative statutory pathways.  *See Hyundai Steel* at 16-19.  Here, for instance, Commerce's adjustment would have been fully justified under 19 U.S.C. § 1677b(f)(1)(A), which authorizes Commerce to alter (or discard) a respondent's reported costs in performing the sales below cost test wherever those costs do not "reasonably reflect" the costs of production; or alternatively under 19 U.S.C. § 1677b(a)(1)(C)(iii), which allows Commerce to discard home market sales prices distorted by a PMS.  As explained below, Commerce's adjustments were also supported by substantial evidence.

### 1.   The Law Permits Commerce's PMS Adjustments

BGH argues that Commerce's PMS adjustments to both ferrochrome and electricity costs were not in accordance with law because Commerce either failed to demonstrate that the distortions "prevent a proper comparison of normal value with export price or constructed export price as required by the statute" or because it unlawfully made a cost-based PMS adjustment in applying the sales below cost test.  *See* BGH Br. at 3-4.  Neither argument has merit.

Regarding Commerce's alleged failure to demonstrate how a cost-based PMS prevents a proper comparison between NV and EP/CEP, BGH misunderstands the statute. As the Federal Circuit recently clarified, while Commerce must find that a *sales*-based PMS prevents a "proper comparison" of normal value and U.S. price, "by contrast," a *cost*-based PMS (at issue here) is a "different standard{}" requiring "just that the exporter's actual costs do not accurately reflect the costs of production."  *Hyundai Steel* at 16 n.10.  Thus, the statute does not require any finding that a cost-based PMS prevents a proper comparison of normal value and U.S. price.  Moreover, as the existence of the sales below cost test makes clear, a proper comparison of NV with EP or CEP is not possible wherever the home market sales prices used to calculate NV fall below the cost of production.  *See* 19 U.S.C. § 1677b(b).

BGH additionally argues that Commerce's PMS adjustments were unlawful because a cost-based PMS adjustment is only permissible when NV is determined based on constructed value.  BGH Br. at 5.  This is erroneous.  The Federal Circuit has held that Commerce could not rely solely on 19 U.S.C. § 1677b(e) to justify adjusting its sales below cost test calculations to account for a cost-based PMS, but pointedly did not find such adjustments *per se* unlawful, nor did it preclude cost-based PMS findings where normal value is based on home market sales prices.  *See Hyundai Steel* at 16-19.  Indeed, the Federal Circuit expressly left open the possibility that other statutory provisions, such as 19 U.S.C. § 1677b(f)(1)(A)

and 19 U.S.C. § 1677b(a)(1)(C)(iii), may support materially identical adjustments, and recognized that precluding Commerce from accounting for cost distortion would lead to "perverse consequences," as described below.  *See id.*   Accordingly, were this court to order a remand in light of *Hyundai Steel*, Commerce must be permitted to consider alternative legal justifications for adjusting BGH's reporting to account for distortions in the German electricity and ferrochrome markets (whether or not these are labeled a "PMS").

For example, the Federal Circuit noted that Commerce was not constrained to rely on the flawed results of an unadjusted sales below cost test, and could reject distorted sales prices that "still pass the sales-below-cost test" set forth in 19 U.S.C. § 1677b(b) by finding a *sales*-based PMS, *e.g.*, under 19 U.S.C. § 1677b(a)(1)(C)(iii).  *See Hyundai Steel* at 16-17. Here, the PMS's effect upon normal value and U.S. price comparability would be relevant, *see* 19 U.S.C. § 1677b(a)(1)(C)(iii), but BGH incorrectly conflates mere comparability with the "*proper* comparison" contemplated by the statute, *see* BGH Br. at 11-12 and 17.  As a general matter, it is not the case that a distortion equally reflected in home market and U.S. sales prices renders a comparison of distortion-to-distortion "proper."  The normal value statute's overarching objective is a "fair comparison" using home market prices "in the ordinary course of trade."  19 U.S.C. §§ 1677b(a), (a)(1)(B)(i).  Prices that would be below cost *but for* the cost suppressing effect of a PMS cannot be considered "normal" and have no place in the antidumping calculation.  *See* 19 U.S.C. § 1677(15) (defining the ordinary course of trade as "normal" conditions and practices).  Put differently, Congress did not create a loophole permitting dumping in the United States as long as the foreign producer benefits from, *e.g.*, non-market inputs or government-set input prices, that allow them to cut prices in their home market as well.  Consequently—apart from performing the sales-below-cost test as set forth in 19 U.S.C. § 1677b(b)—Commerce could lawfully determine that any sales prices falling below undistorted production costs adjusted to counteract the cost-based PMS

were affected by a *sales*-based PMS.  The price-depressing distortion inherent in such sales prevents a "proper" comparison with U.S. price.

The Federal Circuit also expressly declined to opine on whether Commerce's authority to undertake a cost-based PMS adjustment is independently established by 19 U.S.C. § 1677b(f)(1)(A), which states that "{f}or purposes of subsection{} (b)" (*i.e.*, the sales below cost test), costs shall be based on the respondent's books and records *if and only if* those records are both: (a) kept in accordance with the exporting country's generally accepted accounting principles and (b) reasonably reflect the costs associated with the production and sale of the merchandise.  *See Hyundai Steel* at 17-19 (finding appellant had failed to argue the issue before the CIT); 19 U.S.C. § 1677b(f)(1)(A); *see also LG Chem, Ltd. v. United States*, Ct. No. 20-00096, Slip Op. 2021-99 (Ct. Int'l Trade 2021) at 17-18 (citing *France v. United States*, 981 F.3d 1318, 1321-22 (Fed. Cir. 2020)) (noting that 19 U.S.C. § 1677b(f)(1)(A) "unambiguously imposes two binary yes/no conditions," both of which must be met before Commerce is required to rely on a respondent's books and records).  As this Court has recently affirmed, "{o}nce Commerce concludes that a producer's records do not satisfy one of these conditions…the statute relieves {Commerce} of any further obligation to use those records in adjusting costs." *LG Chem*, Slip Op. 2021-99 at 18.  Instead, in such circumstances, "Congress desired Commerce to adjust the respondent's costs as necessary (in the Department's discretion) to ensure the most accurate dumping margin." *LG Chem*, Slip Op. 2021-99 at 19-20.

This is precisely the discretion that Commerce employed here.  In particular, as discussed *supra*, Commerce reasonably determined that BGH's input costs for electricity and ferrochrome are distorted by a PMS.  In such a circumstance BGH's books and records— which are based on those distorted input costs—cannot "reasonably reflect" the costs of

producing subject merchandise,[6] meaning that the conditions of 19 U.S.C. § 1677b(f)(1)(A) are not met.  Notably, the statutory terminology of 19 U.S.C. § 1677b(f)(1)(A), *i.e.*, whether respondent's reported costs "*reasonably reflect*" production costs, closely resembles the Federal Circuit's summation of the finding that underlies a cost-based PMS, *i.e.*, "that the exporter's actual costs do not *accurately reflect* the costs of production."  *See Hyundai Steel* at 17 n.10.  Commerce accordingly had no statutory obligation to rely on the costs reported in BGH's books and records.  *See LG Chem*, Slip Op. 2021-99 at 18.  Instead, in conducting the sales below cost test, Commerce reasonably exercised its discretion to adjust BGH's reported costs to correct for such PMS distortions, thereby "ensur{ing} the most accurate dumping margin" possible.  *See LG Chem*, Slip Op. 2021-99 at 19-20.

Commerce's PMS adjustments were thus not only legal, but imperative from a practical standpoint: when a respondent's reported production costs are distorted by a PMS, the sales below cost test (absent adjustment) is necessarily distorted because it compares sales prices to costs that are distorted by a PMS.  Consequently, normal value may include home market prices that only pass the sales below cost test due to the use of distortedly low production costs.  Put differently, had an adjustment been made to eliminate the cost distortion, additional home market sales prices would have been found below cost and eliminated from normal value.  To avoid the perverse results of an unadjusted sales below cost test, Commerce adjusted BGH's reported costs to account for the PMS when performing the sales below cost test.

---

[6] Indeed, based on the statute's plain language and statutory definitions, it would be absurd for input prices distorted by a PMS to be both "outside the ordinary course of trade," *see* 19 U.S.C. § 1677(15)(C) and 19 U.S.C. § 1677b(e), while still "reasonably reflect{ing}" the costs associated with producing subject merchandise, *see* 19 U.S.C. § 1677b(f)(1)(A).

Business Proprietary Information Removed
Consol. Ct. No.  21-00077

2.   **Commerce's PMS Adjustment for Ferrochrome was Supported by Substantial Evidence**

BGH argues that Commerce's PMS adjustment to correct for distorted German ferrochrome costs was unsupported by substantial evidence because Commerce allegedly made three "calculation errors." BGH Br. at 18-19. Such arguments are without merit. First, BGH claims that Commerce's findings should be overturned because Commerce cited the wrong appendix number as the source of figures in its calculation. BGH Br. at 18. This is clearly harmless error. *See generally Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996) (noting that to determine whether an error in an agency proceeding is harmless a court must examine whether the error was the result of a violation of a statute or regulation and whether there was prejudice to any party). As BGH notes, Commerce mistakenly cited to "Exhibit D-3" of BGH's April 27, 2020 Section D questionnaire response as the source of its figures for BGH's POI ferrochrome purchase value and quantity, [

]. *See* BGH Br. at 18. The citation should have been to [                    ] of the same submission, which is titled [

] *See* Letter from BGH, "Response to Section D Questionnaire" (Apr. 27, 2020) ("BGH DQR") at [                                    ]. [

] clearly shows that BGH's various ferrochrome purchases [

],[7] *see id*. ([                    ]), the precise figures Commerce used in its calculations, *see* Final Margin Calc. Memo at Attachment IV (Appx086811). Commerce violated no statute or regulation in citing to the wrong Appendix and the error resulted in no prejudice to BGH, as Commerce's calculation was fully supported by record evidence.

---

[7] These figures [                                                              ]. BGH DQR at Appendix D-4 (Appx081074).

Second, BGH claims that Commerce's calculations are erroneous because "Commerce compare{d} BGH actual purchases of ferrochrome with the general "Ferrochromium" figure listed by the U.S. Geological Survey ('USGS')" and did not account for alleged price differences.  BGH Br. at 18.  Such an argument is both improper and unsupported by record evidence.  As an initial matter, BGH entirely failed to raise this issue in its administrative case brief, *see generally* BGH Admin Br. at 13-14 (Appx086411-086412), and, under the doctrine of administrative exhaustion, it should be precluded from raising such arguments for the first time on appeal, *see, e.g., Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (2010) (finding that a party's "failure to raise its issue in its administrative case brief {before Commerce} constituted a failure to exhaust administrative remedies" and precluded the complaining party from raising the argument on appeal).

However, even setting aside the issues with administrative exhaustion, BGH's arguments lack any factual basis or grounding in the administrative record.  In calculating a PMS adjustment for distortions in the German ferrochrome market, Commerce took the average of BGH's various grades of ferrochrome and compared it to the average reported in the USGS.  *See generally* Final Margin Calc. Memo at Attachments III (Appx086807) and IV (Appx086811).  BGH provided no evidence whatsoever to indicate that the USGS figures are distorted, represent different sales terms, or otherwise render their comparison to BGH costs inappropriate.  Absent any evidence to the contrary, it was reasonable for Commerce to conclude that the USGS average represented an appropriate benchmark for comparison to BGH's ferrochrome costs.

Third, BGH claims that Commerce erred in relying "exclusively on the USGS price of general ferrochrome in the United States" and "reject{ing} without explanation other evidence on world ferrochrome prices placed on the record by BGH and the other mandatory respondent."  BGH Br. at 18.  Such claims too are inaccurate.  As explained *supra*,

Commerce explained that it relied on U.S. prices for ferrochrome in the USGS—rather than

the data provided by respondents—because record evidence established that USGS data is

"based on U.S. import prices largely from countries other than Kazakhstan."  IDM at 24

(Appx084010).  While the two respondents (including BGH) placed data on the record

concerning ferrochrome imports into selected countries, *see* BGH Br. at 18-19 (citing BGH

PMS Rebuttal at 7-10 (Appx086084-086087) and Attachments 4 (Appx086102-086104) and

6 (Appx086192-086216); SWG PMS Rebuttal at 6-7 (Appx086225-086226) and Exhibit 10

(Appx086311-086315)), neither provided any evidence demonstrating that these import

prices were not similarly distorted by a high proportion of non-commercial, low-price

ferrochrome from Kazakhstan.  Under such circumstances, Commerce reasonably relied on

USGS data which record evidence established is "based on U.S. import prices largely from

countries other than Kazakhstan."  IDM at 24 (Appx084010).   Moreover, Commerce

explained that additional data provided by BGH showing that unit values for Kazakh exports

of ferrochrome to Germany are consistent with unit values of Kazakh exports to other

countries  "do not refute evidence that the German ferrochrome market is distorted."  PMS

Memo at 14 (Appx086335).  This is because Kazchrome's anti-competitive pricing would

logically "affect the price of Kazakh ferrochrome sold in Germany, Italy, or any other

country."  *Id.* (Appx086335).

### 3.  Commerce's PMS Adjustment for Electricity Costs was Supported by Substantial Evidence

BGH similarly argues that Commerce made various "calculation errors" in devising

its PMS adjustment for electricity, rendering its decision unsupported by substantial

evidence.  BGH Br. at 12-14.  Such arguments are also without merit.  First, BGH claims that

Commerce erred by applying the *ad valorem* rate from the CVD investigation without

explaining why this was not a double remedy.  BGH Br. at 12-13.  This is not true.

Commerce explained that antidumping and countervailing duties are designed to remedy two

distinct problems: antidumping duties are intended to remedy a foreign producer's unfair pricing and countervailing duties are meant to address a foreign government's subsidization of local industry.  Final IDM at 21 (Appx084007).  As Commerce noted, there is no basis to assume that foreign government subsidization necessarily results in a foreign producer charging lower U.S. prices and, unlike in other situations, the statute contains no provisions directing Commerce to identify and address a potential double-remedy in the PMS context. *Id.* at 21-22 (Appx084007-084008).

BGH's reference to *Vicentin I*, *see* BGH Br. at 12 (citing 404 F. Supp. 3d at 1340), is unavailing for two reasons.  As an initial matter, in a subsequent decision this Court ultimately found that Commerce's PMS adjustment, which was based on the same distortion found to be a countervailable subsidy in the companion CVD proceeding, was proper and did not result in an unlawful double remedy.  *See Vicentin S.A.I.C. v. United States*, 503 F. Supp. 3d 1255, 1265 (Ct. Int'l Trade 2021) ("*Vicentin II*").  Moreover, *Vicentin* involved an entirely different factual scenario that is inapplicable to the facts of this case.  In particular, in *Vicentin* Commerce constructed normal value based on the respondent's production costs, expenses, and profits and Commerce's cost-based PMS adjustment thus had a direct impact on the normal value calculation (*i.e.*, the PMS adjustment increased costs and thus increased normal value).  *See Vicentin I*, 404 F. Supp. at 1328.  By contrast, here Commerce based normal value on BGH's home market sales prices.  *See Forged Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 44513 (Jul. 23, 2020) (Appx083284-083287), and accompanying PDM at 17 (Appx082891).  The cost-based PMS adjustment in this case was therefore only used to determine the appropriate cost of production benchmark to use in the statutorily mandated sales below cost test and, in turn, to determine which home market sales were

- 32 -

considered outside the ordinary course of trade and properly excluded from the normal value calculation.  Adjusting BGH's costs upwards by reference to the CVD rate does not directly increase normal value, thereby precluding a double remedy.

Next, BGH claims that Commerce failed to adequately explain why its calculation of the cost-based PMS adjustment changed between its original and final PMS determination. BGH Br. at 13.  This too is inaccurate.  Commerce explained that in making its initial PMS adjustment it had erred by: (1) failing to adjust the CVD rates to make them contemporaneous with the relevant antidumping period of investigation and (2) incorrectly used CVD rates that were stated in terms of the subsidies' relationship to total sales (relevant in a CVD determination) rather than input costs (relevant in a cost-based PMS adjustment). Final IDM at 22 (Appx084008).   Commerce explained that its final adjustment calculation corrected for these errors.  *Id.* (Appx084008).  Contrary to BGH's claims, *see* BGH Br. at 13, the fact that BGH paid less than half the cost for electricity that it would have in a non-distorted market does not mean Commerce's calculations were "nonsensical" or otherwise in error.  Rather, they only demonstrate the true extent of distortion in the German electricity market and further justify Commerce's PMS finding.

Finally, BGH claims that Commerce erred by including programs in its PMS-adjustment calculation that either "have nothing to do with electricity" or were received by its affiliate, RPS, "which does not produce subject merchandise."  BGH Br. at 14.  Such arguments are without merit.  Commerce explained that in determining the appropriate PMS adjustment it examined all of BGH's "2018 electricity-related subsidies."  Final IDM at 22 (Appx084008).  Within such "electricity-related subsidies," Commerce reasonably included subsidies for other energy products such as heating oil and natural gas, which can be used as alternatives to electricity or, indeed, to generate electricity itself.  BGH's hyper-literal suggestion that these subsidy programs have "nothing to do with" each other is simply false.

With respect to subsidies received by RPS, Commerce explained in the CVD investigation that such subsidies are appropriately attributable to BGH because RPS provides BGH with key inputs which BGH then uses to produce subject merchandise. *See* FEB Germany CVD PDM at 17. Subsidies received by RPS are thus linked to BGH's cost of manufacture of the downstream FEB product and were reasonably included in the PMS adjustment.

### D. Commerce Lawfully Applied its Differential Pricing Methodology to Identify a Pattern of Prices for Comparable Merchandise that Differ Significantly

Commerce correctly applied its differential pricing methodology and determined that targeted dumping may be occurring, and thus correctly applied its average-to-transaction margin calculation methodology. As Commerce explained, 19 U.S.C. § 1677f-1(d)(1)(A) instructs Commerce to normally calculate dumping margins by comparing either: (a) the weighted average of NV to the weighted average EP/CEP (the A-to-A method) or (b) the NV of individual home or third country transactions to the EP/CEP of individual U.S. sales transactions (the T-to-T method). *See* Final IDM at 10 (Appx083996) (citing 19 U.S.C. § 1677f-1(d)(1)(A)). However, the statute also includes an "exception" to this general rule which allows Commerce to use the average-to-transaction (A-to-T) method where Commerce determines that "there exist a pattern of prices that differ significantly and Commerce explains why either the A-to-A method or the T-to-T method cannot account for such differences." *See id.* at 12 (Appx083998) (citing 19 U.S.C. § 1677f-1(d)(1)(B)). As nothing in the Act mandates how Commerce is to make such determinations, Commerce has used its administrative discretion to develop a court-affirmed test: the differential pricing analysis. *See* Final IDM at 9-10 (Appx083995-083996); *see also Timken,* 179 F. Supp. 3d at 1179 (noting that "Commerce's {differential pricing} methodology lawfully identifies a pattern of export prices that differ significantly"); *cf. JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (holding that the statute "does not require Commerce to determine the

reasons why there is a pattern of export prices for comparable merchandise that differs

significantly among purchasers, regions, or time periods").

     In the first step of the differential pricing analysis, Commerce employs the Cohen's *d*

and ratio tests to determine whether there exists a pattern of prices that differ significantly

among purchasers, regions, or time periods and, if so, the extent of these price differences.

Final IDM at 12-13 (Appx083998-083999).   Using the Cohen's *d* test, which measures the

significance of differences in two groups of data, Commerce "examine{s} whether the prices

of merchandise sold to a distinct purchaser, region or time period differ significantly with the

prices of comparable merchandise to all other purchasers, regions, or time periods,

respectively." *Id.* at 13-14 (Appx083999-084000).   In performing the test, Commerce

compares the Cohen's *d* coefficient, which quantifies the significance of the difference in

prices between the test and comparison group, with one of three standard thresholds (*i.e.*,

small, medium, and large) established by Dr. Cohen.  *Id.* at 12 (Appx083998).  In examining

BGH's U.S. prices in this instance, Commerce used the large threshold of 0.8 which provides

the "strongest indication that there is a significant difference between the mean of the test and

comparison groups." *Id.* (Appx083998).  Indeed, the Federal Circuit has affirmed

Commerce's reliance on the large 0.8 threshold as the basis to determine whether the

observed price differences are significant and BGH provided no evidence to indicate that the

unique characteristics of FEBs warrant use of a different or greater threshold in this case.  *See*

*id.* at 14 (Appx084000) (citing *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d

662, 673 (Fed. Cir. 2019)).

     After determining which of BGH's U.S. sales passed the Cohen's *d* test (and thus

exhibited significant price differences), Commerce then performed the ratio test to aggregate

the value of these sales and assess their frequency and relative importance—and thus

determine whether they evidenced a pattern—during the period of investigation.  *See* Final

IDM at 12-13 (Appx083998-083999).   Here, Commerce determined that 80.26 percent of

BGH's U.S. sales values were at prices that differ significantly, which is well above the 66

percent threshold at which Commerce will consider whether it is appropriate to apply the A-

to-T method to all of a respondent's U.S. sales.  *Id.* at 14 (Appx084000).  As Commerce

noted, BGH provided no evidence to indicate why this standard 66 percent threshold should

be increased for FEB products.  *Id*. (Appx084000).

In the second step of the differential pricing analysis, Commerce examined the

margins calculated using the A-to-A and A-to-T methods and found that they were different.

Final IDM at 13-14 (Appx083999-084000).  Commerce thus reasonably concluded that the

A-to-A (or T-to-T) methods could not account for the pattern of significant price differences

it identified and, in conformance with 19 U.S.C. § 1677f-1(d)(1)(B), used the A-to-T

methodology to calculate a margin for BGH.  *See id.* at 12 (Appx083998).

BGH contends that Commerce erred in applying its differential pricing analysis

because Commerce compared "price differences between different products {which} are

normal and do not give rise to the exception for targeted dumping under the statute."  BGH

Br. at 21.  BGH is mistaken.  As Commerce explained, in performing the Cohen's *d* test,

"{t}he comparison of prices between each pair of test and comparison groups is made for

'comparable merchandise' which is defined as 'the product control number {CONNUM} and

all characteristics of the U.S. sales, other than purchaser, region, and time period, that

Commerce uses in making comparisons between EP or CEP and NV for the individual

dumping margins.'"  Final IDM at 14 (Appx084000); *see also* Commerce Memorandum,

"Amended Final Determination Margin Calculation for BGH Edelstahl Siegen GmbH" (Dec.

23, 2020) at Attachment II (App087080) (printout from Commerce's SAS margin program

showing that [                                                                 ]).  BGH's claim

that Commerce examined "price differences between different products," BGH Br. at 4, is

thus wrong. Instead, Commerce examined only price differences for "comparable merchandise" (*i.e.* products with the same CONNUM). As noted, reliance on the CONNUM in defining individual products is consistent with Commerce practice and has been affirmed by the Courts. *See generally Am. Tubular Prods., LLC v. United States*, 847 F.3d 1354, 1357 (Fed. Cir. 2017) ("A CONNUM is a code used to identify distinct products within the class of subject merchandise under review."); *AG der Dillinger Hüttenwerke v. United States*, Consol. Ct. No. 17-00158, Slip Op. 2021-102 (Ct. Int'l Trade 2021) at *7 ("All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as 'identical' merchandise for purposes of the price comparison."). Notably, BGH does not challenge Commerce's CONNUM coding, structure, or the use of such CONNUMs in the margin program.

BGH's related claim that Commerce unlawfully "appl{ied} inter-product zeroing under the guise of applying the exception in section 1677f-1(d)(1)(B)," BGH Br. at 21, is also without merit. Indeed, the Federal Circuit has made clear that the decision to use the A-to-T methodology is wholly distinct from zeroing and where, as here, Commerce has "fully justified its decision to use the A-T methodology, consistent with 19 U.S.C. § 1677f-1(d)(1)(B), Commerce {is} not required to provide a separate justification for using zeroing on all or some of {a respondent's} sales." *See Apex*, 862 F.3d at 1337.[8]

As explained above, in this case Commerce correctly applied its differential pricing analysis and both: (a) identified a pattern of export prices that differed significantly among

---

[8] BGH notably (and correctly) does not reference the Federal Circuit's opinion in *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) in its opening brief. *Stupp* is inapplicable in situations where, as here, there is no evidence or argument suggesting that Commerce's application of the Cohen's *d* test violated the underlying assumptions of the test, or even precisely what those assumptions are in the first instance. *See Stupp*, 5 F.4th at 1360 (remanding to Commerce for further clarification where "the evidence and arguments before us call into question whether Commerce's application of the Cohen's d test to the data in this case violated the assumptions of normality, sufficient observation size, and roughly equal variances associated with that test").

purchasers, regions, or time periods for comparable merchandise and (b) explained why these differences could not be accounted for by the A-to-A methodology. *See* Final IDM at 9-14 (Appx083995-084000). Commerce thus appropriately used the A-to-T methodology authorized in such situations under 19 U.S.C. § 1677f-1(d)(1)(B) to calculate BGH's dumping margins. *See id*. (Appx083995-084000). Having justified its decision to use the A-to-T methodology, Commerce appropriately used zeroing, which the Federal Circuit has repeatedly affirmed as "an important part of the A-T methodology, with the policy aim of addressing targeted dumping. *See Apex*, 862 F. 3d at 1337 (citing *Union Steel*, 713 F.3d at 1109).

## V.      CONCLUSION

For the foregoing reasons, Consolidated Defendant-Intervenors respectfully request that this Court affirm Commerce's *Final Determination* with respect to Commerce's PMS findings, the reasonableness of Commerce's PMS adjustments, and Commerce's application of its differential pricing methodology. Were this Court to determine remand is warranted in light of *Hyundai Steel*, Commerce should not be prevented from considering alternative legal justifications—such as those expressly reserved by *Hyundai Steel*—for adjusting BGH's reporting to account for distortions in the German electricity and ferrochrome markets (whether or not these are labeled a "PMS")*.

\*          \*          \*

Consol. Ct. No.  21-00077

Respectfully submitted,

/s/ Myles S. Getlan

Myles S. Getlan
Jack A. Levy
Thomas M. Beline
James E. Ransdell
Nicole Brunda

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street NW, Suite 400
Washington, DC 20006
T: (202) 567-2313
F: (202) 567-2301
Dated:  December 17, 2021                Email: mgetlan@cassidylevy.com

*Counsel to Ellwood City Forge Company,*
*Ellwood National Steel Company, Ellwood*
*Quality Steels Company, and A. Finkl & Sons*

- 39 -

## <u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>

The undersigned hereby certifies that the foregoing brief contains 11,597 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:     <u>/s/ Myles S. Getlan</u>
       Myles S. Getlan