**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, *et al*., | ) ) ) |
| Plaintiffs, | ) ) ) |
| BGH EDELSTAHL SIEGEN GMBH, | ) ) ) |
| Consolidated Plaintiff, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES, | ) ) ) |
| Defendant. | ) ) ) |

Consol. Court No. 21-00077

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

SAVANNAH ROSE MAXWELL
U.S. Department of Commerce
Office of Chief Counsel for Trade Enforcement and
Compliance
1401 Constitution Avenue, NW.
Washington, DC 20230-0001
Telephone: (202) 482-3748
Facsimile:  (202) 482-4912
Email:      savannah.maxwell@trade.gov

IN K. CHO
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0463
Facsimile:  (202) 305-7644
Email:      In.K.Cho@usdoj.gov

December 17, 2021

*Attorneys for Defendant*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

   I.   Administrative Determination Under Review ...................................................... 2

   II.   Statement Of The Issues .................................................................................... 2

STATEMENT OF FACTS ............................................................................................ 2

ARGUMENT ................................................................................................................ 5

   I.   Standard Of Review ......................................................................................... 5

   II.   Commerce's Decision Not To Conduct An On-Site Verification Is Supported By Substantial Evidence And In Accordance With Law .......................................... 7

       A.   Ellwood Has Failed To Exhaust Its Administrative Remedies By Failing To Present Its Challenge Against Commerce's Verification Procedures During The Administrative Proceeding .......................................... 8

       B.   Commerce's Verification Procedures Were Consistent With The Statute And Necessary Due To The Exigencies Of The COVID-19 Pandemic .......................... 12

       C.   Commerce's Verification Findings Are Supported By Substantial Evidence ............. 17

       D.   Commerce's Reliance On BGH's Reconciled Cost Database Is Supported By Substantial Evidence And In Accordance With Law .................................... 20

   III.   Commerce's Application Of Its Differential Pricing Methodology Is Supported By Substantial Evidence And In Accordance With Law ........................................... 24

   IV.   Commerce's Determination Of Particular Market Situation For Ferrochrome And Electricity ...................................................................................................... 29

CONCLUSION ............................................................................................................. 29

## **TABLE OF AUTHORITIES**

**Cases**

*ABB, Inc. v. United States*,
920 F.3d 811 (Fed. Cir. 2019)............................................................ 8

*Am. Alloys v. United States*,
30 F.3d 1496 (Fed. Cir. 1994)........................................................... 15

*American Farm Lines v. Black Ball Freight Service*,
397 U.S. 532 (1970)............................................................................. 15

*Apex Frozen Foods Private Ltd. v. United States*,
862 F.3d 1322 (Fed. Cir. 2017) (*Apex I*)................................... 26, 27

*Apex Frozen Foods Private Ltd. v. United States*,
862 F.3d 1337 (Fed. Cir. 2017) (*Apex II*) ................................ 26, 27

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984)........................................................... 6

*Boomerang Tube LLC v. United States*,
856 F.3d 908 (Fed. Cir. 2017)............................................................. 8

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)....................................................................... 6, 13

*Consol. Bearings Co. v. United States*,
348 F.3d 997 (Fed. Cir. 2003)........................................................... 11

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)............................................................................. 5

*Consol. Fibers, Inc. v. United States*,
535 F. Supp. 2d 1345 (Ct. Int'l Trade 2008) .................................... 7

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)....................................................................... 6, 19

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007)..................................................... 8, 12

*Davis v. Wakelee*,
15 S. Ct. 555 (1895).......................................................................... 12

*Dillinger France S.A. v. United States*,
981 F.3d 1318 (Fed. Circ. 2020)................................................. 26, 28

*Dongtai Peak Honey Indus. v. United States*,
777 F.3d 1343 (Fed. Cir. 2015)........................................................... 7

*Dorbest Ltd. v. United States*,
604 F.3d 1363 (Fed. Cir. 2010)........................................................... 9

*Fujitsu General, Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996)............................................................. 7

*Fuwei Films (Shandong) Co. v. United States*,
791 F. Supp. 2d 1381  (Ct. Int'l Trade 2011) ................................. 11

*Goldlink Indus. Co. v. United States*,
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ................................. 20

*Goodluck India Ltd., v. United States,*
    11 F.4th 1335 (Fed. Cir. 2021) ................................................................ 15

*Hyundai Elec. & Energy Sys. Co. v. United States,*
    466 F. Supp. 3d 1303 (Ct. Int'l Trade 2020) ...................................... 24

*Hyundai Steel Co. v. United States,*
    No. 2021-1748, 2021 WL 5856804 (Fed. Cir. Dec. 10, 2021)................ 29

*Itochu Bldg. Prods. v. United States,*
    733 F.3d 1140 (Fed. Cir. 2013).............................................................. 11

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015).......................................................... 7, 25

*Luoyang Bearing Factory v. United States,*
    240 F. Supp. 2d 1268 (Ct. Int'l Trade 2002) ...................................... 11

*Micron Tech., Inc. v. United States,*
    117 F.3d 1386 (Fed. Cir. 1997).............................................................. 15

*Mid Continent Steel & Wire, Inc. v. United States,*
    940 F.3d 662 (Fed. Cir. 2019)................................................................ 25

*Mittal Steel Point Lisas Ltd. v. United States,*
    548 F.3d 1375 (Fed. Cir. 2008)........................................................... 9, 11

*Neenah Foundry Co. v. United States,*
    142 F. Supp. 2d 1008 (Ct. of Int'l Trade 2001) .................................. 14

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006)................................................................ 6

*PAM S.p.A. v. United States,*
    463 F.3d 1345 (Fed. Cir. 2006)................................................................ 7

*Philipp Bros. v. United States,*
    630 F. Supp. 1317 (Ct. Int'l Trade 1986) ............................................ 11

*Prime Time Commerce LLC v. United States,*
    495 F. Supp. 3d 1308 (Ct. Int'l Trade 2021) ........................................ 9

*Rubberflex Sdn. Bhd. V. United States,*
    59 F. Supp. 2d 1338 (Ct. Int'l Trade 1999) ........................................ 12

*Samsung Electronics Co. Ltd., v. United States,*
    72 F. Supp. 3d 1359 (Ct. Int'l Trade 2015) ........................................ 12

*Stanley Works (Langfang) Fastening Sys. Co. v. United States,*
    279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ..................................... 9, 11

*Timken Co. v. United States,*
    179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016) ................................. 26, 28

*Timken Co. v. United States,*
    354 F.3d 1334 (Fed. Cir. 2004)................................................................ 6

*Torrington Co. v. United States,*
    68 F.3d 1347 (Fed. Cir. 1995)................................................................ 15

*Trustees in Bankr. of N. Am. Rubber Thread Co., Inc. v. United States,*
    593 F.3d 1346 (Fed. Cir. 2015)............................................................. 12

*U.S. Steel Grp. v. United States,*
    96 F.3d 1352 (Fed. Cir. 1996)................................................................. 7

*Union Steel v. United States,*
    713 F.3d 1101 (Fed. Cir. 2013)............................................................. 27

iv

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) ................................................................................................ 5, 6

**Statutes**

19 U.S.C. § 1516a ........................................................................................................ 5
19 U.S.C. § 1677 ....................................................................................................... 24
19 U.S.C. § 1677b ................................................................................................ 20, 21
19 U.S.C. § 1677e ..................................................................................................... 19
19 U.S.C. § 1677f-1 ............................................................................................. 25, 28
19 U.S.C. § 1677m ................................................................................................... 13
28 U.S.C. § 2637 ........................................................................................................ 8

**Other Authorities**

Statement of Administrative Action, Uruguay Round Agreements Act,
  H.R. Doc. No. 103-316 (1994), 1994 U.S.C.C.A.N. 4040 ...................................... 14

**Regulations**

19 C.F.R. § 351.307 ............................................................................................ 14, 16
19 C.F.R. § 351.309 .............................................................................................. 9, 11
19 C.F.R. § 351.414 ................................................................................................. 25

**Administrative Determinations**

*Brake Rotors From the People's Republic of China*,
  64 Fed. Reg. 61,581 (Dep't of Commerce Nov. 12, 1999) ..................................... 15

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

_____
                                                  )
ELLWOOD CITY FORGE COMPANY,       )
*et al*.,                                            )
                                                  )
                 Plaintiffs,                    )
                                                  )
BGH EDELSTAHL SIEGEN GMBH,       )            Consol. Court No. 21-00077
                                                  )
                 Consolidated Plaintiff,    )
                                                  )
                 v.                               )
                                                  )
UNITED STATES,                          )
                                                  )
                 Defendant.                  )
_____)

**DEFENDANT'S RESPONSE TO**
**PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response to the Rule 56.2 motions

for judgment on the agency record filed by plaintiffs, Ellwood City Forge Company, Ellwood

National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons (collectively,

Ellwood), and consolidated plaintiff, BGH Edelstahl Siegen GmbH (BGH), challenging certain

aspects of the final determination of the United States Department of Commerce (Commerce) in

the antidumping duty investigation of forged steel fluid end blocks (FEBs) from Germany.

Commerce's final determination is supported by substantial evidence and is in accordance with

the law, except as to the two particular market situation (PMS) adjustments (ferrochrome and

electricity) challenged by BGH.  We respectfully request that the Court sustain Commerce's final

determination, except as to the two PMS adjustments discussed below.

**STATEMENT PURSUANT TO RULE 56.2**

**I.     Administrative Determination Under Review**

The administrative determination under review is the final determination in the antidumping duty investigation of FEBs from Germany.  *See Forged Steel Fluid End Blocks From Germany: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,018 (Dep't of Commerce Dec. 11, 2020) (Final Determination), Appx084045-084047, and accompanying Issues and Decision Memorandum (IDM), Appx083987-084044, as amended by *Forged Steel Fluid End Blocks From Germany and Italy: Amended Final Antidumping Duty Determination for the Federal Republic of Germany and Antidumping Duty Orders*, 86 Fed. Reg. 7,528 (Dep't of Commerce Jan. 29, 2021) (Amended Final Determination), Appx084048-084051.  The period of investigation is October 1, 2018, through September 30, 2019.  Amended Final Determination, Appx084051.

**II.     Statement Of The Issues**

1.     Whether Commerce's decision not to conduct an on-site verification is supported by substantial evidence and in accordance with law.

2.     Whether Commerce's application of its differential pricing methodology is supported by substantial evidence and in accordance with law.

3.     Whether Commerce's particular market situation (PMS) adjustments are supported by substantial evidence and in accordance with law.

**STATEMENT OF FACTS**

On December 19, 2019, Commerce received an antidumping duty petition concerning imports of FEBs from Germany filed by the FEB Fair Trade Coalition, Ellwood Group, and A. Finkl & Sons (collectively, the petitioners), and Commerce initiated its antidumping

2

investigation on January 8, 2020.  *See Forged Steel Fluid End Blocks From the Federal Republic of Germany, India, and Italy*, 85 Fed. Reg. 2,394 (Dep't of Commerce Jan. 15, 2020) (initiation notice), Appx080000-080005.  Commerce subsequently selected Schmiedewerke Gröditz GmbH (SWG) and BGH Edelstahl Siegen GmbH (BGH) as mandatory respondents in this investigation. *See Forged Steel Fluid End Blocks From Italy*, 85 Fed. Reg. 44,500 (Dep't of Commerce July 23, 2020) (Preliminary Determination), Appx083284-083287, and accompanying Preliminary Decision Memorandum (PDM), Appx082875-082897.

On February 6, 2020, Commerce issued its questionnaire to both mandatory respondents. PDM at 4, Appx082878.  From March through May 2020, Commerce received timely questionnaire responses from SWG and BGH.  *See id*. (summarizing timeline of questionnaire responses received).  From March through June 2020, Commerce issued multiple supplemental questionnaires to the mandatory respondents.  *See id*. (discussing questionnaires issued between April and June 2020).  Commerce subsequently received timely responses from respondents.  *Id.* On June 15, 2020, petitioners alleged that a PMS existed in Germany that prevented a proper comparison of the reported prices of the merchandise sold in the home market with merchandise sold in the United States and that the PMS rendered respondents' reported costs of production and financial ratios unreliable for purposes of calculating constructed value.  *See* Petitioner's Particular Market Situation Allegation at 1-6 (May 15, 2020) (Petitioners' PMS Allegation), Appx084420-084425.

On July 16, 2020, Commerce issued its preliminary determination in which it explained its methodology and calculated preliminary dumping margins for SWG and BGH of 15.47 percent and 0.00 percent, respectively.  PDM at 12, Appx082886.  Following the preliminary determination, Commerce issued a post-preliminary determination on petitioners' PMS

allegation, finding that record evidence supported petitioners' allegation that the cost of respondents' ferrochrome and electricity inputs were distorted and that record evidence did not support the price-based allegations.  *See* Post-Preliminary Decision Memorandum on Particular Market Situation Allegations (Dep't of Commerce Oct. 15, 2020), Appx086322-086339.  On November 24, 2020, pursuant to 19 C.F.R. § 351.310(c), Commerce held a public hearing, at the request of interested parties.  *See* IDM at 2, Appx083988; Public Hearing Transcript (Dec. 1, 2020), Appx083893-083986.

Because, as petitioners later acknowledged, the COVID-19 pandemic had made conducting on-site verification impossible, on October 20, 2020, Commerce issued questionnaire requesting additional information from BGH in lieu of performing on-site verification.  *See* IDM at 2, Appx083988; Commerce's Letter to BGH (Oct. 20, 2020) (Verification Questionnaire), Appx083328-083333.  On October 28, 2020, Commerce received responses to its verification questionnaire from BGH.  *See* BGH's Letter, Response to Questionnaire in Lieu of Performing On-Site Verification (Oct. 28, 2020), Appx083336-083356.  Commerce invited the parties' comments and rebuttal to the responses to Commerce's verification questionnaire.  Verification Questionnaire at 2, Appx083329.  On November 9, 2020, Commerce received case briefs from the parties.  *See* Petitioners' Case Brief (Nov. 9, 2020), Appx083814-083891; BGH's Case Brief (Nov. 9, 2020), Appx086397-086413.  On November 18, 2020, Commerce received rebuttal briefs from the parties.  *See* Petitioners' Rebuttal Brief (Nov. 18, 2020), Appx012004-012044; BGH's Rebuttal Brief (Nov. 18, 2020), Appx086420-086442.  Relevant here, petitioners did not object to Commerce's use of the questionnaire to conduct verification in lieu of on-site

4

verification.  *See* Petitioners' Case Brief, Appx083814-083891; Petitioners' Rebuttal Brief, Appx012004-012044.

In its final determination, Commerce made certain changes to the margin calculation for BGH to use its revised cost database submitted on August 3, 2020, including minor corrections based on BGH's responses to Commerce's questionnaire in lieu of on-sight verification.  IDM at 3, Appx083989.  Commerce also conducted its differential pricing analysis, and as a result of that analysis, Commerce applied the average-to-transaction comparison methodology to calculate BGH's final weighted average dumping margin.  *See* IDM at 3-14, Appx083989-084000.  Commerce also made adjustments to the calculations for the cost-based PMS adjustments for ferrochrome and electricity.  *See id*. at 15-36, Appx084001-084022.  Commerce calculated a final dumping margin for BGH of 4.79 percent.  *See* Amended Final Determination, 86 Fed. Reg. at 7530, Appx084050.  Following an affirmative determination of injury by the U.S. International Trade Commission, Commerce published an antidumping duty order on January 29, 2021.  *See id.*, Appx084048-084051.

## ARGUMENT

### I.   Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620

(1966).  Thus, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions.  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

The Court examines Commerce's statutory interpretations under the two-pronged test established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 842-43 (1984).  The Court first examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency must comply with Congress's clear intent.  *Id*. at 842-43.  If "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id*. at 843.  In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."  *Eurodif*, 555 U.S. at 316 (citation omitted).  The Court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."  *Chevron*, 467 U.S. at 843 n.11.  Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency."  *Eurodif*, 555 U.S. at 316 (citation and quotation marks omitted).

This Court affords Commerce an especially great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)).  In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'"  *Id*. (quoting *U.S. Steel Grp*., 96 F.3d at 1362).  Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute.  *Fujitsu General, Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

This Court reviews Commerce's conduct of its administrative proceedings for abuse of discretion.  *See Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1350 (Fed. Cir. 2015).  This Court "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} factfindings and its ultimate action."  *Consol. Fibers, Inc. v. United States*, 535 F. Supp. 2d 1345, 1354 (Ct. Int'l Trade 2008).  The Court of Appeals for the Federal Circuit has recognized that it is within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it.  *PAM S.p.A. v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006).

## II.   Commerce's Decision Not To Conduct An On-Site Verification Is Supported By Substantial Evidence And In Accordance With Law

The Court should sustain Commerce's decision not to conduct an on-site verification. Ellwood has not exhausted its administrative remedies because Ellwood failed to present, during

the administrative proceeding, its challenge against Commerce's decision not to conduct an on-site verification.  Even if the Court were to consider Ellwood's newly-raised challenge, Commerce's off-site verification procedures were consistent with the statute and necessary given the exigencies of the COVID-19 pandemic.  The verification procedures enabled Commerce to verify various information received from the parties safely and remotely through verification questionnaire.  And even though Ellwood challenges Commerce's factual findings that resulted from the verification procedures, the substantial evidence standard applies to those findings.  Under that deferential standard, a reasonable mind could accept the record evidence as adequate to support Commerce's findings.

     **A.**    **Ellwood Has Failed To Exhaust Its Administrative Remedies By Failing To Present Its Challenge Against Commerce's Verification Procedures During The Administrative Proceeding**

Ellwood has failed to exhaust its administrative remedies because it did not raise during the administrative proceeding its arguments that the procedures chosen by Commerce to conduct its verification were deficient.  Ellwood cannot show that any exception to the exhaustion requirement applies in this case.  Thus, the Court should decline to consider Ellwood's arguments that the procedures chosen by Commerce to conduct its verification were deficient.

Congress has mandated that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."  *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).  As such, courts require parties to exhaust administrative remedies before the agency by raising all issues in their initial case briefs before Commerce.  *See ABB, Inc. v. United States*, 920 F.3d 811, 818 (Fed. Cir. 2019); *Dorbest Ltd. v. United States*,

604 F.3d 1363, 1375 (Fed. Cir. 2010); *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d

1375, 1383 (Fed. Cir. 2008); *Prime Time Commerce LLC v. United States*, 495 F. Supp. 3d 1308,

1313-14 (Ct. Int'l Trade 2021).  Likewise, Commerce's regulations require each party to submit

a case brief that contains all arguments relevant to the final determination.  *See* 19 C.F.R.

§ 351.309(c)(2).  "Simple fairness to those who are engaged in the tasks of administration, and to

litigants, requires as a general rule that courts should not topple over administrative decisions

unless the administrative body not only has erred but has erred against objection made at the time

appropriate under its practice."  *Mittal Steel*, 548 F.3d at 1383-84; *see also Stanley Works*

*(Langfang) Fastening Sys. Co. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade

2017) (discussing purposes of exhaustion requirement).

 Here, Ellwood has failed to exhaust its administrative remedies.  *Compare* Ellwood Br. at

17-36, *with* Petitioners' Case Brief, Appx083814-083891, *and* Petitioners' Rebuttal Brief,

Appx012004-012044.  Rather than conducting an on-site verification, Commerce issued a

questionnaire in lieu of on-sight verification for BGH on October 20, 2020.  *See* Verification

Questionnaire, Appx083328-083333.  Commerce explained that its questions were "similar to

those that . . . Commerce would normally ask during an on-site verification" and that the

questionnaire fulfilled the function of an on-site verification.  *See id*., Appx083328.  On

November 9, 2020, Ellwood filed its case brief but did not argue that Commerce's use of the

verification questionnaire was unlawful.  *See* Petitioners' Case Brief, Appx083814-083891.  On

November 18, 2020, Commerce received rebuttal briefs from Ellwood, but that rebuttal brief

likewise did not contain a challenge against Commerce's verification procedures.  *See*

Petitioners' Rebuttal Brief, Appx012004-012044.[1]

Even though Ellwood now contends that Commerce conducted no verification at all,

Ellwood referred to Commerce's efforts as "verification" during the administrative proceeding.

During the public hearing, Ellwood argued:

> *The virtual verification* or the *verification questionnaire* that was
> issued to BGH revealed further deficiencies that call into question the
> integrity of BGH's submitted data.  You know, verification is a spot
> check and that's what Commerce sought to do in its verification
> questionnaire.

Public Hearing Transcript, Appx083908 (emphasis added); *see also* Petitioners' Case Brief,

Appx083839 (stating that Commerce should not rely on BGH's cost database given "error that

would not have come to light absent verification").[2]

An interested party can establish that it should be excused from the exhaustion

requirement by showing that one of the exceptions to the requirement should apply.  Such

exceptions, however, are limited.  An exception may apply, for example, when a party shows

---

[1] Rather than challenging the verification procedures chosen by Commerce, Ellwood approved them.  Ellwood wrote in a letter to Commerce:

> Petitioner appreciates that Commerce has indicated its intention to
> issue a questionnaire to BGH in lieu of performing an on-site
> verification.

Petitioner's Request That Commerce Include Specific Instructions in BGH Supplemental Questionnaire (Oct. 20, 2020) (P.R. 310).

[2] Ellwood had the ability to raise its concerns regarding the verification process as early as August of 2020.  In a letter dated August 27, 2020, a member of Congress who had visited Ellwood's facility informed Commerce that the member had "serious concerns that the foreign producers will go unverified."  *See* Mike Kelly's Letter to Commerce (Aug. 27, 2020) (P.R. 305).

that raising its argument would have been "futile." *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013). Similarly, the Court may excuse a party's failure to exhaust its administrative remedies if the issue presented for the Court is a "pure question of law" that can be addressed without further factual development or the agency's exercise of discretion. *See id.*[3]

Here, no exception to the exhaustion requirement applies. The record does not show that it would have been futile for Ellwood to challenge Commerce's verification procedures. The issue before the Court is not a pure legal question, given that the validity of Commerce's decision depends partly on the agency's justifications, and evaluating those justification requires consideration of unique facts of this case. *See Consol Bearings*, 348 F.3d at 1003; *Mittal Steel*, 548 F.3d at 1384; *Stanley Works*, 279 F. Supp. 3d at 1190. Further, the pure-legal-question exception does not apply when the relevant statute does not require a specific methodology and Commerce needs to the fill statutory gap. *See Fuwei Films (Shandong) Co. v. United States*, 791 F. Supp. 2d 1381, 1384-85 (Ct. Int'l Trade 2011).

Separately, the Court can reject Ellwood's challenge for violating 19 C.F.R. § 351.309. That regulation requires parties to submit case briefs containing all arguments relevant to Commerce's final determination. *See* 19 C.F.R. § 351.309(c)(2). Courts have recognized a

---

[3] There are other exceptions to the exhaustion requirement. *See Philipp Bros. v. United States*, 630 F. Supp. 1317, 1324 (Ct. Int'l Trade 1986) ("ITA did not take account of this lag in offset tax collection, however, until its final decision . . . . Therefore . . . there was no opportunity to raise the issue at the administrative level."); *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1004 (Fed. Cir. 2003) (unavailability of administrative procedure); *Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268, 1297 n.26 (Ct. Int'l Trade 2002) (intervening judicial decision). Because the record evidence does not indicate that these exceptions are applicable to this case, we discuss only the two most pertinent exceptions, futility and a purely legal question.

violation of 19 C.F.R. § 351.309 as a separate basis for declining to consider a party's arguments. *See Corus Staal*, 502 F.3d at 1379 (explaining that 19 C.F.R. § 351.309 requirement "is therefore not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review"); *Samsung Electronics Co. Ltd., v. United States*, 72 F. Supp. 3d 1359, 1371 (Ct. Int'l Trade 2015). Because Ellwood's administrative case brief does not contain the arguments newly presented before this Court, the Court need not consider them. *See Rubberflex Sdn. Bhd. V. United States*, 59 F. Supp. 2d 1338, 1345 (Ct. Int'l Trade 1999) (considering only arguments presented in administrative case brief).

Alternatively, the Court can reject the new arguments on the basis that Ellwood is estopped from challenging Commerce's verification procedures. When "a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *Davis v. Wakelee*, 15 S. Ct. 555, 558 (1895); *see also Trustees in Bankr. of N. Am. Rubber Thread Co., Inc. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2015) ("{J}udicial estoppel applies just as much when one of the tribunals is an administrative agency as it does when both tribunals are courts."). Because Ellwood maintained a contrary position and expressed approval of Commerce's verification procedures and relied upon those procedures, *see* Petitioner Case Brief, at 3, 15, Appx083823, Appx083835, the Court can find that Ellwood is estopped from challenging Commerce's verification procedures.

### B.    Commerce's Verification Procedures Were Consistent With The Statute And Necessary Due To The Exigencies Of The COVID-19 Pandemic

The Court should sustain Commerce's use of its verification procedures. Commerce's decision to rely on a verification questionnaire rather than to conduct an on-site verification is

consistent with the applicable statute, which does not provide how the agency must conduct a

verification.  The Statement of Administrative Action (SAA) accompanying the Uruguay Round

Agreements Act, Commerce's own regulations, and case law provide certain procedures by

which Commerce ordinarily conducts a verification, but nothing in the statute, nor Commerce's

regulations, required Commerce to conduct an on-site verification during the COVID-19

pandemic.

     The text of the applicable statute requires Commerce to verify the information used to

make a final determination in an investigation, without providing *how* the agency must conduct a

verification:

> (i) **Verification**
>
> The administering authority shall verify all information relied upon in
> making--
>
> > (1) a final determination in an investigation,
> >
> > (2) a revocation under section 1675(d) of this title, and
> >
> > (3) a final determination in a review under section 1675(a) of this
> > title, if--
> >
> > > (A) verification is timely requested by an interested party
> > > as defined in section 1677(9)(C), (D), (E), (F), or (G) of
> > > this title, and
> > >
> > > (B) no verification was made under this subparagraph
> > > during the 2 immediately preceding reviews and
> > > determinations under section 1675(a) of this title of the
> > > same order, finding, or notice, except that this clause shall
> > > not apply if good cause for verification is shown.

19 U.S.C. § 1677m(i).  Because the statute is silent on whether a verification must be on-site,

leaving a gap for Commerce to fill, *Chevron* deference applies to Commerce's choice of

procedures used to conduct its verification.  *See Chevron*, 467 U.S. at 842.

Ellwood relies on the SAA accompanying the Uruguay Round Agreements Act, which provides that Commerce's "regulations will provide that {the agency} will verify information *in a foreign country*" only after obtaining respondents' consent and notifying the foreign government. Ellwood Br. at 18 (citing H.R. Doc. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4197) (emphasis added). But the SAA also provides that Commerce will conduct its verification "where practicable":

> (6) Verification of Information
>
> . . .
>
> As under existing practice, *where practicable*, verification will be conducted after receipt of all questionnaire responses, and Commerce should provide advance notice as to the general nature of the information which will be requested.

Statement of Administrative Action, Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994), 1994 U.S.C.C.A.N. 4040, 4197 (SAA) (emphasis added). Thus, the SAA does not require an on-site verification in all situations, and Ellwood's reliance on the SAA falls short of establishing that Commerce had an obligation to conduct an on-site verification even during the COVID-19 pandemic.

Ellwood also relies on Commerce's regulations, which provide that the agency will notify a foreign government "that employees of the Department will *visit*" certain persons as part of the verification process. Ellwood Br. at 18 (citing 19 C.F.R. § 351.307(d)) (emphasis added). But the regulations also provide that Commerce "*may* verify relevant factual information" in an investigation. *Id*. § 351.307(a). And given the COVID-19 pandemic, even if Commerce had departed from its own regulations, which it did not, the agency was justified in doing so. *See Neenah Foundry Co. v. United States*, 142 F. Supp. 2d 1008, 1018 (Ct. of Int'l Trade 2001) ("{I}t is always within the discretion of a[n] . . . administrative agency to relax or modify its

procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it.") (quoting *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 539 (1970)).

Courts have recognized that Commerce has wide latitude in deciding how to conduct its verification.  *See Goodluck India Ltd., v. United States*, 11 F.4th 1335, 1342-44 (Fed. Cir. 2021); *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997).  Alternatives to an on-site verification by Commerce have been upheld by this Court.  For example, in *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995), Commerce did not conduct an on-site verification in part because of the outbreak of the Persian Gulf War and the attendant risk involved to international travel.  Likewise, Commerce's decision not to conduct an on-site verification is consistent with the agency's past practice.  *See, e.g.*, *Brake Rotors From the People's Republic of China*, 64 Fed. Reg. 61,581, 61,587 (Dep't of Commerce Nov. 12, 1999) (conducting off-site verification at hotel due to security concerns at production facilities and further explaining that Commerce has discretion to elect to verify off-site).  Indeed, Ellwood suggests an alternate, entirely off-site verification procedure of its own devising that would be proper under the circumstances.  *See* Ellwood Br. at 23 (suggesting that videoconferencing would have been viable substitute to on-site verification).

Ellwood contends that "Commerce did not even attempt to justify its procedures in this investigation" or how Commerce's actions "constituted a lawful substitute for an on-site verification."  *Id*. at 21.  Commerce had no occasion to address an argument that was not presented during the administrative proceeding, as discussed above.  In any event, Commerce explained its reasons for conducting an off-site verification.  Commerce explained:

> We are issuing this questionnaire in lieu of performing an on-site verification.  The purpose of this questionnaire is to probe information

that you have already submitted — not to obtain new information. Accordingly, the questions are similar to those that the Department of Commerce (Commerce) would normally ask during an on-site verification.

Verification Questionnaire, Appx083328.

Ellwood also contends that Commerce's decision not to issue a verification report is contrary to law. *See* Ellwood Br. at 18-19, 21. Although the SAA and the regulations require Commerce to report the "methods, procedures, and results of verification," they do not require Commerce to report such information within the four corners of a single document. *See* SAA, 1994 U.S.C.C.A.N. at 4197; 19 C.F.R. § 351.307(c). The verification questionnaire and responses, the issues and decision memorandum, and the final determination all explain the methods, procedures, and results of the off-site verification Commerce conducted. *See* Verification Questionnaire at 1-6, Appx083328-083333; IDM at 2, 41-44, Appx083988, Appx084027-084030; Final Determination, 85 Fed. Reg. at 80018, Appx084045. And Ellwood had the opportunity to address the responses gathered through the verification questionnaire. *See* Verification Questionnaire at 2, Appx083329 ("Normally, after an on-site verification, parties do not have an opportunity to submit factual information rebutting information collected by Commerce at verification. Accordingly, Commerce will not accept factual information from other interested parties to rebut your response to this request, but *interested parties may address the information submitted in response to this request, in case and rebuttal briefs*.") (emphasis added).

Even if Commerce were required to issue a separate "report," the agency could relax or modify regulatory requirements if there is no substantial prejudice to any party. *See PAM S.p.A.*, 463 F.3d at 1348. In the midst of a global pandemic, Commerce could exercise its discretion and modify certain regulatory requirements to conduct its verification safely and timely. Because the

16

verification methods, procedures, and results in this investigation were placed on the record and Ellwood had the opportunity to address Commerce's verification methods, there cannot be any substantial prejudice to any party.

Therefore, the Court should uphold Commerce's verification methodology.

### C.     Commerce's Verification Findings Are Supported By Substantial Evidence

The Court should reject Ellwood's argument that Commerce's findings that resulted from the verification are not supported by substantial evidence.  During the administrative proceeding, BGH identified in its response to Commerce's verification questionnaire certain errors in BGH's sales databases previously submitted.  *See* IDM at 43-44, Appx084029-084030.  Ellwood argues that Commerce erred by failing to "follow up with additional questions to BGH or to examine additional BGH sales to determine the extent of the reporting issues."  Ellwood Br. at 27. Ellwood also argues that Commerce erred by finding that BGH's corrections were minor.  *Id*. at 27-29.  Commerce's decision not to expand the scope of the verification and the agency's finding that BGH's corrections were minor are supported by substantial evidence.

First, BGH plausibly explained why it made the errors.  BGH explained that the corrections to BGH's one home market sale involved one isolated transaction.  *See* BGH Rebuttal Brief at 12, Appx086433.  The transaction involved an invoice issued using BGH's old processing system.  *Id*.  In addition, BGH explained that, during the administrative proceeding, Europe had strict COVID-19 restrictions in place, which interfered with BGH's ability to prepare and file its submissions.  *See id*. at 16-17, Appx086437-086438.  Further, BGH had limited time to prepare and file voluminous submissions.  *See id*. at 14-15, Appx086435-086436.  Thus, Commerce determined that these were minor clerical errors "which Commerce would normally accept at verification."  IDM at 43, Appx084029.

Second, BGH's errors were limited in scope.  As Commerce explained, the home market sale at issue was an isolated transaction that did not affect any other sales in BGH's home market database.  *See* IDM at 43-44, Appx084029-084030.  BGH's correction to one U.S. sale was a change to a single characteristic of a product.  *Id*.  These corrections identified by BGH did not implicate the reporting of any other sales information.  *Id*. at 44, Appx084030.

Third, the record does not support Ellwood's contention that BGH's conduct during the administrative proceeding raised concerns such that Commerce should not have relied on BGH's submissions.  *See* Ellwood Br. at 28.  BGH made errors, but the mere fact that those errors were made does not support Ellwood's allegations.  As Commerce explained, BGH timely responded to all of Commerce's requests for information and provided supporting documentation that was fully explained in BGH's narrative responses.  *See* IDM at 43, Appx084029.  And as Commerce noted, BGH had reported all of its home market and U.S. sales of FEBs, regardless of whether BGH considered the product sold to be subject to the scope of the investigation.  *See id*. at 44, Appx084030.  These facts, taken together, indicate that BGH's errors were minor and that application of adverse facts available was not appropriate.  When responding to requests for information, respondent's must comply with the "best of its ability" standard, and "{c}ompliance with the 'best of its ability' standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (explaining "While the {'best of ability'} standard does not require perfection, and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.").  Commerce determined that BGH's corrections amounted to minor "clerical errors which Commerce would normally accept a verification."  IDM at 43, Appx084029. And

Ellwood's disagreement with Commerce's view of the record does not mean that no reasonable mind could accept the evidence as sufficient.  *See Consolo*, 383 U.S. at 620 ("{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence").

Moreover, Commerce reasonably found these errors to be minor clerical errors which Commerce would normally accept at verification rather than as a reason for applying either partial or total AFA as Ellwood seems to suggest.[4]  IDM at 42-44, Appx084028-084030.  The relevant statutory provision, 19 U.S.C. § 1677e(a) provides that, subject to section 1677m(d), Commerce shall apply "facts otherwise available" if: (1) necessary information is not the record; or (2) an interested party or any other person (A) withholds information that has been requested, (B) fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 1677m, (C) significantly impedes a proceeding, or (D) provides information that cannot be verified as provided by section 1677m(i) of the Act.  As Commerce explained, BGH timely responded to all of Commerce's requests for information and provided supporting documentation for its narrative responses, so Commerce did not find that BGH withheld requested information, failed to provide information in a timely manner, or significantly impeded the investigation.  *See* IDM at 38-44, Appx084024-084030.  These facts support Commerce's finding that BGH satisfied

---

[4]  Although Ellwood does not directly argue that Commerce should have applied AFA to BGH, in its argument on page 31, it states that absent "reliably and fully supported cost data," commerce cannot rely on the reported data, and further "Commerce has applied total adverse facts available when a proper cost reconciliation is not provided."  Ellwood Br. at 31 (internal citations omitted).

the best-of-its ability standard, such that a partial or total application of adverse facts available was not warranted. *Id*. at 44, Appx084030.

### D.  Commerce's Reliance On BGH's Reconciled Cost Database Is Supported By Substantial Evidence And In Accordance With Law

Ellwood argues that Commerce should not have relied on BGH's cost database for two reasons.  First, Ellwood asserts that BGH's cost database did not reconcile with BGH's financial statements.  Ellwood Br. at 30-31.  Second, Ellwood asserts that Commerce should not have relied on the database because of minor clarifications BGH made to the database at verification. *Id*. 27-29.  Commerce's reliance on BGH's cost database is supported by substantial evidence and in accordance with law.  *See* IDM at 36-44, Appx084022-084030.

At its core, Ellwood's argument that Commerce should not have relied on BGH's cost database amounts to a mere disagreement with Commerce's evaluation of the record evidence. Such disagreement does not suffice to set aside the agency's determination.  *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).  BGH had provided Commerce with a full cost reconciliation and supported this reconciliation with record evidence. *See* IDM at 38, Appx084024.  This cost reconciliation tied to BGH's trial balance and thus to its profit and loss statement prepared in accordance with generally accepted accounting principles in Germany.  *See id*.; 19 U.S.C. § 1677b(f)(1)(A) ("Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.").

Commerce examined the record evidence and determined that BGH's reported costs 'reasonably reflect' the costs associated with the production and sale of the merchandise as

required by the statute.  *See* 19 U.S.C. § 1677b(f)(1)(A).  In its normal course of business,

BGH's cost accounting system tracks and allocates actual costs to specific cost centers but does

not further allocate these actual costs to specific products.  *See* BGH Responses to Section D

Questionnaire at 16 (Apr. 27, 2020), Appx081041.  BGH prepares its finished goods inventory

valuation based upon standard material and fabrication costs prepared on an annual basis at

higher product group levels.  *See id*. at 21, Appx081046.  Contrary to Ellwood's assertions, these

standard costs are used to value monthly finished goods inventories falling into four very broad

product types (i.e., ingots/billets, semi-finished products, open-die forgings, unprocessed bar and

processed bar).  *See* BGH Responses to Section D Supplemental Questionnaire at 2-3 (June 16,

2020), Appx084064-084065.  BGH also maintains basic standard costs for each product code but

does not use them for inventory valuation purposes.  *See* IDM at 38, Appx084024 (citing BGH

Responses to Section D Supplemental Questionnaire at Exhibit SD-45 (Aug. 3, 2020),

Appx083313-083315).  Therefore, to capture the full cost, on the basis of the product

characteristics specified by Commerce in its antidumping questionnaire, BGH reasonably used

its basic standard costs and production information as a starting point to calculate product-

specific costs for Commerce.  BGH used standard pricing calculations for each CONUUM[5]

listing the size and type of the raw material ingot, the quantity of the scrap and shavings, the

yield loss and the cost of each fabrication step.  *See* BGH Responses to Section D Supplemental

Questionnaire at 3 (Aug. 3, 2020), Appx083309.  Commerce found that the method used by

BGH provides product-specific costs based on a combination of actual material costs and

---

[5]  "A CONNUM refers to a control number assigned to materially-identical products to
distinguish them from non-identical, i.e., similar, products." *Eregli Demir ve Celik Fabrikalari
T.A.S v. United States*, 308 F. Supp. 3d 1297, 1321 n.34 (Ct. Int'l Trade 2018) (citation omitted).

adjusted standard conversion costs (by steel making and finishing) for each product characteristic identified by Commerce.  IDM at 39, Appx084025.

Commerce determined that BGH reconciled the cost database it prepared for this investigation to the actual costs recorded in BGH's GAAP financial records.  IDM at 39-40, Appx084024-084025.  BGH complied with Commerce's requests for information on cost reconciliation on three separate occasions.  *See* BGH Responses to Section D Supplemental Questionnaire (May 4, 2020), Appx081187-081193; BGH Responses to Section D Supplemental Questionnaire (Aug. 3, 2020), Appx083307-083311.  BGH explained that the actual period of investigation cost of manufacturing in the reconciliation was allocated between merchandise under consideration (MUC) and non-MUC in the same proportion as the standard costs calculated for MUC and non-MUC.  *See* BGH Responses to Section D Supplemental Questionnaire at 4 (June 19, 2020), Appx081375.  The standard cost for this production was determined using the standard cost rates used in the normal course of business.  *See id*.  As Commerce explained, based on the presentation of the reconciliation it appears that the costs reported to Commerce were overstated, however, it was clear from the record that this was not the case, and that the reported costs reconcile to the financial statements once the costs shifted to MUC under BGH's reporting methodology are subtracted from the non-MUC.  *See* IDM at 39, Appx084025 (citing BGH Responses to Section D Supplemental Questionnaire at Exhibit SD-14, SD-45 (Aug. 3, 2020), Appx081587-081591, Appx083313-083315.  BGH explained that these standard costs only track very broad product types as mentioned above, so to capture the actual costs on the basis of the product characteristics defined by Commerce, BGH used a standard cost calculation for each CONNUM accounting for the specific attributes, such as raw material, scrap, yield loss, and fabrication steps.  *See* IDM at 39 Appx084025 (citing BGH

Responses to Section D Supplemental Questionnaire at 3 (Aug. 3, 2020), Appx083309).

Moreover, as Commerce explained, BGH provided CONNUM-specific worksheets, in addition

to other materials, that showed the calculation of its reported costs for the CONNUMs having the

largest volume of sales in the United States and the home market.  *See* IDM at 40, Appx084026;

BGH Responses to Section D Supplemental Questionnaire, at SD-28 (Aug. 3, 2020); BGH

Verification Response at Exhibits VE-8 to VE-11 (Oct. 29, 2021), Appx083755-083803.  Based

on this information, Commerce determined that the reconciliation submitted by BGH reconciled

the reported costs to the costs in its financial reporting system and therefore are usable.  IDM at

40, Appx084026.  As Commerce explained, "the record shows that BGH appropriately departed

from its normal records, only in the sense that the broad average GAAP-compliant inventory

values do not reflect the physical characteristics of the individual products."  *Id*.  Commerce

further acknowledged that "{w}hile the starting point should be the normal books and records of

the company, when those costs are distortive to the purposes of the antidumping analysis (*i.e.*,

not appropriate for use as a difference-in-merchandise adjustment or measure of whether sales

prices are above or below cost), Commerce directs the respondent to rely on the production and

cost records available to provide more accurate product-specific costs."  *Id*.; *see also* 19 U.S.C.

§ 1677b(f)(1)(A).  Therefore, Commerce reasonably determined that BGH showed from its

reconciliation, and the supporting schedules, that the product-specific costs reconciled to the

costs pursuant to the financial system, and thus it was reasonable to rely on them because they

reflected the costs associated with the production and sale of subject merchandise.  IDM at 40,

Appx084026-084027.

Ellwood relies on this Court's recent decision in *Hyundai Elec. & Energy Sys. Co. v.*

*United States*, for the premise that "absent reliable and fully supported cost data, Commerce

'cannot rely on the reported per-unit {cost of production},' or 'perform the dumping calculations.'"  Ellwood Br. at 31 (citing 466 F. Supp. 3d 1303, 1310 at n. 7 (Ct. Int'l Trade 2020)).  That case is distinguishable.  In that case, after determining that Hyundai's normal books and records were *not reliable* for purposes of reporting Hyundai's cost of production, Commerce sought information underlying Hyundai's normal books and records.  *Id*. at 1309-1310.  Commerce sent multiple supplemental questionnaire to Hyundai explaining deficiencies in Hyundai's reporting.  *Id*.  Ultimately, Hyundai did not provide Commerce the cost information that Commerce required, therefore Commerce applied facts available with an adverse inference (AFA) to mandatory respondent Hyundai "because Hyundai failed to adequately respond to Commerce's requests for cost information."  *Id*. at 1311.  In contrast, BGH fully complied with Commerce's multiple requests for information, and provided hundreds of pages of supporting documentation regarding its cost database.  Therefore, Ellwood's reliance on *Hyundai* is misplaced.

Therefore, the Court should uphold Commerce's reliance on BGH's reconciled cost database as supported by substantial evidence and in accordance with law.

## III.   Commerce's Application Of Its Differential Pricing Methodology Is Supported By Substantial Evidence And In Accordance With Law

Commerce applied its differential pricing methodology to decide whether to rely on the average-to-average (A-to-A) method to calculate BGH's dumping margin.  Commerce correctly applied its differential pricing methodology to decide not to use the A-to-A method but instead the average-to-transaction (A-to-T) method.

A dumping margin is the "amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."  19 U.S.C. §§ 1677(35)(A), 1673e(a)(1).  Commerce has three methods to compare normal value with export price: the A-to-A method,

the transaction-to-transaction (T-to-T) method, and the A-to-T method.  *See* 19 U.S.C. § 1677f-1(d)(1); 19 C.F.R. § 351.414(b).  Generally, Commerce uses the A-to-A method, 19 C.F.R. §§ 351.414(a)-(e), but Commerce may use the A-to-T method in an investigation, as the agency did here, when two conditions are satisfied:

(i)     there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

(ii)    the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii) {(*i.e.*, A-to-A method or T-to-T method)}.

19 U.S.C. § 1677f-1(d)(1)(B).  This language does not provide how Commerce should assess the existence of a pattern of prices that differ significantly or how the agency should explain why the A-to-A method or the T-to-T cannot account for such differences.  *See JBF RAK*, 790 F.3d at 1362.  To fill that gap, Commerce uses its differential pricing analysis.  *See id*.; IDM at 9-13, Appx083995-083999 (providing overview of differential pricing analysis).

The initial step of Commerce's differential pricing analysis addresses the first statutory requirement — the existence of a pattern of prices that differ significantly.  IDM at 12, Appx083998.  To evaluate whether such a pattern exists, Commerce uses two tests: the "Cohen's *d* test" and the "ratio test."  *Id*.  The Cohen's *d* test evaluates whether the "prices to a given purchaser, region or time period differ significantly from the prices of all other sales."  *Id*.  Passing this test means that the calculated Cohen's *d* coefficient is 0.8 or greater.  *See Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 673 (Fed. Cir. 2019) (discussing Cohen's *d* test).  The ratio test evaluates whether the extent of the price differences identified as part of the Cohen's *d* test constitute a pattern of prices that differ significantly.  IDM at 12, Appx083998.  Passing the ratio test means that the value of sales that pass the Cohen's *d* test "account for 66 percent or more of the value of total sales."  *See* PDM at 14, Appx082888; IDM

25

at 14, Appx084000; *Timken Co. v. United States*, 179 F. Supp. 3d 1168, 1173 (Ct. Int'l Trade 2016) (discussing ratio test).

The second step of Commerce's differential pricing analysis addresses the second statutory requirement — the explanation of why the price differences identified under the first step cannot be taken into account using either the A-to-A method or the T-to-T method.  19 U.S.C. § 1677f-1(d)(1)(B)(ii).  As part of the second step, Commerce uses the "meaningful difference test" to assess whether an alternative comparison method, based on the results of the Cohen's *d* and ratio tests, "yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only."  PDM at 14, Appx082888.  Commerce finds a meaningful difference in this context when: (1) "there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the *de minimis* threshold;" or (2) "the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the *de minimis* threshold."  *Id*.  Courts have upheld various aspects of Commerce's differential pricing analysis. *See e.g.*, *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1324-27 (Fed. Circ. 2020); *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1322 (Fed. Cir. 2017) (*Apex I*); *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337 (Fed. Cir. 2017) (*Apex II*).  Our analysis below focuses on only a few pertinent cases.

Here, Commerce's differential pricing analysis is supported by substantial evidence and in accordance with law.[6]  Commerce found that 80.26 percent of the value of BGH's U.S. sales

---

[6]  BGH does not challenge Commerce's Cohen *d* test, so this case does not implicate *Stupp Corp. v. United States*, 5 F.4th 1341, 1357 (Fed. Cir. 2021).

passed the Cohen's *d* test, and this percentage exceeded the 66 percent threshold under the ratio test, thus supporting the use of the A-to-T method.  IDM at 13, Appx083999.  As for the meaningful difference test, Commerce found that the A-to-A method could not account for such differences.  *See id*. 13-14, Appx083999-084000.

BGH contends that Commerce unlawfully engaged in "zeroing," a practice of disregarding the negative margins on non-dumped sales.  BGH Br. at 19-22.  But the Federal Circuit has upheld Commerce's use of zeroing when the agency applies the A-to-T method, as Commerce correctly noted.  *See* IDM at 13-14, Appx083989-083990; *Union Steel v. United States*, 713 F.3d 1101, 1109 (Fed. Cir. 2013).  The Federal Circuit has explained that zeroing is permissible when Commerce uses the A-to-T method, for which zeroing reveals masked dumping:

> Commerce's decision to use or not use the zeroing methodology reasonably reflects unique goals in differing comparison methodologies.  In average-to-average comparisons, as used in investigations, Commerce examines average export prices; zeroing is not necessary because high prices offset low prices within each averaging group.  When examining individual export transactions, using the average-to-transaction comparison methodology, prices are not averaged and zeroing reveals masked dumping.  This ensures the amount of antidumping duties assessed better reflect the results of each average-to-transaction comparison.  Commerce's differing interpretation is reasonable because the comparison methodologies compute dumping margins in different ways and are used for different reasons.

*Union Steel*, 713 F.3d at 1109; *see also Apex I*, 862 F.3d at 1331; *Apex II*, 862 F.3d at 1348.

Thus, Commerce permissibly used zeroing because the agency relied on the A-to-T method.  *See* IDM at 3-4, Appx083989-083990.

BGH next argues that Commerce unlawfully used "inter-product zeroing."  BGH Br. at

21.  According to BGH:

> By its explicit terms, the exception in section 1677f-1(d)(1)(B) applies
> only to a pattern of export prices that differ significantly among
> purchasers, regions, or periods of time for "*comparable merchandise*."
> Accordingly, the exception in section 1677f-1(d)(1)(B) is concerned
> with significant price differences for the *same product* among
> purchasers, regions or time periods.  Price differences between
> *different products* are normal and do not give rise to the exception for
> targeted dumping under the statute.
>
> Therefore, the fact that an exporter may sell certain products below
> normal value and other products above normal value does not trigger
> the exception in section 1677f-1(d)(1)(B) and does not permit
> Commerce to deviate from its standard A-A method without zeroing.
> It is therefore unlawful for Commerce to apply inter-product zeroing
> under the guise of applying the exception in section 1677f-1(d)(1)(B).

*Id*.  We construe BGH to be arguing that 19 U.S.C. § 1677f-1(d)(1)(B), which allows Commerce

to use the A-to-T method subject to the two conditions discussed above, requires Commerce to

examine price differences for the "same product."  But the statute directs Commerce to consider

whether "there is a pattern of export prices (or constructed export prices) for *comparable*

*merchandise* that differ significantly among purchasers, regions, or periods of time." 19 U.S.C.

§ 1677f-1(d)(1)(B) (emphasis added).  The statute does not limit Commerce's consideration of

price differences for the "same product," as BGH alleges.  And BGH's products are not so

different from each other to make them not "comparable merchandise."  *See Dillinger France*,

981 F.3d at 1326 (reasoning that differences among respondent's made-to-order products does

not preclude those products from Commerce's treatment of those products as "comparable

merchandise").  Further, Commerce used CONNUMs as the basis for establishing "comparable

merchandise," and that practice has been upheld by this Court.  *See Timken*, 179 F. Supp. 3d at

1180.

In sum, Commerce's use of its differential pricing analysis continues to be a reasonable exercise of Commerce's discretion to administer the antidumping statute, and  BGH has identified no error in Commerce's application of its differential pricing analysis.

**IV.     Commerce's Determination Of Particular Market Situation For Ferrochrome And Electricity**

BGH argues that Commerce's PMS adjustments for its ferrochrome and electricity inputs are contrary to law and not supported by substantial evidence.  BGH Br. at 8-18.  We do not oppose BGH's request for remand as to these PMS adjustments.

On December 10, 2021, the Federal Circuit issued a precedential decision in *Hyundai Steel Co. v. United States*, No. 2021-1748, 2021 WL 5856804 (Fed. Cir. Dec. 10, 2021), holding that the 2015 amendments to the antidumping statute do not authorize Commerce to use the existence of a PMS as a basis for adjusting a respondent's costs of production to determine a respondent has made home market sales below costs.  This precedential decision, which is adverse to the United States, is binding upon this Court.  In its motion for judgment on the agency record, BGH's seeks a remand of this matter as to two cost-based PMS adjustments.  Because the Federal Circuit issued the *Hyundai Steel* opinion after Commerce's final determination, the agency had no opportunity to consider the decision.  The United States therefore does not oppose the remand sought by BGH regarding those PMS adjustments in light of the intervening precedent.  We respectfully submit that the *Hyundai Steel* decision does not govern other issues.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's final results in all aspects, except as the two PMS adjustments.  We request that the Court deny Ellwood's

motion for judgment on agency record in its entirety and deny BGH's motion except as to the

two PMS adjustments.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

/s/ In K. Cho
SAVANNAH ROSE MAXWELL                IN K. CHO
U.S. Department of Commerce          Trial Attorney
Office of Chief Counsel for Trade Enforcement and   U.S. Department of Justice
Compliance                           Civil Division
1401 Constitution Avenue, NW.        Commercial Litigation Branch
Washington, DC 20230-0001            P.O. Box 480, Ben Franklin Station
Telephone: (202) 482-3748            Washington, DC 20044
Facsimile:  (202) 482-4912           Telephone: (202) 616-0463
Email:      savannah.maxwell@trade.gov   Facsimile:  (202) 305-7644
                                     Email:      In.K.Cho@usdoj.gov

December 17, 2021                     *Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Standard Chambers Procedure 2(B)(2) of the U.S. Court of International Trade, I certify that this brief contains 8,931 words and complies with the word-count limit set forth in Standard Chambers Procedure 2(B)(1).  To make this certification, I have relied on the word-count feature of Microsoft Word.

/s/ In. K. Cho                          
IN K. CHO
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0463
Facsimile:  (202) 305-7644
Email:     In.K.Cho@usdoj.gov

December 17, 2021                                    *Attorney for Defendant*