# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Stephen Alexander Vaden, Judge

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, *et. al.*, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Consol. Ct. No. 21-00077 |
| UNITED STATES, | )<br>) **PUBLIC DOCUMENT** |
| Defendant, | )<br>) |
| and | )<br>) |
| BGH EDELSTAHL SIEGEN GMBH, | )<br>) |
| Defendant-Intervenor. | )<br>) |

## REPLY BRIEF OF
## <u>BGH EDELSTAHL SIEGEN GMBH</u>

Marc. E. Montalbine
J. Kevin Horgan
Gregory S. Menegaz
Alexandra H. Salzman
**DEKIEFFER & HORGAN**
1090 Vermont Ave, N.W.
Suite 410
Washington, D.C. 20005
(202) 783-6900
email: montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

Date: January 18, 2022

**TABLE OF CONTENTS**

I.  ARGUMENT ................................................................................................................. 1

    A.  Commerce Erred in Making PMS Adjustments to BGH's Reported Cost of Production .................................................................................................................. 1

    B.  Commerce Erred in Its Application of the Differential Pricing Methodology ...... 5

II. CONCLUSION AND PRAYER FOR RELIEF .............................................................. 11

## TABLE OF AUTHORITIES

**Cases**

AG der Dillinger Hüttenwerke v. United States
  532 F. Supp. 3d 1338 (CIT 2021) .................................................................................... 8, 9

Apex Frozen Foods Private Ltd. v. United States
  862 F.3d 1322 (Fed. Cir. 2017) (*Apex I*) ............................................................................ 8

Apex Frozen Foods Private Ltd. v. United States
  862 F.3d 1337 (Fed. Cir. 2017) (*Apex II*) ........................................................................... 8

Borusan Mannesmann Boru Sanayi Ve Ticaret A.S .v. United States
  426 F. Supp. 3d 1395 (CIT 2020) ....................................................................................... 2

Cent. Va. Cmty. Coll. v. Katz
  546 U.S. 356 (2006) ............................................................................................................ 9

Changzhou Wujin Fine Chem. Factory Co. v. United States
  701 F.3d 1367 (Fed. Cir. 2012) ........................................................................................... 3

Cohens v. Virginia
  19 U.S. 264 (1821) .............................................................................................................. 9

Corus Staal BV v. United States
  502 F.3d 1370 (Fed. Cir. 2007) ........................................................................................... 3

Dillinger France S.A. v. United States
  350 F. Supp. 3d 1349 (CIT 2018) .................................................................................... 8, 9

Dillinger France S.A. v. United States
  981 F.3d 1318 (Fed. Cir. 2020) .................................................................................. 5, 7, 9

Dong-A Steel Co. v. United States
  475 F. Supp. 3d 1317 (CIT 2020) ....................................................................................... 2

Dongbu Steel Co. v. United States,
  635 F.3d 1363 (Fed. Cir. 2011) ........................................................................................... 6

Hyundai Steel Co. v. United States
  483 F. Supp. 3d 1273 (CIT 2019) .................................................................................... 4, 5

Hyundai Steel Co. v. United States
  No. 2021-1748, 2021 U.S. App. LEXIS 36442 (Fed. Cir. 2021) ..................................*passim*

Husteel Co. v. United States,
  426 F. Supp. 3d 1376 (CIT 2020)..................................................................................2, 4

Husteel Co. v. United States,
  476 F. Supp. 3d 1363 (CIT 2020).....................................................................................2

Maracich v. Spears
  570 U.S. 48 (2013)............................................................................................................6

Novosteel SA v. United States
  284 F.3d 1261 (Fed. Cir. 2002).........................................................................................3

Saha Thai Steel Pipe Pub. Co. v. United States
  422 F. Supp. 3d 1363 (CIT 2019).....................................................................................2

Saha Thai Steel Pipe Pub. Co. v. United States
  476 F. Supp. 3d 1378 (CIT 2020).....................................................................................2

SEC v. Chenery Corp.
  332 U.S. 194 (1947)..........................................................................................................3

Stanley Works (Langfang) Fastening Sys., Ltd. v. United States
  279 F. Supp. 3d 1172 (CIT 2017).....................................................................................9

Stupp Corp. v. United States
  5 F.4th 1341 (Fed. Cir. 2021) .........................................................................................10

Thai I-Mei Frozen Foods Co. v. United States
  616 F.3d 1300 (Fed. Cir. 2010).........................................................................................4

Union Steel v. United States
  713 F.3d 1101 (Fed. Cir. 2013).........................................................................................8

**Statutes**

19 U.S.C. § 1677b(a)(1)(C)(iii) ...........................................................................................3, 4

19 U.S.C. § 1677b(b) ........................................................................................................1, 2, 3

19 U.S.C. § 1677b(b)(1) ...........................................................................................................4

19 U.S.C. § 1677b(b)(3) .......................................................................................................2, 3

19 U.S.C. § 1677b(e) ................................................................................................................1

19 U.S.C. § 1677b(f)............................................................................................................3, 4

19 U.S.C. § 1677b(f)(1)(A) ..................................................................................................... 3, 4

19 U.S.C. § 1677f-1(d)(1)(A) ....................................................................................................... 6

19 U.S.C. § 1677f-1(d)(1)(B) .................................................................................................*passim*

19 U.S.C. § 1677f-1(d)(1)(B)(i) ................................................................................................. 6, 8

**Other Authorities**

Implementation of the Findings of the WTO Panel in US-Zeroing (EC): Notice of Determinations Under Section 129 of the Uruguay Round Agreements Act and Revocations and Partial Revocations of Certain Antidumping Duty Orders, 72 Fed. Reg. 25261 (2007) ............... 6

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994) reprinted in 1994 U.S.C.C.A.N 4040 ...................................................................... 5

Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26720 (2014) ...................... 7

Black's Law Dictionary (11th ed. 2019) ........................................................................................ 9

BGH Edelstahl Siegen GmbH ("BGH"), defendant-intervenor and plaintiff in the companion case <u>BGH Edelstahl Siegen GmbH v. United States</u>, Court No. 21-00079 (CIT), hereby submits this brief in reply to Defendant's response in opposition to plaintiffs' motions for judgment on the agency record (Dec. 17, 2021) (ECF No. 37) ("Gvt. Resp. Br.") and the response brief of Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company and A. Finkl & Sons (collectively, "Petitioners" or "Consolidated Defendant-Intervenors") (Dec. 17, 2021) (ECF No. 33) ("Pet. Resp. Br.").

I.   **ARGUMENT**

   **A. Commerce Erred in Making PMS Adjustments to BGH's Reported Cost of Production**

On December 10, 2021, the U.S. Court of Appeals for the Federal Circuit affirmed the long line of precedent from this Court, holding that the antidumping statute does not authorize a particular market situation ("PMS") adjustment to the cost of production when Commerce applies the sales-below-cost test to determine which home market sales to exclude from the calculation of normal value. <u>Hyundai Steel Co. v. United States</u>, No. 2021-1748, 2021 U.S. App. LEXIS 36442 *; __ F.4th __; 2021 WL 5856804 (Fed. Cir. 2021), *aff'g*, 483 F. Supp. 3d 1273 (CIT 2019). The Federal Circuit specifically found that:

> The structure of section 1677b, as amended by the TPEA, clearly indicates that Congress intended to limit PMS adjustments to calculations pursuant to the "constructed value" subsection, 19 U.S.C. § 1677b(e), and not to authorize Commerce to make such adjustments pursuant to the "cost of production" subsection, *id*. § 1677b(b).

<u>Hyundai Steel</u>, 2021 U.S. App. LEXIS 36442 *11.

The Federal Circuit's decision is directly applicable to this case and, indeed, the Government concedes that *Hyundai Steel* is a "precedential decision . . . adverse to the United States" and is "binding upon this Court." Gvt. Resp. Br. 29. The Government further states that

1

it "does not oppose the remand sought by BGH regarding those PMS adjustments in light of the intervening precedent." Id.

Based upon *Hyundai Steel*, Commerce's cost-based PMS adjustments for BGH's electricity and ferrochrome inputs are impermissible as a matter of law because the statute does not authorize Commerce to make such adjustments pursuant to the cost of production subsection in 19 U.S.C. § 1677b(b).  Section 1677b(b)(3) is the sole basis given by Commerce for its cost-based PMS adjustments in this case.  IDM, 16 (citing section 773(b)(3) of the Tariff Act of 1930, as amended (the Act)) (Appx002293).  In making these cost-based PMS adjustments, Commerce acknowledged but ignored the long line of cases in which this Court previously determined that Commerce is not authorized to make adjustments to a respondent's costs of production to account for a PMS.  See id.; see also Hyundai Steel Co., 483 F. Supp. 3d at 1279 (citing Saha Thai Steel Pipe Pub. Co. v. United States, 422 F. Supp. 3d 1363, 1368-70 (CIT 2019)); Husteel Co. v. United States, 426 F. Supp. 3d 1376, 1383-89 (CIT 2020); Borusan Mannesmann Boru Sanayi Ve Ticaret A.S .v. United States, 426 F. Supp. 3d 1395, 1411-12 (CIT 2020); Dong-A Steel Co. v. United States, 475 F. Supp. 3d 1317, 1337-41 (CIT 2020); Husteel Co. v. United States, 476 F. Supp. 3d 1363, 1370-73 (CIT 2020); Saha Thai Steel Pipe Pub. Co. v. United States, 476 F. Supp. 3d 1378, 1382-86 (CIT 2020)).

Because the application of *Hyundai Steel* to this proceeding is a direct matter of law, the only action for Commerce to take on remand with respect to this issue is to remove the cost-based PMS adjustments for BGH's electricity and ferrochrome inputs and recalculate BGH's dumping margin.  The remand should not be expanded to "consider alternative legal justifications for adjusting BGH's reporting" based upon alleged distortions in the German electricity and ferrochrome markets as requested by Petitioners.  See Pet. Resp. Br. 26.  In their

response brief, Petitioners opine that adjustments could potentially be made under section 1677b(a)(1)(C)(iii) (regarding normal value based upon third-country sales) or section 1677b(f)(1)(A) (regarding calculating costs based upon the records of the foreign producer). However, the deadline for making PMS allegations in this case has long since passed. Petitioners could have raised whatever allegations they desired in their PMS allegations and other submissions during the underlying administrative proceeding. Petitioners chose to base their allegations concerning the German electricity and ferrochrome markets exclusively upon an adjustment to the costs of production under section 1677b(b) even though a long line of precedent from this Court already found that such adjustments were unlawful. Similarly, Commerce based it PMS adjustments for electricity and ferrochrome solely upon section 1677b(b)(3). All parties must abide by the deadlines established in an investigation and there is no legal basis to reopen the record at this point to allow Petitioners to make new allegations that could have timely been made during the investigation.

Indeed, the Federal Circuit rejected similar attempts by the petitioner in *Hyundai Steel* to reference alternative legal justifications, such as section 1677b(f)(1)(A). The Federal Circuit stated:

> Commerce did not rely on section 1677b(f)(1)(A) in its final determination; it instead relied solely on the TPEA amendments for its authority to adjust the respondents' costs of production due to a PMS when conducting the sales-below-cost test. Nor did Welspun (or any other defendant before the Trade Court) rely on that section in support of Commerce's adjustments in its final determination. And the Trade Court did not address the section 1677b(f)(1)(A) argument that Welspun has now raised. Welspun has therefore not preserved that argument for appellate review. *See Corus Staal BV v. United States*, 502 F.3d 1370, 1378 n.4 (Fed. Cir. 2007); *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002). Moreover, under well-settled principles of administrative law, Commerce's failure to base its ruling in whole or in part on section 1677b(f)(1)(A) means that section 1677b(f) is not available as an alternative ground for upholding Commerce's final determination. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Changzhou Wujin Fine Chem. Factory Co. v.*

*United States*, 701 F.3d 1367, 1379 (Fed. Cir. 2012); *Thai I-Mei Frozen Foods Co. v. United States*, 616 F.3d 1300, 1307 (Fed. Cir. 2010) ("[W]e review only the bases on which Commerce made its determination."). We therefore do not address Welspun's section 1677b(f)(1)(A) argument in this case.

Hyundai Steel, 2021 U.S. App. LEXIS 36442 *19-20.

The same principles apply in this case. Petitioners did not rely upon any alternative justifications for its PMS allegations on electricity and ferrochrome in the underlying investigation; nor did Commerce rely upon any alternative justifications in its final determination. Therefore, under well-settled principles of administrative law, alternative justifications that were not raised during the underlying investigation are not now available as alternative grounds for upholding Commerce's final determination.

It should also be noted that this Court has already held that section 1677b(f) does not allow for a PMS adjustment. *See* Husteel, 426 F. Supp. 3d at 1389 (stating that "Congress did not amend either section 1677b(b)(1) (below costs sales) or section 1677b(f) (calculation of a cost of production) to allow for a PMS adjustment"). Similarly, section 1677b(a)(1)(C)(iii) is limited to situations where normal value is based upon third country sales, which is not the case in this proceeding. *See* 19 U.S.C. § 1677b(a)(1)(C)(iii).

The Court should also dismiss as moot Petitioners' lengthy arguments alleging that Commerce's cost-based PMS adjustments for BGH's electricity and ferrochrome inputs are allegedly supported by substantial evidence. *See* Pet. Resp. Br. 13-24. Based upon *Hyundai Steel*, Commerce's cost-based PMS adjustments are impermissible as a matter of law because the statute does not authorize Commerce to make such adjustments pursuant to the cost of production subsection in 19 U.S.C. § 1677b(b). Therefore, because there is no legal basis for making the cost-based PMS adjustments, any discussion of the adjustments being supported by substantial evidence is moot. This was the ruling made by the Federal Circuit in *Hyundai Steel*,

4

where the court stated:

> Because it was impermissible for Commerce to adjust Hyundai's and SeAH's costs of production to account for a PMS, we need not reach the question whether Commerce's PMS finding was supported by substantial evidence.

Hyundai Steel, 2021 U.S. App. LEXIS 36442 *20.

Accordingly, pursuant to *Hyundai Steel* and the prior precedent of this Court, the Court should find that Commerce's cost-based PMS adjustments for BGH's electricity and ferrochrome inputs are unlawful and remand the matter to Commerce with instructions that Commerce remove the PMS adjustments and recalculate BGH's dumping margin.

### B. Commerce Erred in Its Application of the Differential Pricing Methodology

As explained in BGH's initial brief, Commerce erred in calculating BGH's dumping margin by applying zeroing to CONNUMs[1] that had no dumped transactions. BGH Br. 19-22 & App. 1. Zeroing is the practice of disregarding the negative margins on non-dumped transactions in calculating the antidumping duty rate and can only be applied within the limits of the targeted dumping exception in 19 U.S.C. § 1677f-1(d)(1)(B).[2] *See* id. at 20. Where a CONNUM has no dumped transactions, the average-to-average methodology (A-A method) cannot mask targeted dumping because there is no dumping. It is therefore unlawful for Commerce to apply zeroing to CONNUMs that have no dumped transactions (*i.e.*, inter-product zeroing) under the guise of applying the exception in section 1677f-1(d)(1)(B).

---

[1] "CONNUM" stands for "matching control number" or "product control number" and identifies the physical characteristics of the product for each transaction. Products having the same CONNUM have the same physical characteristics as identified by Commerce.

[2] It is undisputed that the purpose of 19 U.S.C. § 1677f-1(d)(1)(B) is to address situations "where targeted dumping may be occurring." Dillinger France S.A. v. United States, 981 F.3d 1318, 1324 (Fed. Cir. 2020) (quoting Statement of Administrative Action *accompanying the* Uruguay Round Agreements Act, H.R. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178).

5

As shown by the table in Appendix 1 to BGH's initial brief, two of BGH's U.S. CONNUMs, accounting for more than half of all U.S. transactions, had no dumped transactions at all. BGH Br. App. 1. Had Commerce not zeroed out the negative margins on these non-dumped transactions, BGH's dumping margin would have been *de minimis*. See id. Commerce only arrived at the 4.79% dumping margin for BGH by zeroing out the negative margins on the CONNUMs having no dumped transactions.

It is undisputed that zeroing is not permitted when Commerce applies the standard average-to-average comparison method (A-A method) for calculating dumping margins in investigations under 19 U.S.C. § 1677f-1(d)(1)(A). S*ee* BGH Br. 19-20 (citing Implementation of the Findings of the WTO Panel in US-Zeroing (EC): Notice of Determinations Under Section 129 of the Uruguay Round Agreements Act and Revocations and Partial Revocations of Certain Antidumping Duty Orders, 72 Fed. Reg. 25261 (2007); *see also* Dongbu Steel Co. v. United States, 635 F.3d 1363, 1371-73 (Fed. Cir. 2011) (finding that it was unreasonable for Commerce to continue the practice of zeroing in administrative reviews once Commerce decided to stop using zeroing in antidumping duty investigations to comply with WTO treaty obligations)). Commerce may only deviate from this standard A-A methodology without zeroing when the requirements of the exception for targeted dumping in 19 U.S.C. § 1677f-1(d)(1)(B) are met. The Government and Petitioners do not dispute that, as an "exception," the terms of section 1677f-1(d)(1)(B) must be read "narrowly" in order to preserve the primary operation of the underlying provision. *See* BGH Br. 21 (quoting Maracich v. Spears, 570 U.S. 48, 60 (2013)).

The targeted dumping exception in section 1677f-1(d)(1)(B) requires significant price differences in export prices for "comparable merchandise" among purchasers, regions or time periods. 19 U.S.C. § 1677f-1(d)(1)(B)(i). Commerce has uniformly defined "comparable

merchandise" as merchandise having the same CONNUM. For example, in its 2014 request for comments on the differential pricing analysis, Commerce stated:

> Comparable merchandise is defined as the product control number {(*i.e.*, CONNUM)} and any characteristics of the sales, other than purchaser, region and time period, that the Department uses in making comparisons between export price (or constructed export price) and normal value for the individual dumping margins.

Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26720, 26722 (2014). Commerce repeated this same definition in its preliminary and final issues and decision memoranda in this investigation. Preliminary IDM, 13 (Appx001984); Final IDM, 14 (Appx002291). The Federal Circuit Court of Appeals has also recognized that "comparable merchandise" under section 1677f-1(d)(1)(B) is "defined by product control numbers ('CONNUMs')." Dillinger France S.A. v. United States, 981 F.3d 1318, 1326 (Fed. Cir. 2020). In its response brief, the Government also acknowledges that "Commerce used CONNUMs as the basis for establishing 'comparable merchandise.'"[3] Gvt. Resp. Br. 28.

It is therefore undeniable that the targeted dumping exception in section 1677f-1(d)(1)(B) must be applied on a CONNUM-specific basis. "Comparable merchandise" means CONNUM, and the existence of targeted dumping must therefore be identified for each CONNUM individually. Section 1677f-1(d)(1)(B) addresses the narrow situation where the same CONNUM is sold at prices that "differ significantly among purchasers, regions, or periods of

---

[3] The Government's statement that the "statute does not limit Commerce's consideration of price differences for the 'same product,' as BGH alleges" fully misunderstands BGH's argument. *See* Gvt. Resp. Br. 28. By the term "same product," BGH simply means the same CONNUM. With respect to Commerce's margin calculations, products are defined by CONNUMs and products having the same CONNUM are treated as the same product (*i.e.*, "identical merchandise"). BGH's argument is simply that the statute limits Commerce's consideration of price differences indicating targeted dumping to price differences for the same CONNUMs. The Government agrees with this point, stating that it uses "CONNUMs as the basis for establishing 'comparable merchandise'" under section 1677f-1(d)(1)(B). Gvt. Resp. Br. 28.

time." 19 U.S.C. § 1677f-1(d)(1)(B)(i). Price differences between different products (*i.e.*, different CONNUMs) are normal and do not give rise to the exception for targeted dumping under the statute.

There is therefore no legal basis for Commerce to zero out the margins for CONNUMs that have no dumped transactions under the guise of applying the targeted dumping exception in section 1677f-1(d)(1)(B). By definition, CONNUMs having no dumped transactions cannot involve targeted dumping.

It is also important to note that it is zeroing that accounts for the different results in the average-to-average (A-A method) and the average-to-transaction (A-T method) methods as applied by Commerce. If Commerce did not apply zeroing with its differential pricing methodology, the result under the A-A and the A-T methods would be exactly the same. It is therefore imperative that any zeroing be narrowly applied within the confines of the targeted dumping exception in section 1677f-1(d)(1)(B).

The Government's and Petitioners' reliance upon the Federal Circuit decisions in *Union Steel*, *Apex I* and *Apex II* is inapposite. *See* Gvt. Resp. Br. 27; Pet. Resp. Br. 37-38. These decisions only discuss zeroing as applied to certain specific aspects of Commerce's differential pricing methodology. None of these decisions specifically address the issue of inter-product zeroing (*i.e.*, zeroing the negative margins on CONNUMs having no dumped transactions).[4]

This Court's decisions in *Dillinger France* and *Dillinger Hüttenwerke* show that the issue of inter-product zeroing is separate and distinct from other challenges to zeroing within

---

[4] It should also be noted that *Union Steel*, *Apex I* and *Apex II* all involved administrative reviews where the normal comparison methodology is the A-T method. This current case involves an investigation where the statutorily prescribed comparison methodology is the A-A method and the A-T method can only be applied if the specific requirements of the targeted dumping exception in section 1677f-1(d)(1)(B) are fulfilled.

Commerce's differential pricing methodology.  In both of these cases, the Government argued that the respondents had failed to exhaust their administrative remedies with respect to their arguments of inter-product zeroing despite the fact that the respondents had extensively challenged the issue of zeroing under the differential pricing methodology during the underlying administrative proceeding.  *See*, Dillinger France S.A. v. United States, 350 F. Supp. 3d 1349, 1371 (CIT 2018), *rev'd in part*, 981 F.3d 1318 (Fed. Cir. 2020); AG der Dillinger Hüttenwerke v. United States, 532 F. Supp. 3d 1338, 1344 (CIT 2021).  In both cases, this Court accepted the Government's arguments and dismissed the respondents' challenge to inter-product zeroing.  For example, in *Dillinger Hüttenwerke*, the Court stated:

> Dillinger's contention that its argument is merely "part and parcel" of its zeroing allegations . . . does not excuse its failure to explicitly expound on its inter-product argument at the administrative level because a challenge to the application of one aspect of § 1677f-1(d)(1)(B) "do{es} not incorporate any conceivable challenge to elements of that analysis."

Dillinger Hüttenwerke, 532 F. Supp. 3d at 1344 (quoting Stanley Works (Langfang) Fastening Sys., Ltd. v. United States, 279 F. Supp. 3d 1172, 1189 (CIT 2017)).  The Court made the same ruling in *Dillinger France* and included a multi-page discussion as to how none of the exceptions to administrative exhaustion applied.  *See* Dillinger France, 350 F. Supp. 3d at 1371-73.[5]

---

[5] At the end of its multi-page discussion holding that the respondent had failed to exhaust its administrative remedies with respect to inter-product zeroing, the Court in *Dillinger France* stated that respondent's inter-product argument failed on the merits because the respondent "provide{d} no reasoning or authority to support its assertion that it is 'unlawful for the Department to apply inter-product zeroing under the guise of applying the exception in section 1677f-1(d)(1)(B).'"  Dillinger France, 350 F. Supp. 3d at 1373.  Having already dismissed respondent's arguments for failure to exhaust, this statement by the Court is mere *dicta*.  "*Dicta*" or "*obiter dicta*" is a "judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)."  *Dictum*, Black's Law Dictionary (11th ed. 2019).  A court is not bound to follow *dicta* in a prior case in which the point now at issue was not fully debated.  *See* Cent. Va. Cmty. Coll. v. Katz, 546 U.S. 356, 363 (2006) (citing opinion of Chief Justice Marshall in Cohens v. Virginia, 19 U.S. 264 (1821)).

9

The Federal Circuit's recent decision in *Stupp* also confirms that Commerce's discretion in applying the differential pricing methodology is not without limit. In *Stupp*, the Federal Circuit noted concerns relating to Commerce's application of the Cohen's *d* test in adjudications where the data groups being compared are small, are not normally distributed, and have disparate variances. Stupp Corp. v. United States, 5 F.4th 1341, 1357 (Fed. Cir. 2021). According to the court, these "concerns raise questions about the reasonableness of Commerce's use of the Cohen's *d* test in less-than-fair-value adjudications, warranting further supporting explanation from the Department." Id. While these specific issues have not been raised in this current case, the Federal Circuit's decision shows that Commerce's differential pricing methodology must be carefully applied in order to meet the narrow provisions of the targeted dumping exception in 19 U.S.C. § 1677f-1(d)(1)(B).

Accordingly, the Court should find that Commerce erred in calculating BGH's dumping margin by applying zeroing to CONNUMs that had no dumped transactions and remand the matter to Commerce with instructions that Commerce recalculate BGH's dumping margin without applying zeroing to CONNUMs that had no dumped transactions.

## II. CONCLUSION AND PRAYER FOR RELIEF

Accordingly, we respectfully request that the Court find that the aspects of Commerce's Final Determination discussed in this reply brief and in BGH's Rule 56.2 memorandum in support of motion for judgment upon the agency record (ECF No. 23-2 & 27) are not supported by substantial evidence on the administrative record and not in accordance with the law and remand this case to Commerce for redetermination.

                                                          Respectfully submitted,

                                                          /s/ Marc E. Montalbine

                                                          Marc E. Montalbine*
                                                          J. Kevin Horgan
                                                          Gregory S. Menegaz
                                                          Alexandra H. Salzman**
                                                          **deKieffer & Horgan, PLLC**
                                                          Suite 410
                                                         1090 Vermont Ave., N.W. 20005
                                                         Tel: (202) 783-6900
                                                         Fax: (202) 783-6909
                                                         email: montalbine@dhlaw.de

Date: January 18, 2022                  *Counsel to BGH Edelstahl Siegen GmbH*

_____

\* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

\*\* Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2013 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court, the undersigned certifies that this brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains **3,249** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ *Marc E. Montalbine*

Marc E. Montalbine*
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

---

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).