**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

|  |  |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, | ) ) ) ) ) |
| Plaintiffs and Consolidated Defendant-Intervenors, | ) ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| BGH EDELSTAHL SIEGEN GMBH, | ) ) ) ) |
| Defendant-Intervenor and Consolidated Plaintiff. | ) ) ) |

Consol. Ct. No.  21-00077

**NON-CONFIDENTIAL VERSION**

Business Proprietary Information Removed from Brackets on Pages 16-23.

**REPLY BRIEF OF ELLWOOD CITY FORGE COMPANY,**
**ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL**
**STEEL COMPANY, AND A. FINKL & SONS**

Myles S. Getlan
Jack A. Levy
Thomas M. Beline
James E. Ransdell
Nicole Brunda
**CASSIDY LEVY KENT (USA) LLP**
900 19th Street NW
Suite 400
Washington, DC 20006
(202) 567-2300

*Counsel to Ellwood City Forge Company,*
*Ellwood National Steel Company,*
*Ellwood Quality Steels Company, and A.*
*Finkl & Sons*

January 18, 2022

## Table of Contents

Page

ARGUMENT ................................................................................................................ 2

I.   Plaintiffs Requested a Lawful Investigation and Administrative Remedies Were
     Exhausted; Regardless, the Futility and Pure Question of Law Exceptions Apply ............... 2

     A.   Administrative Remedies Were Exhausted With Respect to Verification ..................... 3

     B.   In the Alternative, the Futility and Pure Question of Law Exceptions to the
          Exhaustion Doctrine Apply ................................................................................. 6

II.  The COVID-19 Pandemic Did Not Provide Commerce With Discretion to Ignore Its
     Acknowledged Statutory and Regulatory Verification Procedures ....................................... 10

     A.   Defendant's Litigating Position is Not Entitled to *Chevron* Deference; Even if it
          Were, No "Genuine Ambiguity" Exists ........................................................................ 11

     B.   Even Under *Chevron* Step Two, the COVID-19 Pandemic Does Not Justify
          Ignoring the Statute and Regulations ........................................................................ 13

III. Commerce's Verification Findings Were Not Supported by Substantial Evidence ............. 15

IV.  Commerce's *Final Determination* Unlawfully Relied Upon BGH's Unreconciled
     Cost Information ............................................................................................................... 18

     A.   BGH Did Not Reconcile Its Reported Costs to Its Audited Financial Records ........... 19

     B.   BGH's Accounting System Did Not Make a Cost Reconciliation Impossible ............ 22

CONCLUSION .............................................................................................................. 24

## <u>Table of Authorities</u>

<u>Page(s)</u>

<u>Statutes</u>

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................................23

19 U.S.C. § 1675(a)(4) .............................................................................................8

19 U.S.C. § 1677b(f)(1)(A) .....................................................................................19

19 U.S.C. § 1677e(a)(2)(D) .....................................................................................18

19 U.S.C. § 1677m(i) ..........................................................................................3, 18

19 U.S.C. § 1677m(i)(1) .........................................................................................12

19 U.S.C. § 3512(d)) ...............................................................................................12

19 U.S.C. § 3513(a)(2) ............................................................................................13

28 U.S.C. § 2637(d) ..................................................................................................6


<u>Regulations</u>

19 C.F.R. § 351.307(b)(1)(a) ...................................................................................13

19 C.F.R. § 351.307(b)(1)(b) ...................................................................................13

19 C.F.R. § 351.307(c) .......................................................................................13, 15

19 C.F.R § 351.309 ...................................................................................................9


<u>Court Decisions</u>

*Agro Dutch Indus., Ltd. v. United States,* 508 F.3d 1024, 1029 (Fed. Cir. 2007) ...........................8

*Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) ......................................................14

*Bomont Industries v. United States,* 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990) ........................................................................................................10, 14

*Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212 (1988) .....................................................11

*Canadian Solar Int'l Ltd. v. United States,* 378 F. Supp. 3d 1292, 1305 n.14 (Ct. Int'l Trade 2019) ................................................................................................4

*Carr v. Saul*, 141 S. Ct. 1352, 1361 (2021) ...............................................................6

*Chevron, U.S.A., Inc. v. Nat. Res Defendant's Council, Inc.*, 467 U.S. 837 (1984) .................................................................................................... *passim*

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003) ....................6

*Corus Staal BV v. United States,* 502 F.3d 1370 (Fed. Cir. 2007) .................... 6-7, 9

*Hor Liang Indus. Corp. v. United States,* 337 F. Supp. 3d 1310 (Ct. Int'l Trade 2018) ................................................................................................9

*Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021) ..............................................................................................................22

*Hyundai Elec. & Energy Sys. Co. v. United States*, 466 F. Supp. 3d 1303 (Ct. Int'l Trade 2020) ......................................................................................22

*Investment Company Institute v. Camp,* 401 U.S. 617 (1971) ................................11

*Itochu Bldg. Prods. v. United States,* 733 F.3d 1140 (Fed. Cir. 2013) .............4, 6, 9

*Kisor v. Wilkie,* 139 S. Ct. 2400 (2019) ............................................................ 12-13

*McGee v. United States*, 402 U.S. 479 (1971) ...........................................................4

*McKart v. United States*, 395 U.S. 185 (1969) .........................................................4

*Micron Tech. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) .......................11-12

*Mohasco Corp. v. Silver*, 447 U.S. 807 (1980) ......................................................13

*Myland Indus., Ltd. v. United States*, 31 C.I.T. 1696 (2007) ............................ *passim*

*Parisi v. Davidson*, 405 U.S. 34 (1972) ....................................................................4

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) ...................... 12-13

*Universal Polybag Co. v. United States*, 577 F. Supp. 2d 1284 (Ct. Int'l Trade 2008) ..............................................................................................................17-18

*Weinberger v. Salfi*, 422 U.S. 749 (1975) .................................................................4

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ...................................................................................................7

NON-CONFIDENTIAL VERSION

*Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328 (Ct. Int'l Trade 2015)....................................................................................................................5

Administrative Determinations

*Final Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80018 (Dec. 11, 2020) ........................................................................... *passim*

*Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 2394 (Jan. 15, 2020).....................................................................................................2-3

*Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg 44513, 44515 (July 23, 2020) ...............................................3, 5, 7

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, ) ) ) ) ) | |
| Plaintiffs and Consolidated Defendant-Intervenors, ) ) | Consol. Court No. 21-00077 |
| v. ) | |
| ) | **NON-CONFIDENTIAL** |
| UNITED STATES, ) | **VERSION** |
| Defendant, ) ) | |
| and ) | |
| ) | |
| BGH EDELSTAHL SIEGEN GMBH, ) | Business Proprietary Information |
| ) | Removed from Brackets on Pages |
| ) | 16-23. |
| Defendant-Intervenor and Consolidated Plaintiff. ) ) ) | |

**PLAINTIFFS' REPLY BRIEF**

Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons (collectively, "Plaintiffs") herein reply to the briefs filed on December 17, 2021, by Defendant, the United States ("Defendant's Br.") and Defendant-Intervenor, BGH Edelstahl Siegen GmbH ("BGH Br.") responding to Plaintiffs' opening brief in this action ("Plantiffs' Br."). Neither of the responses overcome the challenges raised. The Court should not refuse to consider Plaintiffs' challenges to Commerce's unlawful "in-lieu of on-site verification" procedures on exhaustion grounds because the issue was exhausted and exceptions to the doctrine apply in these circumstances (**Section I**). Turning to the substance, the Government fails to establish that the statute, its legislative history, or Commerce's regulations permitted it to ignore express minimum prerequisites by "short-circuit{ing}

1

verification,"[1] declining to issue a verification report, and relying upon unverified information (**Section II**). Even if Commerce's modified procedures were lawful, Commerce's findings were unsupported by substantial evidence. In particular, Commerce's approach left it no reasonable basis on which to conclude that reporting errors revealed by Commerce's pseudo-verification questionnaires were limited or "minor" in nature, rather than a pervasive flaw in BGH's reporting (**Section III**). Finally, Commerce's determination was additionally unlawful because Commerce relied on reported cost data engineered specifically for this proceeding which BGH could not reconcile to its audited financial records, rendering the data fundamentally unreliable (**Section IV**). For each of these reasons remand is necessary and appropriate.

**ARGUMENT**

I.   **Plaintiffs Requested a Lawful Investigation and Administrative Remedies Were Exhausted; Regardless, the Futility and Pure Question of Law Exceptions Apply**

Defendant argues this Court should deny Plaintiffs relief from Commerce's inadequate "verification" procedures because Plaintiffs allegedly (1) failed to exhaust administrative remedies, (2) omitted arguments from their administrative case brief, and (3) present "contrary" administrative and litigating positions. *See* Defendant's Br. at 8-12. The record belies Defendant's contentions. Plaintiffs requested, and Commerce initiated, an antidumping duty investigation under the Tariff Act of 1930, as amended ("the Act"). *See Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 2394 (Jan. 15, 2020) ("*Initiation Notice*") (Appx080000-

---

[1] *See Ellwood City Forge Company v. United States*, Court No. 21-00007, ECF No. 28 at 5 (ordering remand to "allow Commerce, at its discretion, to perform on-site verification, which would moot all procedural issues created by the agency's decision to short-circuit verification"). The Court further suggested "Commerce may wish to consider seeking voluntary remand in similar cases to comply with its verification obligations." *Id*. Were Defendant to seek such a voluntary remand in this action, Plaintiffs would consent.

2

080005).[2]  Plaintiffs believed Commerce would comply with the Act's basic, unambiguous requirements, and those Commerce established by regulation.  Commerce affirmed as much in its July 2020 *Preliminary Determination*, stating its intent to conduct verification "{a}s provided in section 782(i)(1) of the Act."  *Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg 44513, 44515 (July 23, 2020) ("*Preliminary Determination*") (Appx083286); 19 U.S.C. § 1677m(i).  Not until late October could Plaintiffs have possibly known that Commerce had changed its mind—despite entreaties to conduct a traditional verification.  And up until the early December *Final Determination*, Plaintiffs were unaware of the degree to which Commerce's treatment of its "request for information in lieu of verification"—a then-novelty with which Plaintiffs had no prior experience—would ultimately diverge from statutory requirements and Commerce's established verification procedures.  *See Final Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80018, 80018 (Dec. 11, 2020) ("*Final Determination*") (Appx084045).  Nevertheless, Commerce recognized that on-site verification is "provided for in section 782(i) of the Act."  *See id.* (Appx084045).  The exhaustion doctrine does not support Commerce's bid for impunity.  The need for verification was addressed administratively; in the alternative, well-established exceptions apply.

A.   **Administrative Remedies Were Exhausted With Respect to Verification**

Defendant first claims that Plaintiffs failed to exhaust their administrative remedies by failing to challenge Commerce's unlawful verification procedures during the investigation.  Defendant's Br. at 7-8.  In essence, Defendant seeks to inoculate the Government against its obligation to observe statutory requirements, unless parties reiterate foundational obligations the

---

[2] In accordance with Section (d) of Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden (Rev'd Feb. 17, 2021), this brief cites the Bates numbers corresponding to the confidential version of the joint appendix, but omit "PR" and "CR" style references.

Government *already recognized* in the administrative proceeding in question.  Such impunity serves no practical purpose, and is not sanctioned by the exhaustion doctrine.

As the Supreme Court has explained, "the exhaustion requirement is not to be applied 'blindly in every case.'"  *McGee v. United States*, 402 U.S. 479, 485 (1971) (quoting *McKart v. United States*, 395 U.S. 185, 201 (1969)).  Rather, its applicability is a practical question, weighing the purposes of the exhaustion requirement against the abrogation of a plaintiff's right to judicial review and lawful administrative decision-making.  *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013) (overturning the CIT's use of the exhaustion doctrine).  "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies."  *Parisi v. Davidson*, 405 U.S. 34, 37 (1972); *see also Weinberger v. Salfi*, 422 U.S. 749, 765 (1975) ("exhaustion is generally required as a matter of preventing premature interference with agency processes").  The CIT has recharacterized "{t}he determinative question {a}s whether Commerce was put on notice of the issue."  *Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292, 1305 n.14 (Ct. Int'l Trade 2019) (quotations omitted).

Here, Commerce was not denied the opportunity to perform any act "within its special competence."  *Parisi*, 405 U.S. at 37.  And Commerce was clearly "on notice" of its statutory obligation to conduct an on-site verification and issue a verification report.  Commerce stated in its *Preliminary Determination* that "{a}s provided in section 782(i)(1) of the Act*, Commerce intends to verify the information relied upon in making its final determination."  85 Fed. Reg at 44515 (Appx083286).  Commerce was thereafter reminded that "the law provides for audits—or 'verification'—to confirm the truth behind the foreign respondents' sales and cost" and that such

verification was imperative in this case, *see* Letter from Rep. Kelly (Aug. 27, 2020) (Appx098353).  Indeed, Defendant now concedes Commerce was aware of "serious concerns that the foreign producers will go unverified," an acknowledgment that is fatal to its exhaustion argument.  See Def. Br. at 10 n.2.  Notably, the exhaustion doctrine is issue-specific, not party-specific.  *E.g.*, *Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1351 (Ct. Int'l Trade 2015) ("One well-recognized exception to the doctrine of exhaustion permits a party to litigate an issue that the party did not exhaust at the administrative level where that issue was raised before the agency by a different party.") (collecting cases).

Commerce nevertheless indicated it would "be issuing a questionnaire to BGH Siegen in lieu of performing an on-site verification," *see* Ex Parte Memo (Oct. 19, 2020) (Appx083327). Commerce's *Final Determination* explicitly acknowledged its on-site statutory verification obligations and admitted Commerce's noncompliance.  *Final Determination* at 80018 (Appx084045) ("Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation *as provided for in section 782(i) of the Tariff Act of 1930*….").

In sum, Commerce stated it would comply with statutory verification requirements in its *Preliminary Determination*, was thereafter reminded of those requirements, and admitted deviating from those requirements in its *Final Determination*.  Commerce was thus plainly aware of the issue; nothing more was needed to "exhaust" administrative remedies.  No practical purpose is served by permitting the Government to avoid scrutiny under these circumstances, nor did Defendant's response brief before this Court even suggest it would have undertaken on-site verification and issued a verification report had Plaintiffs detailed Commerce's shortcomings in their administrative case brief.  *See* Defendant's Br. at 8-12.

**B.    In the Alternative, the Futility and Pure Question of Law Exceptions to the Exhaustion Doctrine Apply**

The exhaustion doctrine is discretionary and only required "where appropriate," *see* 28 U.S.C. § 2637(d), meaning it must "serve some practical purpose where applied." *Itochu*, 733 F.3d at 1145. Indeed, as Defendant acknowledges, "{a}n interested party can establish that it should be excused from the exhaustion requirement by showing that one of the exceptions to the requirement should apply." Defendant's Br. at 10. Relevant here, the exhaustion requirement may be excused where "pursuing that route would clearly be futile, *i.e.* where it is clear that additional filings with the agency would be ineffectual." *Itochu*, 773 F.3d at 1145 (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1378-79 (Fed. Cir. 2007)). Similarly, exhaustion is not required where the question at issue is a "pure question of law," meaning statutory construction alone is sufficient to resolve the case. *See generally Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003). Both exceptions apply here, though only one is needed.

*First*, contrary to Defendant's conclusory assertion, it would have been futile for Plaintiffs to challenge Commerce's verification procedures during the briefing stage of the proceeding. *See* Defendant's Br. at 9, 11 (criticizing Plaintiffs for not raising arguments in their case brief and subsequently claiming, without explanation, that "{t}he record does not show that it would have been futile for {Plaintiffs} to challenge Commerce's verification procedures"). As the Supreme Court has made clear, "{i}t makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested. Such a vain exercise will rarely protect administrative agency authority or promote judicial efficiency." *Carr v. Saul*, 141 S. Ct. 1352, 1361 (2021) (internal citations omitted); *see also Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (internal citations omitted) (noting that the futility exception applies where "enforcing the exhaustion requirement would mean that parties would be required

6

to go through obviously useless motions in order to preserve their rights"); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013) (recognizing an exception "where exhaustion would be 'a useless formality'").

As an initial matter, Commerce took three months after issuing its *Preliminary Determination* to reverse its stated intention to conduct a statutorily-compliant verification and instead issue a supplemental questionnaire. Commerce obviously considered and decided late in the investigation to forego verification. Given such circumstances, it is doubtful that contesting this decision would have led Commerce to reconsider. Indeed, conducting a statutorily compliant verification prior to the deadline for the final determination was a temporal impossibility. The Government fails to acknowledge that Commerce would have had *less than two weeks*[3] to (1) consider case and rebuttal brief arguments concerning the legal adequacy of its verification procedures, (2) devise a new, statutorily-compliant verification methodology, (3) communicate and implement that methodology, (4) compile and issue a verification report, (5) solicit revised case and rebuttal briefs incorporating the findings of the verification report, and (6) prepare final determination memoranda based on verified facts that underwent Commerce's internal review process. It was not possible to carry out this multi-step process prior to the statutory deadline. As such, arguing for on-site verification during briefing would have been a useless formality with no practical potential to supplant Commerce's "in lieu of verification" procedures with an on-site verification. Arguing for the issuance of the required verification

---

[3] After Commerce extended the deadlines, briefing concluded on November 18, 2020. *See* Letter from Commerce (Nov. 16, 2020) (Appx098361). A hearing on the briefs was held on November 24, 2020. See Hearing Transcript (Nov. 24, 2020) (Appx083893). Commerce was required to complete its final determination by December 7, 2020. *See Preliminary Determination* at 44515 (Appx083286) ("no later than 135 days after the date of publication of this preliminary determination").

report would similarly have had no practical effect, as the time necessary to consider such arguments and prepare a post-briefing report would have left the parties no meaningful opportunity for comment.

*Second*, Plaintiffs' arguments are excepted from the statutory exhaustion requirement because they pose pure questions of law, *see, e.g.*, *Agro Dutch Indus., Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007) (concluding that "the proper interpretation of {19 U.S.C.} § 1675(a)(4) presents a 'pure question of law' that can be addressed on appeal despite Agro's failure to raise such an argument in the proceeding before Commerce"), *viz.*, whether Commerce acted unlawfully by failing to verify respondents' sales and cost data used in the dumping calculation. *See* Plaintiffs' Br. at 15.  Plaintiffs contend that by acknowledging it was "unable to conduct on-site verification of the information relied upon in making its final determination in this investigation as provided for in section 782(i) of the Tariff Act of 1920, as amended," Commerce *ipso facto* admitted to violating its statutory obligations.  Plaintiffs' Br. at 17. Contrary to Defendant's claims, Commerce's justifications are irrelevant to such a pure question of law.  *See* Defendant's Br. at 11.  That is, regardless of whether Commerce proffers a compelling rationale, the question remains whether Commerce complied with its black-and-white statutory mandate.  This is not, as Defendant suggests in passing, a scenario in which "the relevant statute does not require a specific methodology and Commerce needs to the fill statutory gap."  Defendant's Br. at 11.  Rather, as detailed in Plaintiffs' Opening Brief, the requirements of on-site verification and a verification report are specifically set forth in the statute, SAA, and Commerce's own regulations, and are *not* aspects of verification subject to Commerce's discretionary whims.  *See* Plaintiffs' Br. at 15-22.

Defendant additionally claims Plaintiffs' failure to include certain verification arguments in its administrative case brief violates 19 C.F.R § 351.309 which, Defendant contends, the Federal Circuit made an absolute prerequisite to judicial review in *Corus Staal*. *See* Defendant's Br. at 11-12 (citing *Corus Staal*, 502 F.3d at 1379). But Defendant overreads *Corus Staal*. Commerce has no power to limit this Court's jurisdiction or the scope of review, only Congress may do so. *C.f., e.g.*, *Hor Liang Indus. Corp. v. United States*, 337 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2018) ("*Chevron* deference does not apply to Commerce's regulatory definition {of a party to the proceeding} because Commerce does not administer the standing statute"). Indeed, several years after *Corus Staal* the Federal Circuit recognized that in circumstances where, as here, there is no new factual or legal argument plaintiff could have made in the case brief that "might have affected Commerce's position, aided judicial review, or given {plaintiff} the relief it sought" it is inappropriate to consider 19 C.F.R. § 351.309 an absolute requirement. *See Itochu*, 733 F.3d at 1147. Put differently, the exceptions to the exhaustion doctrine apply equally to situations in which a party failed to include an argument in its administrative case brief.

Finally, Plaintiffs do not here assert a position "contrary" to the one presented to Commerce. *See* Defendant's Br. at 12. Plaintiffs' claims are thus not precluded by estoppel principles. Context matters. Well prior to the statements highlighted by Defendant, Commerce had already reversed its initially stated intent to conduct verification, claiming that in-person verification was not possible, hence the issuance of questionnaires "in lieu of performing an on-site verification." *See, e.g.,* Commerce Letter (Oct. 20, 2020) at 1 (Appx083328). Plaintiffs' subsequent references to Commerce's "verification" questionnaire and procedures in no way constituted "approval" of those procedures. *See* Defendant's Br. at 12. Instead, they merely reflect Plaintiffs' understanding that, as a practical matter given the late stage of the proceeding

9

and Commerce's prior flip-flop, the on-site verification "provided for" under the statute was not going to occur.

To be clear, Plaintiffs *never* stated that Commerce's alternate procedures constituted a "verification" that complied with the statute and regulations. Moreover, at the time of Plaintiffs' statements, Plaintiffs knew only that Commerce had obtained information, but not how far Commerce's treatment of that information would deviate from statutorily required verification practices. Plaintiffs reasonably believed Commerce would follow the statute, and its past practice, at least to the extent of treating verification "like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." *Bomont Industries v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990). As discussed further below, Commerce did no such thing: following this pseudo-"verification," major gaps in BGH's responses persisted, and, contrary to Commerce's established practice in similar situations, it arbitrarily declined to apply adverse inferences to fill these holes.

## II.   The COVID-19 Pandemic Did Not Provide Commerce With Discretion to Ignore Its Acknowledged Statutory and Regulatory Verification Procedures

As noted above, Commerce's *Final Determination* acknowledged it "was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation *as provided for in section 782(i) of {the Act}*." *See Final Determination* at 80018 (Appx084045) (also describing Commerce's final questionnaire as a "request for information *in lieu of verification*") (emphasis added). Thus, Commerce was aware its procedures did not comply with the statute. Tellingly, Defendant makes no attempt to square its contrary litigating position with Commerce's administrative pronouncements. Implicitly recognizing that it cannot do so, Defendant simply asserts that either: (1) the statute "does not provide" for an on-site verification (*i.e.*, the opposite of what Commerce itself concluded in the

*Final Determination*), or (2) even if the statute did provide for on-site verification, Commerce was permitted to ignore such requirements due to the ongoing COVID-19 pandemic. Defendant's Br. at 12-17.  But the COVID-19 pandemic did not amend the U.S. Constitution, confer upon Commerce authority to unilaterally amend Congress' statute, or otherwise catapult Commerce into a lawmaking role.  In short, none of Defendant's arguments have merit.

### A.  Defendant's Litigating Position is Not Entitled to *Chevron* Deference; Even if it Were, No "Genuine Ambiguity" Exists

Defendant first asserts that this Court should afford *Chevron* deference to Commerce's verification procedures because the statute "does not provide how the agency must conduct a verification." *See* Defendant's Br. at 12-13; *see generally Chevron, U.S.A., Inc. v. Nat. Res Defendant's Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("*Chevron*").  Defendant is doubly wrong.  As an initial matter, the Government's litigating position is not entitled to *Chevron* deference—particularly where it directly contradicts Commerce's administrative statements.  *Cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (quoting *Investment Company Institute v. Camp*, 401 U.S. 617, 628 (1971)) ("{W}e have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question, on the ground that 'Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.'").  Put simply, because Commerce acknowledged on-site verification is "provided for" under the statute, *Chevron* deference is not available to support appellate counsel's alternate view.[4]

---

[4] Commerce's acknowledgement that an on-site verification is "provided for" under the statute also distinguishes this case from *Micron Tech. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997). As BGH notes, *Micron Tech*. found Commerce had discretion to devise verification procedures because it had "not formally defined verification requirements."  *See* BGH Br. at 13 (quoting *Micron Tech.* 117 F.3d at 1395).  Here, by contrast, Commerce acknowledged statutory

*(footnote continued on next page)*

More fundamentally, Defendant's position fails at *Chevron* "step one."  Congress

established the requirements of on-site verification and a post-verification report, *see* Plaintiffs'

Br. at 15-18, leaving no "genuine ambiguity" with respect to these issues, *see Kisor v. Wilkie*,

139 S. Ct. 2400, 2415 (2019).  The statute prescribes that Commerce "*shall* verify all

information relied upon in making a final determination in an investigation."  19 U.S.C. §

1677m(i)(1) (emphasis added).  Regardless of circumstances, Commerce must verify.  As for

what "verification" is, using "all the traditional tools of construction," *Kisor*, 139 S. Ct. at 2415,

including the "authoritative" Statement Administrative Action ("SAA"), *see* Plaintiffs' Br. at 18

(quoting 19 U.S.C. § 3512(d)), it is—at minimum—"in a foreign country" (*i.e.*, on-site) and is

followed by a verification report "prior to {a} final determination in an investigation."  SAA at

868.

Defendant and BGH attempt to read ill-defined exceptions into these minimum

requirements.  Congress created no such exceptions.  Contrary to Defendant's assertions, *see*

Defendant's Br. at 14, the SAA does not (and cannot) permit Commerce to conduct verification

only "where practicable."  Section 782(i)(1)'s language is mandatory and unequivocal—"shall."

Moreover, the relevant portion of the SAA also opens with mandatory language—"will verify

information in a foreign country."  SAA at 868.  "{W}here practicable" appears two paragraphs

later, referring only to the precise timing of verification and the need for pre-verification notices,

without referencing location.  SAA at 868.  Likewise, Commerce's regulations do not (and

cannot) permit Commerce to forego verification during an antidumping investigation.  *See*

Defendant's Br. at 14.  While "Commerce, like other agencies, must follow its own regulations,"

---

minimum standards, which it claimed it was "unable" to follow.  *Final Determination* at 80018
(Appx084045).

*Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996), an agency regulation cannot override a statutory mandate, *e.g.*, *Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980) ("{agency's} 'interpretation' of the statute cannot supersede the language chosen by Congress."); *see also* 19 U.S.C. § 3513(a)(2) (authorizing regulations to "implement{}"—not rewrite—the URAA). Consistent with these precepts and the statute's plain text, 19 C.F.R. § 351.307(b)(1)(a) states Commerce "*will verify* factual information upon which {Commerce} relies in…an antidumping investigation" and other specified proceedings. 19 C.F.R. § 351.307(b)(1)(b) (emphasis added). By contrast, Commerce "may {choose to} verify" only in other proceedings not specifically enumerated, and not relevant here. *See id.*

In sum, neither response brief identifies any ambiguity sufficient to create a "practicability" exception to on-site verification. With respect to the verification report, no party seriously challenges that it must be both "prior to" the final determination and issued by Commerce, or suggests these prerequisites were met. SAA at 868; 19 C.F.R. § 351.307(c). As the statute, informed by "all the traditional tools of construction," *Kisor*, 139 S. Ct. at 2415, unambiguously indicates on-site verification and a timely verification report are mandatory, the analysis must conclude at *Chevron* step one.

### B. Even Under *Chevron* Step Two, the COVID-19 Pandemic Does Not Justify Ignoring the Statute and Regulations

Defendant's and BGH's remaining arguments assume some genuine ambiguity exists with respect to whether on-site verification and the timely issuance of a verification report are mandatory, and thus speak to *Chevron* "step two"—an analysis this Court need not undertake based on the foregoing discussion. Regardless, these arguments fail. Defendant acknowledges the SAA, Commerce's regulations, and case law "provide certain procedures by which Commerce ordinarily conducts a verification," but contends Commerce was not required to

13

follow such procedures "given the exigencies of the COVID-19 pandemic."  Defendant's Br. at 8, 13; *see also* BGH Br. at 13.   This slipperiest of slopes implies the untenable conclusion that Congress authorized Commerce to unilaterally determine when it will—and will not—follow the law.  Pandemic-related staffing challenges cannot justify Commerce's rewriting of minimum verification standards "provided for" by statute in a manner that seriously prejudices a domestic industry materially injured by dumped imports.  As the Supreme Court has recently made clear "our system does not permit agencies to act unlawfully even in the pursuit of desirable ends." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021).

Moreover, even if the statute did afford Commerce some flexibility regarding these minimum prerequisites, such flexibility is not absolute.  For example, as an alternative to Plaintiffs' *Chevron* step one argument, multi-day, real-time videoconferencing was suggested as a substitute for the mandated on-site verification.  *See* Defendant's Br. at 15; Plaintiffs' Br. at 22-23.  While not "on-site," this could have allowed Commerce to approximate normal procedures and more thoroughly assess the credibility of BGH's data.  *See* Plaintiffs' Br. at 23-24. Commerce's single questionnaire served neither purpose, and for want of explanation, Commerce's methodological choice was arbitrary.  Likewise, "verification" does not occur merely because BGH supplied a certain number of pages.  *See* BGH Br. at 14-15.  The purpose of a verification is to "test information provided by a party for accuracy and completeness," not amass new data.  *See Bomont*, 733 F. Supp. at 1508.  Commerce's unprobed acceptance of BGH's written questionnaire responses provided no such test.

Turning to the verification report, while the SAA and Commerce's regulations do not explicitly limit Commerce to a single document, both unambiguously require that Commerce report "methods, procedures, and results of verification" "prior to" its final determination.  *See*

14

SAA at 868; 19 C.F.R. § 351.307(c).  Commerce's final determination and IDM, on which

Defendant relies, *see* Defendant's Br. at 16, do not satisfy this temporal requirement.  Nor does

Defendant's *post hoc* rationale concerning "safe{} and timely" verification, *see* Defendant's Br.

at 16-17, explain how the work-from-home environment precluded publication of a report of

Commerce's so-called "verification."

 BGH's claim that the "in-lieu of on-site verification" questionnaire and response

constituted the mandated "report" is similarly without merit.  *See* BGH Br. at 9-10.  Commerce's

questionnaire did not speak to "methods" and "procedures" for evaluating responses, nor could it

possibly speak to "results."  *See* SAA at 868.  As for the response, the report must be issued by

"Commerce," not BGH.  SAA at 868; *see also* 19 C.F.R. § 351.307(c).

 Finally, Defendant is wrong that Commerce's failures did not prejudice any party.  *See*

Defendant's Br. at 16-17.  Commerce admitted to changing the final margin calculation based on

its "findings related to our request for information in lieu of verification."  *Final Determination*

at 80018 (Appx084045).   The lack of a timely report precluded Plaintiffs from influencing such

changes or otherwise challenging Commerce's methods, procedures, and results in

administrative briefs.

**III.** **Commerce's Verification Findings Were Not Supported by Substantial Evidence**

 Defendant and BGH contend that substantial evidence supported Commerce's

determination that errors identified during "verification" were "limited" and "minor," and

therefore did not impugn BGH's data as a whole.  *See* Defendant's Br. at 17-18; BGH Br. at 18.

Defendant and BGH further claim Commerce would normally accept such errors in an on-site

verification, and correctly did so here.  *See* Defendant's Br. at 19; BGH Br. at 18.  The record

does not support these positions or Defendant's bid to have it both ways.

The claim that BGH's errors were limited to "isolated transaction{s} that did not affect any other sales in BGH's home market database," Defendant's Br. at 18; *see also* BGH Br. at 18, is unsupported by the factual record.  BGH did not correct these errors *sua sponte*.  Instead, it identified these errors—which affected two of the four sales (50%) subject to additional query in Commerce's questionnaire—*only after* Commerce requested documentation to validate the accuracy of BGH's reporting.  BGH did not voluntarily supply any documentation validating the remainder of its sales reporting, nor did it claim to have reviewed its other submitted data for similar errors.  *See generally* BGH Verification QR at 1-3 (Appx083336-083338).

Instead, BGH confined itself to providing what Commerce subsequently deemed "plausible explanations" for the errors in these two individual transactions.  *See* Final IDM at 43 (Appx084029).  But "plausible explanations" are not verified facts and, equally problematically, BGH's explanations call into question the validity of BGH's [          ] unscrutinized transactions.  That is, many of the "explanations" Defendant references would logically impact *all* of BGH's data.  *See* Defendant's Br. at 17 (noting, *inter alia*, alleged time constraints and difficulties in preparing submissions during the pandemic).  As Commerce undertook no further inquiry, it simply had no way of knowing whether the identified errors reflected reporting issues beyond the four examined sales.

Nor does record evidence support characterizing the errors as "minor."  *See* Defendant's Br. at 17; BGH Br. at 18.  As Plaintiffs explained, Commerce's correction of BGH's erroneous tensile strength reporting (STRENGTHH) for one of the examined home market sales changed the relevant CONNUM to [                              ] BGH's dumping margin when incorporated into Commerce's margin calculations.  *See* Plaintiffs' Br. at 28.  Any error that prevents Commerce from its statutory obligation to calculate an accurate dumping margin can

hardly be considered minor.  Moreover, Commerce *had previously* asked BGH to "confirm that STRENGTHH is correctly reported for each of BGH Siegen's home market sales," including SEQH [     ].  *See* Letter from Commerce (Jun. 4, 2020) at 5 (Appx081361).  That STRENGTHH reporting errors persisted in home market sales data during "verification" indicates, at a minimum, BGH's carelessness, if not [

                                        ].  Such significant concerns compelled further scrutiny.

      Defendant and BGH finally contend that Commerce was obligated to accept BGH's allegedly "minor" corrections because Commerce would normally accept such errors at the beginning of an on-site verification.  *See* Defendant's Br. at 17; BGH Br. at 18.  But, Commerce did not conduct an on-site verification.  BGH cannot have it both ways, vehemently opposing the heightened scrutiny of on-site verification while laying claim to its benefits.  While Commerce's on-site verification agenda typically informs respondents that any minor errors identified must be reported to Commerce officials at the beginning of verification, *see, e.g. Universal Polybag Co. v. United States*, 577 F. Supp. 2d 1284, 1294 (Ct. Int'l Trade 2008) (describing typical Commerce verification agenda), Commerce's questionnaire "in lieu of on-site verification" included no such instructions, *see generally* Letter from DOC (Oct. 20, 2020) (Appx083328-083333).  This distinction reflects the differences between on-site verification and the modified procedures used here.  During an on-site verification, Commerce routinely tests proffered first-day corrections during the remainder of verification.  By contrast, when "verification" consists of a single paper questionnaire, Commerce has no way of confirming the accuracy of a respondent's claimed corrections nor the extent to which such corrections were limited or minor.  Thus, BGH's identification of errors on page two of its single written response, *see* BGH Br. at 18, is not equivalent to a respondent identifying errors on day one of an on-site verification.

Rather, it is tantamount to a respondent submitting such corrections in the final minutes of an on-site visit, which Commerce would normally not accept. *See generally Universal Polybag*, 577 F. Supp. 2d at 1295-1296 (upholding Commerce's rejection of corrections provided later in verification because "the verification team was unable to verify these changes").

In sum, even if Commerce's procedures in lieu of on-site verification were lawful, the resulting findings were unsupported by substantial evidence. In particular, after BGH revealed errors in half of the individually audited sales significant enough to [

], Commerce should, at a minimum, have reviewed and validated additional sample sales to confirm the validity of BGH's claim that these were the only sales affected. The statute simply does not allow Commerce to rely on data determined to be only "plausibly" correct. *See generally* 19 U.S.C. §§ 1677m(i), 1677e(a)(2)(D) (requiring that Commerce either (a) verify all information relied upon in making a final determination or (b) apply facts available where a respondent provides information that cannot be verified). As this did not occur, Commerce's verification findings were unsupported by substantial evidence.[5]

## IV.   Commerce's *Final Determination* Unlawfully Relied Upon BGH's Unreconciled Cost Information

Defendant and BGH erroneously claim that BGH either fully reconciled its cost data or that BGH's accounting systems made such reconciliation impossible. *See* Defendant's Br. at 20-24; BGH Br. at 20-28. However, their layers of unnecessary complexity cannot obscure a very

---

[5] Defendant appears to confuse Plaintiffs' distinct requests for relief. *See* Defendant's Br. at 30, n.4. Arguments as to whether Commerce should be required to apply adverse facts available ("AFA") due to the errors uncovered in BGH's sales reporting are premature. *See* Plaintiffs' Br. at 26-30. Commerce must first comply with the statute to determine whether BGH's reporting is verifiable. If not, AFA would be warranted. *See, e.g.*, *Universal Polybag*, 577 F. Supp. 2d at 1295 (upholding Commerce's application of AFA where a respondent's sales traces failed verification). Commerce's reliance on BGH's unreconciled cost data is a distinct deficiency that may separately warrant the application of AFA. *See* Plaintiffs' Br. at 30-36 and Section IV.

simply accounting problem: BGH's reported costs for merchandise under consideration ("MUC") do not tie to its audited financial records.

### A.   BGH Did Not Reconcile Its Reported Costs to Its Audited Financial Records

The statute requires that Commerce ensure a respondent's costs "reasonably reflect the costs associated with the production and sale" of MUC.  *See* 19 U.S.C. § 1677b(f)(1)(A).  To do this Commerce follows the sequential process articulated in *Myland Indus., Ltd. v. United States*, 31 C.I.T. 1696 (2007).  As BGH acknowledges, "{t}he first step is to confirm by way of the cost reconciliation that 'the respondent has accounted for all costs before allocating those costs to individual products.'"  BGH Br. at 22.  Only after this cost reconciliation is complete can Commerce move to the second step (*i.e.* examining the respondent's methodology for allocating those costs to specific products).  *See* BGH Br. at 23 (citing *Myland*, 31 C.I.T. at 1703).  This sequence is logical: Commerce cannot evaluate a cost-allocation methodology without first knowing that the total amount to be allocated is accurate.  Yet here Commerce (and BGH) inexplicably skipped *Myland*'s critical first step.

The compounding flaws in BGH's so-called "reconciliation" are readily apparent when examining Attachment 1 of Commerce's cost calculation memorandum, which replicates BGH's methodology.  *See* Final Cost Calculation Memorandum (Dec. 7, 2020) ("Cost Calc. Memo.") at Attachment 1 (Appx098291), *see also* BGH Br. at 22 (claiming Attachment 1 demonstrates BGH's reconciliation).  BGH first determined that MUC represented [      ]% (d) [6] of its companywide standard costs during the POI.[7]  However, BGH's companywide *standard* costs ([

---

[6] For convenience, figures are followed by Commerce's letter designation, *e.g.*, "(d)," from the "Formula" column of Attachment 1 (Appx098291).

[7] As BGH explains, the "standard costs" used to devise the [      ]% ratio are imprecise standard costs used by BGH to value its monthly finished goods inventory for broad product types.  *See*

*(footnote continued on next page)*

]) (c) are  [              ] (f) [              ] its companywide *actual* costs as reported in its audited financial statement ([                    ]) (g).  Attachment 1 (Appx098291); *see also* Table 1, *infra* (Flaw One).  BGH attributes this [          ] largely to the cost of major raw materials being excluded from its standard costs, BGH Br. at 22-23.

To calculate "actual" MUC costs, BGH then used its *standard cost ratio* ([      ]%) to allocate its companywide financial statement costs, calculating that [              ] (i) of its financial statement costs were MUC-related.  But this crude, back-of-the-envelope estimate implicitly assumes MUC accounts for [    ]% of the [              ] raw material costs included in BGH's companywide *financial statement* costs.  As these were [          ] from BGH's companywide *standard* costs, however, this assumption is unsupported by the factual record.[8]  *See* Attachment 1 (Appx098291); Table 1 (Flaw Two).

BGH's final comparison of this estimate of "actual" MUC costs ([              ]) (i) and the sum of product-specific costs reported in BGH's cost database ([              ]) (k) exhibits a [          ] difference, *see* Table 1 (Flaw Three), underscoring the flaws in BGH's methodology.  In sum, BGH did not demonstrate that its product specific costs accounted for all costs because it could not demonstrate what its actual MUC costs were.

---

BGH Br. at 26-27.  BGH relied on different standard costs to report CONNUM-specific costs in its cost database, relying on standard pricing calculations which "are tailored to the specific raw materials and fabrication steps required for each specific product."  Id. at 27.  BGH only ran these "tailored" calculations for MUC, not non-MUC, and therefore could not link these "tailored" standard costs to its audited financial records.  This is the heart of the problem.

[8] BGH claims its cost figures are reasonable because MUC accounts for [      ]% of the quantity and [    ]% of the revenue of its sales.  *See* BGH Br. at 21-22.  But these figures say nothing about MUC *costs*.  The record is silent as to whether MUC accounted for [      ]% of raw material costs, or some higher or lower proportion.

**TABLE 1**



*See* Cost Calc Memo, Attach. 1 (Appx098291)

BGH *claims* its pricing calculations must be accurate because its reported MUC costs were greater than its "actual" MUC costs. BGH Br. at 22. Defendant similarly asserts that Commerce reconciled everything once all costs "shifted to MUC under BGH's reporting methodology" are taken to account. Defendant's Br. at 22. But this puts the cart before the horse. Commerce must first determine what a respondent's total MUC costs are *before* it can assess whether respondent accounted for all such costs in its product-specific cost-allocation methodology. Put differently, BGH's claim that its cost-allocation methodology shifted "additional costs" to MUC would be true *only if* the total "actual" MUC cost figure ([                    ]) were correct. But, as detailed above, this figure is just a crude estimate based on Commerce's unsupported assumption that MUC accounted for [      ] of BGH's total company-wide material costs. If, for example, MUC actually accounted for [

] of these material costs, then BGH in fact *underreported* product-specific costs in its cost

database.  Without determining what portion of the [                    ] raw material costs is

actually attributable to MUC, BGH's total actual MUC costs cannot be determined on this

record, leaving Commerce no way of evaluating whether BGH's product-specific allocation

methodology was accurate.

**B.   BGH's Accounting System Did Not Make a Cost Reconciliation Impossible**

Defendant and BGH's assertions that the nature of BGH's cost accounting system made

it impossible to provide a complete and accurate cost reconciliation are similarly without merit.

*See* Defendant's Br. at 22; BGH Br. at 24-28.  Antidumping duty investigations are conducted

for specific products which routinely account for only a "minute" proportion of a respondent's

overall production and sales.  This is not unique and Commerce nonetheless requires respondents

to reconcile reported product-specific costs to their audited financial statement to demonstrate

that the respondent's reported antidumping costs capture all actual costs.  *See generally Myland*,

31 C.I.T. at 1703 (cost reconciliation is a necessary "starting point for verifying the accuracy of a

respondent's reported costs").  Indeed, the Federal Circuit recently rejected the notion that the

"nature of {a respondent's} accounting" system can absolve a respondent from reconciling its

costs. *See Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1090 (Fed. Cir.

2021).[9]

---

[9] Contrary to Defendant's assertions, *see* Defendant's Br. at 23-24, this Court's determination in *Hyundai Elec. & Energy Sys. Co. v. United States*, 466 F. Supp. 3d 1303 (Ct. Int'l Trade 2020), and the Federal Circuit's subsequent affirmation of that decision are both relevant and on-point. As in *Hyundai*, Commerce here repeatedly asked BGH to reconcile its aggregate reported costs of production to its financial statements. *See generally* Plaintiffs Br. at 8-12.  And, similar to the respondent in *Hyundai*, BGH repeatedly failed to do so.  That Commerce accepted BGH's "reconciliation" but declined to accept the respondent's in *Hyundai* only underscores the incongruity of Commerce's determination in this case.

Moreover, while the responsibility of demonstrating the completeness and accuracy of reported costs ultimately lies with BGH, *see* Plaintiffs' Br. at 31, such a reconciliation is hardly impossible, *see generally* BGH Br. at 24-28.  There are various ways BGH could have demonstrated what proportion of its actual audited financial statement costs were attributable to MUC.  For example, BGH states that it has "standard pricing calculations {that} are tailored to the specific raw materials and fabrication steps required for each specific product" that it sells.  BGH Br. at 27.  Rather than using these standard pricing calculations only for MUC, BGH could have used them for both MUC <u>and non-MUC</u> to demonstrate that when these standard pricing calculations are used to value all of its products, the sum of costs equals the total actual costs as reported in its audited financial statement ([                    ]).  Such a reconciliation would have demonstrated what BGH's actual POI MUC costs were (*i.e.*, *Myland* step one), and allowed Commerce to evaluate whether BGH reported all such costs in its antidumping database (*i.e., Myland* step two).  Instead, BGH performed these calculations only for MUC, producing a total MUC figure that did not tie to anything on its audited financial statement, and asked Commerce to assume it was correct.  This is the "deficiency" in BGH's standard pricing calculations.  *See* BGH Br. at 27. Commerce's decision to rely on BGH's calculation in the *Final Determination* was thus unsupported by substantial evidence and contrary to law.  This fact alone warrants remand.[10]

---

[10] BGH's contention that this Court must reject Plaintiff's challenge to Commerce's final determination because Plaintiffs did not argue that Commerce should have applied adverse facts available ("AFA") is absurd.  *See* BGH Br. at 29.  As Plaintiffs demonstrated, Commerce's decision was unlawful because, *inter alia*, Commerce relied on BGH's unreconciled cost data.  Such an unlawful determination cannot stand.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).  How exactly Commerce might remediate this deficiency is a question for remand.

NON-CONFIDENTIAL VERSION

## CONCLUSION

Commerce's *Final Determination* is both unlawful and unsupported by substantial evidence. Despite their best efforts to confuse, obfuscate, or bypass the fundamental issues, the arguments of Defendant and BGH cannot change (and largely do not even address) the significant challenges Plaintiffs raised with respect to Commerce's *Final Determination*. Accordingly, this Court should remand the determination with instructions that Commerce verify the information provided by BGH and thereby properly address the factual issues raised during the proceeding.

Respectfully submitted,

/s/ Myles S. Getlan

Myles S. Getlan
Jack A. Levy
Thomas M. Beline
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street NW, Suite 400
Washington, DC 20006
T: (202) 567-2313
F: (202) 567-2301
Dated: January 18, 2022        Email: mgetlan@cassidylevy.com

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

**<u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>**

The undersigned hereby certifies that the foregoing brief contains 6,978 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 7,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:    /s/ Myles S. Getlan
         Myles S. Getlan