**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY,<br>ELLWOOD NATIONAL STEEL COMPANY,<br>ELLWOOD QUALITY STEELS COMPANY, and<br>A. FINKL & SONS,<br><br>  Plaintiffs and Consolidated<br>  Defendant-Intervenors,<br>    v.<br><br>UNITED STATES,<br><br>  Defendant,<br><br>  and<br><br>BGH EDELSTAHL SIEGEN GMBH,<br><br><br>  Defendant-Intervenor and<br>  Consolidated Plaintiff. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Consol. Ct. No.  21-00077 |

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs respectfully provide this notice of supplemental authority concerning Commerce's remand redetermination in *Bonney Forge Corp.*.  *See Bonney Forge Corp. et al. v. United States*, Court No. 1:20-cv-03837, ECF Doc. 61, *Final Results of Redetermination Pursuant to Court Remand* (June 30, 2022) ("*Bonney Forge Redetermination*"), attached as **Exhibit 1**.  The *Bonney Forge Redetermination* supports Plaintiffs' arguments regarding the futility exception to the exhaustion doctrine.

In the *Bonney Forge Redetermination,* Commerce contends that the administrative case brief was not the "appropriate time" to raise arguments concerning verification procedures

1

because, with only 63 days remaining before the final determination, it was "far too late in the proceeding for Commerce to pursue the request."  *Id.* at 13-14.  Commerce continues,

> Case briefs are intended to allow parties to argue about issues arising from a closed factual record.  Raising the possibility of a virtual verification for the first time in a case brief is simply too late in the proceeding for Commerce to reverse course, sort out the significant logistics involved, conduct verifications, draft verification reports, analyze a second round of briefs, and hold another hearing, before issuing the final determination by the statutory deadline.  *Id*. at 13.

Put differently, Commerce was "powerless to grant the relief requested," *see Carr v. Saul*, 141 S. Ct. 1352, 1361 (2021) (quoted in Plaintiffs' Reply Br. at 6), because Commerce simply could not conduct a verification after submission of case briefs.  This corroborates Plaintiffs' futility arguments in this action.  Indeed, in this action, there were only 28 days between the filing of case briefs and the final determination[1] — *i.e.*, *less than half* of the time available in *Bonney Forge*.  Commerce simply could not have arranged an on-site verification after case briefs.  Thus, such arguments qualify for the futility exception to the exhaustion doctrine.  *See* Plaintiffs' Reply Br. at 6-8.

Should the Court consider supplemental briefing on this issue appropriate, Plaintiffs would be pleased to supply a brief for the Court's consideration.

---

[1] Here, administrative case briefs were submitted on November 9, 2020; the final determination was signed on December 7, 2020.

Respectfully submitted,

/s/ Myles S. Getlan

Myles S. Getlan
Jack A. Levy
Thomas M. Beline
James E. Ransdell
Nicole Brunda

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street NW, Suite 400
Washington, DC 20006
T: (202) 567-2313
F: (202) 567-2301
Email: mgetlan@cassidylevy.com

Dated:  July 7, 2022

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

**<u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>**

The Rules of the U.S. Court of International Trade and the Standard Chambers

Procedures do not specify a word count limitation for notices of supplemental authority.

Nevertheless, notices of supplemental authority are commonly accepted by the court.  *See, e.g.*,

*SeAH Steel Corp. v. United States*, USCIT Consol. Ct. No. 19-00086, ECF Doc. 99 (Dec. 7,

2020).   In the spirit of Federal Rule of Appellate Procedure 28(j), undersigned counsel hereby

certifies that the foregoing notice of supplemental authority contains 347 words, exclusive of the

caption block, document title, signature block, and certificates of counsel, and therefore does not

exceed the 350 word limit specified in the Federal Rules of Appellate Procedure.


By:    <u>/s/ Myles S. Getlan    </u>
              Myles S. Getlan

# Exhibit 1

**UNITED STATES DEPARTMENT OF COMMERCE**
Office of the General Counsel
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C. 20230

June 30, 2022

**FILED ELECTRONICALLY VIA CM/ECF**

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

Re:     Redetermination Pursuant to Court Remand Order in
         *Bonney Forge Corp. et al. v. United States*, Ct. No. 20-03837

Dear Mr. Toscano:

Pursuant to the Court's order of February 2, 2022, please find attached the U.S. Department of Commerce's Redetermination Pursuant to Court Remand in the above-captioned action.

In accordance with Court Rule 56.2(h)(1), filing of the administrative record index for the remand proceeding will follow under separate cover. Should you have any questions concerning the matter, please contact me at (240) 449-5906.

Respectfully submitted,

/s JonZachary Forbes
JonZachary Forbes
Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance

Attachment

Mr. JonZachary Forbes
June 30, 2022
Page 2

cc:

**Roger Brian Schagrin**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: rschagrin@schagrinassociates.com

**Kara Marie Westercamp**
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 305-7571
Fax: (202) 514-8624
Email: kara.m.westercamp@usdoj.gov

**David G. Forgue**
Barnes, Richardson & Colburn, LLP
303 East Wacker Drive
Suite 305
Chicago, IL 60601
(312) 297-9555
(312) 565-1782 (fax)
dforgue@barnesrichardson.com

A-533-891
Remand
Court No. 1:20-cv-03837
POI: 10/1/2018 – 9/30/2019
**Public Document**
E&C/OVII: CM

***Bonney Forge Corporation and United Steel, Paper and Forestry, Rubber, Manufacturing
and Service Workers International Union v. United States,*
Court No. 1:20-cv-03837, Slip Op. No. 22-8 (CIT February 2, 2022)**

## FINAL RESULTS OF REDETERMINATION
## PURSUANT TO COURT REMAND

## I. SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the Court), issued on February 2, 2022.[1]  These final results of redetermination concern

Commerce's final determination in the less-than-fair-value (LTFV) investigation of forged steel

fittings from India, covering the period October 1, 2018, through September 30, 2019.[2]  The

plaintiffs are Bonney Forge Corporation and United Steel, Paper and Forestry, Rubber,

Manufacturing, Energy, Allied Industrial and Service Workers International Union (the

petitioners).

Prior to the COVID-19 pandemic, following a preliminary determination, Commerce

would generally conduct on-site verification[3] of information submitted by mandatory

---

[1] *See Bonney Forge Corporation and United Steel, Paper and Forestry, Rubber, Manufacturing and Service Workers International Union v. United States*, Court No. 1:20-cv-03837, Slip Op. No. 22-8 (CIT February 2, 2022) (*Remand Order*).
[2] *See Forged Steel Fittings from India:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 66306 (October 19, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[3] There is no statutory definition of "verification."  For purposes of this proceeding, we refer to our pre-COVID verification procedures, which generally involved traveling to a respondent's facilities as "on-site verification."  Additionally, while the petitioners' case brief requests that Commerce conduct a "virtual verification" they do not define or otherwise explain what they meant by the term.  Commerce assumes that the petitioners' case brief request is for a virtual verification conducted in "real time."  Under this assumption and to distinguish between the

respondent(s) at the party's facilities abroad.[4]  However, in the underlying investigation, Commerce was unable to conduct an in-person, on-site verification of the sole cooperative mandatory respondent, Shakti Forge Industries Pvt. Ltd. (Shakti), due to the COVID-19 pandemic and ensuing restrictions.[5]  As a result, Commerce issued Shakti post-preliminary questionnaires in lieu of a traditional, on-site verification and relied on "facts otherwise available" in reaching its *Final Determination*.[6]  In its *Remand Order*, the Court remanded Commerce's decision, faulting Commerce for not directly addressing the petitioners' request for "virtual verification" in their case brief.[7]  The Court also suggested that Commerce may wish to consider conducting verification of Shakti on remand to comply with its statutory obligations.[8]

Consistent with the Court's *Remand Order*, Commerce is providing a fuller explanation as to the option of a remote, real-time verification, and why a verification conducted in real time was not plausible during the investigation.  Further, upon reconsideration, Commerce is making a new agency determination that the post-preliminary questionnaires issued by Commerce satisfy Commerce's verification requirements under section 782(i) of the Act.  As described in greater detail below, we determine that the use of post-preliminary questionnaires in lieu of an in-person, on-site verification, and our subsequent analysis of the information collected via those questionnaires reasonably constituted verification of the factual information relied upon by

---

verification conducted in the underlying investigation and the petitioners' request, we refer to the petitioners' request for "virtual verification" as a request for a "real-time virtual verification" (*i.e.*, a verification conducted remotely by Commerce employees in the United States via a videoconferencing platform with live participation from company representatives).

[4] *See* Memorandum, "Cancellation of Verification and Briefing Schedule," dated August 4, 2020 (Verification Cancelation Memorandum), at 1.

[5] *Id.*

[6] *See Final Determination* IDM at 2.  In the *Final Determination*, Commerce cited section 776(a)(2)(D) of the Tariff Act of 1930, as amended (the Act) which provides that in situations where information has been provided, but the information cannot be verified, Commerce will use "facts otherwise available" in reaching the applicable determination.

[7] *See Remand Order* at *e.g.*, 15; *see also* footnote 3.

[8] *Id.* at *e.g.*, 25.

Commerce in making its determination. This is consistent with our verification practice that has evolved during the COVID-19 pandemic, as highlighted below. We also discuss the factual predicate underpinning Commerce's exercise of discretion at the time of the investigation in declining to conduct a real-time virtual verification of Shakti through other means.

Commerce first issued the analysis below in a Draft Remand.[9] All parties were given 13 days to comment on the Draft Remand and Commerce received comments from the petitioners and Shakti on June 1, 2022.[10] Commerce has provided responses to all comments received below following a restatement of the analysis from the Draft Remand, with minor revisions.

## II.    BACKGROUND

The underlying proceeding represents one of Commerce's earliest trade remedy investigations that was disrupted by the COVID-19 pandemic. On March 2, 2020, Shakti submitted its complete response to Commerce's Initial Questionnaire.[11] Shortly thereafter, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.[12] Four days later, Commerce prohibited all non-mission-critical travel, and transitioned employees to full-time remote work.[13] On March 24, 2020, the Government of India (GOI) imposed a nationwide lockdown that required all businesses to close and all residents to remain at home, with limited exceptions provided for the continuation of essential public services.[14] On March

---

[9] *See* Draft Results of Redetermination Pursuant to Court Remand, dated May 19, 2022.
[10] *See* Petitioners' Letter, "Forged Steel Fittings from India:  Comments on Draft Results of Redetermination Pursuant to Court Remand," dated June 1, 2022 (Petitioners' Draft Remand Comments); *see also* Shakti's Letter, "Forged Steel Fittings from India:  Comments on Draft Remand Results of Redetermination Pursuant to Court Remand, dated June 1, 2022 (Shakti's Draft Remand Comments).
[11] *See Forged Steel Fittings from India:  Preliminary Affirmative Determination of Sales at Less-Than-Fair-Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 FR 32007 (May 28, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM), at 4.
[12] *See Remand Order* at 5.
[13] *Id.* at 5 (citing https://www.commerce.gov/sites/default/files/2020-03/AllHandsCoronavirusUpdate3-16-20.pdf).
[14] *See, e.g.*, Shakti's Letters, "Forged Steel Fittings from India:  Shakti Forge Industries Pvt. Ltd. Extension Request for 2nd Supplemental Questionnaire Response," dated March 31, 2020 (Shakti's March 31, 2020 Letter); "Forged Steel Fittings from India:  Shakti Forge Industries Pvt. Ltd. Extension Request for Section A through C

31, 2020, the U.S. Department of State issued a Global Level 4:  Do Not Travel Advisory and
began repatriating U.S. citizens stranded abroad due to the limited, or nonexistent, flights to the
United States, along with airport closures, border closures, mandatory quarantines, and other
movement restrictions.[15]  Thus, the case record and Commerce's analysis illustrate how in a
matter of days, the then-emerging COVID-19 crisis upended nearly every aspect of daily life,
and created unprecedented global challenges, including for Commerce's investigatory and
verification processes.  Despite these challenges, as Commerce explains in detail below, the
record also demonstrates that Shakti continued to cooperate to the best of its ability and that
Commerce was able to satisfy itself that the information provided was reliable for purposes of
making a *Final Determination*.

Through a series of letters, Shakti conveyed the increasingly dire circumstances in India
and the difficulties it faced as the COVID-19 pandemic unfolded.  In an April 16, 2020, letter,
Shakti provided the GOI's extended lockdown order, and reiterated that because its business
operations were not exempt from the GOI's lockdown measures, its staff was legally barred from
accessing the company's facilities and faced fines and imprisonment for noncompliance.[16]  In
another letter requesting an additional extension of time, Shakti wrote:

> {T}he global COVID-19 pandemic has impacted India particularly hard.  The
> entire country of India has been under near-total lockdown for more than two
> months.  In light of the continued spread, the Indian government recently further
> extended the lockdown until June 30, 2020.[17]

---

Supplemental Questionnaire Response," dated April 16, 2020 (Shakti's April 16, 2020 Letter); and "Forged Steel
Fittings from India:  Shakti Forge Industries Pvt. Ltd. Extension Request for 2nd Supplemental Questionnaire
Response," dated April 20, 2020 (Shakti's April 20, 2020 Letter).
[15] *See* Verification Cancelation Memorandum at Attachment I.
[16] *See* Shakti's April 16, 2020 Letter.
[17] *See* Shakti's Letter, "Forged Steel Fittings from India:  Shakti Forge Industries Pvt. Ltd. Extension Request for
Section D 2nd Supplemental Questionnaire Response," dated June 18, 2020 (Shakti's June 18, 2020 Letter).

Additionally, Rajkot, Gujarat (*i.e.*, where Shakti's facilities are located), was classified as a "red zone hotspot" by the GOI, meaning that it experienced the most significant COVID-19 outbreak, and consequently, the most stringent and prolonged restrictions.[18]  As such, Shakti's staff was prohibited from leaving their homes, and subject to other COVID-related restrictions for an extended period of time beyond that required by the nationwide lockdown.  This fact along with the inability of Commerce officials to travel to India ruled out the possibility of an in-person verification.  Complicating matters, Shakti reported that:

> Further, unlike many offices in the United States, {Shakti} does not have robust work from home infrastructure.  Home computers and home internet connections are not widespread among {Shakti} personnel … Lastly, the fact remains that {Shakti} does not maintain many of its records pertaining to the anti-dumping investigation electronically.[19]

From this, it was clear that Shakti's employees lacked the ability to work remotely, and the company's mainly manual recordkeeping, which Shakti consistently reported as an issue from the very beginning of the investigation (*i.e.*, before COVID),[20] meant that it was unable to provide much of the information requested by Commerce during the lockdown.  Due to the exceptional circumstances, Commerce granted Shakti several weeks of extensions, which delayed the proceeding.[21]  With limited electronic records and an inability to reliably access the

---

[18] *Id.* at Attachments 2 and 3.

[19] *Id*. (citations omitted).

[20] *See*, *e.g.*, Shakti's Letter, "Shakti Forge Industries Pvt. Ltd. Extension Request for Section A Questionnaire Response:  Forged Steel Fittings from India (A-533-891)," dated January 21, 2020 ("these issues are compounded by the fact that {Shakti} does not maintain many of its records electronically.  Thus, a great deal of time is required to manually go through records to review and prepare the information requested by {Commerce}.")

[21] *Id.*; *see also*, *e.g.*, "Forged Steel Fittings from India:  Shakti Forge Industries Pvt. Ltd. Extension Request for Section BCD Questionnaire Response," dated February 6, 2020; "Forged Steel Fittings from India:  Shakti Forge Industries Pvt. Ltd. Extension Request for Section BCD Questionnaire Response," dated February 17, 2020; "Forged Steel Fittings from India:  Request to reconsider the extension granted to respond to Section D of the Original Anti-Dumping Questionnaire," dated February 20, 2020; "Forged Steel Fittings from India:  Shakti Forge Industries Pvt. Ltd. Extension Request for 2nd Supplemental Questionnaire Response," dated March 31, 2020; Shakti's April 16, 2020 Letter; and Shakti's April 20, 2020 Letter.

internet, it also became evident that attempting to conduct a real time virtual verification of Shakti would not be plausible.

Notwithstanding the unique complexities of the case, the investigation proceeded in accordance with the applicable statutory deadlines. On May 20, 2020, Commerce issued its *Preliminary Determination* and preliminarily found that Shakti did not sell subject merchandise at LTFV during the period of investigation.[22] In June 2020, the petitioners submitted three separate sets of comments expressing concerns with Shakti's cost allocation methodology and urging Commerce to collect additional information from Shakti.[23] Although the record clearly indicated that travel to, from, and within India was not possible after March 2020,[24] the petitioners did not mention verification at all in their post-preliminary comments.[25] On July 13, 2020, Shakti submitted rebuttal comments in response to the petitioners' post-preliminary comments.[26]

Between June and July 2020, Commerce issued Shakti Post-Preliminary Questionnaires, incorporating the petitioners' concerns, and requesting voluminous documentation from Shakti

---

[22] *See Preliminary Determination* PDM at 3-4.

[23] *See* Petitioners' Letters, "Forged Steel Fittings from India: Post Pre-Prelim Comments, SFIPL," dated June 11, 2020; and "Forged Steel Fittings from India: Additional Post Pre-Prelim Comments, SFIPL," dated June 16, 2020; and Petitioners' Letter, "Forged Steel Fittings from India: Additional Post Pre-Prelim Comments, SFIPL," dated June 25, 2020 (collectively, Petitioners' Post-Preliminary Comments).

[24] *See, e.g.*, Shakti's March 31, 2020 Letter ("Due to the COVID-19 global pandemic, very stringent protective measures are in place in India, such as: Government of India, has announced lock down of entire country of 1.30 Billion people …. Thus, except for the front-liners (Doctors, Police, daily need food *etc.*) engaged in essential services, no one is allowed to step outside home. All the business establishments have been closed by local authorities …. The punishment for violation of lockdown includes fine or imprisonment, or both. Thus, for {Shakti} it is legally impossible to open the factory/office premises and allow its staff to work on supplemental questionnaire response …. Also, due to restrictions placed on Airlines & local transportation the accounting consultant of {Shakti} cannot travel to {Shakti}'s office to guide and assist the lengthy supplemental." And from Attachment 1 of the GOI's lockdown measures: "All transport services air, rail, roadways – will remain suspended."). *See also* Shakti's Letter, "Antidumping Duty Investigation of Forged Steel Fittings from India (A-533-891): Extension Request for Comment on Particular Market Allegation," dated April 7, 2020 (Shakti's April 7, 2020 Letter).

[25] *See* Petitioners' Post-Preliminary Comments.

[26] *See* Shakti's Letter, "SFIPL's Rebuttal Comment on Petitioner second and third post preliminary comment: Forged Steel Fittings from India," dated July 13, 2020 (Shakti's July 13, 2020 Rebuttal Comments).

to substantiate its reported cost and sales information.[27]  In preparing its response to the Post-Preliminary Questionnaires, Shakti identified three inadvertent errors affecting a small number of its reported CONNUMs, theoretical weight calculations, and costs.[28]  Shakti requested that Commerce allow it to correct the errors as part of "minor corrections," an important element of traditional on-site verifications that provides respondents a final opportunity to correct any minor errors before the information is verified.[29]  Shakti also noted that the errors it identified and wished to correct related to the same issues raised by the petitioners in their post-preliminary deficiency comments.[30]  Commerce accepted Shakti's minor corrections request on July 17, 2020.[31]  Shakti subsequently filed a 1,998-page response to Commerce's Post-Preliminary Questionnaires, as well as revised sales and cost databases.[32]  The petitioners did not comment on Shakti's responses to the Post-Preliminary Questionnaires.

On August 4, 2020, Commerce issued a memorandum to the file formally canceling on-site verification and setting a deadline for case and rebuttal briefs.[33]  In the Verification Cancelation Memorandum, Commerce stated the following:

> we would normally proceed to verification of the responses provided by Shakti. However, during the course of this investigation, a Global Level 4 travel advisory

---

[27] *See* Commerce's Letters, "Antidumping Duty Investigation of Forged Steel Fittings from India," dated June 15, 2020 (Cost Post-Preliminary Questionnaire); and "Antidumping Duty Investigation of Forged Steel Fittings from India:  Sixth Supplemental Questionnaire," dated July 2, 2020 (Sales Post-Preliminary Questionnaire) (collectively, Post-Preliminary Questionnaires).

[28] *See* Shakti's July 13, 2020 Rebuttal Comments at 5-7.

[29] "Minor corrections" is not a term found in the Act or the regulations, but a term of art with a distinct meaning within Commerce's verification practice.  *See Reiner Brach GmbH & Co. KG v. United States*, 206 F. Supp. 2d 1323, 1334 (CIT 2002) (discussing "Commerce's practice of accepting minor adjustments" or "minor corrections" during verification); *see also Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1339 (Fed. Cir. 2021) (discussing the possible acceptance of "minor corrections" as part of Commerce's verification agenda).

[30] *See* Shakti's July 13, 2020 Rebuttal Comments at 7.

[31] *See* Commerce's Letter, "Antidumping Duty Investigation of Forged Steel Fittings from India:  Minor Corrections and Extension of Time Requests," dated July 17, 2020.

[32] *See* Shakti's Letters, "Full Response for 5th Supplemental Questionnaire Response:  Forged Steel Fittings from India," dated July 6, 2020 (Shakti's Cost Post-Preliminary Questionnaire Response); and "Response for 6th Supplemental Questionnaire Response:  Forged Steel Fittings from India," dated July 23, 2020 (Shakti's Sales Post-Preliminary Questionnaire Response) (collectively, Shakti's Post-Preliminary Questionnaires Response).

[33] *See* Verification Cancelation Memorandum.

was imposed, preventing Commerce personnel from traveling to conduct
verification.  Due to this, as well as the impending statutory deadline for the
completion of the final determination, we are unable to conduct verification in
this investigation ….  Accordingly, as we are unable to proceed to verification in
this investigation for reasons beyond our control, we intend to rely on the
information submitted on the record, which we relied on in making our
*Preliminary Determination* (and as further developed via responses to subsequent
supplemental questionnaires and factual information submitted on the record), as
facts available in making our final determination.[34]

The Verification Cancelation Memorandum shows that Commerce's concept of verification at

the time assumed it would take place on-site and in-person, with very few exceptions made under

limited circumstances.[35]  However, as discussed below, since the completion of the underlying

investigation, Commerce has reconsidered the meaning of the term "verification" in light of the

prolonged international restrictions resulting from the ongoing COVID-19 pandemic.[36]  The

---

[34] *Id.* (quotations and internal citations omitted).

[35] Commerce is unaware of a virtual or offsite verification being conducted under circumstances similar to Shakti's.
For example, as the Court notes (*see Remand Order* at 23), Commerce verified a Pakistani plastics producer at the
Washington, D.C. office of its trade counsel.  However, the producer was able to send all relevant officials to
Washington, D.C. to meet with Commerce personnel along with almost all relevant documentation.  Moreover, the
producer was able to provide adequate remote access to its electronic systems enabling access to all remaining
personnel and documentation.  *See Polyethylene Terephthalate Resin from Pakistan:  Final Determination of Sales
at Less Than Fair Value*, 83 FR 48281, 48282 (September 24, 2018), at fn. 6.

[36] *See, e.g.*, *Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Final Determination of Sales at
Less Than Fair Value*, 85 FR 80018 (December 11, 2020) ("Commerce was unable to conduct on-site verification of
the information relied upon in making its final determination in this investigation as provided for in section 782(i) of
{the Act}.  Accordingly, we took additional steps in lieu of an on-site verification and requested additional
documentation and information."); *see also Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe
from the Russian Federation:  Preliminary Affirmative Determination of Sales at Less Than Fair Value,
Postponement of Final Determination, and Extension of Provisional Measures*, 86 FR 8891 (February 10, 2021)
("As provided in section 782(i)(1) of the Act, Commerce intends to verify the information relied upon in making its
final determination,  Normally, Commerce verifies information using standard procedures, including an on-site
examination of original accounting, financial, and sales documentation.  However, due to current travel restrictions
in response to the global COVID-19 pandemic, Commerce is unable to conduct on-site verification in this
investigation.  Accordingly, we intend to verify the information relied upon in making the final determination
through alternative means in lieu of an on-site verification."); and *Raw Honey from Brazil:  Final Determination of
Sales at Less Than Fair Value*, 87 FR 22182 (April 14, 2022) ("Commerce was unable to conduct on-site
verification of the information relied upon in making its final determination in this investigation.  However, we took
additional steps in lieu of an on-site verification to verify the information relied upon in making this final
determination, in accordance with section 782(i) of {the Act}.").

courts have repeatedly affirmed Commerce's broad discretion in determining what constitutes verification.[37]

On August 11, 2020, the petitioners submitted a case brief, in which they referenced, for the first and only time, virtual verification. Specifically, the petitioners stated that "{i}f Commerce does not find that {Shakti}'s information cannot be verified, it should verify {Shakti}'s information remotely."[38] The remainder of the petitioners' case brief and rebuttal case brief[39] focused on the petitioners' issues with Shakti's reported cost information. Further, the petitioners' sole reference to verification was in the context of the presentation of their concerns with Shakti's cost reporting and they did not propose any specific methodology for conducting a verification remotely. Because the petitioners did not raise the concept of a remote verification until the briefing stage, when the record was closed to new factual information, and did not provide any explanation of the methodology or identify any missing documentation from the 1,998 additional pages that were provided in support of Shakti's Post-Preliminary Questionnaire Responses, Commerce did not specifically address this aspect of the petitioners' verification comment.

A public hearing was held via teleconference on September 11, 2020.[40] At the administrative hearing, the petitioners again urged Commerce to rely on adverse facts available (AFA) with respect to Shakti, but did not comment on the issue of verification, even though it was raised by Shakti, when it argued that by responding fully and accurately to each of

---

[37] *See, e.g., Yantai Timken Co., Ltd. v. United States*, 521 F. Supp. 2d 1356, 1369 (CIT 2007); *Hercules, Inc. v. United States*, 673 F. Supp. 454, 469 (1987) ("The decision to select a particular {verification} methodology rests solely within Commerce's sound discretion."); and *American Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994) ("{T}he statute gives Commerce wide latitude in its verification procedures.").

[38] *See* Petitioners' Letter, "Forged Steel Fittings from India: Submission of Case Brief," dated August 11, 2020 (Petitioners' Case Brief), at 19.

[39] *See* Petitioners' Letter, "Forged Steel Fittings from India: Submission of Rebuttal Brief," dated August 24, 2020.

[40] *See* Neal R. Gross and Co., Inc.'s Letter, "Public Hearing in the Matter of the Antidumping Duty Investigation of Forged Steel Fittings from India," dated September 11, 2020 (Hearing Transcript).

Commerce's questionnaires, Commerce "has already conducted a virtual verification."[41]   The

petitioners' omission of any mention of verification at the hearing further reinforced

Commerce's understanding that the request for remote verification in their case brief was only

included to emphasize their material – or overarching – concerns with the accuracy of Shakti's

cost reporting.

On October 13, 2020, Commerce published its *Final Determination*, in which Commerce

calculated a *de minimis* final weighted-average dumping margin for Shakti.[42]   On October 21,

2020, the petitioners filed a ministerial error allegation alleging that Commerce committed an

"unintentional" error by accepting Shakti's cost reporting.[43]   The petitioners stated that "{t}his

error was unintentional in that had Commerce considered all the information of record, it would

not have agreed with {Shakti},"[44] and suggested Commerce remedy the "error" by applying

AFA.[45]   On October 23, 2020, Shakti filed rebuttal comments in response to the petitioners'

ministerial error allegation.[46]   In its rebuttal comments, Shakti reiterated that the narrative

excerpts cited by the petitioners were taken out of context and manipulated, and the allegation

predicated on incorrect and incomplete information.[47]

On November 20, 2020, Commerce issued its response to the petitioners' ministerial

error allegation, finding that the allegation did not constitute a ministerial error, as it did not meet

the regulatory definition of the term.[48]   Commerce further stated that it had considered the full

---

[41] *Id.* at 49-50.
[42] *See Final Determination* IDM.
[43] *See* Petitioners' Letter, "Forged Steel Fittings from India:  Ministerial Error Comments," dated October 21, 2020.
[44] *Id.* at 2.
[45] *Id.* at 5.
[46] *See* Shakti's Letter, "Response to Petitioners' Allegations of Ministerial Errors:  Forged Steel Fittings from India," dated October 23, 2020.
[47] *Id.*
[48] *See* Memorandum, "Response to Ministerial Error Allegation in the Final Determination," dated November 20, 2020.

facts of the record, and after analyzing all available information, determined to accept Shakti's statements and explanations concerning its reporting of processing costs.[49]  Commerce also highlighted its statement from the *Final Determination* that it was able to "confirm" Shakti's explanations regarding its reported cost information via questionnaires.[50]  As a result, Commerce made no changes to its *Final Determination*.  On December 11, 2020, Commerce issued an antidumping duty order on forged steel fittings from India.[51]  Subject merchandise produced and exported by Shakti was excluded from the *Order* due to Commerce's final determination that Shakti did not sell forged steel fittings at LTFV during the period of investigation.[52]

In its *Remand Order*, the Court states that "Commerce has two options on remand.  It may offer a fuller explanation of its reasoning at the time of the action it defends, or it may take new agency action."[53]  Based on the Court's directive that we make a new determination on the issue of verification, we have reexamined the steps Commerce took in this investigation and find that Commerce's use of Post-Preliminary Questionnaires in lieu of an in-person, on-site verification and Commerce's subsequent analysis of the information collected via the questionnaires reasonably satisfies the verification requirement of 782(i) of the Act.  As such, we no longer find it necessary to base our *Final Determination* on facts available, and, in line with our recent practice, consider the information to be verified via the Post-Preliminary Questionnaires issued in lieu of on-site verification.

---

[49] *Id.* at 3.
[50] *Id.*
[51] *See Forged Steel Fittings from India and the Republic of Korea:  Antidumping Duty Orders*, 85 FR 80014 (December 11, 2020) (*Order*).
[52] *Id.*
[53] *See Remand Order* at 19.

## III.     DISCUSSION

As noted above, the petitioners mentioned the issue of verification only once in the underlying investigation:  in their August 11, 2020, case brief.[54]  The petitioners' case brief is primarily dedicated to highlighting perceived inconsistencies in Shakti's cost reporting to support its central argument that Commerce should base Shakti's final margin on AFA.[55]  The relevant excerpt relating to verification is provided below in its entirety:

> If Commerce finds that it has sufficient consistent information to verify {Shakti}'s questionnaire responses and chooses not to rely on adverse factual information to determine a margin, we urge the agency to verify {Shakti}'s information.  Commerce has explained why it cannot at this time engage in a normal verification of {Shakti}'s data.  However, this does not preclude Commerce from verifying {Shakti}'s information remotely.  Commerce has issued six supplemental questionnaires and collected extensive information from {Shakti}.  As Petitioners have shown above, there remain many outstanding questions about the accuracy of {Shakti}'s allocation of cost information.  Petitioners have also pointed out there is very little benchmark information that can be used to confirm the accuracy of {Shakti}'s reporting.  We urge Commerce to engage in a virtual verification of that reporting.[56]

Thus, the petitioners' only mention of verification was presented in the context of their issues with Shakti's cost accounting and their primary argument for AFA.

Additionally, as noted above, Commerce held an administrative hearing, which afforded parties an opportunity (*i.e.*, 45 minutes) to provide an oral summary of their briefs to Commerce ahead of the final determination.[57]  The petitioners did not mention verification at the hearing, even when the topic was raised by Shakti.[58]  Instead, the petitioners' presentation at the administrative hearing focused solely on urging Commerce to apply AFA to Shakti pursuant to

---

[54] *See* Petitioners' Case Brief at 19-20.
[55] *Id*. at *e.g.*, i.
[56] *Id*. at 19-20 (citations and quotation marks omitted).
[57] *See* Commerce's Letter, "Antidumping Duty Investigation of Forged Steel Fittings from the India- Hearing Schedule," dated September 3, 2020.
[58] *See* Hearing Transcript at 49-50.

their concerns with the accuracy of Shakti's cost data, a concern addressed by Commerce and Shakti throughout the investigation.[59]

Further, although the petitioners' case brief was timely submitted, their request for virtual verification came far too late in the proceeding for Commerce to pursue the request. Case briefs are intended to allow parties to argue about issues arising from a closed factual record. Raising the possibility of a virtual verification for the first time in a case brief is simply too late in the proceeding for Commerce to reverse course, sort out the significant logistics involved, conduct the sales and cost virtual verifications, draft the verification reports, allow for a second round of case and rebuttal briefs to discuss the findings of the verification reports, hold another hearing on the issues raised in that second round of briefs, if requested, and analyze all comments before issuing the final determination by the statutory deadline. As noted above, Shakti had repeatedly notified interested parties of the restrictive lockdown measures in place that prevented travel to, from, and within India.[60]

The petitioners also noted difficulties resulting from the COVID-19 pandemic. For example, the petitioners' March 24, 2020 extension request, stated "{a}s Commerce is well aware, the response to the COVID-19 pandemic has disrupted normal business operations," and goes on to mention the mandatory closure of nonessential businesses in Washington, D.C., and describe the complicated transition to remote work, at the advice of public health officials.[61] As such, the petitioners were aware that the COVID-19 pandemic prevented an in-person verification from taking place since at least March 2020. For that reason, Commerce adapted to

---

[59] *See* Post-Preliminary Questionnaires; *see also, e.g.*, Shakti's July 13, 2020 Rebuttal Comments; and Shakti's Post-Preliminary Questionnaires Response.
[60] *See, e.g.*, Shakti's April 7, 2020 Letter; Shakti's April 16, 2020 Letter; and Shakti's June 18, 2020 Letter.
[61] *See* Petitioners' Letter, "Forged Steel Fittings from India: Request for Extension of Time to Submit Particular Market Situation Allegation," dated March 24, 2020.

the situation and issued Post-Preliminary Questionnaires in lieu of on-site verification to corroborate the information reported by Shakti in advance of the final determination. If parties had a genuine suggestion regarding alternative verification approaches, the appropriate time for parties to have raised that argument would have been sometime between April and June 2020, when Commerce normally would have prepared for, and conducted, verification.

In addition, the petitioners did not include any explanation of what a virtual verification would entail, nor did they suggest a method to verify Shakti's information remotely. As discussed further below, the record evidence demonstrates that there were many difficulties Shakti experienced as a small company with mainly manual recordkeeping, which were exacerbated by the COVID-19 pandemic. In particular, prior to the submission of the petitioners' case brief, Shakti repeatedly reported that its employees were legally confined to their homes during the GOI's lockdown and had limited access to personal computers and reliable internet.[62] Another issue is the significant time difference between Shakti's location in Rajkot, India, and Commerce's Washington, D.C. headquarters. Yet, there was not a specific suggested method for conducting a virtual verification of Shakti's manual records when the company had limited and unreliable internet access and limited personnel availability, or for bridging the night-and-day time difference between the two countries. The petitioners' failure to include any such guidance is presumably because it was clear that there was no manner to overcome such issues, particularly just a few weeks away from the final determination deadline.

When considering how to fulfill the verification requirement under the difficult circumstances caused by COVID-19, Commerce considered all options, including a real-time virtual verification. However, although Commerce did not specifically explain its decision

---

[62] *See, e.g.*, Shakti's March 31, 2020 Letter; Shakti's April 7, 2020 Letter; and Shakti's June 18, 2020 Letter.

making for the record (*e.g.*, through a memorandum to the file), Commerce determined that a remote, real-time virtual verification of Shakti was not possible for several reasons. Specifically:

- Shakti's lack of electronic recordkeeping;[63]

- Shakti's inability to access its systems remotely due to internet infrastructure issues;[64]

- the lockdown and curfew in effect that prevented Shakti's personnel from accessing its facilities;[65]

- travel restrictions preventing Shakti's accounting consultant from traveling to its facilities;[66]

- the nine-and-a-half-hour time difference between Washington, D.C., and Rajkot, India, where Shakti is located; and,

- Commerce's lack of experience with virtual verifications that would have taken a considerable amount of time and training to develop, test, and attempt, which was not possible to do on such short notice.

For these reasons, it is clear from the record that Shakti was simply not in a position to participate in a virtual verification remotely. The Court states that Commerce may provide a fuller explanation for why it chose not to conduct virtual verification at the time of the investigation.[67] By delineating the factual predicate underlying our determination as to why we did not conduct a real-time virtual verification of Shakti, we believe that we are providing a fuller explanation of our decision.

---

[63] *See, e.g.*, Shakti's April 16, 2020 Letter at 3.
[64] *See, e.g.*, Shakti's June 18, 2020 Letter at Attachments 2 and 3.
[65] *See, e.g.*, Shakti's April 16, 2020 Letter at 1.
[66] *Id.* at 2.
[67] *See Remand Order* at 18.

In its *Remand Order*, the Court faults Commerce for not addressing the petitioners' request for virtual verification in its case brief.[68]  While Commerce did not directly address the petitioners' additional suggestion of virtual verification to test the reliability of Shakti's response, Commerce did acknowledge and address the petitioners' material concerns with the accuracy and completeness of Shakti's cost information and their request to ensure the reliability of Shakti's information.[69]  The record demonstrates that Commerce fully considered the petitioners' concerns with the reliability of the responses and, thus, incorporated such comments into the Post-Preliminary Questionnaires issued in lieu of on-site verification.  Further, we requested complete responses from Shakti addressing each of the issues raised by the petitioners in their comments regarding Shakti's reporting.  We were also able to verify the reliability of Shakti's reporting via the Post-Preliminary Questionnaires.  Although there is no express definition of verification, the purpose of verification is to corroborate information reported earlier in the proceeding to Commerce, and establish, to Commerce's satisfaction, that such information is accurate and reliable for purposes of making our final determination.  On this basis, we issued Shakti Post-Preliminary Questionnaires, incorporating the petitioners' comments and concerns, to test Shakti's books and records and confirm that its reported information was reliable.

Among the information requested in the Post-Preliminary Questionnaires, we asked Shakti to "provide the parameters you used to derive the theoretical weight for *each* product sold in the home and U.S. markets."[70]  As explained by Shakti, a response to this question "requires demonstration of weight calculation of more than 1,000 products which itself is a voluminous

---

[68] *Id.* at 2-3.
[69] *See Final Determination* IDM at 2.
[70] *See* Commerce's Sales Post-Preliminary Questionnaire at 3.

task."[71]  We also requested that Shakti "provide complete information to corroborate the information you reported for the following sales in the home and U.S. markets."[72]  This required Shakti to provide source documentation to support its reported information for ten individual invoices, representing over ten home market sales and hundreds of export sales to the United States.[73]  We also requested that Shakti respond to each of the petitioners' allegations of misreporting concerning its sales and cost databases and provide documentation to support its answers.[74]  Additionally, we requested that Shakti provide the fiscal year March 31, 2020 audited financial statements for Shakti and SF.  However, those financial statements were not yet available at that time due to COVID-19 lockdown.[75]  Regarding the direct materials inventory, we requested Shakti to explain how they calculated the consumption quantities and to provide sample invoices on certain months to support the previously reported purchases.[76]  We also requested additional information from Shakti concerning the costs of the affiliated and unaffiliated tollers, another concern raised by the petitioners.  Specifically, we requested that Shakti explain and demonstrate how they calculated the costs and to provide sample jobwork invoices.[77]  These are the same types of requests made during a traditional verification.  In response, Shakti provided nearly two-thousand pages of source documentation and explanation, which exceeded the volume of documentation typically provided and examined during a traditional verification.[78]

---

[71] *See* Shakti's Letter, "Forged Steel Fittings from India:  Shakti Forge Industries Pvt. Ltd. Extension Request for 6th Supplemental Questionnaire Response," dated July 17, 2020, at 2.
[72] *Id.*
[73] *See* Shakti's Final Home Market and U.S. Sales Databases, filtered by invoices listed in the Post-Preliminary Questionnaire.
[74] *Id.*
[75] *See* Shakti's Cost Post-Preliminary Questionnaire Response at 1 and 2.
[76] *Id.* at 2 to 5 and Exhibits S4-2(a), S4-2(b), S4-2(c), S4-3. S4-3(b), S4-4(a) and Sf-4(b).
[77] *Id.* at 7 to 13 and Exhibits S4-6(a), Sf-6(b), S4-7(a) and S4-7(b).
[78] *See* Shakti's Post-Preliminary Questionnaires Response.

Significantly, the petitioners never submitted deficiency comments regarding Shakti's extensive responses to the Post-Preliminary Questionnaires.  Nonetheless, to emphasize our corroboration of the information relied upon in the *Final Determination* and acknowledgement of the petitioners' case brief comment regarding verification, we stated "in lieu of verification, we issued Shakti two post-preliminary questionnaires regarding its previously reported sales and cost information."[79]  We further stated that Shakti's Post-Preliminary Questionnaire Response "consisted of the type of corroborating documentation from Shakti's normal books and records that Commerce typically examines at verification (*e.g.*, ledgers, invoices, mechanical drawings and specifications, *etc.*)."[80]  Therefore, Commerce believes that it also indirectly addressed the petitioners' verification request by noting the similarities between the information collected and corroborated by the Post-Preliminary Questionnaires and traditional verification.[81]

While Commerce did not specifically characterize the Post-Preliminary Questionnaires as "verification," due to the more narrow understanding of verification at the time, Shakti's Post-Preliminary Questionnaire Response allowed Commerce to verify Shakti's information for purposes of section 782(i)(1) of the Act.  Further, based upon our reconsideration of the record and the actions taken, we are making a new determination on remand that Commerce's corroboration of Shakti's sales and cost reporting via the Post-Preliminary Questionnaires and Shakti's extensive responses to those questionnaires constituted a verification pursuant to section 782(i)(1) of the Act.  As stated by Shakti during the administrative hearing, "by responding to the six supplemental responses Shakti has already provided all information and {Commerce} has already conducted a virtual verification."[82]

---

[79] *See Final Determination* IDM at 2.
[80] *Id.*
[81] *Id.*
[82] *See* Hearing Transcript at 50.

The Court also notes that Commerce has previously found alternative means of conducting verification under exceptional circumstances and cites three examples where Commerce deviated from its normal verification practices.[83] Specifically, the Court references a verification that took place in Washington, D.C., when travel to Pakistan was not permitted; an investigation that was tolled by 29 days following the September 11, 2001 attacks to allow for a slightly delayed verification; and a verification that took place at a Beijing hotel instead of at the respondent's facilities following an attack on the Chinese Embassy in Belgrade.[84] However, the situations and solutions in each of the cited cases are not analogous to the conditions and consequences caused by the COVID-19 pandemic.

As an initial matter, an important distinction between the cases referenced and the case at hand is that each of the noted cases resulted from security concerns affecting a specific geographical area. When security concerns are limited to a single area and travel is not restricted, it is possible to conduct verification at alternative locations. However, because COVID-19 is a *global* pandemic which closed international borders including those of India and the United States, there were no suitable alternative locations to conduct in-person verification in 2020.

Regarding the investigations of *Stainless Steel Bar from Italy, France, Germany, South Korea, and the United Kingdom*, Commerce tolled the final determinations deadline by less than a month, to accommodate certain verifications that were delayed due to the September 11, 2001 attacks.[85] Unlike in those proceedings, there was no foreseeable end date for the travel restrictions caused by the COVID-19 pandemic; thus, tolling all investigation deadlines by a one-

---

[83] *See Remand Order* at 23.
[84] *Id.* at 23-24.
[85] *Id.*

month would still not result in the resumption of on-site verification.  Additional time would

likewise not have resolved Shakti's technological impediments which prevented a virtual

verification.

The most significant difference between each of the referenced cases and the underlying

investigation, is that travel, at least in some form, was possible, whereas, in 2020, there were

global travel bans in place, including a ban on travel to India by U.S. citizens and travel to the

United States by Indian nationals.[86]  In the verification that took place in Washington, D.C.,

representatives from Pakistan were able to attend in-person.[87]  While some of the *Stainless Steel*

*Bar* verifications were delayed, they still were able to take place in-person.[88]  Verifications for

*Chinese Brake Rotors* were likewise also conducted in-person, albeit some at a Beijing hotel.[89]

Nevertheless, as shown by the cases referenced above, Commerce has a documented

history of verifying information to the fullest extent possible, even under difficult circumstances.

This case is no exception.  Even when it was not possible to hold an offsite verification in

Washington, D.C., or at an alternative location in a foreign country, and when tolling the final

deadlines of numerous proceedings for the remainder of the pandemic would have been

impracticable, Commerce found a new solution to verify Shakti's reported information.  The

extensive Post-Preliminary Questionnaires and corresponding responses demonstrate

Commerce's efforts in quickly adapting to the unprecedented global conditions caused by the

COVID-19 pandemic to collect, analyze, and corroborate information relied upon in our

proceedings.

---

[86] *See, e.g.*, Verification Cancelation Memorandum at Attachment; *see also* Shakti's April 16, 2020 Letter at 2.
[87] *See Remand Order* at 23.
[88] *Id.* at 23-24.
[89] *Id.*

Now that we have reconsidered the issue anew, we have taken new agency action and find that the Post-Preliminary Questionnaires, together with Shakti's complete responses, satisfy the verification requirement. We also find that the Post-Preliminary Questionnaires and responses thereto were a reasonable alternative to in-person, on-site verification, or real-time, remote verification given the unique conditions caused by the COVID-19 pandemic, as well as other barriers specific to the case which impeded such means of virtual verification.

## IV.    COMMENTS ON DRAFT RESULTS OF REDETERMINATION

<u>Comment 1:  Whether Commerce's Remand Redetermination Complies with the Court's Order</u>

*Petitioners' Comments:*[90]

- The Court summarized the Supreme Court's guidance in *Regents* by stating that Commerce has two paths available on remand:  "{i}t can expand on the original explanations offered for the chosen action, or it may take new agency action consistent with procedural requirements."[91]  The Court further stated that "a new decision based on current conditions is most likely required."[92]

- As Commerce has made a new determination, it must comply with the statutory requirements of an investigation, specifically, the statute which requires Commerce to verify all information relied upon in making a final determination in an investigation.[93] In doing so, Commerce must assess its ability to verify at the time of this remand and consider the practices it has adopted for verification at this time.[94]

---

[90] *See* Petitioners' Draft Remand Comments.
[91] *Id.* at 3.
[92] *Id.*
[93] *Id.*
[94] *Id.*

- The Court made clear what assessment would be appropriate by stating: "{s}hould the Government maintain its position that verification remains impossible, the Government can explain in the record why it is safe for senior Department of Justice and Cabinet officials to travel to India in person on discretionary trips, but not safe for civil servants with statutory responsibilities to do the same, even if only virtually," and, "{i}n any new decision, if Commerce wishes to maintain its position that verification of any type is impossible, it must explain why now, in 2022, {Commerce} representatives cannot travel in person to India or conduct some form of virtual verification.  It would be relevant to consider recent policy changes and the travel of other U.S. officials in recent months."[95]

- Commerce should reconsider its redetermination regarding verification in light of current conditions.[96]

*Shakti's Comments:*[97]

- Commerce appropriately reviewed the entirety of the record in this matter and concluded that the extensive Post-Preliminary Questionnaires and its analysis of the information Shakti provided in response to such questionnaires satisfied its verification requirement.

- Commerce's remand redetermination is not only supported by the record but recognizes that the purpose of a verification is to ensure that data is accurate, rather than to necessarily travel abroad.

**Commerce's position:**  We disagree with the petitioners that an analysis of verification possibilities under current conditions is required to comply with the *Remand Order*.  The Court stated that, "*if* Commerce wishes to maintain its position that verification of any type is

---

[95] *Id.* at 3-4.
[96] *Id.* at 4.
[97] *See* Shakti's Draft Remand Comments.

impossible," *then* it must explain why it cannot conduct verification in 2022 in light of recent official U.S. government travel for other purposes.[98]  As discussed above, upon reconsideration of the issue, Commerce has taken new agency action, and now concludes that verification has taken place, in accordance with the requirements of an investigation.

Because Commerce is no longer maintaining its position from the *Final Determination* that verification was not possible, and instead is concluding on remand that verification has already been completed in this investigation, consideration of current verification practices and possibilities appears unnecessary.  As explained above, "{a}n attempt by Commerce to conduct additional verification of Shakti's responses via a virtual web conference or other methodology the petitioners might have suggested would be unnecessary as the information had already been verified under section 782(i)(1) of the Act."  The fact that verification was conducted in a manner distinct from the petitioners' concept of what verification should look like, does not detract from the fact that Shakti demonstrated, to Commerce's satisfaction, that its reported information was accurate and complete.  Moreover, as previously noted, the petitioners have not identified any specific issues in their remand comments with Shakti's reported information that calls into question the accuracy or completeness of its reporting.

We also note that while the underlying investigation represents the earliest instance of Commerce issuing questionnaires in lieu of on-site verification, this verification method was adopted by Commerce as standard practice during the pandemic and implemented across all investigations after the *Final Determination*.[99]  Thus, the concept of such questionnaires

---

[98] *See Remand Order* at 3 (emphasis added).

[99] *See, e.g.*, *Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Final Determination of Sales at Less Than Fair Value*, 85 FR 80018 (December 11, 2020) ("Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation as provided for in section 782(i) of {the Act}.  Accordingly, we took additional steps in lieu of on-site verification and requested additional documentation and information."); *see also Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe*

constituting an adequate method of verification given the limitations caused by the COVID-19 pandemic is something that Commerce has consistently affirmed over the past two years, and not a novel legal interpretation limited to this remand redetermination.[100]

Comment 2: Whether Commerce's Verification of Shakti is Supported by Substantial Evidence

*Petitioners' Comments:*

- The collection of additional material via questionnaires does not constitute verification.[101]

- Upon redetermination, Commerce concludes that it has verified Shakti's information because it issued Post-Preliminary Questionnaires that characterized its questions as the kind of "requests made during a traditional verification."[102]

- Commerce did not undertake the assessment of Shakti's responses that is typical of verification. Specifically: Commerce was not able to test values for reasonableness, assess values over time, trace values to accounting materials, tie accounting information

---

*from the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 FR 8891 (February 10, 2021) ("As provided in section 782(i)(1) of the Act, Commerce intends to verify the information relied upon in making its final determination. Normally, Commerce verifies information using standard procedures, including an on-site examination of original accounting, financial, and sales documentation. However, due to current travel restrictions in response to the global COVID-19 pandemic, Commerce is unable to conduct on-site verification in this investigation. Accordingly, we intend to verify the information relied upon in making the final determination through alternative means in lieu of an on-site verification."); and *Raw Honey from Brazil: Final Determination of Sales at Less Than Fair Value*, 87 FR 22182 (April 14, 2022) ("Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation. However, we took additional steps in lieu of an on-site verification to verify the information relied upon in making this final determination, in accordance with section 782(i) of {the Act}."). While Commerce conducted verification via questionnaires in lieu of on-site verification from May 2020 through May 2022, in June 2022, Commerce conducted a real-time virtual verification for the first time. The process of developing, testing, and implementing these new real-time virtual verification procedures took over two years. This real-time virtual verification was dependent upon reliable internet access and videoconferencing abilities, as well as records maintained electronically which could be shared and viewed in real-time, all of which were not available or severely limited in the case of Shakti. Commerce also worked with internal security specialists to ensure that the relevant videoconferencing platform was secure. Additionally, Commerce, in collaboration with officials from its administrative protective order office, developed a new method of sending and receiving business proprietary information for purposes of the real-time virtual verification to ensure that such information was protected from unauthorized disclosure or access.

[100] *Id.*

[101] *See* Petitioners' Comments at 4.

[102] *Id.*

24

to worksheets used to prepare reported cost information, examine Shakti's original books and records in real time, or identify missing information.[103]

- Commerce provided no assessment of Shakti's information that typically appears in a verification report summarizing the agency's findings.

- In sum, Commerce did not verify the information Shakti chose to submit in this investigation.

**Commerce's position:**  We disagree with the petitioners and continue to find that Commerce's verification of Shakti via Post-Preliminary Questionnaires reasonably satisfies the verification requirement of the Act.  Further, we find that the petitioners' claims regarding the differences between what Commerce did in the underlying investigation and what Commerce has done during in-person verifications lack merit.

While section 782(i) of the Act directs Commerce to verify information relied upon in making its final determination, the statutory language regarding verification is ambiguous which provides Commerce with broad discretion in how it chooses to conduct verification.  As explained by the Court in *Timken*, "Congress therefore contemplated giving Commerce wide latitude in applying the verification provision to allow it to adapt rapidly to the myriad of circumstances that it faces in the daily administration of the antidumping law."[104]  As a result of the ambiguity of the statute and latitude afforded to Commerce, the methodology and means by which Commerce verifies information may vary, and often does, by case, as in the circumstance of the COVID-19 pandemic.  Thus, while Commerce may perform similar exercises across cases, there are no mandatory or fixed verification procedures.  In this instance, Commerce's

---

[103] *Id.*
[104] *See Timken Co. v. United States*, 699 F. Supp. 300, 305 (CIT 1988) (*Timken*).

interpretation as to what may constitute verification is not procedurally deficient, arbitrary or capricious, or manifestly contrary to the statute.[105]

The petitioners take a narrow view of what constitutes verification and argue that Commerce must perform certain exercises to satisfy the verification requirement of the Act.  As an initial matter, the authority to determine which issues to examine at verification rests solely with Commerce, not any other interested party.  The courts have repeatedly affirmed Commerce's broad discretion in determining what constitutes verification, including Commerce's discretion to determine what information to verify, which tests to perform, and how to perform them.[106]  As noted above, the purpose of verification is to corroborate information reported by the respondents earlier in the proceeding, and establish, *to Commerce's satisfaction*, that such information is accurate and reliable for purposes of making a final determination.  For the reasons noted in the *Final Determination* and expanded upon above, Shakti demonstrated to Commerce's satisfaction that its reported information was reliable for purposes of Commerce's final determination, and thus the verification requirement has been satisfied.

Notwithstanding that the discretion to determine which information to verify and how to accomplish such verification rests with Commerce alone, we also disagree with the petitioners' argument that certain procedures performed during a "typical" verification, which they describe abstractly without reference to actual possible deficiencies, were not performed at all by Commerce during the proceeding.  Specifically, the petitioners claim that Commerce's chosen method of verification (*i.e.*, the Post-Preliminary Questionnaires) did not allow Commerce to test

---

[105] *See Jinko Solar Co., Ltd. v. United States*, 961 F.3d 1177, 1183 (Fed. Cir. 2020) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).
[106] *See, e.g., Maui Pineapple Co., Ltd. v. United States*, 264 F. Supp. 2d 1244, 1258-59 (CIT 2003); *Torrington Co. v. United States*, 146 F. Supp. 2d 845, 897-98 (CIT 2001); and *FAG Kugelfischer Georg Schafer AG v. United States*, 131 F.Supp.2d 104, 133 (CIT 2001) ("Commerce enjoys wide latitude in its verification procedures.").

values for reasonableness, assess values over time, trace values to accounting materials, tie accounting information to worksheets used to prepare reported cost information, examine Shakti's original books and records in real time, or identify missing information.

Contrary to the petitioners' assertions, from the initial questionnaire to the supplemental questionnaires, and ending with the Post-Preliminary Questionnaires, Commerce consistently tested values for reasonableness, assessed values, traced values to accounting materials, and reconciled information. Commerce's evaluation of parties' responses throughout the normal questionnaire process, like its evaluation of verification exhibits during a traditional verification, is performed to gain confidence in the information a party has reported throughout the course of the proceeding. Moreover, a key factor in authenticating a response is the consistency of what is presented; the more information a party places on the record the more difficult it becomes for the party to manipulate a response, because each answer must comport with the existing record evidence. Further, conducting verification via questionnaire does not preclude Commerce or any other interested party from identifying missing information. Commerce regularly identifies missing, incomplete, or inconsistent information provided in response to questionnaires. This is evidenced by Commerce's issuance of four supplemental questionnaires to Shakti identifying aspects of its responses that "required additional information" prior to the *Preliminary Determination*, as well as the petitioners' comments alleging deficiencies in Shakti's responses to those questionnaires. That neither Commerce nor the petitioners identified missing information in Shakti's voluminous Post-Preliminary Questionnaire Responses speaks to the completeness of Shakti's reporting, not to any party's ability to identify missing information.

While Commerce did reconcile Shakti's reported information to copies of relevant source documentation, the petitioners are correct in that Commerce was not able to examine Shakti's

original books and records in "real time" via the Post-Preliminary Questionnaires.  Commerce acknowledges that there are certain advantages to conducting on-site verification over other forms of verification.  However, Commerce is not arguing that the verification conducted in the underlying investigation is identical to an on-site verification.  Instead, based upon its reexamination of the Post-Preliminary Questionnaires and responses, Commerce has recognized that its exercise of discretion in choosing to conduct verification via Post-Preliminary Questionnaires is reasonable given the multiple complicating case-specific circumstances, and further, that Shakti's extensive responses to those questionnaires and Commerce's analysis of the responses reasonably satisfies the verification requirement and its underlying goal, to corroborate the accuracy and completeness of the existing record.

Given that the testing procedures cited by the petitioners were performed throughout the process, the petitioners' comment essentially comes down to an insistence on "real time" questions and answers.  That is, an argument that a "live" verification forces the respondent to provide internally consistent responses immediately.  Faced with the inherent limitations imposed by the global pandemic, Commerce reasonably issued the Post-Preliminary Questionnaires to accomplish procedures that would normally be performed at an on-site verification.  While not immediate, the deadlines for the Post-Preliminary Questionnaire responses were significantly shorter than the 45 plus days allowed for response to the initial AD questionnaire.  Moreover, even during a "live" or "real time" verification, requests for documents or answers to questions are not fulfilled "immediately."  Respondents may be given hours or even days to provide certain information at the discretion of the Commerce officials conducting the verification.  Regardless, the inability of Commerce to demand information

"immediately," does not render the Post-Preliminary Questionnaire method of verification unreasonable or inadequate.

Next, while the petitioners provide a list of typical or boilerplate procedures, they do not cite to any of Shakti's information that is internally inconsistent or to specific procedures that were not performed which would call into question the overall reliability of the response. They in short do not provide any predicate for concluding that additional boilerplate procedures would have disclosed discrepancies or inaccuracies.

Finally, the petitioners also note that Commerce did not issue a verification report, which is inconsistent with its procedures following on-site verifications. Given the transparent nature of the verification questionnaires and responses the petitioners had direct knowledge of the procedures and methods of verification, and the results of verification, Shakti's responses, were placed directly on the record of this investigation. To the extent the regulations would require Commerce to issue a separate "report," the U.S Court of Appeals for the Federal Circuit held in *PAM S.p.A.* that the agency can relax or modify regulatory requirements if there is no substantial prejudice to any party.[107] A formal verification report was not required when Commerce did not conduct an on-site verification in this investigation and all verification questionnaires and responses were placed directly on the record without prejudicing any party.[108]

Comment 3:  Whether Arguments made in Commerce's Original Investigation are Supported by Substantial Evidence

*Petitioners' Comments*:

---

[107] *See PAM S.p.A. v. United States*, 462 F.3d 1345, 1348 (Fed. Cir. 2006) (*PAM S.p.A.*).
[108] *Id.*

- While stating that it has made a new determination, Commerce continues to argue that its original decision not to verify Shakti's responses was justified.[109]

- Commerce argues that Shakti was not in a position to engage in a virtual verification at the time of the original investigation because it did not have computers and its data was inaccessible.[110]  While verification may not have been "plausible" it was clearly possible because Shakti provided thousands of pages of data requested by Commerce, the majority of which were produced by computer.[111]

- Shakti's responses also appeared to be prepared by consulting accountants who managed to obtain the necessary data.[112]

- Further, Shakti's president and two consulting accountants were able to participate in the virtual hearing that Commerce held in the investigation.[113]

- In sum, the data relied on by Commerce for its conclusion that it verified Shakti's data belies its assertion that Shakti could not have participated in a virtual verification.[114]

- Commerce also argues that the petitioners requested virtual verification too late in the proceeding, stating that it was clear from March 2020 that travel to and from India was not possible.[115]  Commerce ignores the facts that (1) it announced it was going to verify Shakti in May 2020; (2) Commerce did not indicate any change to the verification portion of the *Preliminary Determination* until its August 4, 2020 Verification Cancelation

---

[109] *See* Petitioners' Draft Remand Comments at 5.

[110] *Id.*  The petitioners' comments mischaracterize Commerce's lengthy explanation as to why a real-time verification of Shakti was not possible in 2020.  As summarized below, Commerce's decision to conduct verification via Post-Preliminary Questionnaires was predicated on several case-specific factors, including a lack of robust internet infrastructure and personal computers available to Shakti's employees, among other issues.

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.* at 6.

Memorandum; and (3) the petitioners requested virtual verification in their August 11, 2020, case brief, a week after being notified that Commerce was canceling verification.[116]

- Thus, the petitioners' response was as timely as it could have been given the information provided by Commerce.[117]

**Commerce's position:**  Contrary to the petitioners' assertion, Commerce did not state that Shakti could not engage in virtual verification "because {Shakti} did not have computers and its data was inaccessible."[118]  Commerce stated that a real-time virtual verification was not possible in the underlying investigation for several reasons, in particular:

- Shakti's lack of electronic recordkeeping;[119]

- Shakti's inability to access its systems remotely due to internet infrastructure issues;[120]

- The lockdown and curfew in effect that prevented Shakti's personnel from accessing its facilities;[121]

- Travel restrictions preventing Shakti's accounting consultant from traveling to its facilities;[122]

- The nine-and-a-half-hour time difference between Washington, D.C., and Rajkot, India, where Shakti is located; and

- Commerce's lack of experience with real-time virtual verifications that would have taken a considerable amount of time and training to develop, test, and attempt, which was not possible to do on such short notice.

---

[116] *Id.*
[117] *Id.*
[118] *Id.* at 5.
[119] *See, e.g.,* Shakti's April 16, 2020 Letter at 3.
[120] *See, e.g.,* Shakti's June 18, 2020 Letter at Attachments 2 and 3.
[121] *Id.*
[122] *See, e.g.,* Shakti's April 16, 2020 Letter at 2.

There is no dispute that Shakti had, at times, access to computers and internet.  The crucially significant fact is that Shakti's personnel lacked *home* computers and *home* internet connections, and thus, could not meaningfully participate in any real-time verification while lockdown measures prevented access to Shakti's facilities (*i.e.*, where all staff had internet access and where original source documents were kept, largely on paper).[123]  The GOI's lockdown that shuttered non-essential businesses, including Shakti, lasted from March 24 to June 30, 2020.[124]  During this period, a real-time virtual verification was not possible because Shakti's facilities were forcibly closed, and its staff confined to their homes which lacked reliable internet access.

Beginning in July 2020, the GOI loosened lockdown measures; however, only thirty percent of Shakti's staff was permitted to access its facilities on an alternate day basis due to social distancing requirements, while curfews and other restrictions on travel, transportation, and other matters, remained in effect.[125]  These issues continued to impede a real-time virtual verification because only a limited number of Shakti's staff would have been able to access

---

[123] *See*, *e.g.*, Shakti's June 18, 2020 Letter ("unlike many offices in the United States, {Shakti} does not have robust work from home infrastructure.  Home computers and home internet connections are not widespread among {Shakti} personnel … .  Lastly, the fact remains that {Shakti} does not maintain many of its records pertaining to the anti-dumping investigation electronically.  Thus, a great deal of time is required to manually go through records to review and prepare the information requested by {Commerce}.")

[124] *See* Shakti's March 31, 2020 Letter; *see also* Shakti's June 18, 2020 Letter ("The entire country of India has been under near-total lockdown for more than two months.  In light of the continued spread, the Indian government recently further extended the lockdown until June 30, 2020."  Shakti also provided the GOI's lockdown orders and extensions, along with Indian news articles discussing the measures).

[125] *See* Shakti's June 18, 2020 Letter ("Although some office workers will be allowed to return to work, per state guidelines only 30 percent of the staff may be in attendance at any time.  This means that while {Shakti} will prioritize responding to {Commerce's} questionnaire, many other parts of the {Shakti} organization will also require a share of that 30 percent allotment.  Thus, it will not be possible to prepare and submit the questionnaire response as quickly as could be possible under normal circumstances, even after a partial return to work is permitted.  Also, it may be noted that our of the total 30% staff, production worker required for production is more and personnel involved in the antidumping working is very less {sic}."); *see also* Shakti's July 6, 2020 Letter ("the global COVID-19 pandemic has impacted India particularly hard and the positive cases is {sic} still increasing drastically.  In light of the continued spread, protective measures are in force. … Although workers will be allowed to return to work, per state guidelines with social distancing, {Shakti}'s staff is present on {sic} office on alternate day basis."); Shakti's March 31, 2020 Letter from the GOI's lockdown measures at Attachment 1:  "All transport services air, rail, roadways – will remain suspended."); and Shakti's April 16, 2020 Letter at Attachment 1 (the GOI's extended lockdown measures which continued to severely limit transport and travel) and Attachment 3 (indicating that a curfew remained in effect in Rajkot, India, without expiration).

Shakti's facilities to engage in virtual verification, every other day. The nine-and-a-half hour time difference along with the curfew applicable to Shakti's facilities and personnel further complicated any real-time virtual verification because it meant that Shakti's staff could only participate in a real-time virtual verification for a few hours each morning. For these reasons, Commerce issued Shakti Post-Preliminary Questionnaires in lieu of a real-time virtual or on-site verification.

In their comments, the petitioners state that Shakti, along with two of its accounting consultants, were able to participate in a September 2020 hearing, insinuating that this fact undermines Shakti's reported lack of computer or internet access. As an initial point, we note that the referenced hearing is not comparable to any form of verification. Verification is a time-consuming process in which Commerce collects and examines documents provided by the respondent and reconciles such documents to the record information previously reported to ensure its accuracy and completeness. Real-time virtual or on-site verifications also involve detailed discussions with company officials and representatives, and often translators.[126] Additionally, unlike in a hearing where only publicly disclosed information is discussed, verification requires examination and discussion of documentation containing sensitive business proprietary information (BPI) belonging to the respondent, which is not publicly available. Shakti certified that the unauthorized disclosure of its BPI could cause substantial harm to Shakti's business operations.[127] At the time of the investigation, Commerce did not have measures in place to adequately protect Shakti's BPI from inadvertent access or disclosure if such information was shared via teleconference or other information technology systems such as

---

[126] Although certain representatives of Shakti speak English, Shakti also provided source documentation in Gujarati language. *See, e.g.*, Shakti's Sales Post-Preliminary Questionnaire Response at "Sales Traces" (ACCESS barcode 4004761-08).
[127] *See, e.g.*, Shakti's March 20, 2020 Letter at 1 – 2.

email or videoconferencing platforms.  Furthermore, we note that the hearing was held via

teleconference, where parties called into a conference line, and did not require computer or

internet access.[128]  We further note that the hearing transcript includes instances of "audio

interference," another indication that Shakti's network access was indeed unreliable, and as such,

attempts to conduct verification of Shakti via teleconference would likely suffer from the same

or similar technical issues as a real-time virtual verification over a videoconferencing platform

(*e.g.*, problems with adequate bandwidth, problems with protecting the security of business

proprietary data and information systems, problems with having to address multiple issues with

multiple analysts and company representatives simultaneously, *etc.*).[129]

     For similar reasons, we do not believe the possible participation of consultant accountants

in the preparation of Shakti's Post-Preliminary Questionnaire Responses demonstrates a real

time virtual verification would have been possible.  There is no evidence on the record of the

extent to which these consultants assisted in the preparation of the responses.  It could be that

they simply provided general guidance by email or phone, or that they were given a database

which they were then able to analyze and prepare for Commerce on their own (*i.e.*, without the

constant, live interaction with Shakti personnel for an extended period that a real-time virtual

verification would have required).  Moreover, while Commerce must examine voluminous

supporting documentation to corroborate the information a respondent reports, presumably a

consultant is able to accept the data provided by its client without the need for such

substantiating information.

---

[128] *See* Commerce's Letter, "Antidumping Duty Investigation of Forged Steel Fittings from India – Hearing Schedule, dated September 3, 2020 ("Commerce has scheduled a public hearing, to be held via *tele*conference … "A *tele*conference access number will be provided at that time." (Emphasis added)).
[129] *See, e.g.*, Hearing Transcript at 50.

The petitioners also claim that their request for verification was timely given the August 4, 2020, memorandum officially canceling on-site verification. While Commerce acknowledged that the petitioners' case brief was timely filed, as explained above, raising the possibility of a real-time virtual verification for the first time in a case brief does not allow sufficient time for Commerce to reverse course, sort out the significant logistics involved, conduct verifications, draft verification reports, analyze a second round of briefs, and hold another hearing, before issuing the final determination. As further explained above, although Commerce did not officially cancel on-site verification until August 2020, the petitioners were aware that COVID-19 prevented travel to and from India and the United States since March 2020, and thus, prevented a typical on-site verification. As such, if the petitioners had a genuine suggestion regarding alternative verification approaches, the appropriate time to raise such arguments would have been sometime between April and June 2020, when Commerce normally would have prepared for and conducted verification.

The petitioners also note that Commerce stated its intention to verify Shakti in the *Preliminary Determination*, but later canceled verification. However, as explained above, Commerce did undertake measures to accomplish the goals of verification in this proceeding, albeit not labeled "verification" at the time. Therefore, there is little material inconsistency between Commerce's statement in the May 2020 *Preliminary Determination* (*i.e.*, "{a}s provided in section 782(i) of the Act, we intend to verify Shakti's information relied upon in making our final determination.") and the verification process that took place in the underlying investigation via the Post-Preliminary Questionnaires. Although Commerce did state that it was relying on facts available instead of the verification statute in the final determination, we have reconsidered this statement on remand and made a new determination. As discussed above,

Commerce's concept of verification at the time of the original investigation assumed verification would take place on-site and in-person. As such, Commerce's "cancelation" of verification was in reference to canceling the traditional method of verification (*i.e.*, on-site), but Commerce reasonably crafted a methodology to achieve the substantive goals of verification to the best of its ability given the numerous complicating and rapidly changing circumstances. This is demonstrated by Commerce's Post-Preliminary questionnaires, which included questions taken from Commerce's verification agenda, and its analysis of Shakti's nearly two-thousand pages of documentation in response to those questionnaires. Thus, while Commerce did not conduct a traditional on-site verification, it was able to accomplish the main objectives of any verification via the Post-Preliminary Questionnaires, and upon reconsideration, Commerce now considers that the Post-Preliminary Questionnaires satisfy the verification requirement of the Act, consistent with Commerce's recent practice during the COVID-19 pandemic.

## V. FINAL RESULTS OF REDETERMINATION

As a result of this *Remand Order*, we determine that Commerce's use of Post-Preliminary Questionnaires in lieu of an in-person, on-site verification, and Commerce's subsequent analysis of the information collected via such questionnaires reasonably satisfies the verification requirement under 782(i) of the Act.

☒                              ☐

_____           _____
Agree                          Disagree

6/30/2022

X _____

Signed by: Abdelali Elouaradia

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance