Slip Op. No. 22-122

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ELLWOOD CITY FORGE CO.,<br>ELLWOOD NATIONAL STEEL CO.,<br>ELLWOOD QUALITY STEELS CO.,<br>and A. FINKL & SONS,<br><br>*Plaintiffs/Defendant-Intervenors,*<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant,*<br><br>and<br><br>BGH EDELSTAHL SIEGEN GMBH,<br><br>*Defendant-Intervenor/Plaintiff.* | Before: Stephen Alexander Vaden,<br>Judge<br><br>Consol. Court No. 1:21-00077 |

## <u>OPINION</u>

[Denying Ellwood City's Motion for Judgment on the Agency Record and granting BGH Edelstahl's Motion in part.]

Dated: November 8, 2022

*Myles S. Getlan*, Cassidy Levy Kent LLP, of Washington, DC, for Plaintiffs. With him on the brief were *Jack A. Levy*, *Thomas M. Beline*, *James E. Ransdell, IV*, and *Nicole Brunda*.

*Sarah E. Kramer*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, Commercial Litigation Branch, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, and *Hendricks Valenzuela*, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 2 of 48

Consol. Court No. 1:21-00077                                            Page 2

*James Kevin Horgan*, deKieffer & Horgan, PLLC, of Washington, DC, for Defendant-Intervenor. With him on the brief were *Alexandra H. Salzman*, *Gregory Stephen Menegaz*, and *Marc Edward Montalbine*.

**Vaden, Judge:**   Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons (collectively "Ellwood City" and "Plaintiffs") filed this case on February 26, 2021, under Section 516A of the Tariff Act of 1930, as amended.   Plaintiffs challenge certain aspects of the final determination in the less-than-fair-value investigation of forged steel fluid end blocks (FEBs) from Germany issued by the U.S. Department of Commerce (Commerce).   Specifically, Plaintiffs challenge Commerce's decision to issue verification questionnaires in lieu of conducting on-site verification, the results obtained from that procedure, the cost data on which Commerce relied, and Commerce's subsequent determination of a 3.82% dumping margin for BGH Edelstahl Siegen GmbH (BGH), a German producer of FEBs and mandatory respondent in this investigation.   *See* Compl., ECF No. 6.   In the companion consolidated case, No. 21-00079, BGH challenges Commerce's use of a particular market situation adjustment to the sales-below-cost test and what it refers to as the "inter-product zeroing" Commerce used in its differential pricing analysis.   BGH Mot. for J. on the Agency R. at 3, ECF No. 23.   Before the Court are both Motions for Judgment on the Agency Record.   For the reasons set forth below, Ellwood City's Motion is **DENIED**, BGH's Motion is **GRANTED** in part, and the case is **REMANDED** to Commerce for further consideration consistent with this opinion.

# BACKGROUND

The products at issue in this case are fluid end blocks produced in Germany

for import into the United States.  The International Trade Administration described

the types of FEBs included in the scope:

> The products covered by this investigation are forged steel
> fluid end blocks (fluid end blocks), whether in finished or
> unfinished form, and which are typically used in the
> manufacture or service of hydraulic pumps.
>
> The term "forged" is an industry term used to describe the
> grain texture of steel resulting from the application of
> localized compressive force. Illustrative forging standards
> include, but are not limited to, American Society for
> Testing and Materials (ASTM) specifications A668 and
> A788.
>
> . . .
>
> The products covered by this investigation are: (1) Cut-to-
> length fluid end blocks with an actual height (measured
> from its highest point) of 8 inches (203.2 mm) to 40 inches
> (1,016.0 mm), an actual width (measured from its widest
> point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm),
> and an actual length (measured from its longest point) of
> 11 inches (279.4 mm) to 75 inches (1,905.0 mm); and (2)
> strings of fluid end blocks with an actual height (measured
> from its highest point) of 8 inches (203.2 mm) to 40 inches
> (1,016.0 mm), an actual width (measured from its widest
> point) of 8 inches (203.2 mm) to 40 inches (1,016.0 mm),
> and an actual length (measured from its longest point) up
> to 360 inches (9,144.0 mm).
>
> . . .
>
> A fluid end block may be imported in finished condition
> (i.e., ready for incorporation into a pump fluid end
> assembly without further finishing operations) or
> unfinished condition (i.e., forged but still requiring one or

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 4 of 48

Consol. Court No. 1:21-00077                                          Page 4

> more finishing operations before it is ready for incorporation into a pump fluid end assembly). Such finishing operations may include: (1) Heat treating; (2) milling one or more flat surfaces; (3) contour machining to custom shapes or dimensions; (4) drilling or boring holes; (5) threading holes; and/or (6) painting, varnishing, or coating.

*Forged Steel Fluid End Blocks from The Federal Republic of Germany, India, and Italy: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 2,394, 2,399 Appendix I (Jan. 15, 2020) (describing the particular characteristics of FEBs included in this investigation), J.A. at 80,005, ECF No. 42.

## STATEMENT OF FACTS

### I.      The Antidumping Investigation

The investigation at issue began on December 18, 2019, when Plaintiffs filed a petition with the Department of Commerce alleging that German producers were selling FEBs at less than fair market value in the United States.  *Forged Steel Fluid End Blocks from the Federal Republic of Germany, India, and Italy:  Initiation of Less-than-Fair-Value Investigations*, 85 Fed. Reg. 2,394 (Jan. 15, 2020).  Commerce initiated an investigation on January 15, 2020, and published its Respondent Selection Memorandum identifying BGH Edelstahl Siegen GmbH as a mandatory respondent on February 4, 2020.  Preliminary Decision Memorandum (PDM) at 3, J.A. at 82,877.  Commerce sent BGH a standard initial questionnaire on February 10, 2020, requesting information about the German producer's sales in the United

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 5 of 48

Consol. Court No. 1:21-00077                                           Page 5

States and costs of production.  *Id.*  Between March 10, 2020, and April 28, 2020, BGH submitted responses to each section of the initial questionnaire.  *Id.* at 4.

During the period that BGH was submitting its questionnaire responses, the World Health Organization officially classified COVID-19 as a pandemic.  *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, WORLD HEALTH ORGANIZATION (Mar. 11, 2020) https://bit.ly/WHORemarks.  On March 15, 2020, the Department of Commerce issued an agency-wide memorandum prohibiting all travel not "mission-critical and pre-approved by senior bureau leadership."  DEP'T OF COMMERCE, *All Hands: Coronavirus Update (3-16-20)* https://bit.ly/commercecoronavirus.  The CDC issued a Level 4 travel advisory, urging all U.S. citizens to avoid international travel on March 31, 2020.  CENTERS FOR DISEASE CONTROL AND PREVENTION, Global Level 4 Health Advisory:  Do Not Travel (Mar. 31, 2020).

Given those pandemic-related disruptions, Commerce postponed the preliminary determination in the investigation by fifty days from March 26, 2020, to July 16, 2020.  *Forged Steel Fluid End Blocks from the Federal Republic of Germany, India and Italy:  Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 17,042 (March 26, 2020).  Meanwhile, Commerce continued to issue supplemental questionnaires to BGH between April and June of 2020.  PDM at 4, J.A. at 82,879.  With some extensions, BGH timely responded to those questionnaires.  *Id.*  Based on the initial information it had gathered from BGH,

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 6 of 48

Consol. Court No. 1:21-00077                                                    Page 6

Commerce issued a Preliminary Affirmative Determination of Sales at Less Than Fair Value (SLTFV), assessing a preliminary zero percent dumping margin for BGH. *Forged Steel Fluid End Blocks from Germany: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures* (Prelim. Determination), 85 Fed. Reg. 44,513, 44,514 (July 23, 2020).

On October 20, 2020, Ellwood City filed comments on Commerce's planned verification method. There, Ellwood City stated that it "appreciate[d] that Commerce [] indicated its intention to issue a questionnaire to BGH in lieu of performing an on-site verification." Pet'rs' Req. That Commerce Include Specific Instructions in BGH Suppl. Questionnaire (Oct. 20, 2020), bar code 4042079-01, PR 310. Ellwood City then made a number of specific recommendations, including that "consistent with on-site verifications, Commerce should instruct BGH to support its responses with source documentation" and that Commerce should impose a one-week deadline for the verification questionnaire response because "BGH has been aware for nearly three months that Commerce would verify BGH's submitted information." *Id.*

Later that same day, Commerce issued a questionnaire "in lieu of performing an on-site verification." Letter to BGH, J.A. at 83,328, ECF No. 42. Commerce explained that the purpose of the questionnaire was "to probe information . . . already submitted – not to obtain new information." *Id.* Thus, "the questions are similar to those that the Department of Commerce (Commerce) would normally ask during an

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 7 of 48

Consol. Court No. 1:21-00077                                          Page 7

on-site verification." *Id.*  BGH requested an extension of time to complete the verification response, and Commerce ultimately granted a one-day extension while explaining that it could not grant a longer extension because it would frustrate the purposes of its chosen verification methodology.  Letter Granting Extension, J.A. at 83,334, ECF No. 42.  BGH submitted its response on October 28, 2020.  J.A. at 83,336, ECF No. 42.

BGH and Ellwood City submitted administrative case briefs on November 9, 2020.  IDM at 2, J.A. at 83,988, ECF No. 42.  Ellwood City's submission repeatedly refers to the questionnaires as verification, calling the procedure "verification" and a "verification questionnaire."  Administrative Case Br. at 3, ECF No. 48 ("BGH's response to Commerce's sales trace requests at verification establishes that BGH's CONNUM reporting methodology is riddled with material errors . . . ." and "verification revealed that BGH relied on inadequate records . . . ."); *see, e.g.*, *id.* at 15 ("[I]n its verification questionnaire, Commerce again asked BGH to validate its reported costs . . . ."); *id.* at 18 ("BGH's verification documentation indicates . . . ."); *id.* at 19 ("an error that would not have come to light absent verification . . . ."); *id.* at 25 ("BGH . . . fail[ed] to comply with Commerce's requests at verification."); *id.* at 70 ("BGH's verification documentation reveal significant reporting errors . . . .").

The parties then requested a virtual public hearing, which Commerce held on November 24, 2020.  There, counsel for Ellwood City once again referenced "verification" and "verification questionnaires" without objecting to their use in lieu

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 8 of 48

Consol. Court No. 1:21-00077                                                    Page 8

of traditional on-site verification. *See generally* Tr. of Hearing, J.A. at 83,893, ECF No. 42. Instead, Ellwood City only questioned whether BGH had submitted verifiable information and argued that discrepancies in its responses prevented Commerce from being able to rely on the submitted information. *Id.* at 11:4–8, J.A. at 83,903 ("I'm going to address . . . BGH's failure to correctly report other information that was revealed in the verification . . . ."); 16:16–22, J.A. at 83,908 ("The virtual verification or the verification questionnaire that was issued to BGH revealed further deficiencies that call into question the integrity of BGH's submitted data . . . verification is a spot check and that's what Commerce sought to do in its verification questionnaire.").

On December 8, 2020, Commerce issued its Final Issues and Decision Memorandum (IDM), explaining in detail its decision to assign a dumping margin of 3.82% to BGH. J.A. at 83,987, ECF No. 42. Commerce published the Final Determination on December 11, 2020. *Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value* (Final Determination), 85 Fed. Reg. 80,018 (Dec. 11, 2020).

## II.    The Present Dispute

In February 2021, Ellwood City sued Commerce, challenging its final determination regarding BGH. Compl., ECF No. 6. BGH moved to intervene as Defendant-Intervenor on March 29, 2021. Consent Mot. Intervene, ECF No. 10. On May 6, 2021, the parties moved to consolidate with companion case 21-00079, in which BGH as Plaintiff challenges elements of the same determination. The Court

granted that Motion on May 7, 2021, designating the present case as the lead consolidated case.  Consent Mot. to Consolidate Cases, ECF No. 17; Order Granting Mot. to Consolidate Cases, ECF No. 18.  Before the Court are Rule 56.2 Motions for Judgment on the Agency Record from Plaintiffs in this case, Ellwood City, and Plaintiff in the companion case, BGH.  ECF Nos. 23, 25.  Ellwood City asks this Court to reverse Commerce's final determination on the bases that (1) Commerce's failure to conduct on-site verification was contrary to law and (2) Commerce's overall determination is unsupported by substantial evidence and contrary to law because it relied on unreconciled cost data.  ECF No. 25.  BGH similarly asks this Court to reverse and remand Commerce's final determination but on the bases that (1) Commerce erred in making particular market situation adjustments to BGH's reported costs and (2) Commerce erred in its application of differential pricing methodology.  ECF No. 23.

Commerce filed its response on December 17, 2021, asserting that (1) Ellwood City waived its verification argument by failing to raise it during the administrative proceeding; (2) Commerce's verification procedures were consistent with statutory requirements and necessary given the worldwide pandemic; and (3) Commerce's application of differential pricing methodology with regard to BGH was supported by substantial evidence and in accordance with law.  Def.'s Resp. to Pls.' Rule 56.2 Mot. for J. on the Agency R. (Def.'s Resp.), ECF No. 37.  Commerce did not oppose a remand on BGH's particular market situation claims.  *Id.* at 29.

Case 1:21-cv-00077-SAV    Document 55    Filed 11/08/22    Page 10 of 48

Consol. Court No. 1:21-00077                                              Page 10

Defendant-Intervenor BGH's December 17, 2021 response similarly argued that (1) Commerce's verification procedures were within its discretion and fulfilled the statutory requirements and (2) Commerce's verification questionnaire elicited sufficient information such that Commerce's reliance on BGH's data was supported by substantial evidence.  Resp. Br. of Def.-Int. BGH Edelstahl Siegen GmbH (BGH Resp.), ECF No. 35.

In its response, Ellwood City claimed that (1) substantial evidence supported Commerce's findings that a particular market situation disrupted the German ferrochrome and electricity markets, (2) the law permitted the adjustments Commerce made, and (3) Commerce lawfully applied its differential pricing methodology.  Ellwood City Resp. Br. in Opp'n to BGH Edelstahl Siegen GmbH's Rule 56.2 Mot. for J. on the Agency R. (Ellwood City Resp.), ECF No. 33.

Ellwood City and BGH filed reply briefs on January 18, 2022.  Ellwood City asserted that (1) it had exhausted administrative remedies regarding verification or, alternatively, that futility and the pure-question-of-law exceptions applied, (2) Commerce's new verification techniques were not justified by the pandemic, (3) Commerce's verification findings were not supported by substantial evidence, and (4) Commerce's final determination unlawfully relied on BGH's unreconciled cost information.  Reply Br. Ellwood City, ECF No. 40 (Ellwood City Reply).  BGH simply reasserted its earlier claims regarding Commerce's findings.  Reply Br. BGH Edelstahl Siegen GmbH, ECF No. 38 (BGH Reply).

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 11 of 48

Consol. Court No. 1:21-00077                                          Page 11

The Court held oral argument on April 25, 2022.  The Court confirmed that
BGH was "not contesting [Commerce's] application of the Cohen's D [*sic*] test and the
ratio test to this data set, correct?"  To which BGH counsel responded: "That's right,
Your Honor."  Oral Arg. Tr. at 22:2–5 (Tr.).

On July 7, 2022, Ellwood City filed a Notice of Supplemental Authority,
arguing that Commerce's recent Remand Results in an unrelated case pending before
this Court, *Bonney Forge Corporation v. United States*, Case No. 20-3837, concede
that it would have been futile for Ellwood City to make its verification argument in
the administrative brief.  Notice of Suppl. Authority at 2, ECF No. 54.  In that case,
Commerce stated that it would have been too late logistically for Commerce to
conduct a virtual verification when a party waited until its final case brief to make
the request.  *Id.*

## JURISDICTION AND STANDARD OF REVIEW

This Court has exclusive jurisdiction over Ellwood City and BGH's challenge
to Commerce's Final Determination under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C.
§ 1581(c), which grant the Court authority to review actions contesting final
affirmative determinations, including any negative part of such determinations, in
an antidumping order.  The Court must sustain Commerce's "determination, finding,
or conclusion" unless it is "unsupported by substantial evidence on the record, or
otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  This standard
requires that Commerce thoroughly examine the record and "articulate a satisfactory

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 12 of 48

Consol. Court No. 1:21-00077                                              Page 12

explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted); *accord Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d 1322, 1328 (CIT 2010). "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *New Am. Keg v. United States*, No. 20-0008, 2021 WL 1206153, at *6 (CIT Mar. 23, 2021). "It is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992).

Reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The Federal Circuit has described "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

# DISCUSSION

## I.       Summary

Several diverse arguments are presented by each of the parties in this consolidated case.  The Court deals with Ellwood City's arguments first.  It contends that (1) Commerce's "questionnaire in lieu of on-site verification" procedure was contrary to law, (2) Commerce's verification results are unsupported by substantial evidence, and (3) Commerce improperly relied on cost data that allegedly failed to reconcile.  Pls.' Mot. at 13, ECF No. 25.  The Court then considers BGH's contentions.  BGH maintains that (1) Commerce's particular market situation adjustment to BGH's cost of production was contrary to law, and (2) the "inter-product zeroing" aspect of its differential pricing analysis was inconsistent with statute.  BGH Mot. at 3–4, ECF No. 23.

Ellwood City failed to properly preserve its objection to Commerce's verification procedure.  During the underlying investigation, Ellwood City evinced satisfaction and acceptance of the questionnaire method.  Although it was obvious very early in the investigation that Commerce would not conduct in-person verification, Ellwood City never lodged an objection to Commerce's verification methodology in the underlying proceeding.   No exceptions to administrative exhaustion apply; therefore, the Court will not address that argument now.  Regarding Ellwood City's remaining arguments, the Court finds that substantial

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 14 of 48

Consol. Court No. 1:21-00077                                                    Page 14

evidence supports both Commerce's verification findings and its reliance on BGH's cost data. Ellwood City's motion is therefore **DENIED**.

Because of intervening precedent from the Federal Circuit, the Government does not oppose BGH's request for a remand to address the issue of the particular market situation adjustment to BGH's costs. Def.'s Resp. at 29, ECF No. 38. The Court does not find that Commerce's differential pricing analysis was contrary to law, however, and sustains Commerce's use of zeroing. Accordingly, BGH's Motion for Judgment on the Agency Record is **GRANTED** in part. The case is **REMANDED** for Commerce to recalculate a dumping margin consistent with this opinion.

## II.    Administrative Exhaustion

Ellwood City forfeited its verification argument when it failed to object to Commerce's verification methodology at any time during the antidumping investigation. The CIT's exhaustion paradigm is established by statute and clarified by Commerce's regulations. The CIT will require the exhaustion of administrative remedies "where appropriate." 28 U.S.C. § 2637(d); 19 C.F.R. § 351.309(c)(2) (2018). Here, it would not only have been appropriate but also highly desirable for Ellwood City to put Commerce on notice of its objection to Commerce's "questionnaire in lieu of on-site verification method" during the investigation. Despite the new and continuing arguments that Ellwood City raises regarding the applicability of two exceptions to the exhaustion requirement, its failure to timely raise these arguments is excused neither by the futility exception nor the pure-question-of-law exception.

Though the Court rules on the specific facts of this case, the same legal principles regarding exhaustion discussed in its recent opinion *Ellwood City Forge Co. v. United States* apply to the facts at hand and will therefore be summarized here. No. 1:21-00073, 2022 WL 2129102 (CIT June 14, 2022).  The purpose of the "general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts" is to "protect[] administrative agency authority and promot[e] judicial efficiency." *McCarthy v. Madigan*, 503 U.S. 140, 144–45 (1992).  The Court of International Trade thus requires the exhaustion of administrative remedies in antidumping order reviews "where appropriate."  28 U.S.C. § 2637(d).  Department of Commerce regulations establish that the administrative case brief is the *last* opportunity for parties to submit any arguments they deem relevant.  Parties can and should raise their objections early and often; but after the case brief stage, any arguments not included are deemed forfeited.  19 C.F.R. § 351.309(c)(2) (2018) (requiring that parties include in their final case briefs "all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results").  In other words, parties must "state all relevant arguments in their final brief to the agency or forever hold their peace." *Ellwood City*, 2022 WL 2129102, at *8.

The goal of exhaustion is to ensure that "Commerce was put on notice of the issue" and had an opportunity to resolve it. *Trust Chem Co. Ltd. v. U.S.*, 791 F. Supp.

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 16 of 48

Consol. Court No. 1:21-00077                                           Page 16

2d 1257, 1268 n.27 (CIT 2011); *see also Luoyang Bearing Corp. v. United States*, 347 F. Supp. 2d 1326, 1352 (CIT 2004) ("[P]laintiff's brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it," but a plaintiff cannot "merely mention[] a broad issue without raising a particular argument.").

Commerce argues that Plaintiff failed to exhaust its administrative remedies because "it did not raise during the administrative proceeding its arguments that the procedures chosen by Commerce to conduct its verification were deficient." Def.'s Resp. at 8, ECF 37. The Court concurs. Ellwood City had many opportunities to object to the verification methodology Commerce suggested; however, neither in its post-preliminary comments on verification, nor in its seventy-one-page case brief, nor in its hearing with Commerce officials did Ellwood City object. Instead, it repeatedly embraced Commerce's questionnaire "in lieu of performing on-site verification." Questionnaire, J.A. at 83,328, ECF No. 42. In the investigation, Ellwood City simply called the procedure "verification" and the method chosen a "verification questionnaire," not "so-called verification" or any designation to indicate dissatisfaction with the procedure. Administrative Case Brief at 3, ECF No. 48 ("BGH's response to Commerce's sales trace requests at verification establishes that BGH's CONNUM reporting methodology is riddled with material errors . . . verification revealed that BGH relied on inadequate records . . . ."); *see, e.g.*, *id.* at 15 ("[I]n its verification questionnaire, Commerce again asked BGH to validate its

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 17 of 48

Consol. Court No. 1:21-00077                                        Page 17

reported costs . . . ."); *id.* at 18 ("BGH's verification documentation indicates . . . ."); *id.* at 19 ("[A]n error that would not have come to light absent verification . . . ."); *id.* at 25 ("BGH . . . fail[ed] to comply with Commerce's requests at verification."); *id.* at 70 ("BGH's verification documentation reveal significant reporting errors . . . ."). The public hearing demonstrated similar approval of the verification regime. Tr. of Hearing 11:4–8, 16:16–22 ("I'm going to address . . . BGH's failure to correctly report other information that was revealed in the verification" and "The virtual verification or the verification questionnaire that was issued to BGH revealed further deficiencies that call into question the integrity of BGH's submitted data . . . verification is a spot check and that's what Commerce sought to do in its verification questionnaire.").

This is not a case of just failing to include an argument in the final case brief, as the regulation requires; an objection to the verification procedure is nowhere to be found in the administrative record — even when it was clear that Commerce would not be conducting an "on-site" verification. *See* 19 C.F.R. § 351.309(c)(2) (2018). Commerce conducted what it presumably considered to be a valid verification, using questionnaires "in lieu of performing on-site verification." Letter to BGH, J.A. 83,328, ECF No. 42. Before, during, and afterward, Ellwood City had the opportunity to object that the questionnaire verification failed to satisfy the statutory requirements for verification in 19 U.S.C. § 1677m(i)(1) but failed to do so. Commerce could not have been put on notice or responded on the record to an argument that was not raised during the investigation. Allowing Ellwood City to proceed would therefore

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 18 of 48

Consol. Court No. 1:21-00077                                            Page 18

enable "circumvent[ion]" of the prerequisites of exhaustion prescribed by existing caselaw. *Luoyang Bearing Corp. v. United States*, 347 F. Supp. 2d 1326, 1352 (CIT 2004). A "brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it," but Ellwood City made no attempt to articulate the argument during the investigation and has therefore forfeited its argument about the validity of the verification procedure. *Id.*

Ellwood City argues that the futility and pure-question-of-law exceptions excuse its failure to timely raise its verification argument. Its reliance on those exceptions is misplaced. Ellwood City Reply at 6, ECF No. 41. The Court deals with each in turn.

### A. Futility

Ellwood City's arguments here are largely the same as those it advanced in its previous case involving Italian steel producers; and though the Court's analysis of the unique facts of this case will be thorough, the Court will be brief in recounting the identical legal principles. Ellwood City claims that "arguing for on-site verification during briefing would have been a useless formality," given the limited time frame that Commerce would have had to carry out a full verification. Ellwood City Reply at 7, ECF No. 41 ("It was not possible to carry out this multi-step process prior to the statutory deadline."). Ellwood City bolsters this argument by citing to a recent Commerce publication that describes those logistical barriers in another case.

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 19 of 48

Consol. Court No. 1:21-00077                                      Page 19

Notice of Suppl. Authority at 2, ECF No. 54.  For the reasons that follow, the Court is unpersuaded by Ellwood City's novel interpretation of futility.

As the Federal Circuit has explained, "a party often is permitted to bypass an available avenue of administrative challenge if pursuing that route would clearly be futile, i.e., where it is clear that *additional* filings with the agency would be ineffectual." *Itochu Bldg. Prod. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013) (internal quotation marks omitted) (emphasis added).  The parties here set *Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) and *Itochu* in opposition to each other, but this is an inaccurate framework for the facts of this case.  In both *Corus Staal* and *Itochu*, there was some objection made during the administrative proceedings.  In *Itochu*, for example, the party had repeatedly and zealously "put its argument on the record before Commerce issued its preliminary results: it set forth its position in comments, met with eight department officials to discuss the issue, and submitted legal support for its position." *Itochu*, 733 F.3d at 1146.  Likewise in *Corus Staal*, a respondent set forth its argument before the preliminary determination (an argument Commerce rejected) but failed to raise the argument again in its final case brief to allow Commerce to reconsider or respond. *Corus Staal*, 502 F.3d at 1378. Neither case blesses the complete failure to raise an issue during the entirety of the administrative proceeding.

For this reason, Ellwood City's argument that Commerce essentially concedes futility in its Remand Redetermination in the unrelated case *Bonney Forge* is

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 20 of 48

Consol. Court No. 1:21-00077                                                    Page 20

misguided.  Notice of Suppl. Authority, ECF No. 54.  In the Remand Redetermination

of *Bonney Forge v. United States*, Case No. 20-3837, Commerce explains its decision

to not to conduct a real-time virtual verification in that investigation despite a timely

request from one of the parties to do so.[1]  Notice of Suppl. Authority, Ex. 1, at 13, ECF

No. 54.  Commerce says that, while the request for virtual verification was "timely

submitted," it "came far too late in the proceeding for Commerce to pursue the

request."  *Id.*  Commerce goes on to assert that "[i]f parties had a genuine suggestion

regarding alternative verification approaches, the appropriate time for parties to

have raised that argument would have been sometime between April and June 2020,

when Commerce normally would have prepared for, and conducted, verification."  *Id.*

at 14.  At best, the Remand Redetermination in *Bonney Forge* provides Ellwood City

with some degree of post hoc confidence that, had it objected at the last possible

opportunity, Commerce would have refused to change course.  But this is insufficient:

"The mere fact that an adverse decision may have been likely does not excuse a party

from a statutory or regulatory requirement that it exhaust administrative remedies."

*Corus Staal*, 502 F.3d at 1379.

Commerce's explanation instead supports the natural interpretation and

purpose of 19 C.F.R. § 351.309(c)(2) as a regulation designating the *last* opportunity

to state an objection that that a party hopes to raise later before a court, not

---

[1] The record in *Bonney Forge* is not part of the record in this case.  Because the Remand Results in *Bonney Forge* do not advance Ellwood City's argument, the Court will nonetheless address the issue.

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 21 of 48

Consol. Court No. 1:21-00077                                          Page 21

designating the *only* time the objection may be brought to the agency's attention.

Though an argument raised only in the final administrative case brief should still be

acknowledged and considered by the agency and will still be preserved for appeal to

the CIT, a party should object early and often if it believes the agency is acting

unlawfully to allow the agency to consider and respond to the concern.  In this case,

Ellwood City knew that Commerce did not intend to conduct on-site investigation in

Germany as early as October 19, 2020, when Commerce memorialized a phone call in

which it informed BGH that Commerce would issue a questionnaire in lieu of

verification.  Telephone Notification of Questionnaire in Lieu of Verification, J.A. at

2,046, ECF No. 43.  The very next day, Ellwood City submitted comments on

Commerce's verification questionnaire in which it evinced no objection to Commerce's

chosen procedure.  Indeed, Ellwood City expressed its gratitude, stating that it

"appreciate[d] that Commerce has indicated its intention to issue a questionnaire to

BGH in lieu of performing an on-site verification."  Pet'rs' Req. That Commerce

Include Specific Instructions in BGH Suppl. Questionnaire (Oct. 20, 2020), J.A. at

12,048, ECF No. 43 (also acknowledging familiarity with the other two investigations

in which Ellwood City was a petitioner and Commerce had already likewise issued

questionnaires instead of conducting on-site verification).  On October 20, 2020,

Commerce issued the promised supplemental questionnaire "in lieu of performing an

on-site verification" to BGH.  Letter to BGH, J.A. at 83,328, ECF No. 42.  Yet Ellwood

City once again failed to object in either its administrative case brief on November 9,

Case 1:21-cv-00077-SAV    Document 55    Filed 11/08/22    Page 22 of 48

Consol. Court No. 1:21-00077                                    Page 22

2020, or the hearing on November 24, 2020.  Administrative Case Br., ECF No. 48; Tr. of Hearing, J.A. at 83,893, ECF No. 42.  Ellwood City had at least three opportunities to object after receiving confirmation of Commerce's intent to employ a questionnaire in lieu of verification, but Ellwood City repeatedly failed to do so.

Although it is true that it "makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested," *Carr v. Saul*, 141 S. Ct. 1352, 1361 (2021), here it was well within Commerce's ability to consider and potentially alleviate concerns about its verification methods.  Commerce's assertions that it would not have been logistically feasible to accomplish a virtual verification in another case between the administrative case briefing stage — when the issue was first raised — and the final determination does not excuse Ellwood City from having never raised the issue at all.  It only emphasizes that Ellwood City, which had the benefit of observing how Commerce was (or was not) conducting verifications in other investigations with timelines earlier in the pandemic, should have raised its objections *as soon as possible*.[2]  *See, e.g.*, *Bonney Forge Corp. v. United States*, 560 F. Supp. 3d 1303 (CIT 2022) (producer requested a "virtual verification" in its final administrative case brief to the agency after it became clear that Commerce would not conduct a traditional verification).

---

[2] Ellwood City was also involved in two other simultaneous antidumping investigations of FEBs from Italy and India during this period.  *See Forged Steel Fluid End Blocks from Italy: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 79,996 (Dec. 11, 2020); *Forged Steel Fluid End Blocks from India: Final Negative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,003 (Dec. 11, 2020).  Ellwood City, therefore, was fully aware of how Commerce was responding to the pandemic and its statutory duty to conduct verification.

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 23 of 48

Consol. Court No. 1:21-00077                                        Page 23

Even if Commerce could not have further tolled the deadline for the final determination or established new verification procedures in the remaining time, "it would still have been preferable, for purposes of administrative regularity and judicial efficiency," for Ellwood City "to make its arguments in its case brief and for Commerce to give its full and final administrative response in the final results." *Corus Staal*, 502 F.3d at 1380.   Commerce could then have acknowledged and responded to Ellwood City's objections on the record.   And this is to say nothing of what procedural modifications Commerce could have made had Plaintiffs not remained silent but instead stated their objections early and often. *Cf. Itochu*, 733 F.3d at 1146 (noting that appellant stated its objections before eight separate departmental officials and submitted its legal rationale in writing *before* the optional final briefing stage).

In short, Ellwood City failed to put Commerce on notice of its argument at any point in the proceeding.   Commerce was blindsided by Ellwood City's objection to its verification procedure before the Court.   Ellwood City never met with Commerce officials to discuss the issue of on-site verification.   Furthermore, after verification took place, Ellwood City submitted a brief that evinced its acceptance of Commerce's use of verification questionnaires "in lieu of on-site verification."   Ellwood City never once stated any objection to the off-site verification methodology, despite having ample opportunity to do so.   A properly timed objection could have led Commerce to

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 24 of 48

Consol. Court No. 1:21-00077                                                    Page 24

change course or provide a further explanation.  The futility exception "is a narrow one," and Ellwood City has not satisfied it here. *Corus Staal*, 502 F.3d at 1380.

## B.  Pure Question of Law

The second exception presents a less complicated juridical framework, but Ellwood City's failure to exhaust is similarly not excused by its appeal to the pure-question-of-law exception.  "Requiring exhaustion may also be inappropriate where the issue for the court is a 'pure question of law' that can be addressed without further factual development or further agency exercise of discretion."  *Itochu*, 733 F.3d at 1146.  If an argument "implicates a pure question of law, it may be addressed" on appeal if "[s]tatutory construction alone is sufficient to resolve the merits of the argument."  *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007).  Ellwood City's verification argument implicates factual inquiries into Commerce's past practice and the logistics of verification; accordingly, the pure-question-of-law exception does not apply.

The Federal Circuit has limited this exception solely to appeals eschewing fact-intensive inquiries.  An argument is not a "pure legal issue" if it also alleges that "Commerce arbitrarily changed its well-established practice and contravened the reasonable expectations of importers."  *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003).  Where a party's allegations "require[] a factual record of Commerce's past practice and an assessment of Commerce's justifications for any departure from that past practice," the Federal Circuit has held that

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 25 of 48

Consol. Court No. 1:21-00077                                            Page 25

"[s]tatutory construction alone" is not sufficient to resolve the case and it therefore cannot qualify as a "pure question of law." *Id.*

Ellwood City argues that the pure-question-of-law exception applies here. It places considerable emphasis on Commerce's acknowledgement that it was "unable to conduct onsite verification of the information relied upon in making its final determination in this investigation as provided for in section 782(i)." Ellwood City Reply at 8, ECF No. 40; 85 Fed. Reg. 79,996–97. Plaintiffs claim Commerce thereby admitted a violation of this provision and assert that "the question remains whether Commerce complied with its black-and-white statutory mandate." Ellwood City Reply at 8, ECF No. 40. But Ellwood City's true inquiry has both factual and legal components. In its brief, Ellwood City suggests that "Commerce could have, for example, arranged a virtual 'on site' verification visit with BGH, given Commerce's extensive use of videoconferencing during the pandemic." Ellwood City Mot. at 23, ECF No. 25. There is not only the legal question of whether a "virtual on site" verification complies with the statute but also the factual question of the feasibility of such an endeavor in this instance. That is precisely why Commerce should have first been alerted to the argument during the pendency of the investigation rather than on appeal to this Court. Commerce could have explored the suggestion and either accepted it or provided a reason on the record why it was not possible.

Ellwood City's request is analogous to the situation in *Consolidated Bearings* in which the Federal Circuit ruled that the pure-question-of-law exception could not

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 26 of 48

Consol. Court No. 1:21-00077                                              Page 26

be applied when a party claims Commerce deviated from "well-established practice and contravened the reasonable expectations of importers." *Consol. Bearings Co.*, 348 F.3d at 1003. Like Ellwood City, Consolidated Bearings first alleged that all a court need do is examine specific statutory provisions to rule on its claim. *Compare* Pls.' Mot. at 15 (citing 19 U.S.C. § 1677m(i); 19 C.F.R. § 351.307*), with Consol. Bearings Co.*, 348 F.3d at 1003 (citing 19 U.S.C. § 1675). However, this seemingly simple statutory claim quickly morphs into allegations that Commerce's decision was an "unlawful deviation from past practice." *Compare* Pls.' Mot. at 22–23 (citing past alternatives that could have been employed in this case), *with Consol. Bearings Co.*, 348 F.3d at 1003 (noting that Consolidated alleged Commerce violated its "well-established prior practice of applying the final results of administrative reviews to importers who did not participate in the review, but import the same merchandise from resellers"). Indeed, Ellwood City's acceptance of these past "off-site" practices as "verification" and suggestion of virtual alternatives confirm the factual rather than purely legal nature of the inquiry. *See* Pls.' Mot. at 20–21, 23–24 (complaining that Commerce "failed to explain why alternative mechanisms of the type previously employed, or that more closely approximated on-site verification, were not possible."). These are exactly the type of allegations that "require a factual record of Commerce's past practice and an assessment of Commerce's justifications for any departure from that past practice." *Consol. Bearings Co.*, 348 F.3d at 1003. No such record exists because Plaintiffs failed to raise their claim before the agency. As "[s]tatutory

construction alone" is not sufficient to resolve Plaintiffs' claim, the pure-question-of-law exception does not apply.[3]  *Id.*

## C. Failure to Exhaust

The Federal Circuit has held that Congress intended "absent a strong contrary reason, the [trade] court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Corus Staal*, 502 F.2d at 1379.  Had Plaintiffs done so here, this Court would have had the benefit of the agency's reasoned judgment about both its interpretation of its legal authorities as well as its past practices.  Because Ellwood City chose not to assert the alleged illegality of Commerce's verification questionnaire, the administrative record is devoid of Commerce's explanation of both the law and the facts supporting its chosen methodology.  The Court may not now consider extra-record evidence about past

---

[3] To the extent Plaintiffs' argument regarding the lack of a verification report is separate from their larger verification questionnaire argument, the Court will accept their premise *arguendo* that Commerce failed to include the required materials in the record and that the pure-question-of-law exception applies.  Plaintiffs' claim still fails because they have not demonstrated substantial prejudice.  *See Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) (stating the "general principle" that it is always within the discretion of "an administrative agency to relax or modify its procedural rules . . . when in a given case the ends of justice require it.  The action . . . is not reviewable except upon a showing of substantial prejudice to the complaining party."); *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1330 (Fed. Cir. 2013) ("the suspension in this case could be invalidated only if Great American showed that the agency's procedural error caused it substantial prejudice"); *PAM S.p A. v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006) ("[A]gencies may relax or modify their procedural rules and . . . a subsequent agency action is only rescindable 'upon a showing of substantial prejudice.'")  Plaintiffs point to no argument they would have raised had Commerce earlier placed additional information on the record, *see* Pls.' Mot. at 21, ECF No. 21, and Plaintiffs had plenty of notice Commerce did not intend to conduct a traditional on-site verification.  Letter to Metalcam, J.A. at 3,027, ECF No. 30 (informing all parties of the "questionnaire in lieu of on-site verification" method Commerce planned to pursue).  Plaintiffs just chose not to object.  Indeed, the remaining substantive arguments Plaintiffs advance are the same ones they made — and preserved — before the agency.

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 28 of 48

Consol. Court No. 1:21-00077                                            Page 28

practices to resolve Plaintiffs' claim. *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (limiting the

Court to reviewing conclusions and evidence found "on the record"). Ellwood City has

failed to identify a "strong contrary reason" not to apply the general rule that claims

may not be raised for the first time in court. *Corus Staal*, 502 F.3d at 1379. The

Court therefore may not consider the merits of Plaintiffs' claims because of their

failure to exhaust their administrative remedies. *See* 28 U.S.C. § 2637(d).

### III.   Verification Procedure and Results

Ellwood City argues that Commerce's procedure for verifying BGH's data was

unlawful and separately that its results are unreliable. Although the Court does not

reach the merits of the verification procedure claim because of a failure to exhaust,

Ellwood City successfully preserved its objections that the verification results were

unreliable. The Court finds that Commerce was justified in relying on the verification

results and upholds Commerce's findings on this issue.

Dumping occurs "when a foreign producer sells a product in the United States

at a price that is below that producer's sales price in the country of origin." *Dongbu

Steel Co. v. United States*, 635 F.3d 1363, 1365 (Fed. Cir. 2011); *see* 19 U.S.C. §

1677(34). If requested by a domestic industry, "Commerce conducts an investigation

to determine whether and to what extent dumping is occurring." *Dongbu Steel*, 635

F.3d at 1365. In those investigations, "Commerce determines antidumping duties for

a particular product by comparing the product's 'normal value' (the price a producer

charges in its home market) with the export price of comparable merchandise." *Id.*

The Court reviews both "Commerce's verification process" and the verification results themselves under the substantial evidence standard. *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1397 (Fed. Cir. 1997). In doing so, the Court looks "to whether a reasonable mind might accept the relevant evidence in the record as adequate to support the results of Commerce's verification." *Id.* The Court can only sustain Commerce's action if the agency "articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43. When reviewing a determination for substantial evidence, the Court's role is not to "reweigh the evidence" or "reconsider questions of fact anew." *Trent Tube Div.,* 975 F.2d at 815.

In *Micron Tech*, the Federal Circuit found that substantial evidence supported Commerce's verification results even when (1) Commerce stated that it "was not able to trace costs to company source documents" because the respondent's "normal cost accounting system prepared unit cost information on a semi-annual basis, while its cost response reported information on a monthly basis" and where, (2) despite a petitioner's objection, the Court was able to reconcile cost of production figures for another respondent. 117 F.3d at 1399–1400. An examination of the record here demonstrates that Commerce articulated "a satisfactory explanation for its action including a rational connection between the facts found and the choice made" in Ellwood City's preserved arguments. *Motor Vehicle Mfrs.*, 463 U.S. at 43.

Ellwood City bases its argument about the unreliability of the verification results on errors BGH reported in two of the four transactions Commerce traced as part of its verification questionnaire.  Ellwood City Mot. at 29, ECF No. 25.  BGH reported both errors to Commerce at the beginning of its verification questionnaire response.  The first was an error in the reported length of the product; the initial reported length was off by 11.5 mm, or less than a half inch on a block over four feet in length.  BGH Verification Questionnaire Response, Ex. VE-5 (Oct. 28, 2020), J.A. at 83,337, ECF No. 42; BGH Rebuttal Brief at 11 (Nov. 18, 2020), J.A. at 86,432, ECF No. 42.  Commerce's analysis determined that the error had no impact on any other fields or to the dumping margin nor did it seem to be "indicative of a systemic reporting issue."  IDM at 43–44, J.A. at 84,029–30, ECF No. 42 ("The correction to the U.S. sale consists of change to a single product characteristic.").

The second correction was to a transaction of a CONNUM[4] not sold in the United States in which BGH initially misreported information for three variables: tensile strength, number of bores, and days between end of production and shipment.  BGH Verification Questionnaire Response, Ex. VE-5 (Oct. 28, 2020), J.A. at 83,337, ECF No. 42.  BGH explained on the record that those errors arose because the invoice for that transaction came from BGH's old order processing system, and a review of

---

[4] "'CONNUM' is a contraction of the term 'control number,' and is Commerce jargon for a unique product.  A particular CONNUM roughly corresponds to a particular product defined 'in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding.'" *Xi'an Metals & Minerals Import & Export Co., Ltd. v. U.S.*, 2022 WL 4391436, at *2 (Fed. Cir. Sept. 23, 2022) (internal citations omitted).

the record revealed that the transaction was the only sales file that came out of the old order processing system.  J.A. at 2,875, ECF No. 43.  The corrections did change the CONNUM categorization, but neither the original nor the revised CONNUM were sold in the United States and the price or cost data were not altered.  It thus had no significant impact on the overall dumping margin.[5]  *Id.*

On review of all the data before it, Commerce considered both corrections to be "minor clerical errors which Commerce would normally accept at verification."  IDM at 43, J.A. at 84,029, ECF No. 42.  One related to a proportionately small inaccuracy in the length of a product; the other was an outlier transaction from an outdated processing system of a product not sold in the United States.  Neither of those errors implicate widespread problems such that Commerce should have disregarded the legitimacy of all of BGH's information or should have been *compelled* to request additional information.  As in *Micron Tech*, where some slight differences in the cost reporting system did not impact the overall reliability of the data, there are reasonable explanations for both errors Ellwood City identifies — explanations fully articulated by Commerce — and a reasonable mind could find that sufficient evidence exists to support Commerce's verification results on the basis of its explanation.

---

[5] Moreover, BGH established at oral argument, and the other parties did not dispute, that each individual CONNUM was composed of at least 18 factors.  Tr. 72:18–25.  This means that the four sales traces Commerce completed involved entry of 72 individual data factors on behalf of BGH, meaning that, if BGH had inaccuracies in 4 entries, its overall error rate was still only 5%.

Case 1:21-cv-00077-SAV    Document 55    Filed 11/08/22    Page 32 of 48

Consol. Court No. 1:21-00077                                      Page 32

Accordingly, the Court finds that substantial evidence exists to support Commerce's reliance on its verification outcomes.

## IV. Cost Reconciliation

Ellwood City objects that Commerce impermissibly relied on BGH's cost data after it failed to reconcile. Commerce and BGH assert, by contrast, that BGH's costs do reconcile and that Commerce had all the information it needed to rely on BGH's costs. *See* Ellwood City Mot. at 30, ECF No. 25; Def.'s Resp. at 20, ECF No. 37; BGH Resp. at 20, ECF No. 35. Commerce is required to ensure that a respondent's costs of production reconcile to its audited financial statements. 19 U.S.C. § 1677b(f)(1)(A). The statute directs that costs in antidumping investigations "be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). "Cost-reconciliation information refers to cost of production information that Commerce requires a party to provide to reconcile the reported costs to the company's audited financial statements." *Hyundai Elec. & Energy Sys. Co. v. United States*, 466 F. Supp. 3d 1303, 1310 n.7 (CIT 2020).

Ellwood City argued before the agency that BGH's cost reconciliation was unsupported and reiterates that argument again before this Court. Ellwood City Mot. at 30, ECF No. 25. Specifically, Ellwood City asserts that BGH's cost database did not reconcile with BGH's financial statements and that Commerce's reliance on the

database was misplaced because of edits BGH made to the database at verification.
*Id.* at 27–31. Because the Court finds sufficient evidence on the record to support
Commerce's reliance on the cost database, the Court rejects Ellwood City's objections.

There is no dispute that BGH's records are "kept in accordance with the
generally accepted accounting principles" of Germany so that the sole question here
is whether the records BGH provided "reasonably reflect the costs associated with
the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). Commerce
explained on the record the many steps BGH took to provide complete and accurate
information in the manner Commerce requested. BGH collected and provided this
information despite its cost accounting system not generally allocating costs down to
specific products but instead to specific "cost centers." IDM at 38, J.A. at 84,024, ECF
No. 42. Commerce concluded that BGH "reasonably used its basic standard costs and
production information as a starting point in order to calculate product-specific costs
for Commerce," and it determined that the "method used by BGH provides product-
specific costs based on a combination of actual material costs and adjusted standard
conversion costs (by steel making and finishing) for each product characteristic
identified by Commerce." *Id.* at 39. BGH also "submitted CONNUM-specific
worksheets which show the precise calculation of its reported costs for the CONNUMs
having the largest volume of sales in the U.S. and the home market" and "provided
various worksheets (i.e., material cost calculation worksheet, alloy scrap calculation
worksheet, copies of inventory valuation lists, copies of standard pricing calculations,

Case 1:21-cv-00077-SAV    Document 55    Filed 11/08/22    Page 34 of 48

Consol. Court No. 1:21-00077                                                    Page 34

various standard cost build ups, variance worksheets, etc.) to support its reported CONNUM-specific costs." *Id.* at 39–40. Ultimately, Commerce determined, after explaining its reasoning in detail, that "the reported costs fully reconcile to the company's financial statement costs." *Id.* at 40. Substantial evidence on the record supports Commerce's conclusion.

## V.    Particular Market Situation Adjustments

BGH disputes Commerce's particular market situation (PMS) adjustments to its cost of production, relying on numerous CIT cases for the proposition that Commerce's adjustments are contrary to law. BGH Mot. at 5–19, ECF No. 23. Recent Federal Circuit precedent has confirmed BGH's position, and Commerce does not oppose a remand on this issue. Accordingly, the request for a remand will be granted.

19 U.S.C. § 1677b describes how Commerce is to determine "normal value," (*e.g.*, the price at which the merchandise is sold in the home country) for purposes of its antidumping calculations. The statute instructs Commerce to calculate the normal value of the product by determining "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country." *Id.* § 1677b(a)(1)(B)(i). However, if Commerce determines that the normal value of the subject merchandise cannot be discerned by that method, then Commerce may use the "constructed value" of the merchandise. *Id.* § 1677b(a)(4). "Constructed value" is described by § 1677b(e) as the sum of the following: (1) the cost of materials and production; (2) either the actual amount

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 35 of 48

Consol. Court No. 1:21-00077                                    Page 35

realized in a sale in that foreign country or, if unavailable, an average of actual profits for that product or the profit from a similar product; and (3) the cost of packing and shipping to the United States. As relevant here, § 1677b(e) also states that for purposes of paragraph § 1677b(e)(1) (cost of materials and production), "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology."

The problem is that § 1677b(e) does not apply when there are sales of subject merchandise below the cost of production. *See* 19 U.S.C. § 1677b(b). The statute instead prescribes a separate cost calculation — one without language permitting adjustments for particular market situations. *Id.* § 1677b(b)(3). Commerce took the position that, when it believes a "particular market situation" exists, Commerce can effectively cut-and-paste the language of § 1677b(e) into § 1677(b). IDM at 16, J.A. at 84,002. *But see Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

This Court has stridently disagreed with Commerce's non-textual approach to statutory interpretation. *See, e.g., Hyundai Steel Co. v. United States*, 483 F. Supp.

3d 1273, 1279 (CIT 2020), *aff'd* 19 F.4th 1346 (Fed. Cir. 2021) (cataloging CIT cases finding that "[a]s this Court has held repeatedly, the statute does not authorize an adjustment to the cost of production when Commerce applies the sales-below-cost test to determine which home market sales to exclude from the calculation of normal value."). The Federal Circuit recently has concurred with this Court that the "structure of section 1677b . . . clearly indicates that Congress intended to limit PMS [particular market situation] adjustments to calculations pursuant to the 'constructed value' subsection, 19 U.S.C. § 1677b(e), and not to authorize Commerce to make such adjustments pursuant to the 'cost of production' subsection, *id.* § 1677b(b)." *Hyundai Steel Co. v. United States*, 19 F.4th 1346, 1352 (Fed. Cir. 2021). Commerce thus may not employ a particular market situation adjustment "when calculating the cost of production for purposes of applying the sales-below-cost test." *Id.*

The bulk of BGH's August 9, 2021 Motion for Judgment on the Agency Record is dedicated to the argument that Commerce erred in making such adjustments to BGH's reported cost of manufacture. BGH Mot. at 5–19, ECF No. 23. BGH cited to the numerous CIT decisions holding that 19 U.S.C. § 1677b(b) does not authorize Commerce to make particular market situation adjustments to a respondent's cost of production when Commerce applies the sales-below-cost test to determine which home market sales to exclude from the calculation of normal value. *Id.* at 5.

In its December 17, 2021 response, the Government acknowledged the
"precedential decision" in *Hyundai Steel*, "which is adverse to the United States" and
"is binding upon this Court." Def.'s Resp. at 29, ECF No. 37. The United States
"therefore does not oppose the remand sought by BGH regarding those PMS
adjustments in light of the intervening precedent." *Id.* The Court notes that,
although the Federal Circuit's decision is certainly binding on the CIT, it is more
relevant that it is "binding" on Commerce — especially given that Commerce has
stubbornly maintained its interpretation of the statute despite losing before the CIT
on this issue at least seven times in the past three years. *See, e.g.*, *Hyundai Steel Co.*,
483 F. Supp. 3d at 1279; *Saha Thai Steel Pipe Pub. Co. v. United States*, 422 F. Supp.
3d 1363, 1368–70 (2019); *Husteel Co. v. United States*, 426 F. Supp. 3d 1376, 1383–
89 (2020); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S .v. United States*, 426
F. Supp. 3d 1395, 1411–12 (2020); *Dong-A Steel Co. v. United States*, 475 F. Supp. 3d
1317, 1337–41 (2020); *Husteel Co. 6 v. United States*, 476 F. Supp. 3d 1363, 1370–73
(2020); *Saha Thai Steel Pipe Pub. Co. v. United States*, 476 F. Supp. 3d 1378, 1382–
86 (2020). In compliance with *Hyundai Steel*, the Court remands this issue to allow
Commerce to recalculate the dumping margin without impermissible cost-based
particular market situation adjustments for BGH's electricity and ferrochrome
inputs. Like the Federal Circuit in *Hyundai Steel*, this Court "need not reach the
question whether Commerce's PMS finding was supported by substantial evidence,"

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 38 of 48

Consol. Court No. 1:21-00077                                          Page 38

having established that the adjustments were not permitted by statute.  19 F.4th at

1356.

## VI.    Differential Pricing Methodology

BGH argues that Commerce's application of its differential pricing analysis

was unlawful when it employed "inter-product zeroing" based on a misunderstanding

of the definition of "comparable merchandise."   BGH Mot. at 21, ECF No. 23.

Differential pricing analysis is the methodology Commerce uses to determine what

procedure for determining dumping margins it should employ and is designed to

identify patterns of prices that vary significantly across time, regions, or purchasers.

*Stupp Corp. v. United States*, 5 F.4th 1341, 1345 (Fed. Cir. 2021).[6]  The governing

statute requires that Commerce perform this analysis for "comparable merchandise"

but does not define the term.  *See* 19 U.S.C. § 1677f-1(d)(1).  Although BGH believes

that Commerce impermissibly applied the method to multiple products, the Court

finds that BGH is making a distinction without difference and denies BGH's Motion

with respect to this issue.

19 U.S.C. § 1677f-1 describes the methodology for determining dumping rates.

It explains the default method:  Commerce will determine if there has been dumping

either "by comparing the *weighted average* of the normal values to the *weighted*

---

[6] The Court notes the objections of both Commerce and Ellwood City that *Stupp* is inapplicable to this case because BGH has not challenged Commerce's application of the Cohen's *d* test.  Def.'s Resp. at 26 n.6, ECF No. 37; Ellwood City Resp. at 37 n.8, ECF No. 33.  While the Court agrees that the broader legal holdings of *Stupp* do not apply here, its clear explication of the highly technical issue of differential pricing methodology is useful, and the Court references it for that purpose.

*average* of the export prices (and constructed export prices) for comparable merchandise" — in Commerce's regulations, the average-to-average method — or "by comparing the normal values of *individual transactions* to the export prices (or constructed export prices) of *individual transactions* for comparable merchandise," the transaction-to-transaction comparison method.  19 U.S.C. § 1677f-1(d)(1)(A)(i)-(ii) (emphasis added); 19 C.F.R. § 351.414; *see also Stupp Corp.*, 5 F.4th at 1345 ("When calculating a weighted average dumping margin, Commerce typically uses the average-to-average comparison method . . . [which] compares the weighted average of the respondent's sales prices in its home country during the investigation period to the weighted average of the respondent's sales prices in the United States during the same period.").

Section 1677f-1(d)(1) contains an exception, however.  Commerce may determine whether subject merchandise is being sold in the United States at less than fair value "by comparing the *weighted average* of normal values to export prices (or constructed export prices) of *individual transactions* for comparable merchandise" — the average-to-transaction method — if two conditions are present:  (1) "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time"; and (2) Commerce "explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii)." § 1677f-1(d)(1)(B) (emphasis added); *Stupp Corp.*, 5 F.4th at 1345 ("Commerce refers to the alternative method of

calculating a weighted average dumping margin as the 'average-to-transaction' method.").

This exception was created because the average-to-average method "sometimes fails to detect 'targeted' or 'masked' dumping, because a respondent's 'sales of low-priced "dumped" merchandise would be averaged with (and offset by) sales of higher-priced "masking" merchandise, giving the impression that no dumping was taking place.'" *Stupp Corp.*, 5 F.4th at 1345 (quoting *Apex*, 862 F.3d at 1341) ; *see also Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367, 1370–71 (Fed. Cir. 2022) ("The object is to uncover 'targeted' dumping, a label for an exporter's unduly low pricing in portions (less than all) of its overall U.S. sales, which would be 'masked' (offset) by the exporter's other, higher-priced sales if only overall averages are considered."). The rationale for the average-to-transaction exception is that "targeted dumping is more likely to be occurring when export prices fit a pricing model that differs significantly among different periods of time, different purchasers, or different regions of the United States." *Stupp Corp.*, 5 F.4th at 1345.

When using the average-to-transaction method, Commerce "subtract[s] each individual export price for a particular product group from the weighted average of the home market prices for that product group in an iterative fashion, and sum[s] the results." *Id.* at 1347–48. In so doing, "Commerce 'zeroes out' iterations that produce a negative dumping margin (i.e., when the weighted average home market price is less than an individual export price), a practice known as 'zeroing.'" *Id.* at 1348. The

Federal Circuit has determined that the practice of zeroing is appropriate when Commerce is using the average-to-transaction comparison method, because "[w]hen examining individual export transactions, using the average-to-transaction comparison methodology, prices are not averaged and zeroing reveals masked dumping. This ensures the amount of antidumping duties assessed better reflect the results of each average-to-transaction comparison." *Union Steel v. United States*, 713 F.3d 1101, 1109 (Fed. Cir. 2013). However, the average-to-transaction method "cannot be said to require zeroing methodology." *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1362 (Fed. Cir. 2010).

In *Apex Frozen Foods Private Ltd. v. United States*, Commerce evaluated an Indian shrimp importer's sales with the Cohen's *d* test[7] and then "applied the [average-to-transaction] methodology (with zeroing) to those sales passing the test, and the [average-to-average] methodology (without zeroing) for sales that did not pass, resulting in two antidumping margins: an [average-to-transaction] margin and an [average-to-average] margin." 862 F.3d 1337, 1349–50 (Fed. Cir. 2017).

---

[7] "For each subset within a category, Commerce makes that subset the 'test group' and aggregates the remaining subsets in that category into the 'comparison group.' If both groups have at least two observations (i.e., sales prices), and if the sum of the comparison group is at least five percent of the total amount of export sales, Commerce applies the 'Cohen's *d* test,' named after statistician Jacob Cohen, to evaluate whether the test group differs significantly from the comparison group. The formula for calculating the Cohen's *d* value is as follows:

$$\frac{|M_c - M_t|}{\sigma_p}$$

[the mean of group one minus the mean of group two divided by the pooled standard deviation for the two groups]." *Stupp Corp.*, 5 F.4th at 1346 (internal citations omitted).

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 42 of 48

Consol. Court No. 1:21-00077                                    Page 42

Commerce then aggregated the two dumping margins by zeroing out the negative average-to-average margin, a step to which the importer objected as improperly skewing the overall calculation. *Id.* at 1350. The Federal Circuit disagreed, however. It noted that the mixed alternative approach employed by Commerce resulted in a tension, because "[z]eroing the negative [average-to-average] margins would appear to 'defeat the purpose' of using the [average-to-average] methodology in the mixed calculation at all" but aggregating negative margins with positive margins would "run[] into a similar paradox, wherein Commerce would effectively be performing 'double offsetting' and 're-masking' masked dumping revealed by the [average-to-transaction] methodology." *Id.* In other words, "in seeking to combine the two methodologies to arrive at a single antidumping rate, Commerce would be forced to subordinate the policy goals of one to the other." *Id.* Thus, even when Commerce was presented with a situation in which some sales for which there was a negative dumping margin would be subsumed by sales with a positive dumping margin, the Federal Circuit found it was appropriate for Commerce "to maximize and preserve the extent of uncovered masked dumping," and that Commerce's "decision was consistent with the overall statutory purpose." *Id.*

Other litigants before the CIT have previously advanced arguments that "the exception in § 1677f-1(d)(1)(B) applies only to significant differences for the same product among purchasers, regions, or time periods and does not relate to significant price differences between different products" and that it is therefore "unlawful for the

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 43 of 48

Consol. Court No. 1:21-00077                                                    Page 43

Department to apply inter-product zeroing under the guise of applying the exception in section 1677f-1(d)(1)(B)." *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1371, 1373 (CIT 2018).  In *Dillinger*, the CIT found that the litigant failed to preserve that argument and therefore did not reach the merits of the challenge.  The Court nevertheless opined in dicta that the inter-product zeroing argument would have failed on the merits because the litigant provided "no reasoning or authority to support its assertion."  *Id.* at 1373; *see also AG der Dillinger Huttenwerke v. United States*, 532 F. Supp. 3d 1338, 1344 (CIT 2021) (dismissing the same inter-product zeroing argument from another respondent who failed to exhaust administrative remedies).  The argument that applying zeroing between different products is contrary to the statute has to date not been addressed on the merits by this Court.

For Commerce to use the average-to-transaction method, there must be a pattern of export prices for "comparable merchandise."  19 U.S.C. § 1677f-1(d)(1)(B)(i).  These sets of products may differ significantly among purchasers, regions, or periods of time — all variables that may confound simple comparisons.  Given these realities, the Federal Circuit has shed light on the meaning of "comparable merchandise."  In *Dillinger France S.A. v. United States*, a French producer of steel and carbon plates argued that "Commerce's use of the Cohen's *d* test to determine a pattern among export prices was not in accordance with the law because Dillinger's products are custom-made."  981 F.3d 1318, 1326 (Fed. Cir. 2020).  Commerce had defined comparable merchandise "by product control numbers

('CONNUMs'), which have certain 'physical characteristics' that were subject to notification and comment during Commerce's investigation." *Id.* Commerce rejected Dillinger's claim that "its made-to-order products are inferably so unique and embrace such a wide range of grades within a given [CONNUM] that any comparison of U.S. prices on a CONNUM basis must take into account these inter-CONNUM variations." *Id.* The Federal Circuit discerned no error in Commerce's determination, indicating that even custom-made products may qualify as "comparable merchandise" as long as they fall within the same product control number. *Id*; *see generally The Timken Co. v. United States*, 179 F. Supp. 3d 1168, 1180 (CIT 2016) ("[Respondent] fails to demonstrate that using CONNUMs as a basis for establishing 'comparable merchandise' is unreasonable.").

In its Motion for Judgment on the Agency Record, BGH advances the argument that "inter-product zeroing" is not permitted by 19 U.S.C. § 1677f-1, the statute that governs the determination of the weighted average dumping margin. BGH Mot. at 21, ECF No. 23. At the outset, the Court notes that BGH and the Government seem to agree that by "same product," they mean "same CONNUM." *Compare* BGH Reply at 7 n.3, ECF No. 38 ("By the term 'same product,' BGH simply means the same CONNUM.") *with* Def.'s Resp. at 28, ECF No. 37 ("Commerce used CONNUMs as the basis for establishing 'comparable merchandise.'") *and* IDM at 14, J.A. at 2,291 (defining "comparable merchandise" as "the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 45 of 48

Consol. Court No. 1:21-00077                                                    Page 45

Commerce uses in making comparisons between [the export price] or [the constructed export price] and [the normal value] for the individual dumping margins").

It is well settled that zeroing is permissible when Commerce applies the average-to-transaction method; and similarly, the other elements of the differential pricing analysis have been upheld by the Federal Circuit. *See Union Steel*, 713 F.3d at 1109. Unlike the respondents in *Dillinger France* and *Dillinger Huttenwerke*, BGH preserved its inter-product zeroing argument in the record below so that this Court may now fully consider its merits. *Compare* BGH Case Br. at 8–9, J.A. at 86,407, ECF No. 42 (arguing that it is "unlawful for Commerce to apply inter-product zeroing under the guise of applying the exception in section 1677f-1(d)(1)(B)") (emphasis in original) *with Dillinger France S.A.*, 350 F. Supp. 3d at 1371 (finding that respondent "failed to exhaust its administrative remedies for advancing its inter-product argument") *and AG der Dillinger Huttenwerke*, 532 F. Supp. 3d at 1344 (agreeing "that Dillinger should have raised this argument before the agency"). Notably, however, BGH has not challenged any specific aspect of Commerce's use of the Cohen's *d* test or ratio test.[8] Tr. at 22:2–5 (The Court: "Now, if I read your brief

---

[8] "If the Cohen's *d* value is equal to or greater than 0.8 for any test group, the observations within that group are said to have 'passed' the Cohen's *d* test, i.e., Commerce deems the sales prices in the test group to be significantly different from the sales prices in the comparison group. . . . Commerce counts the number of observations within each product group that were tagged as 'passing,' and applies what it calls a 'ratio test' to the results: If the total percentage of passing transactions is 33% or less, Commerce uses the default average-to-average method to calculate the weighted average dumping margin. If the total percentage is 66% or more, Commerce tentatively selects the alternative average-to-transaction method as the method it will use to calculate the weighted average dumping margin. If the total percentage is between 33% and 66%, Commerce tentatively selects a hybrid approach in which it applies the alternative average-to-transaction method to those transactions passing the

correctly, you are not contesting [Commerce's] application of the Cohen's D [*sic*] test and the ratio test to this data set, correct?"  BGH counsel: "That's right, Your Honor.").

That it does not is significant given other recent disputes regarding Commerce's administration of the test.  *See Stupp Corp.*, 5 F.4th at 1360 (finding that remand was required given uncertainty about the reliability of Commerce's use of Cohen's *d* with a company's datasets).  BGH's specific argument is essentially that, having used Cohen's *d* and determined that a pattern of differential pricing exists, Commerce then used the average-to-transaction methodology and zeroed out negative dumping margins for some control numbers that could have offset positive dumping margins of other control numbers.  BGH Mot. at 19, ECF No. 23.  BGH argues that this is inconsistent with the purpose and text of the statute, which is to detect and prevent masked dumping.  *Id.* at 21–22.  Not so, however; it is appropriate for Commerce to "maximize and preserve the extent of uncovered masked dumping," and that is "consistent with the overall statutory purpose" even when, as in *Apex*, it means that the benefit of negative dumping margins (CONNUMs sold at lower prices in Germany than in the U.S.) to a respondent will be offset by necessary zeroing to preserve Commerce's ability to address the positive dumping margins (CONNUMs sold at lower prices in the U.S. than in Germany).  *See Apex*, 862 F.3d at 1350.  Once

---

Cohen's *d* test and the average-to-average method to the remainder of the transactions." *Stupp Corp.*, 5 F.4th at 1347 (citations omitted).

Case 1:21-cv-00077-SAV   Document 55   Filed 11/08/22   Page 47 of 48

Consol. Court No. 1:21-00077                                                                 Page 47

Commerce has justified its use of the average-to-transaction method, its use of zeroing is permissible, as is the case here. *Union Steel*, 713 F.3d at 1109. BGH has failed to challenge Commerce's decision to apply the average-to-transaction method. Commerce applied that method in a manner approved — but not mandated by — the Federal Circuit. Accordingly, the Court will find substantial evidence supports the portion of the decision BGH chose to challenge.

## CONCLUSION

This case is remanded on narrow grounds. Ellwood City forfeited its objection to Commerce's use of a verification questionnaire in lieu of in-person verification. Commerce provided a satisfactory explanation on the record of its reliance on BGH's costs, and its verification results are therefore supported by substantial evidence. The Court is similarly unpersuaded by BGH's narrow argument that Commerce's differential pricing methodology impermissibly zeroes the margin for control numbers with negative dumping. Accordingly, only BGH's request for a remand based on Commerce's illegal finding of a particular market situation is granted.

On consideration of all papers and proceedings held in relation to this matter, and on due deliberation, it is hereby:

**ORDERED** that Ellwood City's Motion for Judgment on the Agency Record is **DENIED**; it is further

**ORDERED** that BGH's Motion for Judgment on the Agency Record is **GRANTED IN PART**; it is further

**ORDERED** that Commerce's determination is remanded for reconsideration of the particular market situation adjustment consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the Court within 120 days of this date.

**ORDERED** that Defendant shall supplement the administrative record with all documents considered by Commerce in reaching its decision in the Remand Redetermination;

**ORDERED** that Plaintiffs shall have 30 days from the filing of the Remand Redetermination to submit comments to the Court; and

**ORDERED** that Defendant shall have 15 days from the date of Plaintiffs' filing of comments to submit a reply; and it is further

**ORDERED** that Defendant-Intervenor shall have 15 days from the date of Defendant's filing of comments to submit a reply.

.

**SO ORDERED.**


                                                        /s/ Stephen Alexander Vaden
                                                        Stephen Alexander Vaden, Judge


Dated: November 8, 2022
          New York, New York