A-428-847<br>
Remand<br>
Court No. 21-00077<br>
Investigation<br>
**Public Document**<br>
E&C/OVIII:  KJ

*Ellwood City Forge Co., Ellwood National Steel Co., Ellwood Quality Steels Co.,*
*and A. Finkl & Sons v. United States*,
Consolidated Court No. 21-00077 (CIT November 8, 2022)
Forged Steel Fluid End Blocks from Germany

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court) in *Ellwood City Forge Co., Ellwood National Steel Co., Ellwood Quality Steels Co., and A. Finkl & Sons v. United States*, Slip Op. No. 22-123, (CIT November 8, 2022) (*Remand Order*).  These final results of redetermination concern the final determination in the less-than-fair-value investigation of forged steel fluid end blocks from Germany.[1]

In the *Remand Order*, the Court granted BGH Edelstahl Siegen GmbH's (BGH's) request for a remand to reconsider Commerce's particular market situation (PMS) adjustment to its sales-below-cost test.[2]

**II.   LEGAL FRAMEWORK**

Section 504 of the TPEA added the concept of "particular market situation" in the

---

[1] *See Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Final Determination of Sales at Less Than Fair Value*, 85 FR 80018 (December 11, 2020) (*Final Determination*) and accompanying Issues and Decision Memorandum (IDM); *see also Forged Steel Fluid End Blocks from the Federal Republic of Germany and Italy: Amended Final Determination for the Federal Republic of Germany and Antidumping Duty Orders*, 86 FR 7528 (January 29, 2021) (*Germany AD Order*).
[2] *See Remand Order* at 2 and 34.

definition of the term "ordinary course of trade" in section 771(15) of the Tariff Act of 1930, as amended (the Act), and for purposes of constructed value under section 773(e) of the Act.[3] Section 773(e) of the Act states that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology." Although the Act does not define "particular market situation," the SAA explains that, for example, a situation may exist "where there is government control over pricing to such an extent that home market prices cannot be considered competitively set" or where there are "differing patterns of demand in the United States and the foreign market."[4]

At the time Commerce issued the *Final Determination*, Commerce interpreted the amendments to sections 771(15) and 773(e) of the Act to be applicable for purposes of Commerce's sales-below-cost test under section 773(b)(1) of the Act.

### III. BACKGROUND

In the *Final Determination*, Commerce found that record evidence supported a finding that a PMS existed in Germany which distorted the costs of electricity and ferrochrome.[5] Specifically, Commerce found that "the regulatory regime distorts the actual cost of electricity in the German market such that a PMS exists," and that "the German ferrochrome market is distorted by the significant presence of low-priced ferrochrome from Kazakhstan."[6] Therefore, for the *Final Determination*, to quantify and adjust for the electricity distortion, Commerce

---

[3] *See Trade Preferences Extension Act of 2015*, Pub. L. No. 114-27, 129 Stat. 362, 385 (2015) (TPEA).
[4] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 822.
[5] *See Final Determination* IDM at Comment 3.
[6] *Id.*

adjusted BGH's electricity costs using the final electricity subsidy rates Commerce found for BGH in the companion countervailing duty investigation equalized to the period of investigation (POI).  Specifically, to estimate the amount of the 2018 electricity-related subsidies attributable to the POI, we calculated the percentage of BGH's POI electricity costs relative to its total 2018 electricity costs and applied the resulting rate to the total 2018 electricity-related subsidies. With respect to ferrochrome, Commerce compared a POI benchmark price from the United States Geological Survey to BGH's average purchase price paid during the POI, and then adjusted BGH's reported ferrochrome costs by the resulting difference.[7]

Shortly before Commerce's rule 56.2 brief was due in the underlying litigation, the U.S. Court of Appeals for the Federal Circuit (CAFC) held that "section {773 of the Act}, as amended by the TPEA, clearly indicates that Congress intended to limit PMS adjustments to calculations pursuant to the 'constructed value' and not to authorize Commerce to make such adjustments pursuant to the 'cost of production' subsection."[8]  In compliance with *Hyundai Steel*, the Court remanded this issue to allow Commerce to recalculate the dumping margin without impermissible cost-based PMS adjustments for BGH's electricity and ferrochrome inputs.[9]

On January 31, 2023, we released the Draft Remand Results to interested parties for comment.[10]  On February 15, 2023, we received comments from Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons

---

[7] *Id.*
[8] *See Hyundai Steel Co., Ltd. v. United States*, 19 F.4th 1346, 1352 (Fed. Cir. 2021) (*Hyundai Steel*).
[9] *See Remand Order* at 37.
[10] *See* Draft Results of Remand Redetermination, *Ellwood City Forge Co., Ellwood National Steel Co., Ellwood Quality Steels Co., and A. Finkl & Sons v. United States*, Consolidated Court No. 21-00077 (CIT November 8, 2022), dated January 31, 2023 (Draft Remand Results).

3

(collectively, the FEB Fair Trade Coalition, or the Coalition) and BGH.[11]  In consideration of these comments, we made certain changes to our Draft Remand Results.[12]

## IV.  ANALYSIS

Pursuant to the CAFC's decision in *Hyundai Steel* referenced above, the statute only permits the adjustment of cost of production for a PMS when making comparisons based on constructed value, not for purposes of the sales-below-cost test.  In this investigation, in certain instances, we calculated normal value based on constructed value.[13]  Therefore, consistent with the CAFC's precedential opinion in *Hyundai Steel*, we are making a PMS adjustment for the comparisons based on constructed value, but are not making a PMS adjustment when applying the sales-below-cost test.  We have recalculated BGH's weighted-average dumping margin accordingly.[14]  Because BGH's revised rate is zero, and all other estimated dumping margins established for producers/exporters individually investigated are determined entirely under section 776 of the Act, Commerce calculated the all-others rate by averaging BGH's zero rate with the rate calculated under section 776 of the Act.[15]

## V.  COMMENTS ON DRAFT RESULTS OF REDETERMINATION

**Comment 1:  Commerce's Draft Remand Results Incorrectly Limit Its Options for Applying PMS Adjustments in Price-to-Price Calculations**

*The Coalition's Comments:*

- Commerce's Draft Remand Results incorrectly limit the options for applying PMS adjustments in price-to-price calculations.[16]

---

[11] *See* FEB Fair Trade Coalition's Letter, "FEB Fair Trade Coalition's Comments on Draft Remand Results," dated February 15, 2023 (the Coalition's Comments); and BGH's Letter, "Comments on Draft Results of Redetermination," dated February 15, 2023 (BGH's Comments).
[12] *See* Memorandum, "Calculation Memorandum for BGH Edelstahl Siegen GmbH, dated concurrently with these final results of redetermination (Calculation Memorandum for BGH).
[13] *See* Memorandum, "Amended Final Margin Calculation for BGH Edelstahl Siegen GmbH," dated December 23, 2020, at the attached margin-calculation log (line 8701).
[14] *See* Calculation Memorandum for BGH.
[15] *See Id*. and Comment 2, below.
[16] *See* the Coalition's Comments at 3.

4

- Commerce overreads *Hyundai Steel* and fails to address viable alternative statutory pathways for adjusting price-to-price comparisons to account for a PMS that distorts production costs.[17]
- Commerce is not precluded from adjusting its dumping calculations to account for a PMS that distorts BGH's production costs where the comparison is price-to-price.
- In this case, the CIT ordered remand for "reconsideration of the particular market situation adjustment," as opposed to ordering a remand for Commerce to reverse the calculation.[18]
- Commerce's Draft Remand Results incorrectly frame this issue as if it were merely a binary choice between applying a PMS adjustment for purposes of the sales-below-cost test or applying no PMS adjustment at all for price-to-price comparisons.[19]
- Commerce could adjust the margin program to test whether BGH's distorted costs "reasonably reflect" true production costs, pursuant to section 773(f)(1)(A) of the Act.[20]
- In this case, having determined that BGH's input costs for electricity and ferrochrome are distorted by a PMS, Commerce may conclude that BGH's books and records cannot "reasonably reflect" the costs of producing subject merchandise.[21]
- As one option, the Coalition proposes that Commerce include a PMS adjustment, basically adjusting BGH's reported costs to account for PMS distortion and thereby "reasonably reflect" its production costs.[22]
- This approach is necessary because, when a respondent's reported production costs are distorted by a PMS, the sales-below-cost test is distorted and, thus, normal value may include home market prices that only pass the sales-below-cost test due to the use of distortedly low production costs.[23]
- Because the cost-based PMS prevents a proper comparison with U.S. price, Commerce could use constructed value for all sales. Where a respondent's production costs are distorted by a PMS, a price-to-price comparison would not be appropriate.[24]
- Home market prices that are derived from distorted costs of production due to a PMS cannot be considered normal and have no place in an antidumping calculation.[25]
- To avoid this outcome (apart from performing the unmodified sales-below-cost test as set forth in section 773(b) of the Act) Commerce can separately perform an adjusted test to identify any home market sales prices falling below production costs that have been adjusted to counteract the cost-based PMS.[26]

---

[17] *Id.*
[18] *Id.* at 4 (citing *Remand Order* at 37, 48).
[19] *Id.* at 4.
[20] *Id.* at 5.
[21] *Id.* at 6 (citing sections 771(15)(C) and 773(e), 773(f)(1)(A) of the Act).
[22] *Id.* at 7.
[23] *Id.*
[24] *Id.*
[25] *Id.* at 8-9 (citing section 771(15) of the Act)).
[26] *Id.* at 9.

- For such sales, Commerce would base normal value on constructed value, including a PMS adjustment.[27]

**Commerce's Position:**

While we recognize that the Coalition makes certain statutory arguments to support making a cost-based PMS adjustment, pursuant to Commerce's remand request and the Court's *Remand Order*, we determine that it is not appropriate to address those arguments in the context of these final results of redetermination.

The Court granted a remand, which Commerce did not oppose, specifically to "recalculate the dumping margin without impermissible cost-based particular market situation adjustments for BGH's electricity and ferrochrome inputs."[28]  Importantly, the Court remanded this case  "on narrow grounds" so that Commerce may reconsider its finding of a PMS.[29]  While the Coalition contends that Commerce may rely on other avenues to support making a cost-based PMS adjustment in accordance with the CAFC's decision in *Hyundai Steel*, in line with Commerce's remand request and the Court's *Remand Order*, we determine that this remand redetermination is not the appropriate proceeding in which Commerce should address, for the first time, alternative possible interpretations of the CAFC's analysis in *Hyundai Steel*. Accordingly, we have declined to consider the Coalition's arguments in the context of these final results of redetermination.

**Comment 2:   Commerce Should Not Extend Any "Windfall" Resulting from BGH's Litigation to the All-Others Rate**

*The Coalition's Comments:*

- BGH did not challenge the all-others rate and, even if it had, any such challenge would fail for lack of standing, the most obvious defect being the lack of any injury to BGH.[30]

---

[27] *Id.*
[28] *See Remand Order* at 37.
[29] *Id*. at 34-38, 47.
[30] *See* the Coalition's Comments at 10.

- The Court has determined that Commerce is not statutorily mandated to adjust the all-others rate when the mandatory respondent rates on which it is based are recalculated, even though it is Commerce practice.[31]

**Commerce's Position:**

Commerce continues to follow its practice of revising the all-others rate even in situations where no party to a proceeding challenges the all-others rate. Indeed, even in the sole case on which the Coalition relies, the Court discusses at length how "it is Commerce's practice to recalculate the all-others rate" and how it is irrelevant that "(Plaintiff) failed to seek such relief."[32] Commerce views adjusting the all-others rate as a consequential (*i.e.*, collateral) change properly within the scope of the litigation. If the Court affirms this remand redetermination and Commerce consequently issues an amended final determination effectuating this remand redetermination, it will be governed by section 735 of the Act, which provides for both the determination of weighted-average dumping margins for individually investigated respondents and an all-others rate that, as a general rule, derives from the weighted-average dumping margins determined for the individually investigated respondents. The all-others rate, without an adjustment from Commerce, would continue to rely on BGH's previous rate that has been considered unlawful by the Court. Therefore, the all-others rate must be revised.

Section 735(c)(5)(A) of the Act lays out the general rule for determining the all-others rate. However, when all estimated dumping margins established for exporters and producers individually investigated are zero, *de minimis*, or determined entirely under section 776 of the Act, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated

---

[31] *Id*. at 10 (citing *United States Steel Corp. v. United States*, 348 F. Supp. 3d 1248, 1258 (CIT 2018) (*U.S. Steel Corp.*)).
[32] *See U.S. Steel Corp.*, 348 F. Supp. 3d at 1260-61.

weighted average dumping margins determined for the exporters and producers individually investigated." Because BGH's revised rate is zero, and all other estimated dumping margins established for exporters and producers individually investigated are determined entirely under section 776 of the Act, Commerce will calculate the all-others rate pursuant to the exception under section 735(c)(5)(B) of the Act -- averaging BGH's zero rate with the rate calculated under section 776 of the Act.[33]

**Comment 3:** **If Commerce's Remand Proceedings Yield a New Dumping Margin for BGH, Commerce Will Be Undertaking New Agency Action and On-Site Verification Will be Mandatory**

*The Coalition's Comments*

- If Commerce's remand proceeding ultimately yields a revised dumping margin for BGH, an on-site verification will be mandatory.[34]
- Because Commerce's Draft Remand Results reverse the agency's position with respect to accounting for PMS cost distortion in calculating the dumping margin for sales observations where normal value is based on home market prices, this will constitute new agency action if carried forward into Commerce's final redetermination.[35]
- Accordingly, this includes Commerce's obligation to verify all information relied upon in a final determination in an investigation.[36]
- Any process that is not on-site and followed by a timely verification report is not a "verification" within the meaning of section 782(i) of the Act.[37]

**Commerce's Position:**

In the *Remand Order*, the Court stated that the Coalition forfeited its objection to Commerce's use of a verification questionnaire in lieu of an in-person verification.[38] Moreover, this remand does not constitute a separate segment of the proceeding but, rather, is a redetermination of the investigation findings conducted in accordance with the "narrow"

---

[33] *See* Calculation Memorandum for BGH.
[34] *See* the Coalition's Comments at 11.
[35] *Id*. at 11 (citing *Dep't. of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020); and *United States Steel Corp. v. United States*, 319 F. Supp. 3d 1295, 1301 (CIT 2018)).
[36] *Id*. at 12 (citing section 782(i)(1) of the Act).
[37] *Id*. at 15.
[38] *See Remand Order* at 47.

instructions of the Court.[39]  Accordingly, we have declined to consider this argument in the context of these final results of redetermination.

**Comment 4:   Commerce's Revisions to the Margin Programs Are Erroneous and Distortive**

*BGH's Comments*
- Commerce made an error in removing the cost-based PMS adjustments from its margin programs; the proper removal of the adjustments would necessarily reduce BGH's margin.[40]
- The error occurred when Commerce removed the cost-based PMS adjustment from the home market sales program, including the calculation of variable cost of manufacturing (VCOMCOP) for the difference-in-merchandise (DIFMER) test, but maintained the cost-based PMS adjustment in calculating VCOMCOP for U.S. sales in the margin program.[41] The DIFMER calculation is distorted because the VCOMCOP for home market sales is not being increased by the PMS adjustment while the VCOMCOP for U.S. sales is being increased by the PMS adjustment.[42]
- This different calculation of VCOMCOP for home market and U.S. sales causes more home market sales to fail the DIFMER test and, therefore, the number of sales based on constructed value is erroneously increased.[43]
- Because section 773(e) of the Act is limited to the calculation of constructed value, it provides no basis for the use of a PMS adjustment in the DIFMER analysis.[44]

**Commerce's Position:**

We agree with BGH and have revised our calculations in accordance with the Court's instruction to recalculate the dumping margin without cost-based PMS adjustments for purposes of the sales-below-cost test.  Our DIFMER calculation in the draft redetermination margin program was distorted because the VCOMCOP for home market sales was not increased by the PMS adjustment while the VCOMCOP for U.S. sales was increased by the PMS adjustment.

---

[39] *Id.*
[40] *See* BGH's Comments at 2.
[41] *Id.*
[42] *Id.* at 5.
[43] *Id.*
[44] *Id.* (citing *China Steel Corp. v. United States*, 393 F. Supp. 3d 1322, 1346 (CIT 2019)).

Therefore, the DIFMER was erroneously increased, incorrectly causing more sales to revert to constructed value for the calculation of normal value.

**Comment 5:   Commerce's Cost-Based PMS Adjustments Are Not Supported by Substantial Evidence on the Record**

*BGH's Comments:*
   a. <u>Electricity</u>
- The only evidence cited by Commerce in support of its finding that a PMS existed with respect to the German electricity market was the final determination in the concurrent countervailing duty investigation of forged steel fluid end blocks.[45]
- It is clear that no significant market distortions existed with respect to the German electricity market.  Record information shows that electricity costs in Germany were far above those in the United States and other industrialized countries.  This factual information was not disputed by either Commerce or the Coalition.[46]
- Commerce provides no explanation as to why the evidence showing that German prices for natural gas and ferrochrome exceeded those in the United States was determinative while the same evidence regarding electricity was dismissed.[47]
- There is no evidence of government control over pricing in the German electricity market to such an extent that home market prices cannot be considered to have been competitively set.[48]
- Commerce failed to substantiate that the claimed distortions in electricity costs prevent a proper comparison of normal value with export price or constructed export price, and the cost-based PMS adjustment on electricity must, therefore, be rejected.[49]
- Commerce failed to explain properly how the countervailing duties on fluid end blocks have not remedied the alleged distortion in electricity costs.[50]
- In addition, Commerce failed to adequately explain its calculation of the cost-based PMS adjustment to electricity costs.[51]
- Commerce also included in its benefit calculation programs that have nothing to do with electricity, as well as alleged benefits to a related company, Rohstoff-, Press- und Schneidbetrieb Siegen GmbH, that does not produce subject merchandise.[52]

   b. <u>Ferrochrome</u>
- Commerce seems to impose an irrebuttable presumption that input prices in a foreign market that are lower than U.S. input prices represent *per se* a PMS.  Evidence on the

---

[45] *Id.* at 8.
[46] *Id*. at 9.
[47] *Id.*
[48] *Id*.
[49] *Id*. at 12.
[50] *Id*. (citing, *e.g.*, *Vicentin S.A.I.C. v. United States*, 42 F. 4th 1372, 1381 (Fed. Cir. 2022)).
[51] *Id*. at 14.
[52] *Id.* at 15.

- record shows that German ferrochrome prices are comparable to prices in other G20 countries.[53]
- Moreover, BGH presented extensive and uncontroverted evidence that it purchases no significant amounts of ferrochrome originating in Kazakhstan.[54]
- Commerce's exclusive reliance on the information supplied by the Coalition is unsupportable.[55]
- Commerce failed to establish that the circumstances relating to ferrochrome from Kazakhstan are "particular" to producers of the subject merchandise.[56]
- Commerce also failed to establish that the circumstances relating to ferrochrome from Kazakhstan prevent the cost of materials and fabrication from accurately reflecting the cost of production in the ordinary course of trade.[57]
- Commerce failed to show that any alleged distortions with respect to ferrochrome would prevent a proper comparison of normal value with export price or constructed export price.[58]
- Commerce's calculation of a cost-based PMS adjustment for ferrochrome is incorrect for several reasons. First, neither of the figures listed in Commerce's calculations for BGH's POR Ferrochrome Purchases Value (EUR) and BGH's POI Ferrochrome Purchases Quantity (KG) can be found in the referenced exhibit.[59]
- Second, Commerce compares BGH's actual purchases of ferrochrome with the general "Ferrochromium" figure listed by the U.S. Geological Survey (USGS), but this figure does not list any identifying information about the product or sales covered.[60]
- Third, Commerce's calculation is based exclusively on the USGS price of general ferrochrome in the United States, and Commerce rejected without explanation other evidence on world ferrochrome prices placed on the record by BGH and the other mandatory respondent.[61]

**Commerce's Position:**

As stated above in Commerce's response to Comment 1, pursuant to the Court's *Remand Order*, this remand redetermination is being conducted on narrow grounds to remove the PMS adjustments when applying the sales-below-cost test. The Court neither addressed, nor

---

[53] *Id*. at 16.
[54] *Id*. at 17.
[55] *Id*.
[56] *Id*. at 18.
[57] *Id*.
[58] *Id*. at 19 (citing *Husteel Co. v. United States*, 426 F. Supp. 3d 1376, 1390 (CIT 2020)).
[59] *Id*. at 20.
[60] *Id*.
[61] *Id*.

remanded, Commerce's original findings regarding the existence of a PMS for electricity and ferrochrome.[62] Accordingly, we have declined to consider BGH's arguments in the context of these final results of redetermination.

## VI. FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, Commerce has, as discussed above, revised certain aspects of its dumping analysis.[63] Based on these changes, Commerce determines that the following weighted-average dumping margins exist for the period of October 1, 2018, through September 30, 2019:

| Company | *Final Results* Margin (percent) | Remand Weighted-Average Dumping Margin (percent) |
|---|---|---|
| BGH Edelstahl Siegen GmbH | 4.79 | 0.00 |
| All Others | 4.79 | 39.18 |

Should the Court affirm these final results of redetermination, Commerce intends to publish a notice of amended final determination in the *Federal Register* and issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the discussion above.

3/10/2023

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
 for Enforcement and Compliance

---

[62] *See Remand Order* at 37-38.
[63] *See* Calculation Memorandum for BGH.