## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY,<br>ELLWOOD NATIONAL STEEL COMPANY,<br>ELLWOOD QUALITY STEELS COMPANY, and<br>A. FINKL & SONS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br>and<br><br>BGH EDELSTAHL SIEGEN GMBH,<br><br>Defendant-Intervenor. | Consol. Ct. No.  21-00077<br><br>**NON-CONFIDENTIAL<br>VERSION**<br><br>Business Proprietary Information<br>Removed from Brackets on Pages<br>1, 3-7 |

### <u>PLAINTIFFS' COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND</u>

Myles S. Getlan
Jack A. Levy
Thomas M. Beline
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2300
Fax: (202) 567-2301

*Counsel to Ellwood City Forge Company, Ellwood
National Steel Company, Ellwood Quality Steels
Company, and A. Finkl & Sons*

Dated:  April 13, 2023

## **Table of Contents**

Page

I.  COMMERCE'S REVISIONS TO THE MARGIN PROGRAM IN THE FINAL
    REDETERMINATION CONTAIN A CALCULATION ERROR THAT
    DISTORTS BGH'S DUMPING MARGIN ...................................................................... 2

    A.  Commerce's Revision to the Margin Program Between the Draft and Final
        Redetermination was Flawed .................................................................................. 5

II. COMMERCE UNLAWFULLY REFUSED TO CONSIDER ALTERNATIVE
    STATUTORY PATHWAYS FOR ADJUSTING FOR BGH'S DISTORTED
    PRODUCTION COSTS ............................................................................................. 7

    A.  Commerce Unlawfully Refused to Consider Plaintiffs' Statutory Arguments .............. 8

    B.  Plaintiffs' Statutory Arguments Provide Viable Alternative for Commerce to
        Adjust its Antidumping Calculations to Counteract BGH's Distorted Costs ............... 10

III. CONCLUSION ......................................................................................................... 17

# Table of Authorities

Page(s)

**Statutes**

19 U.S.C. § 1677b(a) ...................................................................................................16

19 U.S.C. § 1677b(a)(1)(B)(i)................................................................................12, 16

19 U.S.C. § 1677b(a)(1)(C)(iii) .....................................................................12, 15, 16

19 U.S.C. § 1677b(b) ...........................................................................................14, 15, 17

19 U.S.C. § 1677b(e) .............................................................................................. *passim*

19 U.S.C. § 1677b(f)(1)(A)......................................................................................... *passim*

19 U.S.C. § 1677f(i)(3) ...................................................................................................8

19 U.S.C. § 1677(15)(C) ...............................................................................................14

19 U.S.C. § 1677(15) ..............................................................................................15-16

**Court Decisions**

*Abbott Labs. v. Gardner,* 387 U.S. 136 (1967)) ............................................................11

*Ad Hoc Shrimp Trade Action Comm. v. United States,* 882 F. Supp. 2d 1377
(Ct. Int'l Trade 2013) ...................................................................................................10

*Altx, Inc. v. United States,* 370 F.3d 1108 (Fed. Cir. 2004)..............................................*8*

*Altx, Inc. v. United States,* 167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001).......................*8*

*Atar, S.r.L. v. United States*, 637 F. Supp. 2d 1068 (Ct. Int'l Trade 2009) ............ 15-16

*Bonney Forge Corp. v. United States*, 560 F. Supp. 3d 1303 (Ct. Int'l Trade
2022) ...............................................................................................................................*8*

*Camreta v. Greene*, 131 S. Ct. 2020 (2011) ................................................................11

*France v. United States*, 981 F.3d 1318 (Fed. Cir. 2020)...........................................13

*Fuyao Glass Indus. Group Co. v. United States,* 30 Ct. Int'l Trade 165
(2006)............................................................................................................................10

*Husteel Co. v. United States,* 98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015)................8, 14

*Hung Vuong Corp. v. United States*, 483 F.Supp.3d 1321 (Ct. Int'l Trade 2020) ................................................................................................................8

*Hyundai Steel Co. v. United States,* 19 F. 4th 1346 (Fed. Cir. 2021) ................................... *passim*

*LG Chem, Ltd. v. United States*, Ct. No. 20-00096, Slip Op. 2021-99 (Ct. Int'l Trade 2021) ................................................................................... *passim*

*Local No. 8-6, Oil, Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363 (1960) ...................................................................................................11

*Strand v. United States*, 951 F.3d 1347, 1349 (Fed. Cir. 2020) ........................................8

*Nakornthai Strip Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303 (Ct. Int'l Trade 2008) .......................................................................................10

*NEXTEEL Co. v. United States,* 28 F.4th 1226 (Fed. Cir. 2022) .......................................9

*NSK Ltd. v. United States*, 510 F.3d 1375 (Fed. Cir. 2007) ...........................................11

*Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330 (Fed. Cir. 2007) ................................................................................................................11

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ................................................................................................12, 16

Administrative Determinations

*Certain Frozen Warmwater Shrimp from Thailand,* 76 Fed. Reg. 40,881 (July 12, 2011) ...............................................................................................17

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | | |
|---|---|---|
| ELLWOOD CITY FORGE COMPANY,<br>ELLWOOD NATIONAL STEEL COMPANY,<br>ELLWOOD QUALITY STEELS COMPANY, and<br>A. FINKL & SONS, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Consol. Ct. No.  21-00077 |
| | ) | |
| UNITED STATES, | ) | **NON-CONFIDENTIAL** |
| | ) | **VERSION** |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| BGH EDELSTAHL SIEGEN GMBH, | ) | Business Proprietary Information |
| | ) | Removed from Brackets on Pages |
| Defendant-Intervenor. | ) | 1, 3-7 |
| | ) | |
| | ) | |

**PLAINTIFFS' COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF
REDETERMINATION PURSUANT TO COURT REMAND**

Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons (collectively, "Plaintiffs"), hereby submit comments in opposition to the final results of redetermination pursuant to court remand published by the U.S. Department of Commerce ("Commerce") and filed in this consolidated action on March 14, 2023 (ECF No. 59) ("Final Redetermination").  Plaintiffs' comments are timely submitted in accordance with the schedule set forth in the Court's opinion ordering remand.  *See* USCIT Slip Op. 22-122 at 48 (ECF No. 55) ("Slip Op. 22-122").

These comments raise two issues, both of which individually require further remand in this action.  *First*, the revised dumping margin calculations in Commerce's Final Redetermination contain a significant calculation error that [          ] the dumping margin

calculated for BGH Edelstahl Siegen GmBH ("BGH") (**Section I**).  *Second*, Commerce

unlawfully declined to even consider alternative statutory justifications for undertaking

calculation adjustments to offset BGH's distorted costs when calculating the dumping margin for

BGH's price-to-price sales comparisons (**Section II**).

I.    **COMMERCE'S REVISIONS TO THE MARGIN PROGRAM IN THE FINAL REDETERMINATION CONTAIN A CALCULATION ERROR THAT DISTORTS BGH'S DUMPING MARGIN**

Commerce's antidumping calculation involves the following equation:[1]

$$COSTDIFF = \frac{|\,VCOMCOP(H) - VCOMCOP(U)\,|}{AVG\_TCOMCOP(U)}$$

This variable cost difference ("COSTDIFF") calculation is a filtering mechanism to determine

whether a given FEB model or product sold in the U.S. market can reasonably be compared with

the closest, non-identical FEB model or product sold in the home market.  *See* Commerce's

Policy Bulletin Number 92.2, included as **Attachment 2**.   If the difference in the variable costs

of merchandise sold in the home and U.S. markets (*i.e.*, VCOMCOP(H) – VCOMCOP(U), also

known as the difference in merchandise or "DIFMER") exceeds 20% of the average total cost of

manufacture of the U.S. model (*i.e.*, AVG_TCOMCOP(U)), Commerce will reject the

comparison as unreasonable.  *Id.*   Exceeding this 20% threshold is known as "failing" the

"COSTDIFF" test.  Stated differently, a large difference in the variable costs to produce the non-

identical U.S. and home market models indicates that those models are too dissimilar to compare

---

[1] While the implementation of these calculations in Commerce's margin program are treated as business proprietary information, the equations themselves are publicly available as part of the "ME Macros" program available on Commerce's website.  *See* "*Antidumping Margin Calculation Programs*," access.trade.gov (last updated Dec. 30, 2022), *available at* access.trade.gov/resources/sas/programs/amcp.html (**Attachment 1**).

for margin calculation purposes.  Pursuant to longstanding Commerce policy, each failure (*i.e.*, COSTDIFF exceeding 20%) results in Commerce either utilizing another home market model that does not exceed the 20% COSTDIFF threshold or resorting to constructed normal value to calculate the dumping margin associated with the U.S. market sale in question. *Id.* Commerce's Final Redetermination included a distortive modification to the COSTDIFF calculation that resulted in [                                        ], which [          ] BGH's margin, and requires remand.

Commerce determined that its application of the COSTDIFF test in its draft remand results was distorted "because the VCOMCOP for home market sales {*i.e.*, VCOMCOP(H)} was not increased by the PMS adjustment while the VCOMCOP for U.S. sales {*i.e.*, VCOMCOP(U)} was increased," creating a mismatch through which "the DIFMER {*i.e.*, the numerator in the COSTDIFF test equation} was erroneously increased, incorrectly causing more sales to revert to constructed value for the calculation of normal value."  Final Calc Memo at 2 (Appx099243); *see also* Final Redetermination at 9 (Appx012113).

<u>Commerce's Draft Redetermination COSTDIFF Test[2]</u>

[                                                                          ]

However, Commerce's Final Redetermination margin program—which interested parties had no opportunity to comment on before it was submitted to this Court—contains a distortion of the

---

[2] These calculations are implemented in multiple steps in Commerce's margin program, which [

                                        ].  *See* Draft Calc Memo at Appx099096 ( [
                                                  ] ),
Appx099098 ( [
                ] ), Appx099112 ( [
                    ]).

[                           ].  As shown below, Commerce's revised COSTDIFF calculation removed

the PMS adjustment from the variable costs of manufacture for U.S. sales ("VCOMCOP(U)") in

the numerator of the COSTDIFF calculation [



].

<u>Commerce's Final Redetermination COSTDIFF Test</u>[3]


[                                                            ]


As detailed below, [                  ] distorts the COSTDIFF test, erroneously [

], which has the effect of [



].  Put simply, Commerce's margin

results are incorrect.  As the margin program in Commerce's Final Redetermination continues to

be erroneous and distortive this Court must remand Commerce's Final Redetermination for

Commerce to remove the newly introduced distortion from its COSTDIFF calculations.[4]

---

[3] *See* Final Calc Memo at Appx099354 ( [

] ), Appx099356 ( [

] ), Appx099370 ( [

]).

[4] To remove the identified distortion, Commerce notably has at least two options.  [

*(footnote continued on next page)*

**A.  Commerce's Revision to the Margin Program Between the Draft and Final Redetermination was Flawed**

Commerce erred in applying the COSTDIFF test in its Final Redetermination because while it revised both variables in the COSTDIFF test numerator (*i.e.*, both VCOMCOP(H) and VCOMCOP(U)) to remove the PMS adjustment, [

].  This distorted COSTDIFF calculation resulted in certain CONNUMs artificially [

] the numerator (in which the PMS adjustment was removed) and [

].

This can be seen clearly through an analysis of U.S. CONNUM [

], which accounted for approximately [                ] of BGH's U.S. sales during the POR.  U.S. CONNUM [                              ] had a calculated VCOMCOP(U) of [           ] and an AVG_TOTCOMCOP(U) of [         ].  The most similar CONNUM sold in the home market is [                              ], which had a calculated VCOMCOP(H) of [         ].[5]

Inaccurate COSTDIFF Test With [                              ] (Final Redetermination)

[                                                                                      ]

Accurate COSTDIFF Test Without [                              ]

[                                                                                  ]

_____

]

[5] These figures were calculated based on Commerce's margin programs and the sales and cost databases submitted by BGH.

As shown in the equations above, the distorted COSTDIFF calculation Commerce employed in the Final Redetermination yields a COSTDIFF test value of [

].  Without the erroneously [                              ], Commerce's COSTDIFF test yields a [          ] value of [                    ].  Commerce's Policy Bulletin Number 92.2 makes clear that Commerce will generally not use a failing match—and will instead rely on constructed value—where [

] the COSTDIFF test calculations of all possible merchandise matches exceed the 20 percent threshold.  However, solely due to Commerce's erroneously [

].  Had Commerce correctly [                                                                              ], Commerce would have calculated a [                             ] dumping margin for BGH.

Commerce's calculation error is further confirmed by the fact that its Final Redetermination dumping margin for BGH defies all logic.  Despite continuing to employ an upwards PMS adjustment to normal values based on constructed value (consistent with Slip Op. 22-122)—Commerce [

].[6]  As a matter of mathematics and logic, [

].  The PMS adjustment, which increases the costs that make up constructed value, [

---

[6] Commerce calculated a *de minimis* margin in its Final Redetermination.  *See* Final Redetermination at 12 (Appx012116).  Employing Commerce's same margin program but removing all PMS adjustments (including from constructed value), Ellwood calculates a margin of [                                                                              ].

].  It follows that a margin calculated with an upward

PMS adjustment to costs can [                              ] a margin without any PMS adjustment

whatsoever.  That Commerce's program from the Final Redetermination [

                              ] is clear evidence of Commerce's error and reinforces the

necessity of remand.

## II.     COMMERCE UNLAWFULLY REFUSED TO CONSIDER ALTERNATIVE STATUTORY PATHWAYS FOR ADJUSTING FOR BGH'S DISTORTED PRODUCTION COSTS

On remand, Commerce stated that it removed the PMS cost adjustment "when applying

the sales-below-cost test," while continuing to "mak{e} a PMS adjustment for the comparisons

based on constructed value."  Final Redetermination at 4 (Appx012108).  Plaintiffs agree that

nothing in the Court's remand order provided any basis for Commerce to disturb the PMS

adjustment in comparisons wherein normal value was based on constructed value, and

Commerce was correct to maintain that adjustment.  *See* Slip Op. 22-122 at 35-37 (ordering

remand based on *Hyundai Steel*, which exclusively concerned antidumping calculations wherein

normal value was based on home market prices, known as "price-to-price" comparisons).  And

Plaintiffs do not dispute that *Hyundai Steel* precludes Commerce from relying solely on 19

U.S.C. § 1677b(e) to adjust "sales below cost test" calculations applicable to price-to-price

antidumping comparisons.  However, Commerce is far from powerless to address the cost

distortion that, in Commerce's estimation, *continues to affect BGH's reporting*.  *See* Final

Redetermination at 4, 11-12 (Appx012108, Appx012115-012116) (maintaining that BGH's costs

are distorted).  Plaintiffs advocated alternative statutory pathways whereby Commerce could

make corrective adjustments during remand.  But Commerce both refused to address Plaintiffs'

arguments and misconstrued the Court's remand order.  Each error independently requires

7

further remand and renders Commerce's Final Redetermination unlawful and unsupported by substantial evidence.

### A.    Commerce Unlawfully Refused to Consider Plaintiffs' Statutory Arguments

As this Court recently observed in *Bonney Forge*, Commerce's determination must be remanded where, as here, Commerce failed to adequately consider a relevant argument:

> The Federal Circuit has…found that the Court of International Trade properly remanded determinations when Commerce 'fail{ed} to consider all relevant arguments' made by the parties. *Altx, Inc. v. United States*, 370 F.3d 1108, 1119-20 (Fed. Cir. 2004) (discussing how the CIT 'reasonably was troubled by the failure' of Commerce to address the position of Japanese producers who were a party to the case). An agency decision is unsupported by substantial evidence when key issues 'lack{} record support.' *Strand v. United States*, 951 F.3d 1347, 1349 (Fed. Cir.), *cert. denied*, 141 S. Ct. 894, 208 L. Ed. 2d 452 (2020). A decision by Commerce cannot be supported by substantial evidence if there is no indication that Commerce considered essential arguments or evidence in making its final determination. Indeed, when 'there is nothing in the administrative record showing that Commerce considered (much less addressed)' a party's explanation or argument relating to an issue 'essential to its analysis . . . the Court cannot sustain Commerce's decision.' *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1367 (CIT 2020).

*Bonney Forge Corp. v. United States*, 560 F. Supp. 3d 1303, 1310 (Ct. Int'l Trade 2022); *see also, e.g.*, *Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1359 (Ct. Int'l Trade 2015) ("an agency 'must address significant arguments and evidence which seriously undermines its reasoning and conclusions'") (quoting *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001)); 19 U.S.C. § 1677f(i)(3) (Commerce "shall include in a final determination…an explanation of the basis for its determination that addresses relevant arguments…").

In remanding Commerce's original determination, this Court "{i}n compliance with *Hyundai Steel*" precluded Commerce from employing "impermissible cost-based particular market situation adjustments for BGH's electricity and ferrochrome inputs," and ultimately ordered Commerce to "*reconsider*{} the particular market situation adjustment," rather than

mandating its reversal.  Slip Op. 22-122 at 37, 49 (emphasis supplied) (citing *Hyundai Steel Co. v. United States*, 19 F. 4th 1346 (Fed. Cir. 2021)); *see also* Plaintiffs' Response Brief in Opposition to BGH's Rule 56.2 Motion (Dec. 17, 2021) (ECF Doc. 33) at 26 (arguing that an open-ended remand was legally required).  By its plain text, the Court's order necessarily declined to rule out alternative bases for adjusting BGH's distorted costs (whether or not such distortion were labeled a "PMS") in ways that were "permissible," *i.e.*, consistent with *Hyundai Steel*.  Moreover, insofar as the Court declined to disturb Commerce's underlying PMS distortion finding, Slip Op. 22-122 at 37, it was illogical for Commerce to assume the Court expected Commerce to abdicate its responsibility to administer the antidumping laws and do no more than calculate a price-to-price margin using distorted cost data.  Indeed, as the Federal Circuit recently reaffirmed in *NEXTEEL*, the CIT could not have preemptively forbidden Commerce from accounting for BGH's distorted costs with respect to price-to-price comparisons *in some way*, insofar as the consideration of statutory alternatives left open by *Hyundai Steel* is in no way a "futile" undertaking.  *See NEXTEEL Co. v. United States*, 28 F. 4th 1226, 1238 (Fed. Cir. 2022).

Yet, that is precisely what Commerce refused to do.  Despite Plaintiffs having advanced numerous permissible alternatives for adjusting Commerce's antidumping margin calculations to account for BGH's distorted costs in both Plaintiffs' original response briefs, *see* Plaintiffs' Response Brief in Opposition to BGH's Rule 56.2 Motion (Dec. 17, 2021) (ECF Doc. 33) at 25-28, and in comments on Commerce's remand results, *see* Plaintiffs Comments on Draft Remand Results at 3-9 (Appx012068-012074), Commerce declined to consider these arguments during remand proceedings.  Rather, the entirety of Commerce's analysis on this issue was to

"determine that it is not appropriate to address those arguments in the context of these final results of redetermination." Final Redetermination at 6 (Appx012110).

Commerce misconstrued the plain text of the Court's remand order, and incorrectly asserted, without elaboration, that its refusal to consider Plaintiffs' arguments was somehow "in line with…the Court's *Remand Order*." Final Redetermination at 6 (Appx012110).[7] Contrary to Commerce's self-serving assertion, ignoring Plaintiffs' arguments was not required—or even countenanced—by the Court's remand order. Indeed, Commerce's evident misunderstanding of the Court's remand order constitutes an independent basis for remanding this issue, *see, e.g.*, *Nakornthai Strip Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303, 1310 (Ct. Int'l Trade 2008) ("when an agency does not comply with the court's remand instructions, its remand results will not be sustained.") (citing *Fuyao Glass Indus. Group Co. v. United States*, 30 C.I.T. 165 (2006)), in addition to Commerce's simple failure to address Plaintiffs' arguments. The Final Redetermination must be returned to Commerce so that it may consider Plaintiffs' arguments in the first instance.

**B.   Plaintiffs' Statutory Arguments Provide Viable Alternative for Commerce to Adjust its Antidumping Calculations to Counteract BGH's Distorted Costs**

If adopted, Plaintiffs' alternative statutory approaches would change how Commerce adjusted for BGH's distorted costs and would necessarily affect Commerce's margin calculation.

---

[7] Commerce likewise references its own voluntary remand request as support for its approach, *see* Final Redetermination at 6 (Appx012110), but Commerce's reliance is misplaced. The Court's remand order fixes the scope of remand proceedings, not Commerce's prior preference with respect to the scope. *C.f., e.g.*, *Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1377, 1379 (Ct. Int'l Trade 2013) (addressing agency's motion to expand scope of remand proceedings). Moreover, Commerce's request for voluntary remand was itself based solely on the Federal Circuit's *Hyundai Steel* opinion and did not purport to foreclose the possibility of an alternative adjustment to account for BGH's distorted costs (whether or not labeled a "PMS" adjustment). *See* Defendant's Response Brief in Opposition to Rule 56.2 Motions (Dec. 17, 2021) (ECF Doc. 37) at 29.

Thus, each of Plaintiffs' as yet unaddressed arguments is inherently "significant."  While this Court cannot issue "advisory opinions" on abstract questions of law, *see, e.g.*, *Camreta v. Greene*, 131 S. Ct. 2020, 2038 (2011) ("judicial Power is one to render dispositive judgments, not advisory opinions"); *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1337-38 (Fed. Cir. 2007) ("federal courts are to decide only 'actual controversies by judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in the case before it.'") (quoting *Local No. 8-6, Oil, Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367 (1960)), and Commerce must first espouse a position before an issue ripens for adjudication, *see, e.g.*, *NSK Ltd. v. United States*, 510 F.3d 1375, 1384 (Fed. Cir. 2007) ("Generally, an agency decision is not ripe for judicial review until the allegedly offending agency has adopted a final decision.") (citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967)), Plaintiffs herein summarize their arguments in order to establish their potential to impact Commerce's antidumping margin calculations.

1.  ***Hyundai Steel*** **Did Not Preclude Commerce from Adjusting for Cost Distortions, Whether or Not Such Distortions Have Been Labeled a "PMS"**

Commerce reasoned that pursuant to *Hyundai Steel* "the statute only permits the adjustment of cost of production for a PMS when making comparisons based on constructed value, not for purposes of the sales-below-cost test."  Final Redetermination at 4 (Appx012108). But Commerce overread *Hyundai Steel*, which addressed a narrow statutory question, *viz.*, whether Commerce was authorized by 19 U.S.C. § 1677b(e) to adjust its "sales below cost" test calculations under 19 U.S.C. § 1677b(b) to account for a PMS.  *See Hyundai Steel*, 19 F. 4th at 1352-55.  The Federal Circuit concluded that Commerce was not so authorized.  *See id.* Nevertheless, Commerce is by no means precluded from adjusting its dumping calculations to

account for distortions in BGH's production costs—whether or not such distortions are labeled a "PMS"—merely because the dumping calculations involve a "price-to-price" comparison.

Indeed, *Hyundai Steel* expressly recognized such a result would be "perverse," and furthermore (1) concluded that "Commerce is {not} powerless to address home market sales that are affected by a PMS yet still pass the sales-below-cost test," and (2) declined to reject alternative statutory pathways, such as 19 U.S.C. § 1677b(f)(1)(A) and 19 U.S.C. § 1677b(a)(1)(C)(iii), under which Commerce might just as effectively address cost-based PMS distortion in a price-to-price antidumping comparison. *Id.* at 1355-56. Commerce is obliged to calculate the most accurate dumping margin feasible, *see, e.g.*, *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible."); *LG Chem, Ltd. v. United States*, Ct. No. 20-00096, Slip Op. 2021-99 (Ct. Int'l Trade 2021) at 19-20, and is precluded by 19 U.S.C. § 1677b(a)(1)(B)(i) from using home market sales prices outside the ordinary course of trade in the antidumping calculation. Consistent with these mandates and Commerce's statutory authority, detailed below, Commerce was obligated to fully consider whether to apply the alternative statutory pathways available to account for cost-based PMS distortion in determining the dumping margin for *all* of BGH's U.S. sales, including "price-to-price" comparisons.

### 2. Commerce Could Have Adjusted the Margin Program to Test whether BGH's Distorted Costs "Reasonably Reflect" True Production Costs, Pursuant to 19 U.S.C. § 1677b(f)(1)(A)

Although Commerce is unable to rely upon 19 U.S.C. § 1677b(e)'s "any other calculation methodology" language to directly adjust the sales below cost test, Commerce could instead adjust BGH's costs pursuant to the authority conferred by 19 U.S.C. § 1677b(f)(1)(A). The Federal Circuit expressly declined to rule out Commerce's authority to undertake a *de facto* cost-

based PMS adjustment pursuant to 19 U.S.C. § 1677b(f)(1)(A), which states that "{f}or purposes of subsection{} (b)" (*i.e.*, the sales below cost test), costs shall be based on the respondent's books and records *if and only if* those records are both: (a) kept in accordance with the exporting country's generally accepted accounting principles and (b) reasonably reflect the costs associated with the production and sale of the merchandise.  *See Hyundai Steel*, 19 F. 4th at 1355-56 (finding appellant had failed to argue the issue before the CIT); 19 U.S.C. § 1677b(f)(1)(A); *see also LG Chem, Ltd. v. United States*, Ct. No. 20-00096, Slip Op. 2021-99 (Ct. Int'l Trade 2021) at 17-18 (citing *France v. United States*, 981 F.3d 1318, 1321-22 (Fed. Cir. 2020)) (noting that 19 U.S.C. § 1677b(f)(1)(A) "unambiguously imposes two binary yes/no conditions," both of which must be met before Commerce is required to rely on a respondent's books and records). As the CIT has recently affirmed, "{o}nce Commerce concludes that a producer's records do not satisfy one of these conditions…the statute relieves {Commerce} of any further obligation to use those records in adjusting costs."  *LG Chem*, Slip Op. 2021-99 at 18.  Instead, in such circumstances, "Congress desired Commerce to adjust the respondent's costs as necessary (in the Department's discretion) to ensure the most accurate dumping margin."  *Id.* at 19-20.

Here, having determined that BGH's input costs for electricity and ferrochrome are distorted, Commerce may conclude that BGH's books and records—which are based on those distorted input costs—cannot "reasonably reflect" the costs of producing subject merchandise, *i.e.*, that the preconditions set forth in 19 U.S.C. § 1677b(f)(1)(A) are not met.  That Commerce at some point analyzed these same cost distortions under 19 U.S.C. § 1677b(e) and labeled them a "PMS" cannot divest Commerce of its independent authority under 19 U.S.C. § 1677b(f)(1)(A)

to eliminate said distortion.[8]   Indeed, based on the statute's plain language and statutory

definitions, it would be absurd for input prices distorted by a PMS to be both "outside the

ordinary course of trade," *see* 19 U.S.C. § 1677(15)(C) and 19 U.S.C. § 1677b(e), while still

"reasonably reflect{ing}" the costs associated with producing subject merchandise, *see* 19

U.S.C. § 1677b(f)(1)(A).   Notably, the statutory terminology of 19 U.S.C. § 1677b(f)(1)(A), *i.e.*,

whether respondent's reported costs "*reasonably reflect*" production costs, closely resembles the

Federal Circuit's summation of the finding that underlies a cost-based PMS, *i.e.*, "that the

exporter's actual costs do not *accurately reflect* the costs of production."  *See Hyundai Steel*, 19

F.4th at 1355 n.10.  Under these circumstances, Commerce has no statutory obligation to rely on

the costs reported in BGH's books and records in performing the sales below cost test.  *See LG*

*Chem*, Slip Op. 2021-99 at 18.

Commerce does, however, have wide discretion to refashion its sales below cost test

calculations in response to BGH's failure to satisfy the preconditions of 19 U.S.C. §

---

[8] This Court's opinion in *Husteel* observes that 19 U.S.C. § 1677b(f)(1)(A) was not amended to encompass PMS adjustments.  *See Husteel Co. v. United States*, 426 F. Supp. 3d 1376, 1383 (Ct. Int'l Trade 2020) ("Undeniably Congress did not amend either section 1677b(b)(1) (below costs sales) or section 1677b(f) (calculation of a cost of production) to allow for a PMS adjustment.").  Notably, the Federal Circuit declined to reach or embrace this view in *Hyundai Steel*.  *See* 19 F. 4th at 1355-56.  And in any event, Plaintiffs' argument remains sound, as *Husteel* was limited to the question of whether Section 1677b(f)(1)(A) authorized a "PMS" adjustment.  *See* 426 F. Supp. 3d at 1383.  *Husteel* did not consider the broader question of whether Commerce could rely upon Section 1677b(f)(1)(A) to address distortion in a respondent's reported costs.  Plainly, Commerce can do so.  *See, e.g.*, *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1362, 1365 (Fed. Cir. 2014) (affirming Commerce's decision not to rely upon a respondent's records that did not meet both prerequisites of Section 1677b(f)(1)(A) and instead adjust the respondent's reported costs).  It would be wholly arbitrary to *preclude* Commerce from determining that a cost distortion prevented the respondent's costs from "reasonably reflecting" production costs within the meaning of Section 1677b(f)(1)(A), merely because that distortion had at some point been analyzed under Section 1677b(e) or labeled a "PMS."  Practical realities—*i.e.*, the existence or absence of distortion—rather than semantics, should guide Commerce's understanding of the antidumping statute.

1677b(f)(1)(A).  *See, e.g.*, *LG Chem*, Slip Op. 2021-99 at 19-20; *Thai Plastic Bags*, 746 F.3d at 1362, 1367-68 (affirming "Commerce{'s} exercise {of} its authority to make adjustments to the distortive costs TPBI reported" under Section 1677b(f)(1)(A)).  As one option, the Coalition proposed during remand proceedings that Commerce include a PMS adjustment, essentially reforming BGH's reported costs to account for PMS distortion and thereby "reasonably reflect" BGH's production costs.  Such an approach is not only lawful, but imperative from a practical standpoint—when a respondent's reported production costs are distorted by a PMS, the sales below cost test (absent adjustment) is necessarily distorted because it compares sales prices to costs that are distorted by a PMS.  Consequently, normal value may include home market prices that only pass the sales below cost test due to the use of distortedly low production costs.  To avoid those perverse results and "ensure the most accurate dumping margin" possible, *see LG Chem*, Slip Op. 2021-99 at 19-20, the Coalition argued that Commerce should make use of its authority under 19 U.S.C. § 1677b(f)(1)(A) to adjust BGH's reported costs to account for the PMS when performing the sales below cost test.  Commerce, however, declined to address this significant argument.

### 3. Because this Cost-Based PMS Prevents a "Proper Comparison" with U.S. Price, Commerce Could Have Used Constructed Normal Value for All Sales

*Hyundai Steel* noted that Commerce was not constrained to rely on the flawed results of an unadjusted sales below cost test, and could reject distorted sales prices that "still pass the sales-below-cost test" set forth in 19 U.S.C. § 1677b(b) by finding a *sales*-based PMS, *e.g.*, under 19 U.S.C. § 1677b(a)(1)(C)(iii).[9]  *See Hyundai Steel*, 19 F. 4th at 1355.  Here, the PMS's

---

[9] This Court has long held that no party is obligated to file a formal PMS allegation in order for Commerce to find a sales-based PMS.  *See Atar, S.r.L. v. United States*, 637 F. Supp. 2d 1068, 1080 (Ct. Int'l Trade 2009) ("neither the statute nor the regulations prohibit Commerce from

*(footnote continued on next page)*

effect upon normal value and U.S. price comparability are relevant, but the statutory question is not merely whether the two could somehow theoretically be compared, but whether such comparison would be a "*proper*" comparison. *See* 19 U.S.C. § 1677b(a)(1)(C)(iii). Where a respondent's production costs are distorted by a PMS, a price-to-price comparison would not be "proper."

As an initial matter, Commerce would be incorrect to assume that cost distortion is reflected equally in both home and U.S. market sales prices charged for various different models for FEBs. As a rational economic actor, BGH is assumed to spread its cost savings strategically in the FEB models and markets where BGH stands to benefit the most in terms of gaining market share and customers. Regardless of which FEB model(s) and market(s) that may be at any given time, the result is an imbalanced price-to-price comparison that is necessarily improper.

Moreover, even if one were to assume, *arguendo*, that cost distortion equally impacts all home market and U.S. sales prices, such an equality of distortion still means *normal value is distorted*. There is nothing "proper" about comparing U.S. prices to distorted home market prices—*i.e.*, such comparison does not accurately indicate the extent to which dumping has occurred. The normal value statute's overarching objective is a "fair comparison" limited to home market prices "in the ordinary course of trade." 19 U.S.C. §§ 1677b(a), (a)(1)(B)(i); *see also Yangzhou Bestpak*, 716 F.3d at 1379 ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible."). Home market prices that are derived from distorted costs of production due to a PMS cannot be considered "normal" and have no place in the antidumping calculation. *See* 19 U.S.C. §

---

determining, even absent an allegation, that a third-country market is affected by a particular market situation.").

1677(15) (defining the ordinary course of trade as "normal" conditions and practices).  Put differently, Congress did not create a loophole permitting dumping in the United States as long as the foreign producer benefits from, *e.g.*, non-market inputs or government-set input prices, that allow them to cut prices in their home market as well.

To avoid this "perverse" outcome—apart from performing the unmodified sales-below-cost test as set forth in 19 U.S.C. § 1677b(b)—Commerce can separately perform an adjusted test to identify any home market sales prices falling below production costs that have been adjusted to counteract the cost-based PMS.  As the price-depressing distortion inherent in such sales prevents a "proper" comparison with U.S. price, such sales are affected by a *sales*-based PMS, in addition to the underlying cost-based PMS.  Indeed, despite its refusal to address these arguments during remand, Commerce itself has previously embraced this interpretation of the sales-based PMS provision.  *Certain Frozen Warmwater Shrimp from Thailand*, 76 Fed. Reg. 40,881 (July 12, 2011) ("Shrimp from Thailand"), IDM at Comment 3 ("neither the statute nor the SAA precludes the Department from entertaining PMS allegations related to *the pricing of inputs and the effects this may have on the pricing of the foreign product*…").  For such sales observations, Commerce would base normal value on constructed value as set forth in 19 U.S.C. § 1677b(e), including a PMS adjustment.

## III.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court again remand Commerce's Final Redetermination to permit Commerce to correct the calculation error in its margin program and to consider Plaintiffs' arguments with respect to further adjusting Commerce's antidumping calculations to account for cost distortion in "price-to-price" comparisons.

Respectfully submitted,

/s/ Myles S. Getlan

Myles S. Getlan
Jack A. Levy
Thomas M. Beline
James E. Ransdell
Nicole Brunda

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street NW, Suite 400
Washington, DC 20006
T: (202) 567-2313
F: (202) 567-2301
Email: mgetlan@cassidylevy.com

Dated:  April 13, 2023

*Counsel to Ellwood City Forge Co.,*
*Ellwood National Steel Co., Ellwood*
*Quality Steels Co., and A. Finkl & Sons*

18

**Table of Attachments**

| Attachment No. | Document |
|:---:|:---:|
| 1 | U.S. Department of Commerce Antidumping Program Webpage |
| 2 | U.S. Department of Commerce Policy Bulletin 92.2 |

**<u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>**

The undersigned hereby certifies that the foregoing brief contains 5,115 words, exclusive of the caption blocks, table of contents, table of authorities, table of attachments, signature block, certificates of counsel, and attachments, and therefore complies with the maximum 10,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:   <u>/s/ Myles S. Getlan</u>
      Myles S. Getlan

# Attachment 1

🇺🇸 Official Website of the International Trade Administration   **Here's how you know**



(/)

# Antidumping Margin Calculation Programs

**last update: December 30, 2022**

On this page you will find the generic antidumping (AD) margin calculation programs. These programs are the starting point of our AD calculations. For a particular company in a proceeding, a case analyst will modify the boilerplate code as required for their case.

There are two types of AD calculations – market-economy (ME) and nonmarket-economy (NME). The AD programs (including a common macro program) required for each are found below. In both types, we compare prices in the United States to some minimum standard called, Normal Value (NV).

## Common Macros Program

The required Common Macros program was established to accommodate common methodological code and generic utility functions and that both ME and NME programs utilize in their execution.

1. **Common Macros (diffpriceprograms\common-macros-sas.txt)** (12/29/2022)

## Market-Economy Programs

In ME calculations, we base NV on the company's actual costs and prices in the comparison market. If no suitable comparison market is found, we base NV on Constructed Value (CV) which is a cost-based buildup of a surrogate price.

Here are the three programs used in ME calculations (along with the Common Macros Program):

1. **ME Comparison Market (diffpriceprograms\me-comparison-market-sas.txt)** (12/29/2022)
2. **ME Margin Calculation (diffpriceprograms\me-margin-calculation-sas.txt)** (12/29/2022)
3. **ME Macros (diffpriceprograms\me-macros-sas.txt)** (12/29/2022)

When a comparison market is the basis of NV, the first program used is the ME Comparison Market (CM) program. The CM program is where the case analyst enters information about the company's costs and sales in the comparison market. The ME Macros program is where the bulk of the code is stored. When the CM program is executed, it calls up the relevant portions of code from the ME Macros program to process the CM sales. After the CM Program is run, the ME Margin Calculation program is completed by the analyst. When executed, the ME Margin Calculation program calls in relevant portions of the ME Macros Program to process U.S. sales and then compare them to CM sales or CV to calculate the AD duty rate. When there is no comparison market, only the ME Margin Calculation program and ME Macros program are required for homes of U.S. prices straight to CV.

## Nonmarket-Economy Program

In nonmarket-economy AD calculations, NV is comprised of the company's factors of production (i.e., recipe for manufacturing the goods in question) valued in some appropriate surrogate country.

Here is the NME program used in NME calculations (along with the Common Macros Program):

1. **NME Margin Calculation (diffpriceprograms\nme-margin-calculation-sas.txt)** (12/29/2022)

In all NME calculations, the analyst fills in the required case-specific information.

Please address technical questions about the generic AD margin calculation programs
to the: **E&C SAS Support Team (mailto:ECSAS@trade.gov)**

## For U.S. Businesses

Export Solutions **(https://www.trade.gov/research)**

Research Center **(https://www.trade.gov/research)**

Regulations & Agreements **(https://www.trade.gov/regulations)**

Resolve a Trade Problem **(https://www.trade.gov/resolve-trade-problem)**

Attend an Event **(https://www.trade.gov/attend-event)**

News & Highlights **(https://www.trade.gov/news-and-highlights)**

Let Our Experts Help **(https://www.trade.gov/let-our-experts-help-0)**

## For International Businesses

Buy From the USA **(https://www.buyusa.gov/)**

Invest in the USA **(https://www.selectusa.gov/welcome)**

**International Trade Administration**
**U.S. Department of Commerce**

1401 Constitution Ave NW
Washington, DC 20230

**Connect With ITA**

(ht ₜ s|Hftpst|  ⇆  (htSpsdc/Glenyn/Trade.Gow)/TradeGov)

The **International Trade Administration (https://www.trade.gov/)**, **U.S. Department of Commerce (https://www.commerce.gov/),** manages this global trade site to provide access to ITA information on promoting trade and investment, strengthening the competitiveness of U.S. industry, and ensuring fair trade and compliance with trade laws and agreements. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein. This site contains PDF documents. A **PDF reader (https://get.adobe.com/reader)** is available from Adobe Systems Incorporated.

**USA.gov (http://www.usa.gov)** │ **FOIA (https://www.trade.gov/foia)** │ **Privacy Program (https://legacy.trade.gov/privacy-program.asp)** │ **EEO Policy (https://legacy.trade.gov/hrm/documents/eeo_policy_statement.pdf)** │ **Disclaimer (https://www.trade.gov/endorsement-disclaimer)** │ **Information Quality Guidelines (https://legacy.trade.gov/ITAiqs.pdf)**

# Attachment 2

IMPORT ADMINISTRATION POLICY BULLETIN

Number 92.2

Date of Issue: July 29, 1992

Topic:  Differences in Merchandise; 20% Rule


Approved:   (signed)
        Alan M. Dunn
        Assistant Secretary for
          Import Administration


Statement of Issue

When to make and how to quantify adjustments for differences in
merchandise; 20% limit on adjustment.

Analysis

The statute (Section 772 (a) (4)) provides allowance may be made when
the product on which foreign market value (FMV) is based is not
identical to that exported to the United States.  The regulations
(Section 353.57) provide that the allowance will normally be based on
differences in cost of production, but may be based in differences
in market value.

In practice, and for the reasons cited in the 1985 Study of Antidumping
Adjustments Methodology, we have rarely been able to determine the
direct price effect of a difference in merchandise (Diffmer).  Therefore,
diffmer adjustments are based almost exclusively on the cost of the
physical difference.  We do not make an adjustment because the cost of
production is different; we are measuring the difference in cost
attributable to the difference in physical characteristics.  Note that
the regulations specify that no consideration will be given to cost of
production differences when the compared merchandise has identical
physical characteristics.  Therefore, it is important in any consideration
of a diffmer to isolate the costs attributable to the difference, not just
assume that all cost of production differences are caused by the physical
differences.  When it is impossible to isolate the cost differences, we
should at least determine that conditions unrelated to the physical
difference are not the source of the cost differences, such as when
different facilities are used,  or the cost differences are high but the
actual physical differences appear small.  If the costs of the physical
difference cannot be isolated or it is not reasonably clear that the
differences in production cost are related to the physical difference,
no adjustment should be made.  It is recognized that no fixed rule can
be made here; much depends on the types of product and the physical
differences in the merchandise in each case.  Yet, there should always
be a recognition that it is the physical differences for which the
adjustment is made, that we know precisely what those differences are,
and that the cost differences which form the adjustment are related to
those physical differences and not extraneous factors.


In making a cost-based diffmer allowance the Department uses only
variable and semi-variable manufacturing expenses in quantifying the
cost differences.  Fixed manufacturing costs such as space heating,
lights, and depreciation of plant and equipment are not part of the
adjustment, nor are general, selling, and administrative expenses,
or profits.  We do not adjust for profit; to do so would be making
the adjustment on the basis of value differences (though constructed,
rather than observed), since the selling price is a factor in

enforcement.trade.gov/policy/bull92-2.txt

determining profits. Non-variable expenses are normally incurred
regardless of whether the difference exists or not.  For example,
if a switch is added to a widget sold in the home market, but the
exported item is without the switch, only the cost of the switch,
the labor to install the switch, supervisory labor, and the power to
run the machinery would be allowed, since these are the only additional
expenses that are incurred because the difference existed. We are
assuming that the overhead expenses of the producer remain unchanged
and that the producer will only pass on the customer, thus directly
affecting the price, those expenses additional to the expenses he
would have incurred if the switch had not been installed.  This is
similar in a way to the economic convention that taxes on the producer
are absorbed and taxes on the product are passed to the purchaser.

Since, as in the case of taxes, we know that the convention is probably
not always strictly true, but cannot determine just what portion of
fixed costs might be passed on, the need to limit the adjustment is
necessary.  Otherwise, as the physical differences become larger and
larger, the full, but indeterminable affect on commercial value of
whatever share of factory overheads, GS&A expenses, or profits might
be passed on grows.  To limit the potential differences in commercial
value caused by physical differences, we employ the 20% guideline.
If the commercial value of two products is greatly different, then a
comparison is not reasonable; the difmer adjustment, being limited to
variable manufacturing costs probably cannot fully compensate.  While
we know we cannot accurately measure the impact of all costs on
commercial value, we expect that there is some impact.  When the
variable cost difference exceeds 20%, we consider that the probable
differences in values of the items to be compared is so large that
they cannot reasonably be compared.  Since the  merchandise is not
identical, does not have approximately equal commercial value, and
has such large differences in commercial value that it cannot
reasonably be compared, the merchandise cannot be considered similar
under Section 771 (16) (A), (B),or (C) of the statute.

Although the 20% guideline has been used for a number of years, there
have been some difference in practice in the calculation formula. While
the numerator has always been the difference in variable production cost,
different denominators have been used.  They have sometimes been price,
other times total variable manufacturing cost, and yet other times the total
variable manufacturing costs.  While a case could be made for each
of these, consistency of application is necessary.  Upon further
consideration, we have determined that price is not the best denominator
since it both varies from sale to sale, and may be affected by dumping.
Because variable manufacturing costs change as a share of total
manufacturing costs from product to product, the size of a 20% difference
would consequently vary as well in relation to both the price and total
manufacturing costs.  Therefore, a more stable basis for the denominator
is the total manufacturing costs, and it has been chosen for uniform use.

The 20% guideline is just that, a guideline and not an inflexible rule.
There may be instances in which comparisons may be reasonable even if
the diffmer is in excess of 20% of the cost of manufacture of the U.S. model.
For instance, if there are very small fixed cost differences, such as when
the physical difference is a subcontracted operation or outside purchase,
the potential for distortion in the quantification is less.  Also, if the
comparisons with greater than 20% diffmer adjustments are only a small
portion of the total comparisons, the possible impact of the over 20%
diffmers may be minor in relation to the greater expense to all parties of
having to develop constructed values.  Similarly, the determination that
reasonable comparability ends at a 20% diffmer is not so precise that one
can say a diffmer of over 20% means comparability is never achieved.

The 20% guideline is, however a point of departure in the analysis, and
cannot be ignored.  Any use of comparisons with greater than 20% diffmers

3/15/23, 2:51 PM
Case 1:21-cv-00077-SAV   Document 63   Filed 04/13/23   Page 32 of 32
enforcement.trade.gov/policy/bull92-2.txt

must be explained.  Any relevant special conditions, such as those above,
should be analyzed, as well as the amount by which the diffmer exceeds
20%.  Unless we can explain how the comparison remains reasonable, or
distortion is minimized, we should not make comparisons when diffmers
exceed 20%.  Instead, when there is no other similar merchandise,  we
should revert to constructed value, or in the case of an investigation,
consider whether inclusion of the affected sales is necessary to support
a final determination.


Statement of Policy


Sales of products in domestic or third country markets with variable
manufacturing cost differences exceeding 20% of the total average cost
of manufacture, on a model specific basis, of the product exported to
the United States will normally not be utilized in determining foreign
market value.  Any use of products with the cost of merchandise
differences exceeding 20% shall be noted and fully explained.


Implementation


This policy will be implemented on all future cases and current
administrative reviews and investigation where the information necessary
to determine the diffmer and, if necessary to calculate constructed
value exists and the change can be made without delaying the cases
beyond their due dates.