A-428-847<br>
Remand<br>
Slip Op. 22-123<br>
Investigation<br>
**Public Document**<br>
E&C/OVIII: KJ

*Ellwood City Forge Co., Ellwood National Steel Co., Ellwood Quality Steels Co.,*
*and A. Finkl & Sons v. United States*,
Consolidated Court No. 21-00077, Slip Op. 22-123 (CIT July 24, 2023)
**Forged Steel Fluid End Blocks from Germany**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court or CIT) in *Ellwood City Forge Co., Ellwood National Steel Co., Ellwood Quality Steels Co., and A. Finkl & Sons v. United States*, Consolidated Court No. 21-00077, Slip Op. 22-123, (CIT July 24, 2023) (*Remand Order*).  These final results of redetermination concern the final determination in the less-than-fair-value investigation of forged steel fluid end blocks from Germany.[1]

In the *Remand Order*, the Court granted Commerce's request for a voluntary remand to address alleged errors in the calculation of the dumping margin for BGH Edelstahl Siegen GmbH (BGH) and also remanded for Commerce either to further explain its decision not to consider Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels

---

[1] *See Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Final Determination of Sales at Less Than Fair Value*, 85 FR 80018 (December 11, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Forged Steel Fluid End Blocks from the Federal Republic of Germany and Italy: Amended Final Determination for the Federal Republic of Germany and Antidumping Duty Orders*, 86 FR 7528 (January 29, 2021).

Company, and A. Finkl & Sons' (collectively, the Coalition) arguments regarding alternative pathways for a particular market situation (PMS) adjustment, or to address those arguments.[2]

In accordance with the Court's *Remand Order*, Commerce has corrected the mathematical error with respect to its PMS adjustments in the calculation of BGH's dumping margin and has revised the dumping margin for all other producers or exporters, which is based on BGH's rate.  We have also addressed the Coalition's arguments regarding alternative pathways for a PMS, explaining why they are not permissible.  Because our final results of redetermination differ from our Draft Remand Results,[3] our final analysis is provided in response to parties' comments below.

## II.     LEGAL FRAMEWORK

Section 504 of the Trade Preferences Extension Act (TPEA) of 2015 added the concept of "particular market situation" in the definition of the term "ordinary course of trade," in the Tariff Act of 1930, as amended (the Act).[4]  Specifically, Congress added the PMS concept to sales and transactions that Commerce will consider outside the "ordinary course of trade" and are, thus, not usable in its antidumping duty (AD) calculations.  Under section 771(15) of the Act, Commerce shall find "sales and transactions" to be "outside the ordinary course of trade" in situations in which it "determines that the particular market situation prevents a proper comparison with the export price or constructed export price."[5]  In addition to adding the concept of "particular market situation" to the definition of the term "ordinary course of trade" in section 771(15) of the Act, section 504 of the TPEA added the concept of "particular market situation"

---

[2] *See Remand Order* at 2 and 7.
[3] *See* Draft Results of Redetermination Pursuant to Court Remand, *Ellwood City Forge Co., Ellwood National Steel Co., Ellwood Quality Steels Co., and A. Finkl & Sons v. United States*, Consolidated Court No. 21-00077, Slip Op. 22-123 (CIT July 24, 2023), dated September 28, 2023 (Draft Remand Results).
[4] *See Trade Preferences Extension Act of 2015*, Pub. L. No. 114-27, 129 Stat. 362, 385 (2015).
[5] *Id.*

2

to the definition of constructed value (CV) under section 773(e) of the Act.  Section 773(e) of the Act states that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology."  Although the Act does not define "particular market situation," the SAA explains that, for example, a situation may exist "where there is government control over pricing to such an extent that home market prices cannot be considered competitively set" or where there are "differing patterns of demand in the United States and the foreign market."[6]

At the time that Commerce issued the *Final Determination*, Commerce interpreted the amendments to sections 771(15) and 773(e) of the Act to be applicable for purposes of Commerce's sales-below-cost test under section 773(b)(1) of the Act.

### III.  BACKGROUND

In the *Final Determination*, Commerce made certain PMS adjustments to BGH's cost of production.  BGH contested this determination and, in light of the U.S. Court of Appeals for the Federal Circuit's (Federal Circuit) *Hyundai Steel* decision,[7] Commerce requested a voluntary remand to remove PMS adjustments for purposes of the sales-below cost test.  Subsequently, Commerce requested a voluntary remand to address alleged errors that occurred in removing those PMS adjustments.  The CIT granted the voluntary remand and also remanded Commerce's determination for further explanation regarding its decision not to address the Coalition's

---

[6] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 822.
[7] *See Hyundai Steel Co., Ltd. v. United States*, 19 F.4th 1346, 1352 (Fed. Cir. 2021) (*Hyundai Steel*).

3

arguments regarding alternative pathways for making a PMS adjustment for purposes of the sales-below-cost test.

On September 28, 2023, we released the Draft Remand Results to interested parties for comment.[8] On October 12, 2023, we received comments from the Coalition and BGH.[9]

## IV.  COMMENTS ON DRAFT RESULTS OF REDETERMINATION

**Comment 1:  Commerce's Draft Remand Results Incorrectly Limit Its Options for Applying PMS Adjustments in Price-to-Price Calculations**

*The Coalition's Comments:*

- In the Draft Remand Results, Commerce did not decline to consider the Coalition's alternative statutory pathways on the theory that either pathway was precluded by *Hyundai Steel*.
- *Hyundai Steel* addressed a narrow statutory question, *viz.*, whether Commerce was authorized by section 773(e) of the Act to adjust its sales below cost test calculations under section 773(b) of the Act to account for a PMS.[10] The Federal Circuit concluded that Commerce was not so authorized.[11]
- Nevertheless, Commerce is not precluded from adjusting its dumping calculations to account for distortions in BGH's production costs, regardless of whether or not such distortions are labeled a PMS, merely because the dumping calculations involve a price-to-price comparison.
- *Hyundai Steel* recognized that such a result would be "perverse," and also concluded that: (1) "Commerce is {not} powerless to address home market sales that are affected by a PMS yet still pass the sales-below-cost test"; and (2) the Federal Circuit declined to reject alternative statutory pathways, such as sections 773(f)(1)(A) and 773(a)(1)(C)(iii) of the Act, under which Commerce might just as effectively address cost-based PMS distortion in a price-to-price AD comparison.[12]

---

[8] *See* Draft Remand Results.
[9] *See* Coalition's Letter, "FEB Fair Trade Coalition's Comments on Draft Remand Results," dated October 12, 2023 (Coalition's Comments); and BGH's Letter, "Comments on Draft Results of Redetermination," dated October 12, 2023 (BGH's Comments).
[10] *See* Coalition's Comments at 16 (citing *Hyundai Steel*, 19 F. 4th at 1352-55).
[11] *Id.*
[12] *Id.* (citing *Hyundai Steel*, 19 F.4th at 1355-56).

4

A. <u>Commerce could adjust the margin program to test whether BGH's distorted costs "reasonably reflect" true production costs, pursuant to section 773(f)(1)(A) of the Act.</u>

- The Federal Circuit expressly declined to rule out Commerce's authority to make a *de facto* cost-based PMS adjustment pursuant to section 773(f)(1)(A) of the Act.
- That Commerce analyzed the cost distortions for electricity and ferrochrome under section 773(e) of the Act and considered them a PMS cannot relieve Commerce of its independent authority under section 773(f)(1)(A) of the Act to eliminate these distortions.
- Based on the statute's plain language and statutory definitions, it would be absurd for input prices distorted by a PMS to be both "outside the ordinary course of trade,"[13] while still "reasonably reflect{ing}" the costs associated with producing subject merchandise.[14]
- Commerce has no statutory obligation to rely on the costs reported in BGH's books and records in performing the sales-below-cost test.[15]
- Commerce does have wide discretion to rework its sales-below-cost test calculations in response to BGH's failure to satisfy the preconditions of section 773(f)(1)(A) of the Act.[16]
- As one option, Commerce could include an upward adjustment to BGH's costs, basically adjusting BGH's reported costs to account for distortion and thereby reasonably reflect production costs. Although not a PMS adjustment, from a mathematical standpoint, the magnitude of the adjustment would be the same.
- *Husteel I* was limited to the question of whether section 773(f)(1)(A) of the Act authorized a PMS adjustment.[17] It did not consider the broader question of whether Commerce could rely on section 773(f)(1)(A) of the Act to address distortion in a respondent's reported costs. Commerce can do so.[18]
- It would be arbitrary to preclude Commerce from determining that a cost distortion prevented the respondent's costs from reasonably reflecting production costs within the meaning of section 773(f)(1)(A) of the Act just because that distortion had at some point been analyzed under section 773(e) of the Act or labeled a PMS.
- Where, as here, a respondent's reported production costs are distorted, the sales-below-cost test (absent adjustment) is necessarily distorted because it compares sales prices to distorted costs. Consequently, normal value (NV) may include

---

[13] *Id*. at 19 (citing to sections 771(15)(C) and 773(e) of the Act).
[14] *Id*. (citing section 773(f)(1)(A) of the Act).
[15] *Id*. (citing *LG Chem, Ltd. v. United States*, Ct. No. 20-00096, Slip Op. 2021-99 (CIT 2021) (*LG Chem*), at 18).
[16] *Id*. (citing, *e.g.*, *LG Chem*, Slip Op. 2021-99 at 19-20; and *Thai Plastic Bags Indus. Co. v. United States*, 746 F. 3d 1358, 1362, 1367-68) (Fed. Cir. 2014) (*Thai Plastic Bags*)).
[17] *Id*. at 20 (citing *Husteel Co. v. United States*, 426 F. Supp. 3d 1376, 1383 (CIT 2020) (*Husteel I*).
[18] *Id*. (citing *Thai Plastic Bags*, 746 F. 3d at 1362, 1365).

5

       home market prices that only pass the sales-below-cost test due to the use of distortedly low production costs.
- To avoid such a result, Commerce should use its authority under section 773(f)(1)(A) of the Act to adjust BGH's reported costs to account for the PMS when performing the sales-below-cost test.

B. <u>Because this cost-based PMS prevents a proper comparison with U.S. price, Commerce could use constructed NV for all sales.</u>

- The Federal Circuit noted that Commerce was not constrained to rely on the flawed results of an unadjusted sales-below-cost test and could reject distorted sales prices that "still pass the sales-below-cost test" set forth in section 773(b) of the Act by finding a sales-based PMS, *e.g.*, under section 773(a)(1)(C)(iii) of the Act.[19]
- Commerce already found a PMS to exist. All that remains is to address the second prong of section 773(a)(1)(C)(iii) of the Act: whether this PMS prevents a proper comparison with U.S. price.
- The statutory question is not merely whether NV and U.S. price could somehow theoretically be compared, but rather, whether such a comparison would be a proper comparison.[20]
- As an initial matter, Commerce would be incorrect to assume that a cost distortion is reflected equally in both home market and U.S. sales prices charged for various models of fluid end blocks.
- Even if one were to assume, *arguendo*, that a cost distortion equally impacts home market and U.S. sales prices, such an equality of distortion still means that NV is distorted.
- Congress did not create a loophole permitting dumping in the United States as long as the foreign producer benefits from, *e.g.*, non-market economy inputs or government-set input prices, that allow them to cut prices in their home market as well.
- To avoid this outcome, Commerce can separately perform an adjusted test to identify any home market sales prices falling below production costs that have been adjusted to counteract the cost-based PMS.
- For such sales, Commerce would base NV on CV as set forth in section 773(e) of the Act, including a PMS adjustment.

---

[19] *Id*. at 21 (citing *Hyundai Steel*, 19 F.4th at 1355).
[20] *Id*. at 21-22 (citing section 773(a)(1)(C)(iii) of the Act).

    C.    <u>Absent one of the adjustments described above, Commerce's dumping margin calculation will utilize NVs outside the ordinary course of trade, in violation of the statute.</u>

- Commerce's Draft Remand Results do not tackle the analysis necessary to identify which comparison market prices are outside the ordinary course of trade, therefore making its redetermination unsupported by substantial evidence.
- Declining to analyze whether BGH's costs cause one or more home market sales prices to artificially pass the sales-below-cost test would leave Commerce unaware of whether its margin calculations use sales prices outside the ordinary course of trade as NV.
- Moreover, Commerce would be unaware only as a technical matter, insofar as it has already performed these calculations and their results are already part of the administrative record.
- Commerce's approach violates the prohibition against using sales prices that are outside the ordinary course of trade as NV. This error must be corrected in the final results of redetermination.

*BGH's Comments*:
- The Coalition had every opportunity to address the respondent's statutory challenges to Commerce's PMS adjustment during the original investigation.
- Despite the extensive court precedent striking down Commerce's cost-based PMS adjustments, the Coalition did not raise any alternative bases for the adjustment and relied solely upon the CIT being overturned by the Federal Circuit, which did not happen.
- There is nothing in the Federal Circuit's *Hyundai Steel* decision that provides any new legal precedent for the Coalition's alternative legal theories.[21] In fact, in this decision the Federal Circuit specifically refused to address arguments concerning alternative statutory provisions, such as section 773(f)(1)(A) of the Act, because they were not raised or considered in the original investigation.[22]
- The Coalition's interpretation that sections 773(f)(1)(A) and (a)(1)(C)(iii) of the Act provide an independent mechanism to make wholesale alterations in the dumping margin calculations to account for alleged particular market situations finds no support in the statute, case law, or legislative history.

**Commerce's Position:**

    We agree with the Coalition that we are leaving our finding regarding the existence of a PMS concerning both ferrochrome and electricity undisturbed. We disagree with the Coalition,

---

[21] *Id.* at 4 (citing *Hyundai Steel*, 19 F.4th at 1352).
[22] *Id.* (citing *Hyundai Steel*, 19 F.4th at 1356).

and agree with BGH, about what this finding means for our analysis.  By way of background, in the original investigation, Commerce found that a cost-based PMS existed due to distortions in the prices for two inputs, ferrochrome and electricity, in Germany, and adjusted both BGH's cost of production (through section 773(b) of the Act) and CV (through section 773(e) of the Act).[23]  Commerce requested a voluntary remand to remove the impermissible PMS adjustment to BGH's cost of production, in accordance with *Hyundai Steel*.  On remand, the Coalition raised two "alternative statutory pathways" to account for cost-based PMS distortions in determining the dumping margin for all of BGH's U.S. sales.[24]  Commerce determined that it was "not appropriate to address those arguments in the context of these final results of redetermination."[25]  The Court disagreed with Commerce, stating in its *Remand Order* that Commerce must state a "fulsome rationale for either considering or not considering Plaintiffs' alternative pathways."[26]  In our Draft Remand Results, Commerce explained why each of the Coalition's alternative statutory arguments are not appropriate to address in the context of this remand.

Section 773(a)(1)(C)(iii) of the Act

The Coalition argues that Commerce could "reject distorted sales prices that still pass the sales-below cost test" by finding a sales-based PMS.[27]  It argues that the cost-based PMS's effect upon NV and U.S. price comparability is relevant.  As explained in our Draft Remand Results, 19 CFR 351.301(c)(2)(ii) requires parties to make "allegations regarding market viability in an antidumping investigation or administrative review … 10 days after the respondent interested

---

[23] *See Final Determination* IDM at Comment 3.
[24] *See Final Results of Redetermination Pursuant to Court Remand, Ellwood City Forge Co., Ellwood National Steel Co., Ellwood Quality Steels Co., and A. Finkl & Sons v. United States*, Consolidated Court No. 21-00077 (CIT November 8, 2022) , dated March 10, 2023 (*First Final Remand*), available at https://access.trade.gov/resources/remands/22-123.pdf.
[25] *Id.*
[26] *See Remand Order* at 2 and 7.
[27] *See* Coalition's Comments at 21.

party files the response to the relevant section of the questionnaire, unless the Secretary alters this time limit."[28]  As such, Commerce considered this sales-based PMS allegation to be untimely.  In its comments, the Coalition claimed that it made a timely sales-based PMS allegation which was addressed in Commerce's *Final Determination* IDM.[29]  However, the current sales-based PMS allegation is entirely different from the one addressed in the investigation, which concerned the existence of a cartel in Germany, the use of surcharges in Germany, and physical differences in products between the markets, and made no claim that distortions in ferrochrome and electricity costs would have an impact on the ability to make a proper comparison of prices.[30]  Further, we found that allegation to fall short and the Coalition did not challenge our sales-based PMS finding before the Court.[31]  As such, this new sales-based PMS allegation is untimely.

The Coalition further argues that even if this is an untimely allegation, in its view "'a particular market situation' for purposes of Section 773(a) is a 'particular market situation' for purposes of Section 773(e)" and thus, Commerce just needs to state that the cost-based PMS it found to exist under section 773(e) of the Act also prevents a proper comparison under section 773(a) of the Act.[32]  This is incorrect.  In addition to the fact that section 773(a) of the Act existed before the TPEA was passed in 2015, there are textual differences.  Section 773(a)(1)(C)(iii) of the Act reads that prices in the exporting country (*i.e.*, home market) shall be used as NV unless "the particular market situation in the exporting country does not permit a proper comparison with export price or constructed export price."  Section 773(e) of the Act

---

[28] *See* Draft Remand Results at 7; and 19 CFR 351.301(c)(2)(ii).
[29] *See Final Determination* IDM at Comment 3.
[30] *Compare Id.* with the Coalition's Comments at 21 (not mentioning price fixing or a cartel).
[31] *See Ellwood City Forge Co., Ellwood City National Steel Co., Ellwood Quality Steels Co., and A. Finkl & Sons v. United States*, 600 F. Supp. 3d 1281 (CIT 2022).
[32] *See* Coalition's Comments at 13-14.

9

reads "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade … ." A PMS finding under section 773(a) of the Act requires analysis of a respondent's sales prices (*i.e.*, sales-based) whereas section 773(e) of the Act directs the administering authority to consider if the PMS exists such that costs do not accurately reflect the cost of production (*i.e.*, cost-based). These are two distinct findings based on two distinct analyses.

Although it is possible in theory that distorted costs could contribute to distorted sales prices, the Coalition has provided no support for its allegation that the cost-based PMS in the exporting country does not permit a proper comparison with export price (EP) or constructed export price (CEP). Rather than provide evidence that distorted costs in Germany resulted in distorted prices, the Coalition simply alleged that "BGH is assumed to spread its costs savings strategically in markets where BGH stands to benefit the most in terms of gaining market share and customs."[33] As explained in our Draft Remand Results, substantial evidence requires more than guesswork.[34] The Coalition continues to make an untimely allegation, unsupported by record evidence, that the cost-based PMS finding, based in section 773(e) of the Act, also prevent(s) a proper comparison with U.S. price.

The Coalition further argues that Commerce can analyze whether the PMS prevents a proper comparison through the application of a "quasi-sales below cost test, adjusted to reflect market-based costs."[35] The Coalition claims that Commerce can "refashion its sales below cost

---

[33] *See* Coalition's Letter, "FEB Fair Trade Coalition's Comments on Draft Remand Results," dated February 15, 2023 (Comments on First Draft Remand) at 8.
[34] *See* Draft Remand Results at 9 (citing *China Nat'l Arts & Crafts Imp. & Exp. Corp. v. United States*, 771 F. Supp. 407, 413 (CIT 1991)).
[35] *See* Coalition's Comments at 14.

10

test calculations in response to BGH's failure to satisfy the preconditions of 19 U.S.C. § 1677b(f)(1)." However, as explained below, the Coalition is mistaken in arguing that Commerce can adjust BGH's costs under section 773(f)(1)(A) of the Act to perform the cost test.

Section 773(f)(1)(A) of the Act

Section 773(f)(1)(A) of the Act dictates that the costs of a respondent "shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country … and reasonably reflect the costs associated with the production and sale of the merchandise." The Coalition claims that we have found cost distortions in our cost-based PMS analysis, and thus, we can disregard BGH's books and records as a whole because they do not reasonably reflect BGH's costs.[36] We disagree.

First, the Coalition has the statutory analysis backwards. The statute clearly requires an analysis that begins with the respondent's records; it states that "costs shall normally be calculated based on the records of the exporter or producer of the merchandise, *if such records* … " meet two criteria. The Coalition has not pointed out anything unreasonable in BGH's books and records, but rather, has merely restated our finding that certain costs are distorted. The record does not support any finding that BGH's books and records do not reasonably reflect the costs incurred by BGH. In fact, the Coalition had already made an allegation regarding BGH's books and records in the investigation, and we found that BGH's books and records reasonably reflect the costs associated with the production and sale of subject merchandise.[37]

---

[36] *Id.* at 18 ("having determined that BGH's input costs for electricity and ferrochrome are distorted, Commerce may conclude that BGH's books and records—which are based on those distorted input costs—cannot 'reasonably reflect' the costs of producing subject merchandise").
[37] *See Final Determination* IDM at Comment 5 ("The record is clear that BGH('s) … reported costs 'reasonably reflect the costs associated with the production and sale of the merchandise' as required by statute.")

Second, the Coalition misunderstands our PMS finding.  A PMS is market-based, not necessarily respondent-specific.  In this very case, BGH has argued it does not purchase ferrochrome from the Kazakh company that we found is distorting *market* costs.  Although our original finding that the Kazakh company's sales distort ferrochrome costs in the German *market* remains undisturbed, there is no reason to believe that the books and records of BGH do not adequately reflect its costs.  In other words, section 773(f)(1)(A) of the Act is focused on the books and records of a respondent and whether they reasonably reflect the costs incurred by the respondent.  A cost-based PMS finding is not a finding that reported costs are not a reasonable reflection of the costs respondent actually incurred.  Rather, a PMS finding is based on an analysis that prevailing prices (of inputs) in a given market are different from what they would have been absent certain distortions.  Indeed, the Court has highlighted how the TPEA amendments to the statute notably left section 773(f)(1)(A) of the Act alone, suggesting that a PMS adjustment through this section is not permitted.[38]

**Comment 2:   Commerce Failed to Explain Why It Accepted the Coalition's Untimely Allegations Concerning Errors in the Margin Programs.**

*BGH's Comments:*
- All of the Coalition's arguments upon which Commerce now relies to revise the dumping margin could and should have been raised in its comments to Commerce's first draft results of redetermination, issued on January 31, 2023.
- Commerce provided no explanation as to why it has now considered the Coalition's belated arguments despite its failure to exhaust its prior administrative remedies.
- Commerce may not enforce the doctrine of exhaustion in an arbitrary manner nor bypass the exhaustion argument by voluntarily correcting errors when they increase the dumping margin but not when they decrease the dumping margin.
- It is incumbent upon Commerce to apply its standards impartially to all parties similarly situated.[39]

---

[38] *See Husteel I* ("Undeniably Congress did not amend … section 1677b(f) (calculation of a cost of production) to allow for a PMS adjustment").
[39] *Id*. (citing *Carpenter Tech Corp. v. United States*, 26 CIT 838 (2000)).

No other interested party commented on this issue.

**Commerce's Position:**

We disagree with BGH. By way of background, we issued the draft remand results of the *First Final Remand* on January 31, 2023.[40] On February 8, 2023, we revised the due date for comments. Both the Coalition and BGH filed comments on February 15, 2023; only BGH alerted Commerce to a mathematical error in the draft remand calculations.[41] In the *First Final Remand*, we attempted to correct this error and, in so doing, created another error that depressed BGH's margin. Because this was the final remand, the Coalition did not have an opportunity to alert Commerce to the error before Commerce filed its final remand with the Court. Thus, when the Coalition raised this issue before the Court, it was the Coalition's first opportunity to alert Commerce to the error. Moreover, the Court agreed with the Coalition and rejected BGH's argument, highlighting that BGH's argument "turns the purpose of the exhaustion doctrine on its head." As such, we have corrected the mathematical error in its entirety.[42]

**Comment 3:   Commerce's Cost-Based PMS Adjustments Are Not Supported by Substantial Evidence on the Administrative Record**[43]

- Commerce's cost-based PMS adjustments for comparisons based on CV fail to meet the requirements of the AD statute and are not supported by substantial evidence on the record.
- To establish the existence of a PMS, Commerce must demonstrate that there are distortions present in the market and that those distortions prevent a proper comparison of NV with EP or CEP.[44]

---

[40] *See* Draft Results of Redetermination Pursuant to Court Remand, *Ellwood City Forge Co., Ellwood National Steel Co., Ellwood Quality Steels Co., and A. Finkl & Sons v. United States*, Consolidated Court No. 21-00077, Slip Op. 22-123 (CIT November 8, 2022), dated January 31, 2023.
[41] *See First Final Remand*.
[42] *See* Memorandum, "Draft Remand Results Calculation Memorandum for BGH Edelstahl Siegen GmbH," dated September 28, 2023.
[43] *See* BGH's Comments at 5-21.
[44] *Id*. at 5-6 (citing *Husteel I*; *see also Husteel Co. v. United States*, 471 F. Supp. 3d 1349, 1362 (CIT 2020)).

- In *NEXTEEL*, the Federal Circuit stated that the circumstances supporting a PMS must also be particular to producers of the subject merchandise during the relevant period.[45]
- Commerce must identify what unique facts make the cost of materials and fabrication an inaccurate reflection of the cost of production in the ordinary course of trade.[46]

A. Electricity

  1. No Significant Distortions

- The only evidence cited by Commerce in support of its determination was the final determination in the companion countervailing duty (CVD) investigation of forged steel fluid end blocks.
- Despite requests from BGH, Commerce refused to place anything other than the benefit calculation on the record of the AD investigation and refused to consider contradictory evidence in making its decision.[47]
- The factual evidence which demonstrates that electricity costs in Germany were far above those in the United States and other industrialized countries was never disputed by Commerce or the Coalition.
- In Germany, electricity is produced, sold, and distributed by a network of private companies and in the concurrent CVD investigation there was no allegation or finding that the respondents were receiving electricity at less than adequate remuneration.[48]
- All of the subsidy allegations raised in the CVD investigation involved additional taxes and surcharges on electricity imposed upon German companies to reduce the emission of greenhouse gases, as opposed to the cost of electricity itself.  These environmental measures are not particular to producers of the subject merchandise, but rather, are broadly applicable to companies manufacturing a wide range of products.
- Commerce has failed to establish that these environmental measures prevent the cost of materials and fabrication from accurately reflecting the cost of production in the ordinary course of trade.
- In *NEXTEEL*, the Federal Circuit determined that Commerce failed to establish that electricity prices are any different from what they would be in the ordinary course of trade.[49]

---

[45] *Id*. at 7 (citing *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1234 (Fed. Cir. 2022) (*NEXTEEL*) (citing *SeAH Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1393 (CIT 2021))).
[46] *Id*. at 6 (citing *Garg Tube Exp. LLP v. United States*, 569 F. Supp. 3d 1202, 1211 (CIT 2022)).
[47] *Id*. at 8 (citing *Husteel I* (citing *Consol Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938); and *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 f. 3d 978, 985 (Fed. Cir. 1994)).
[48] *Id*. at 9 (citing *BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241 (CIT 2022); *see also Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Final Affirmative Countervailing Duty Determination*, 85 FR 80011 (December 11, 2020), and accompanying IDM at 23-24)).
[49] *Id*. at 11 (citing *NEXTEEL*, 28 F.4th at 1237).

2. Proper Comparison of NV with EP

- In this proceeding, there is no difference in electricity costs for the production of subject merchandise for domestic and export sale.
- Commerce has failed to prove that the claimed distortions in electricity costs prevent a proper comparison of NV and EP or CEP.  Therefore, the cost-based PMS adjustment for electricity must be rejected.

3. Calculation Errors

- Commerce cannot simply apply CVD rates in an AD investigation as a cost-based PMS adjustment without first explaining how the CVD investigation and the resulting CVDs have not remedied the distortion.[50]
- This is not a situation where Commerce's PMS adjustment is based on an international benchmark price for the applicable input and the EP of the end product is also based on international prices.
- Rather, Commerce takes the full *ad valorem* CVD rates and uses them to increase the costs reported for electricity in the AD investigation.
- In addition, Commerce failed to adequately explain the calculation of the cost-based PMS adjustment to electricity costs.  According to the calculations, the benefit to be added to the actual electricity costs is more than the costs themselves.
- Commerce is claiming that a non-distorted cost of electricity in the German market should have additional environmental taxes, fees, and surcharges of more than 100 percent of the actual costs of electricity, despite the fact that German electricity costs are already far above those in the United States and other industrialized countries.
- Moreover, Commerce includes programs in its benefit calculation that do not relate to electricity.  For example, Commerce includes alleged benefits from sections 51, 54, and 55 of the Energy Tax Act even though this Act does not cover electricity, but rather, is limited to other energy products such as heating oil and natural gas.[51]
- Commerce's calculations also include alleged benefits to a related company, Rohstoff-, Press- und Schneidbetrieb Siegen GmbH, that does not produce subject merchandise.  In addition, the Court has found that Commerce erred in treating the Concession Fee Ordinance (Konzessionsabgabenverordnung or KAV) Relief Program, which Commerce included in its PMS adjustment, as countervailable.[52]

---

[50] *Id*. at 12 (citing *Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d 1323, 1340 (CIT 2019)).
[51] *Id*. at 14 (citing *Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 FR 31454 (May 26, 2020) and accompanying Preliminary Decision Memorandum at 21).
[52] *Id*. at 15 (citing *BGH Edelstahl Siegen GmbH v. United States*, No. 21-00080, Slip Op. 23-71 at 14 (May 9, 2023)).

B. Ferrochrome Costs

1. No Significant Distortions

- Commerce's determination is based only upon information that ferrochrome from Kazakhstan is imported into Germany and that the Kazakh producer, Kazchrome, is state controlled.
- Data on imports of ferrochrome into industrialized countries show that the unit values for ferrochrome imported into Germany are consistent with the unit values for imports into other industrialized Group of Twenty countries. Likewise, data on exports of ferrochrome from Kazakhstan show that unit values for exports to Germany are consistent with the unit values of exports from Kazakhstan to other countries.
- Commerce's disregard of this international data, using only the benchmark U.S. Geological Survey (USGS) price based on import prices, seems to impose an irrebuttable presumption that input prices in a foreign market that are lower than U.S. input prices represent *per se* a PMS.
- BGH submitted full invoices for all purchases of ferrochrome during five months of the period of investigation (POI), October 1, 2018, through September 30, 2019, selected by Commerce. These invoices show that all of BGH's purchases of ferrochrome were from private companies in the European Union (EU) or Switzerland and that almost all the ferrochrome purchased by BGH came from countries other than Kazakhstan.
- Commerce cites no authority for its incorrect statement that PMS findings are market-based and not respondent-specific. Commerce has made both market-based and respondent-specific PMS findings depending upon the facts presented in each case.[53]
- The Coalition's estimates with respect to German ferrochrome requirements sourced from imports, the percentage of total ferrochrome imports from Kazakhstan, and the alleged undervaluation of Kazakh ferrochrome prices are completely inaccurate.
- Commerce stated in its *Final Determination* IDM that Kazakhstan is Germany's largest source of ferrochrome imports, yet disregarded the fact that ferrochrome imported into Germany does not remain there but circulates freely throughout the EU.
- Commerce also failed to establish that the circumstances relating to ferrochrome from Kazakhstan are particular to producers of the subject merchandise and even admits that almost all of the ferrochrome BGH purchased came from countries other than Kazakhstan.
- The ferrochrome used by German producers of forged steel fluid end blocks amounts to only a miniscule portion of the ferrochrome imported into Germany.[54]
- Commerce also failed to establish that the circumstances relating to ferrochrome from Kazakhstan prevent the cost of materials and fabrication from accurately reflecting the cost of production in the ordinary course of trade.

---

[53] *Id*. at 17 (citing *Husteel I*, 426 F. Supp. 3d at 1392, n.20).
[54] *Id*. at 18 (citing to BGH's Letter, Section D Questionnaire Response, dated April 27, 2020, at Appendix D-3).

2. Proper Comparison of NV with EP

- As with electricity, ferrochrome is used without distinction in the production of subject merchandise for both domestic and export sale, and Commerce has made no claim that the cost would not be similarly impacted on both sides of the fair value equation.

3. Calculation Errors

- The source referenced by Commerce in its calculations for BGH's POI Ferrochrome Purchases Value (EUR) and BGH's POI Ferrochrome Purchases Quantity (KG) is Exhibit D-3 in BGH's April 27, 2020, Section D questionnaire response. However, neither of the figures in the calculations are found in this exhibit.
- In addition, Commerce compares BGH's actual purchases of ferrochrome with the USGS price of general ferrochrome in the United States.
- Commerce rejected without explanation other evidence on world ferrochrome prices placed on the record by BGH and the other mandatory respondent, Schmiedewerke Groditz GmbH. There is no requirement in the AD statute that input prices in a foreign market may not be lower than U.S. input prices.
- BGH's purchasing documentation shows that ferrochrome varies in chromium and carbon content, and the relative content of these and other materials affects the purchase price. Delivery terms will also affect the product's ultimate price. Commerce's PMS calculation does not account for these price differences.

**Commerce's Position:**

The Court did not remand our findings regarding the existence of a PMS for ferrochrome and electricity. Further, with the exception of a few new arguments, BGH's comments were addressed in our *Final Determination*, and we continue to rely on our reasoning in that determination.[55] Because the Court never remanded Commerce's decision on the existence of a PMS, BGH's arguments concerning our finding of the existence of a PMS are not within the scope of this remand. However, because of intervening CIT decisions regarding the parallel CVD determination of this investigation concerning the *de jure* specificity of the KAV program, we address this specific argument below.

---

[55] *See Final Determination* IDM at Comment 3.

BGH argues that the CIT has found that Commerce erred in treating the KAV program as countervailable and, as such, Commerce cannot continue to adjust for electricity distortions in our calculations.[56] We disagree. As an initial matter, BGH misunderstands the CIT's decision and our PMS finding. First, the CIT held that Commerce's *de jure* specificity finding as it relates solely to *one* electricity program must be further explained or reconsidered.[57] On remand, Commerce further explained why that program is considered *de jure* specific and the litigation is still ongoing.[58] However, more importantly, our PMS finding is neither directly tied to that program alone, nor is it based entirely on the CVD determination. In the *Final Determination* IDM, we explained that "{i}n the final determination of the companion CVD investigation of fluid end blocks from Germany, we are finding *multiple* electricity programs to be countervailable, which *further* supports the petitioner's allegation that the German market for electricity is distorted by virtue of government subsidization."[59] Indeed, BGH neglects to point out that the CIT sustained our finding that BGH benefited from Section 9a of the Electricity Tax Act, Section 51 of the Energy Tax Act, and the 2018 Special Equalization Scheme – Reduced EEG Surcharge, and other programs that either were not contested before the CIT or contested, and later sustained.[60] As explained in the *Final Determination* IDM, "{t}he sheer number and extent of these programs, when considered collectively, demonstrate the efforts undertaken by the German government to control the German market for electricity."[61]

---

[56] *See BGH Edelstahl Siegen GmbH v. United States*, Court No. 21-00080, Slip Op. 23-71 (May 9, 2023) (*BGH Edelstahl Siegen GmbH*), at 14.
[57] *Id.*
[58] *Id.*
[59] *See Final Determination* IDM at 20 (emphasis added).
[60] *See BGH Edelstahl Siegen GmbH*, Court No. 21-00080, Slip Op. 23-71 at 6-10; and *Final Determination* IDM at 20.
[61] *See Final Determination* IDM at 20-21.

## V.  FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, Commerce has, as discussed above, corrected the mathematical error with respect to its PMS adjustments. As a result, Commerce determines that the following weighted-average dumping margins exist for the period of October 1, 2018, through September 30, 2019:

| Company | *Final Results* Weighted-Average Dumping Margin (percent) | Remand Weighted-Average Dumping Margin (percent) |
|---|---|---|
| BGH Edelstahl Siegen GmbH | 4.79 | 3.08 |
| All Others | 4.79 | 3.08 |

Should the Court affirm these final results of redetermination, Commerce intends to publish a notice of amended final determination in the *Federal Register* and issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the discussion above.

11/20/2023

X _____

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance