## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY,<br>ELLWOOD NATIONAL STEEL COMPANY,<br>ELLWOOD QUALITY STEELS COMPANY, and<br>A. FINKL & SONS,<br><br>                    Plaintiffs,<br><br>      v.<br><br>UNITED STATES,<br><br>                   Defendant,<br>     and<br><br>BGH EDELSTAHL SIEGEN GMBH,<br><br>           Defendant-Intervenor. | Consol. Ct. No.  21-00077<br><br>**NON- CONFIDENTIAL VERSION**<br>*Proprietary Information Subject to Protective Order Removed from Brackets on Page 10.* |

## PLAINTIFFS' COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF COMMERCE'S SECOND REDETERMINATION PURSUANT TO COURT REMAND

Myles S. Getlan
Thomas M. Beline
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2300
Fax: (202) 567-2301

Dated:   December 21, 2023

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

## **Table of Contents**

Page

I.  BACKGROUND AND PROCEDURAL POSTURE ......................................................... 2

II.  COMMERCE'S SECOND REDETERMINATION CONSIDERED
ALTERNATIVE STATUTORY PATHWAYS FOR ADJUSTING BGH'S
DISTORTED PRODUCTION COSTS, BUT ESPOUSES UNLAWFUL
CONCLUSIONS THAT ARE UNSUPPORTED BY SUBSTANTIAL
EVIDENCE .................................................................................................................... 5

    A.  Any Exhaustion Concerns Related to Commerce's Obligation to Address
Plaintiffs' Alternative Statutory Pathway Have Been Negated ...................................... 5

    B.  Commerce's Rationale for Not Adjusting its Price-to-Price Antidumping
Calculations in Order to Account for BGH's Distorted Costs Is Unlawful and
Unsupported by Substantial Evidence ........................................................................... 7

        1.  Commerce's Second Redetermination Continues to Find BGH's Costs
Distorted; Whether that Distortion Could Be Labeled a PMS Is of No
Moment ............................................................................................................... 9

        2.  19 U.S.C. § 1677b(f)(1)(A) Provides a Pathway for Commerce to Address
Cost Distortion in Conducting the Sales Below Cost Test ................................. 11

            i.  Congress Gave Commerce Authority to Adjust its Calculations to
Account for Distortion in a Respondent's Records ...................................... 11

            ii.  Prior Decisions Left the Pathway in Question Open .................................... 14

        3.  Commerce's Interpretation of "Costs Associated with the Production and
Sale of the Merchandise" Is Unlawful ............................................................. 16

            i.  Congress' Intent Is Clear and Commerce Has Unlawfully Narrowed
the Statute ................................................................................................... 17

            ii.  Commerce's Second Redetermination Makes No Mention of
Ambiguity, Precluding this Court from Affirming the Second
Redetermination on that Basis ..................................................................... 22

            iii.  Even if Ambiguity Were to Exist, Commerce's Interpretation Is
Unreasonable .............................................................................................. 23

III.  CONCLUSION ............................................................................................................ 26

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1677(15)(C)............................................................................................21, 23

19 U.S.C. § 1677(16) ......................................................................................................20

19 U.S.C. § 1677a ............................................................................................................2

19 U.S.C. § 1677b .........................................................................................................2, 8

19 U.S.C. § 1677b(a) ......................................................................................................15

19 U.S.C. § 1677b(a)(1)(C)(iii) ......................................................................................24

19 U.S.C. § 1677b(a)(6)(B)(i).........................................................................................20

19 U.S.C. § 1677b(a)(6)(B)(ii) .......................................................................................20

19 U.S.C. § 1677b(b) ........................................................................................12, 14, 24

19 U.S.C. § 1677b(b)(1) .................................................................................................15

19 U.S.C. § 1677b(b)(3) ...................................................................................................4

19 U.S.C. § 1677b(d) ......................................................................................................20

19 U.S.C. § 1677b(e) ................................................................................................ passim

19 U.S.C. § 1677b(f) ........................................................................................11, 14, 15

19 U.S.C. § 1677b(f)(1)(A)...................................................................................... passim

19 U.S.C. § 1677b(f)(1)(C)(i).........................................................................................20

19 U.S.C. § 1677f(i)(3)(A) ...............................................................................................6

19 U.S.C. § 1677m(g) .......................................................................................................6

Court Decisions

*Am. Silicon Techs. v. United States*, 261 F.3d 1371 (Fed. Cir. 2001)...........................23

*Badgerow v. Walters,* 596 U.S. 1 (2022) ......................................................................19

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).....................6, 17, 22

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 66 F.4th 968 (Fed. Cir. 2023) ............................................17

*Corley v. United States*, 129 S. Ct. 1558 (2009).........................................18

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020)........................................................................................4

*Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020)..........................12, 13, 18

*Dolan v. Postal Service*, 546 U.S. 481 (2006) ...........................................20

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996)..................21

*Gleason Indus. Prods. v. United States*, 556 F. Supp. 2d 1344 (Ct. Int'l Trade 2008)....................................................................................7

*Haggar Co. v. Helvering*, 60 S. Ct. 337 (1940).........................................24

*Hibbs v. Winn*, 542 U.S. 88 (2004)......................................................18

*Husteel Co. v. United States*, 426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020)..................................15

*Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363 (Fed. Cir. 2005)........................12, 13

*Hyundai Steel Co. v. United States*, 19 F.4th 1346 (Fed. Cir. 2022)................................... *passim*

*Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011) ....................................20

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)................................................17

*LG Chem, Ltd. v. United States*, 534 F. Supp. 3d 1386 (Ct. Int'l Trade 2021) ............................14

*McCarthy v. Madigan*, 503 U.S. 140 (1992) ...........................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...............................................................6, 22

*Nakornthai Strip Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303 (Ct. Int'l Trade 2008)....................................................................................7

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005)........................................................................6

*NEXTEEL Co., Ltd. v. United States*, Slip Op. 23-18, 2023 WL 8715793 (Ct. Int'l Trade Dec. 17, 2023) ...........................................................8

*Nielsen v. Preap*, 139 S. Ct. 954 (2019) ...............................................18

*Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335 (Fed. Cir. 2011) ................................................................................................12, 15, 16

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 2023 WL 8360080 (Fed. Cir. Dec. 4, 2023) ...........................................................................14, 15, 25

*Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362 (Fed. Cir. 1999)................................12

*Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358 (Fed. Cir. 2014) ..............................................................................................................12

*United States v. L.A. Tucker Truck Lines*, 344 U.S. 33 (1952).....................................................7

*Vicentin S.A.I.C. v. United States*, 466 F. Supp. 3d 1227 (Ct. Int'l Trade 2020) ..............................................................................................................16

*Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067 (2018) ..................................................19

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98 (Fed. Cir. 2022) ..............................................................................................................12, 13

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ..............................................................................................................8, 11

Administrative Determinations

*Forged Steel Fluid End Blocks From the Federal Republic of Germany,* 85 Fed. Reg. 80,018 (Dec. 11, 2020) (AD Inv. Final) ...............................................2, 3, 10

Other Administrative and Legislative Materials

*Uruguay Round Agreements Act, Statement of Administrative Action,* H.R. Doc. No. 103-316................................................................................17, 18, 19

S. Rep. 103-412 (1994) ......................................................................................13, 18, 19

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

|  |  |
|---|---|
| ELLWOOD CITY FORGE COMPANY,<br>ELLWOOD NATIONAL STEEL COMPANY,<br>ELLWOOD QUALITY STEELS COMPANY, and<br>A. FINKL & SONS, ) ) ) ) ) | |
| Plaintiffs, ) | |
| v. ) | |
| UNITED STATES, ) | Consol. Ct. No.  21-00077 |
| Defendant, ) | **NON-CONFIDENTIAL** |
| and ) | **VERSION** |
| ) | *Proprietary Information Subject to* |
| BGH EDELSTAHL SIEGEN GMBH, ) | *Protective Order Removed from* |
| ) | *Brackets on Page 10.* |
| Defendant-Intervenor. ) | |

**PLAINTIFFS' COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF**
**COMMERCE'S SECOND REDETERMINATION PURSUANT TO COURT REMAND**

Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons (collectively, "Plaintiffs"), hereby submit comments in opposition to the final results of redetermination pursuant to court remand published by the U.S. Department of Commerce ("Commerce") and filed in this consolidated action on November 21, 2023 (ECF No. 80) ("Second Redetermination").  Plaintiffs' comments are timely submitted in accordance with the schedule established by this Court's opinion ordering remand.  *See* Slip Op. 23-110 at 17 (Appx000065).

These comments raise one issue requiring further remand in this action.  Commerce's construction of Section 1677b(f)(1)(A) is contrary to law, and its determination that BGH's records "reasonably reflect" production costs despite continuing to find those same costs

distorted by subsidies, price controls, and cheap Kazakh inputs is arbitrary and unsupported by substantial evidence.[1]

## I.     BACKGROUND AND PROCEDURAL POSTURE

In the underlying administrative proceeding, Plaintiffs alleged and Commerce rightfully found that the respondents' production costs were distorted to such an extent that a "cost-based" particular market situation ("PMS") existed.  *See, e.g.*, *Forged Steel Fluid End Blocks From the Federal Republic of Germany*, 85 Fed. Reg. 80,018 (Dec. 11, 2020) (AD Inv. Final) (Appx002336-002338), and accompanying Issues and Decision Memorandum ("Final IDM") at Comment 3.1 (Appx002292-002302) (together, the "*Final Results*").[2]  In calculating the antidumping margin,[3] the normal values for some of BGH Edelstahl Siegen GmbH's ("BGH") sales were based on home market prices, while the normal values for other sales was based on constructed value ("CV").  Commerce applied a PMS adjustment in calculating both the price-to-price antidumping margins (by increasing costs when performing the sales-below-cost test) as well as the CV-to-price antidumping margins (by increasing CV).

---

[1] Plaintiffs take issue with Commerce's failure to adjust BGH's distorted costs in its Second Redetermination.  If, however, Commerce's Second Redetermination were ultimately affirmed in that respect, then Plaintiffs otherwise consider that Commerce reasonably corrected the mathematical problem identified in Section I of Plaintiffs' comments on Commerce's First Redetermination.

[2] Plaintiffs also timely alleged that distortion of BGH's sales prices prevented a proper comparison with U.S. price, giving rise to a particular market situation (*i.e.*, a "sales-based" PMS).  *See* Final IDM at Comment 3.2 (Appx002307-002311).

[3] To summarize and simplify, calculation of an antidumping margin requires Commerce to compare U.S. price (derived according to 19 U.S.C. § 1677a) with "normal value" (derived according to 19 U.S.C. § 1677b).  The magnitude by which normal value exceeds U.S. price is a dumping margin.

**NON-CONFIDENTIAL VERSION**

BGH appealed Commerce's *Final Results*.[4]  Despite not having raised the issue itself administratively, *see* Letter from BGH, "Case Brief" (Nov. 9, 2020) at Appx086392-086413, BGH argued that Commerce's PMS adjustment was unlawful as applied to price-to-price antidumping calculations, *see* "BGH Rule 56.2 Memorandum in Support of Motion for Judgment Upon the Agency Record," ECF Doc. 23-2 (Aug. 9, 2021) at 5-7.  Ultimately, BGH relied on *Hyundai Steel Co. v. United States*, 19 F.4th 1346 (Fed. Cir. 2022), a Federal Circuit decision published on December 10, 2021, one year after Commerce's final determination.  *See* BGH Reply Br., ECF Doc. 38 (Jan. 18, 2022) at 1.  In response, Plaintiffs briefed alternative statutory pathways for adjusting BGH's distorted costs.  *See* "Plaintiffs' Response Brief in Opposition to BGH Edelstahl Siegen GmBH's Rule 56.2 Motion for Judgment on the Agency Record," ECF Doc. 33 at 7, 24-28 (Conf. Ver.).  Rather than engage with these alternatives, Commerce requested a voluntary remand based on *Hyundai Steel*, *see* "Defendant's Response in Opposition to Plaintiffs' Motion for Judgment on the Agency Record," ECF Doc. 37 (Dec. 17, 2021) at 29, which this Court granted, ordering remand "{i}n compliance with *Hyundai Steel*…to allow Commerce to recalculate the dumping margin without impermissible cost-based particular market situation adjustments for BGH's electricity and ferrochrome inputs" and "*reconsider*{} the particular market situation adjustment."  Slip Op. 22-122 at 37, 48 (emphasis supplied) (Appx000037, Appx000048).

Commerce's First Redetermination reversed its original administrative determination with respect to the availability of a "PMS" adjustment when performing the sales below cost test prior to undertaking price-to-price margin calculations.  *Compare* Final IDM at 16 ("Commerce

---

[4] By order of this Court, BGH's appeal, CIT Ct. No. 21-00079, was consolidated with Plaintiffs' appeal, CIT Ct. No. 21-00077.

may make an adjustment to COP *under {19 U.S.C. § 1677b(b)(3)}.*  The adjustment for a PMS is not limited to an adjustment to CV under {19 U.S.C. § 1677b(e)}.") (emphasis supplied) (Appx002293), *with* First Redetermination, ECF Doc. 59 (Mar. 14, 2023) at 4 ("{T}he statute only permits the adjustment of cost of production for a PMS when making comparisons based on constructed value, *not for purposes of the sales-below-cost test*….{C}onsistent with the CAFC's precedential opinion in *Hyundai Steel*, we…are not making a PMS adjustment when applying the sales-below-cost test.") (emphasis supplied) (Appx012108).  Commerce maintained its underlying PMS finding and continued to apply a PMS adjustment in its CV-to-price margin calculations.  *See* First Redetermination at 4 (Appx012108).

Recognizing that Commerce's reversal constituted "new agency action" under the Supreme Court's decision in *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020), Plaintiffs again raised the viable alternative statutory pathways left open by *Hyundai Steel* by which Commerce could adjust its price-to-price antidumping calculations to correct the distortion in BGH's costs.  *See* Plaintiffs' Comments on Draft First Remand Results (Feb. 15, 2023) at 3-9 (Appx012068-012074).  Commerce declined to consider Plaintiffs' arguments, summarily concluding "that it is not appropriate to address those arguments in the context of these final results of redetermination." First Redetermination at 6 (Appx012110).

Plaintiffs objected to Commerce's refusal in comments before this court, *see* Plaintiffs' Comments in Opposition to the Final Results of First Remand, ECF Doc. 63 (Apr. 13, 2023) at 7-17, and furthermore objected to Defendant's attempts to rely on *post-hoc* justifications for the agency's refusal, *see* Plaintiffs' Reply to Defendant's Comments on the Remand Redetermination, ECF Doc. 76 (June 6, 2023) at 1-10.  This court agreed, stating that "{t}he

{first} remand order did not bar Commerce from considering Plaintiffs' arguments," recognizing that "the Court may not make the decision for Commerce," and ordering a second remand for Commerce "to consider the arguments made and state a fulsome rationale for either considering or not considering Plaintiffs' alternative pathways." Slip Op. 23-110 at 14, 16 (Appx000062, Appx000064).

On the second remand, Commerce's draft redetermination initially declined to consider Plaintiffs' alternatives, on the theory that Plaintiffs "did not raise any of these 'alternative statutory pathways' during the course of the investigation." Draft Remand Results at 7 (Appx099484). Plaintiffs objected administratively, *see* Plaintiffs' Comments on Draft Second Remand Results (Oct. 12, 2023) at 1-26 (Appx099874-099899), and Commerce's final redetermination abandoned this procedural justification for non-engagement and considered Plaintiffs' arguments in substance, *see* Second Redetermination at 2, 8-12 (Appx012193, Appx012199-012203). Ultimately, Commerce continued to recognize the distortion in BGH's reported costs, but undertook no corrective adjustment. *See id.* at 12 (Appx012203). Consequently, Commerce's revised antidumping margin knowingly calculates a dumping margin using distorted costs, based on a tortured and unlawful reading of the statute.

## II.   COMMERCE'S SECOND REDETERMINATION CONSIDERED ALTERNATIVE STATUTORY PATHWAYS FOR ADJUSTING BGH'S DISTORTED PRODUCTION COSTS, BUT ESPOUSES UNLAWFUL CONCLUSIONS THAT ARE UNSUPPORTED BY SUBSTANTIAL EVIDENCE

### A.   Any Exhaustion Concerns Related to Commerce's Obligation to Address Plaintiffs' Alternative Statutory Pathway Have Been Negated

As a preliminary matter, Plaintiffs acknowledge the Court's earlier skepticism as to whether Plaintiffs properly preserved their alternative statutory arguments. *See* Slip Op. 23-110 at 14 (noting as a theoretical matter that an exhaustion defense "may have merit")

(Appx000062).  Any such concerns are obviated by Commerce's Second Redetermination.

Although the draft form of Commerce's redetermination indeed invoked an exhaustion defense,

*see, e.g.*, Draft Remand Results at 7 (claiming Plaintiffs "did not raise any of these 'alternative

statutory pathways' during the course of the investigation") (Appx099484), Plaintiffs explained

in their comments that Commerce's reversal of its position concerning the availability of PMS

adjustments in price-to-price dumping calculations constitutes new agency action that triggers

two obligations.  First, Commerce "must comply with the procedural requirements for new

agency action," *see Regents*, 140 S. Ct. at 1907-08, including Commerce's statutory obligations

to provide parties a final opportunity to comment before making a final determination in an

administrative review, 19 U.S.C. § 1677m(g), and to address relevant arguments made by

interested parties concerning the establishment of dumping, 19 U.S.C. § 1677f(i)(3)(A).  Second,

"when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative{s}'

that are 'within the ambit of the existing {policy}.'"  *Regents*, 140 S. Ct. at 1913 (quoting *Motor

Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 51 (1983)); *cf.

also Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 981

(2005) (agencies "must consider varying interpretations and the wisdom of its policy on a

continuing basis.") (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837,

863-64 (1984)).  Each obligation would encompass Commerce's consideration of alternative

adjustments for cost distortion that *Hyundai Steel* did not foreclose, and which Plaintiffs

advocated during remand proceedings.

Implicitly recognizing the foregoing, Commerce's final redetermination abandoned its

exhaustion defense and simply "addressed the Coalition's arguments regarding alternative

pathways for a PMS…."  Second Redetermination at 2 (Appx012193).  In ordering remand, this

Court recognized that "{e}xhaustion serves to ensure that an agency has an opportunity to address an objection or issue at the time of its decision instead of when it is 'haled into federal court.'" Slip Op. 23-110 at 7 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)) (Appx000055). Here, that purpose has been satisfied, insofar as Commerce's Second Redetermination endeavors to address Plaintiffs' arguments, notwithstanding Plaintiffs' remaining disagreements with the particulars of Commerce's analysis. Commerce has thus "erred against objection." *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37 (1952); *cf also Nakornthai Strip Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303, 1312 (Ct. Int'l Trade 2008) (describing exhaustion issues as "mooted" where Commerce "request{ed} to review new issues raised by {Plaintiff} subsequent to Commerce's original determination.") (characterizing *Gleason Indus. Prods. v. United States*, 556 F. Supp. 2d 1344, 1346 n.2 (Ct. Int'l Trade 2008)). Consequently, in evaluating the substantive arguments that follow, there is no basis for this Court to apply an exhaustion bar.

### B. Commerce's Rationale for Not Adjusting its Price-to-Price Antidumping Calculations in Order to Account for BGH's Distorted Costs Is Unlawful and Unsupported by Substantial Evidence

Commerce's Second Redetermination continues to find that BGH's reported costs were distorted. (**Section II.B.1**) Plaintiffs argued that such distorted costs did not "reasonably reflect the costs associated with the production and sale of the merchandise" within the meaning of 19 U.S.C. § 1677b(f)(1)(A), and that Commerce was therefore statutorily authorized to disregard them. This pathway to adjusting for cost distortion fits squarely within the Federal Circuit's prior characterizations of Section 1677b(f)(1)(A) and was expressly left open by the Federal Circuit in *Hyundai Steel*. (**Section II.B.2**) Commerce nevertheless reasoned that it was unable to do so, on the theory—never before embraced by any court—that 19 U.S.C. § 1677b(f)(1)(A) concerns only "whether the {respondent's books and records} reasonably reflect the costs

incurred by the respondent," *i.e.*, what the "respondent actually incurred." Second Redetermination at 12 (Appx012203).[5]  For at least three reasons, any one of which requires remand, the rationale set forth in Commerce's Second Redetermination is unlawful and unsupported by substantial evidence.

*First*, this absurdly narrow reading of Section 1677b(f)(1)(A) contravenes Congress's clear intent.  Commerce ignores the prior interpretations of the Federal Circuit, the plain meaning of broad terms used in Section 1677b(f)(1)(A) as informed by the legislative history, the more specific terms used elsewhere in Section 1677b, and the interlocking and internally consistent structure of Section 1677b.  (**Section II.B.3.i**).  *Second*, even if the statute were ambiguous, Commerce's assumption to the contrary in its Second Redetermination and its failure to recognize this ambiguity as part of its analysis compel further remand.  (**Section II.B.3.ii**) *Finally*, Commerce's construction is unreasonable, insofar as it would have a respondent's reporting "reasonably reflect" its costs even where companywide direct material costs totaled $0.01, so long as it *actually* received its inputs for near-free.  This is directly contrary to 19 U.S.C. § 1677b's mandate that Commerce "achieve a fair comparison" and Commerce's obligation to "calculate dumping margins as accurately as possible."  *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013).  (**Section II.B.3.iii**)  This Court should hold Commerce's interpretation contrary to law and remand Commerce's Second

---

[5] To preempt any specious exhaustion defense by Defendant or Defendant-Intervenor, Plaintiffs note that the above-quoted interpretation of the statutory language was not espoused anywhere in Commerce's Draft Remand Results.  *See* Draft Remand Results at 7-8 (Appx099484-099485).  As such, these comments represent Plaintiffs' first opportunity to address Commerce's interpretation.  *Cf., e.g.*, *NEXTEEL Co., Ltd. v. United States*, Slip Op. 23-181, 2023 WL 8715793 at *3 (Ct. Int'l Trade Dec. 17, 2023) ("Because Commerce did not issue a draft…on which SeAH could comment, SeAH could not have raised its arguments at the administrative level and therefore did not fail to exhaust its administrative remedies.").

Redetermination for Commerce to reconsider its application of 19 U.S.C. § 1677b(f)(1)(A) to the

facts of this case.

> **1. Commerce's Second Redetermination Continues to Find BGH's Costs Distorted; Whether that Distortion Could Be Labeled a PMS Is of No Moment**

Commerce's Final IDM concluded that both the German electricity market and the

German ferrochrome market were distorted.  Final IDM at Comments 3.1.a, 3.1.b (Appx002293-

002302).  Regarding electricity costs, Commerce stated:

> We find that the regulatory regime distorts the costs of electricity in the German market such that a PMS exists. In addition to the government control over pricing for a portion of the electricity market alleged by the petitioner, this regulatory scheme is manifested in several electricity-related subsidy programs.

> { . . . } Commerce found that **both BGH and SWG benefitted** from Section 9a of the Electricity Tax Act and Section 51 of the Energy Tax Act as well as the 2018 Special Equalization Scheme – Reduced EEG Surcharge. Commerce found that both respondents benefitted from additional electricity programs in the CVD Post-Preliminary Determination….The sheer number and extent of these programs, when considered collectively, demonstrate the efforts undertaken by the German government to control the German market for electricity….**Accordingly, we find that electricity costs in Germany are distorted**.

*Id.* at 20 (emphasis supplied) (Appx002297).  Regarding ferrochrome costs, Commerce similarly

stated:

> In this case, the record evidence shows that Kazakhstan is Germany's largest source of ferrochrome imports, and its export prices, while consistent across certain countries including Germany, are lower than the benchmark USGS price (based on U.S. import prices largely from countries other than Kazakhstan).

> Additionally, there is information on the record suggesting that Kazchrome, the state-controlled producer of ferrochrome in Kazakhstan, does not make pricing decisions solely based on commercial considerations, which would affect the price of Kazakh ferrochrome sold in Germany, Italy, or any other country…. In this investigation, **we find that the low-priced imports of ferrochrome from Kazakhstan affect prices for this input in the German market**.

*Id.* at 24-25 (emphasis supplied) (Appx002301-002302).  Commerce's Second Redetermination

expressly "leav{es its} finding regarding the existence of a PMS concerning both ferrochrome

and electricity undisturbed," Second Redetermination at 7 (Appx012198), meaning that Commerce continued to view electricity and ferrochrome costs as distorted, *see id.* at 11 (characterizing the foregoing as "our finding that certain costs are distorted") (Appx012202).

Moreover, these remand proceedings present a unique posture wherein the practical implications of this identified distortion are absolutely clear.  In its *Final Results*, Commerce labeled these distortions a PMS and applied a PMS adjustment to the sales below cost test.  *See Final Results* at 16, 22, 25 (Appx002293, Appx002299, Appx002302); Memorandum from Commerce, "Final Determination Margin Calculation for BGH Edelstahl Siegen GmbH" (Dec. 7, 2020) at 2, Attachment I (Appx086444, Appx086447-086570).  In its Second Redetermination, Commerce has removed the PMS adjustment from the sales below cost test for price-to-price comparisons.  Comparing the two results [



].  Plaintiffs herein advocate that, for purposes of price-to-price antidumping comparisons, Commerce disregard the "PMS" label but rely on the same underlying record evidence of distortion using an alternative statutory pathway to reach a mathematically identical result.  It is indisputable that Commerce's failure to remedy BGH's cost distortion in the Second Redetermination has distorted the results of Commerce's antidumping calculations.  Certainly the statute does not mandate such an absurd result.

As a final note, Commerce's Second Redetermination references its negative finding under Section 1677b(f)(1)(A) concerning an entirely different "allegation regarding BGH's books and records in the investigation," implying that this somehow supports Commerce's conclusions on remand.  Second Redetermination at 11 (Appx012202).  This is misdirection.

What Commerce adjudicated during the original investigation centered on allegations that BGH had failed to reconcile its reported costs with its financial statements. *See* Final IDM at Comment 5 (Appx002315-002321). Underscoring the absence of overlapping operative facts, Commerce made no mention of BGH's electricity and ferrochrome costs being undistorted when adjudicating this issue. *See id.* at Comment 5 (Appx002315-002321). Even after Plaintiffs raised this point during remand, Commerce identified nothing in response. *Compare* Plaintiffs' Comments on Draft Remand at 10-12 (Appx099883-099885), *with* Second Redetermination at 11 (Appx012202). As demonstrated by the Federal Circuit's individualized analysis of three separate Section 1677b(f)(1)(A) issues in *Hynix*, 424 F.3d at 1369-72, this statutory provision can entertain multiple distinct allegations. There is absolutely no inconsistency in Commerce finding that BGH's cost figures reconciled overall, *see* Final IDM at Comment 5 (Appx002315-002321), while also finding that BGH's electricity and ferrochrome cost figures do not reasonably reflect its production costs, particularly where the distortion manifests itself as BGH paying below-market prices for those inputs. Commerce's decision to reject one set of allegations during the investigation is an arbitrary basis for Commerce to reject entirely different allegations based on entirely different facts during remand.

## 2. 19 U.S.C. § 1677b(f)(1)(A) Provides a Pathway for Commerce to Address Cost Distortion in Conducting the Sales Below Cost Test

### i. *Congress Gave Commerce Authority to Adjust its Calculations to Account for Cost Distortion in a Respondent's Records*

"An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." *Yangzhou Bestpak*, 716 F.3d at 1379. In service of this end, subsection (f) of the normal value statute prescribes several "special rules for calculation of cost of production." 19 U.S.C. § 1677b(f). Importantly, these "special rules" expressly apply "{f}or purposes of subsection{} (b)…," *i.e.*, the sales below cost test that

11

Commerce performs as part of its price-to-price antidumping calculations. *Id.*; *see also* 19 U.S.C. § 1677b(b). Relevant here, the first of these "special rules" provides that "{c}osts shall normally be calculated based on the records of the {respondent}" where those records "reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).[6] Thus, pursuant to 19 U.S.C. § 1677b(f)(1)(A), "Commerce has the discretion to diverge from a company's books and records when necessary to calculate an accurate dumping margin." *Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1342 (Fed. Cir. 2011) ("*Saha Thai 2011*"). The Federal Circuit has repeatedly upheld determinations wherein Commerce found the respondent's records failed to "reasonably reflect" production costs. *See, e.g.*, *Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363, 1370 (Fed. Cir. 2005) (changes in accounting methods from expensing to amortizing, though GAAP-compliant, led respondent to report only "a fraction of costs" for the POR); *Saha Thai 2011*, 635 F.3d at 1342 (Commerce lawfully found GAAP-compliant accounting that did not record unpaid import duties as a cost did not reasonably reflect the respondent's costs).

In general, the Federal Circuit has characterized the "reasonably reflect" proviso as permitting Commerce to "reject the {respondent's} records if accepting them would distort the company's true costs." *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1366 (Fed. Cir. 2014) (quoting *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1366 (Fed. Cir. 1999)); *see also Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 107 (Fed.

---

[6] 19 U.S.C. § 1677b(f)(1)(A) includes a second proviso, namely that the records "are kept in accordance with the generally accepted accounting principles of the exporting country." The Federal Circuit has held that the two provisos must *both* be satisfied before the presumption in favor of using the respondent's records takes effect. *E.g.*, *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1321 (Fed. Cir. 2020). Plaintiffs make no argument concerning whether BGH's records were GAAP-compliant.

Cir. 2022) ("1677b(f)(1)(A) permits Commerce to disregard a respondent's GAAP-compliant records upon a finding, supported by substantial evidence, 'that the costs do not reasonably reflect the costs of production and should not, therefore, be used.'") (quoting *Hynix*, 424 F.3d at 1369).  To this end, "Congress 'expect{ed Commerce}… to examine the recorded production costs with a view to determining as closely as possible the *costs that most accurately reflect the resources* actually used in the production of the merchandise in question.'"  *Dillinger*, 981 F.3d at 1323 (quoting S. Rep. 103-412 (1994) at 75) (emphasis supplied).

Relevant here, BGH's distorted electricity and ferrochrome costs **do not** "reasonably reflect the costs associated with the production and sale of the merchandise," 19 U.S.C. § 1677b(f)(1)(A), *i.e.*, "the resources actually used in the production of the merchandise," *Dillinger*, 981 F.3d at 1323.  Commerce's Second Redetermination continues to find the "sheer number and extent of {electricity subsidy} programs, when considered collectively, demonstrate the efforts undertaken by the German government to control the German market for electricity" and distort German electricity costs; and "low-priced imports of ferrochrome from Kazakhstan affect prices for this input in the German market."  Final IDM at 20, 24-25 (Appx002297, Appx002301-002302); *see* Second Redetermination at 7 ("we are leaving our finding regarding the existence of a PMS concerning both ferrochrome and electricity undisturbed.") (Appx012198).[7]  As the CIT has recently affirmed, "{o}nce Commerce concludes that a producer's records do not satisfy one of these conditions…the statute relieves {Commerce} of

---

[7] Commerce administratively devoted some analysis to the implications of "{a} cost-based PMS finding" and whether Section 1677b(f)(1)(A) "permit{s}" "a PMS adjustment."  Second Redetermination at 12 (Appx012203).  This is fundamentally irrelevant to Plaintiffs' argument which concerns whether identified *cost distortion* can render a respondent's records not reasonably reflective of production costs.  Commerce need not find a PMS or make "a PMS adjustment."

any further obligation to use those records in adjusting costs." *LG Chem, Ltd. v. United States*, 534 F. Supp. 3d 1386, 1397 (Ct. Int'l Trade 2021). Instead, "Congress desired Commerce to adjust the respondent's costs as necessary (in the Department's discretion) to ensure the most accurate dumping margin." *Id.* at 1398. Here, therefore, Commerce was authorized to depart from BGH's reported costs in performing the sales below cost test for price-to-price antidumping calculations, and Commerce might have done so had it not unlawfully narrowed the statutory inquiry prescribed by Congress.

ii. *Prior Decisions Left the Pathway in Question Open*

Although the relevant portion of Commerce's Second Redetermination did not cite or rely upon *any* Federal Circuit jurisprudence, for the avoidance of doubt *Hyundai Steel* did not address Section 1677b(f)(1)(A)'s potential as a mechanism for adjusting price-to-price antidumping comparisons to account for distorted production costs. *Hyundai Steel* addressed a narrow statutory question, *viz.*, whether Commerce was authorized by 19 U.S.C. § 1677b(e) to adjust its "sales below cost" test calculations under 19 U.S.C. § 1677b(b) to account for a PMS. *See Hyundai Steel*, 19 F. 4th at 1352-55. The Federal Circuit concluded that Commerce was not so authorized, *see id.*, a holding that occasioned this Court's first remand order, *see* Slip Op. 22-122 at 37 (Appx000037). But *Hyundai Steel* expressly **declined** to "address {the} section 1677b(f)(1)(A) argument." *Id.*, 19 F. 4th at 1356.[8] This argument also was not addressed by the Federal Circuit in its recent *Saha Thai 2023* decision, though the Federal Circuit therein acknowledged that "Section 1677b(f) also governs the calculation of the cost of production." *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 2023 WL 8360080, at *1 (Fed. Cir. Dec. 4,

---

[8] *Hyundai Steel* declined to do so because the argument was first raised after the matter was already before the Federal Circuit. *See id.*

2023) (addressing a scenario wherein Commerce "determine{ed} that the PMS caused home market sale prices to be outside the ordinary course of trade" under 19 U.S.C. § 1677b(a) and resorted to constructed value on that basis) ("*Saha Thai 2023*").

Similarly, Plaintiffs note that their construction of the statute remains undisturbed by the U.S. Court of International Trade's opinion in *Husteel*, which observes that 19 U.S.C. § 1677b(f)(1)(A) was not amended to encompass PMS adjustments. *See Husteel Co. v. United States*, 426 F. Supp. 3d 1376, 1383 (Ct. Int'l Trade 2020) ("Undeniably Congress did not amend either section 1677b(b)(1) (below costs sales) or section 1677b(f) (calculation of a cost of production) to allow for a PMS adjustment."). As noted above, the Federal Circuit declined to reach or embrace this view in *Hyundai Steel*, so *Husteel* does not bind this proceeding. *See* 19 F. 4th at 1355-56. More fundamentally, *Husteel* was limited to the question of whether Section 1677b(f)(1)(A) authorized a "PMS" adjustment. *See* 426 F. Supp. 3d at 1383. But a "PMS" is a specialized finding. *See, e.g.*, *Hyundai Steel*, 19 F. 4th at 1355 n.10 (summarizing prerequisites). *Husteel* did not consider the broader question of whether Commerce could rely upon Section 1677b(f)(1)(A) to address distortion in a respondent's reported costs. Plainly, Commerce can do so. *See, e.g.*, *Saha Thai 2011*, 635 F.3d at 1342 (Commerce lawfully found GAAP-compliant accounting that did not record unpaid import duties as a cost did not reasonably reflect the respondent's costs). It would be wholly arbitrary to *preclude* Commerce from determining that a cost distortion prevented the respondent's costs from "reasonably reflecting" production costs within the meaning of Section 1677b(f)(1)(A) merely because that distortion had at some point been analyzed under Section 1677b(e) or labeled a "PMS."

Practical realities—*i.e.*, the existence or absence of distortion—must guide this Court's understanding of the antidumping statute. To be sure, Commerce must invoke valid legal

authority, but Commerce's past reliance upon a legally erroneous approach does not preclude Commerce from subsequently invoking a lawful approach. *See, e.g.*, *Vicentin S.A.I.C. v. United States*, 466 F. Supp. 3d 1227, 1232-37 (Ct. Int'l Trade 2020)*, aff'd*, 42 F.4th 1372, 1378-79 (Fed. Cir. 2022) (while unlawful when labeled a "circumstance of sale adjustment" to normal value, the same adjustment became lawful when designated a "price adjustment" to U.S. price).  When, as here, a respondent's reported production costs are distorted, the sales below cost test (absent adjustment) is necessarily distorted because it compares sales prices to distorted costs. Consequently, normal value may include home market prices that only pass the sales below cost test due to the use of distortedly low production costs.  To avoid those perverse results and "diverge from a company's books and records when necessary to calculate an accurate dumping margin," *Saha Thai 2011*, 635 F.3d at 1342, the Coalition argued that Commerce should make use of its authority under 19 U.S.C. § 1677b(f)(1)(A) to adjust BGH's reported costs to account for such distortions when performing the sales below cost test.

### 3. Commerce's Interpretation of "Costs Associated with the Production and Sale of the Merchandise" Is Unlawful

The core question for this court to resolve, then, is if the standard of "records…reasonably reflect{ing} the costs associated with the production and sale of the merchandise" set forth in 19 U.S.C. § 1677b(f)(1)(A) refers <u>only</u> to whether "the reported costs are not a reasonable reflection of the costs respondent actually incurred," as Commerce concluded, *see* Second Redetermination at 12 (Appx012203), or if reported costs can be found to not to reasonably reflect costs associated with production where those costs are distorted (*i.e.*, depressed) by subsidization, price controls, and imported inputs priced on a non-market basis.

  i. *Congress' Intent Is Clear and Commerce Has Unlawfully Narrowed the Statute*

Commerce's interpretation is not due any deference under the Supreme Court's framework in *Chevron* because the standard espoused by Commerce on remand is clearly inconsistent with the intent of Congress, given the plain language of the statute and traditional tools of statutory construction. *Chevron*, 467 U.S. at 842-43 & n.9. Courts are obliged to exhaust "all the traditional tools of construction" before concluding that "genuine ambiguity" exists in a statute. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). Here, there is no ambiguity that Commerce's Second Redetermination frames the analysis too narrowly.

The statute and "authoritative" SAA both ask whether "***the costs associated with the production and sale of the merchandise***" are "reasonably reflect{ed}" in the respondent's reporting. 19 U.S.C. § 1677b(f)(1)(A); Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) at 834 ("SAA"); *see also Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 66 F.4th 968, 972 (Fed. Cir. 2023) ("Section 102(d) of the URAA defines the role of the SAA, stating that it 'shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.'"). The SAA further describes Commerce's task (using the example of allocation) in terms which confirm that Commerce's analysis in the Second Redetermination is unlawfully narrow:

> In determining whether to accept the cost allocation methods proposed by a specific producer, Commerce will consider the production cost information available to producer and whether such information could reasonably be used to compute ***a representative measure of the materials***, labor and other costs, including financing costs, incurred to produce the subject merchandise, or the foreign like product.

SAA at 835 (emphasis supplied).[9]  A "representative measure of *the materials*…incurred to produce the subject merchandise" is far more open-ended than Commerce's myopic consideration of "the costs respondent actually incurred."  *Compare* SAA at 835 (emphasis supplied), *with* Second Redetermination at 12 (emphasis supplied) (Appx012203).  This furthermore resembles the language of the Senate Finance Committee instructing Commerce "to examine the recorded production costs with a view to determining as closely as possible the ***costs that most accurately reflect the resources*** actually used in the production of the merchandise in question."  *Dillinger*, 981 F.3d at 1323 (quoting S. Rep. 103-412 (1994) at 75) (emphasis supplied).  The Federal Circuit specifically cited this passage as evidence of "Congress's clear intent."  *Id.* (citing S. Rep. 103-412 (1994) at 75).

Elsewhere, the SAA mandates use of an allocation "method that reasonably reflects *and accurately captures*" costs.  SAA at 835 (emphasis supplied).  While prerequisites for allocation do not govern all aspects of whether costs are "reasonable," the phrasing itself is significant.  Applying by analogy "the basic interpretive canon that '{a} statute should be construed {to give effect} to all its provisions, so that no part will be inoperative or superfluous, void or insignificant,'" *Corley v. United States*, 129 S. Ct. 1558, 1560 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)) (alternations in *Corley*), the "authoritative" SAA's language demonstrates that Congress considered the phrase embedded in the statutory text ("reasonably reflects") could not be reduced to merely "accurately captures."  Commerce therefore erred as a matter of law in limiting "reasonably reflects" to merely "capturing the costs respondent actually

---

[9] Plaintiffs note that the clause in question cannot merely be wanting for an Oxford comma, because "material**s** costs" would be grammatically incorrect.  *Cf., e.g.*, *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("Because words are to be given the meaning that proper grammar and usage would assign them, the rules of grammar govern statutory interpretation unless they contradict legislative intent or purpose.") (cleaned up).

incurred."  *Compare* SAA at 835, *with* Second Redetermination at 12 (Appx012203).

Commerce can—and should—have considered whether those distorted costs constituted a

"representative measure of the materials" and "most accurately reflect the {utilized} resources,"

SAA at 835; S. Rep. 103-412 (1994) at 75.

Reinforcing the above, "it's a 'fundamental canon of statutory construction' that words

generally should be 'interpreted as taking their ordinary, contemporary, common meaning…at

the time Congress enacted the statute.'" *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067,

2074 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).  Contrary to Commerce's

framing, Congress did ***not*** narrowly ask whether the respondent's records reasonably reflect "the

costs associated with the <u>producer's</u> production and sale of the merchandise" or even "the

<u>producer's</u> costs," much less whether those records reasonably reflect "the costs <u>actually</u>

<u>incurred by the producer</u> associated with the production and sale of the merchandise."  Congress

intentionally used open-ended language ("the costs associated with") whose ordinary meaning

encompasses more than just the respondent's formal accounting practices.  To be sure, certain

inquiries would by their nature focus on the producer's actual costs, *e.g.*, assessing a producer's

cost allocations, but this is not the same as saying that the statute limits Commerce *only* to such

inquiries.  Congress could easily have done so but did not.

In notable contrast to the lack of producer-specific limiting clauses in Section

1677b(f)(1)(A), other provisions of Section 1677b demonstrate that Congress indeed knew how

to instruct Commerce to limit itself to a narrower source of costs when Congress intended to do

so.  "{W}hen Congress includes particular language in one section of a statute but omits it in

another section of the same Act, {courts} generally take the choice to be deliberate." *Badgerow*

*v. Walters*, 596 U.S. 1, 11 (2022).  For example, other subsections expressly tie "costs" to the

19

"foreign like product," a statutorily defined term of art that specifically comprises products produced "by the same person" (*i.e.*, the respondent) and sold in their home market, *e.g.*, 19 U.S.C. § 1677b(a)(6)(B)(i) (referencing "costs…incident to placing *the foreign like product* in condition packed ready for shipment…") (emphasis supplied); *id.* § 1677b(a)(6)(B)(ii) (referencing "costs…incident to bringing *the foreign like product* from the original place of shipment to the place of delivery") (emphasis supplied); *see also id.* § 1677(16) (defining "foreign like product"). The precision of Section 1677b(a)(6)(B) contrasts with Section 1677b(f)(1)(A)'s use of the general term "the merchandise," which lacks a statutory definition of its own. In a similar vein, Section 1677b(d) refers to "costs *in the exporting country*, 19 U.S.C. § 1677b(d) (emphasis supplied), and Section 1677b(f)(1)(C)(i) refers to "costs *incurred during the time period* covered by the investigation or review," 19 U.S.C. § 1677b(f)(1)(C)(i) (emphasis supplied). Each of these examples demonstrates Congress's ability to use narrower language than "the costs associated with the production and sale of the merchandise" when it intended to do so. *See* 19 U.S.C. § 1677b(f)(1)(A). Commerce's interpretation implies the existence of nonexistent narrowing language that Congress could have easily included.

Finally, "interpretation…'depends on reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.'" *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011) (quoting *Dolan v. Postal Service*, 546 U.S. 481, 486 (2006)). The statutory context of Section 1677b further supports Plaintiffs' analysis. Notably, the statutory terminology of 19 U.S.C. § 1677b(f)(1)(A), *i.e.*, whether respondent's reported costs "*reasonably reflect*" production costs, closely resembles the Federal Circuit's summation of the finding that underlies a cost-based PMS, *i.e.*, "that the exporter's actual costs do not *accurately reflect* the costs of production." *See*

*Hyundai Steel*, 19 F.4th at 1355 n.10.  Where, as here, Commerce continues to find that a respondent's reported costs do not "accurately reflect the costs of production," *see* 19 U.S.C § 1677b(e), and are "outside the ordinary course of trade," *see id.* § 1677(15)(C), it would be nonsensical for Commerce to also find that those same costs "reasonably reflect" the respondent's true production costs under 19 U.S.C. § 1677b(f)(1)(A).  Yet, that is precisely the result that Commerce's Second Redetermination claims the statute compels.

In sum, the Federal Circuit's prior characterizations of Section 1677b(f)(1)(A) and application of the traditional tools of statutory construction demonstrate a clear Congressional intent to use broader language in 19 U.S.C. § 1677b(f)(1)(A) than is reflected in the one-dimensional construction of Commerce's Second Redetermination.  And, for the avoidance of doubt, Plaintiffs' position does not "turn on complex economic and accounting inquiries" of the type which are due deference.  *See, e.g.*, *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1044 (Fed. Cir. 1996).  That is, Plaintiffs are not challenging Commerce's methodological implementation of its purported inquiry into whether BGH's records "are not a reasonable reflection of the costs respondent actually incurred."  Second Redetermination at 12 (Appx012203).  Rather, Plaintiffs ask this Court to hold unlawful Commerce's framing of the statutory inquiry as requiring only that a respondent's reporting captures "costs respondent actually incurred" for such costs to "reasonably reflect the costs associated with the production and sale of the merchandise."  *Compare* Second Redetermination at 12 (Appx012203), *with* 19 U.S.C. § 1677b(f)(1)(A).  Put differently, Commerce's position that Section 1677b(f)(1)(A) compels Commerce to use a respondent's records, *even if*—as Commerce itself admits occurred here—the costs actually incurred were distorted, is patently unreasonable and unlawful.  As such, this Court should remand Commerce's analysis.

    ii.    *Commerce's Second Redetermination Makes No Mention of Ambiguity, Precluding this Court from Affirming the Second Redetermination on that Basis*

Even if Commerce's interpretation if 19 U.S.C. § 1677b(f)(1)(A) were reviewed for reasonableness under *Chevron*, it is nevertheless necessary for this Court to remand the Second Redetermination.  As a procedural matter, the relevant portion of Commerce's Second Redetermination—which did not appear in Commerce's draft redetermination—reads as if Commerce understood Section 1677b(f)(1)(A) to *require* the conclusion that the agency reached, *i.e.*, that Commerce understood the statute as <u>un</u>ambiguous, but in the opposite direction:

> The Coalition has not pointed out anything unreasonable in BGH's books and records, but rather, has merely restated our finding that certain costs are distorted. The record does not support any finding that BGH's books and records do not reasonably reflect the costs incurred by BGH.
>
> { . . . }
>
> {S}ection 773(f)(1)(A) of the Act is focused on the books and records of a respondent and whether they reasonably reflect the costs incurred by the respondent. A cost-based PMS finding is not a finding that reported costs are not a reasonable reflection of the costs respondent actually incurred.

Second Redetermination at 12 (Appx012203).  As the Court noted in ordering the second remand, "{t}he Court can only affirm Commerce's decisions 'on the basis articulated by the agency itself.'"  Slip Op. 23-110 at 13 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)) (Appx000061).  Here, Commerce assumed that the statute required the interpretation it espoused, an assumption that is contrary to law. Commerce neither acknowledged nor purported to resolve any ambiguity.  *See* Second Redetermination at 12 (Appx012203).  Therefore, Commerce's Second Redetermination is, at minimum, "amenable to…different interpretations" and "the Court may not presume" what Commerce actually meant or "make the decision for Commerce."  Slip Op. 23-110 at 13, 16 (Appx000061, Appx000064).  Were this Court to conclude that Section 1677b(f)(1)(A) is

ambiguous, a further remand would be required for Commerce to reconsider Plaintiffs' argument in light of the ambiguity.

### iii.  *Even if Ambiguity Were to Exist, Commerce's Interpretation Is Unreasonable*

As noted in Section II.3.i, *supra*, the Federal Circuit has already found Congress' intent "clear" that Commerce would "determine{e} as closely as possible the costs that most accurately reflect the resources actually used in the production of the merchandise in question" under 19 U.S.C. § 1677b(f)(1)(A).  *See Dillinger*, 981 F.3d at 1322-23.  This is dispositive of whether relevant ambiguity exists—it does not.  To be sure, courts have noted that Section 1677b(f)(1)(A) is ambiguous in other, more minute respects, *see, e.g.*, *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1378 (Fed. Cir. 2001) ("Neither the statute nor the SAA instructs Commerce as to the methodology it must use to establish depreciation expenses…."), but such holdings do not equate to ambiguity in *all* respects.  Congress clearly did not intend to limit Commerce's inquiry only to whether a respondent's reporting reflects "the costs respondent actually incurred."  Second Redetermination at 12 (Appx012203).

Even in the event some relevant ambiguity were found to exist, Commerce's reading of Section 1677b(f)(1)(A) is substantively unreasonable.  That Commerce at some point analyzed these same cost distortions under 19 U.S.C. § 1677b(e) and labeled them a "PMS" cannot divest Commerce of its independent authority under 19 U.S.C. § 1677b(f)(1)(A) to deviate from distorted cost records.  As noted above, based on the statute's plain language and statutory definitions, it would be absurd for input prices distorted by a PMS to be both "outside the ordinary course of trade," *see* 19 U.S.C. § 1677(15)(C); 19 U.S.C. § 1677b(e), while still "reasonably reflect{ing}" the costs associated with producing subject merchandise, *see* 19 U.S.C. § 1677b(f)(1)(A).  And it is wholly arbitrary for Commerce to *preclude* itself from

23

determining that an identified cost distortion previously labeled a "PMS" prevented the

respondent's distorted costs from "reasonably reflecting" production costs within the meaning of

Section 1677b(f)(1)(A).

Moreover, the practical consequences of Commerce's position that it *cannot* rely on a

finding of cost distortion to find that a respondent's records do not "reasonably reflect the costs

associated with the production and sale of the merchandise" within the meaning of Section

1677b(f)(1)(A) are absurd.  *See, e.g.*, *Haggar Co. v. Helvering*, 60 S. Ct. 337, 339 (1940) (A

reading of a statute that "would lead to absurd results is to be avoided when {it} can be given a

reasonable application consistent with {its} words and with the legislative purpose.").

Commerce *agrees* that BGH's costs are distorted but interpreted Section 1677b(f)(1)(A) to

eliminate its ability to address that distortion.  Briefly, three statutory pathways have been

proposed by which Commerce might adjust its calculations to account for distortion in a

respondent's costs: (1) finding a PMS that affects costs and adjusting the sales below cost test

directly (the "1677b(e) to 1677b(b)" approach); (2) finding a PMS that affects costs, concluding

that said PMS renders sales price comparisons inappropriate, resorting to constructed value

("CV"), and adjusting CV calculations (the "1677b(a)(1)(C)(iii) to 1677b(e)" approach); and (3)

the pathway advocated herein by Plaintiffs, *i.e.*, finding that cost distortion renders a

respondent's records not "reasonably reflect{ive of} the costs associated with the production and

sale of the merchandise," and adjusting the sales below cost test (the "1677b(f)(1)(A) to

1677b(b)" approach).  Commerce relied on Pathway #1 in the underlying investigation, after

which the Federal Circuit deemed Pathway #1 unlawful in *Hyundai Steel*, 19 F. 4th at 1352-55,

occasioning this Court's first remand order, *see* Slip Op. 22-122 at 37 (Appx000037).  Then,

weeks after Commerce filed its Second Redetermination (Nov. 21, 2023) with this Court, the

Federal Circuit deemed Pathway #2 unlawful in *Saha Thai 2023*, 2023 WL 8360080, at *3 (Dec. 4, 2023).  Consequently, only Pathway #3 remains, but Commerce's Second Redetermination unreasonably ruled it out as a possible means of addressing distorted costs.

In *Hyundai Steel*, the Federal Circuit recognized that it would be a "perverse consequence" for "sales that would have otherwise been disregarded under the sales-below-cost test {to} remain in the normal value based on the unadjusted effect of PMS-distorted transactions or costs."  *Hyundai Steel*, 19 F.4th at 1355.  The Federal Circuit noted remaining statutory pathways in concluding that "the construction {we have} adopted…does not have the{se} perverse consequences."  *Id.*  This was followed by a decision in *Saha Thai 2023*, which evidently concluded that Pathway #2 was "indistinguishable" from Pathway #1 and held it unlawful.  *See* 2023 WL 8360080, at *3.  As noted above, however, *Hyundai Steel* expressly left open the possibility of Pathway #3.  *See id.* at 1355-56.  If Pathway #3 were also foreclosed, as in Commerce's Second Redetermination, all that would remain is a strong incentive for respondents to distort their costs, given that the sales below cost test would be completely useless to address even a respondent that paid $0.01 for all of its material costs.  Thus, for example, a respondent could agree with its supplier to invoice inputs exclusive to subject merchandise at lower prices, while invoicing inputs exclusive to <u>non</u>-subject merchandise at higher prices.  The costs "actually incurred" vis-à-vis subject merchandise would in fact be lower, and the fact such inputs were exclusively used for subject merchandise would make the allocation "reasonable."  Nor would such an arrangement be easy to discover, as Commerce does not often inquire beyond the invoices themselves.  This is a readily replicable methodology for dumping with impunity, not a remotely reasonable characterization of Congressional intent.

NON-CONFIDENTIAL VERSION

As a final note, insofar as *Saha Thai 2023*'s impact on the legal landscape could not have been foreseen by Commerce when it filed its Second Redetermination on November 21, 2023, Commerce may wish to request a voluntary remand to reconsider its analysis in light of the sole remaining statutory option.

**III.    CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that this Court hold Commerce's interpretation of 19 U.S.C. § 1677b(f)(1)(A) set forth in the Second Redetermination contrary to law and unsupported by substantial evidence, and again remand this matter to Commerce with instructions to reconsider this pathway for adjusting Commerce's antidumping calculations to account for cost distortion in "price-to-price" comparisons.

*             *             *

Respectfully submitted,

/s/ Myles S. Getlan

Myles S. Getlan
Thomas M. Beline
James E. Ransdell
Nicole Brunda

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street NW, Suite 400
Washington, DC 20006
T: (202) 567-2313
F: (202) 567-2301
Dated:  December 21, 2023          Email: mgetlan@cassidylevy.com

*Counsel to Ellwood City Forge Co.,*
*Ellwood National Steel Co., Ellwood*
*Quality Steels Co., and A. Finkl & Sons*

26

**<u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>**

The undersigned hereby certifies that the foregoing brief contains 7,556 words, exclusive of the caption blocks, table of contents, table of authorities, table of attachments, signature block, certificates of counsel, and attachments, and therefore complies with the maximum 10,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:     <u>/s/ Myles S. Getlan</u>
Myles S. Getlan