UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Stephen Alexander Vaden, Judge

_____
                                                        )
ELLWOOD CITY FORGE COMPANY, *et. al.*,   )
                                                        )
        Plaintiffs/Defendant-Intervenors,     )
                                                        )
                v.                                     )
                                                        )
UNITED STATES,                               )        Consol. Ct. No. 21-00077
                                                        )
        Defendant,                              )
                                                        )
                and                                 )
                                                        )
BGH EDELSTAHL SIEGEN GMBH,             )
                                                        )
        Defendant-Intervenor/Plaintiff.       )
_____)

## BGH EDELSTAHL SIEGEN GMBH
## COMMENTS ON SECOND REMAND REDETERMINATION

Marc E. Montalbine
J. Kevin Horgan
Gregory S. Menegaz
Alexandra H. Salzman
Merisa A. Horgan
**DeKieffer & Horgan, PLLC**
1156 Fifteenth Street, N.W.
Suite 1101
Washington, D.C. 20005
Tel: (202) 783-6900
email: montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

Dated: January 22, 2024                    *Defendant-Intervenor/Plaintiff*

# TABLE OF CONTENTS

I.    ARGUMENT ........................................................................................................... 1

    A.    The Coalition Failed to Raise Its Arguments Concerning Section
        1677b(f)(1)(A) During the Original Investigation .................................................. 1

    B.    Commerce Properly Rejected the Coalition's Arguments Concerning Section
        1677b(f)(1)(A) ..................................................................................................... 4

    C.    Commerce's Cost-Based PMS Adjustments Are Not Supported by Substantial
        Evidence on the Administrative Record ................................................................ 6

        1.    Electricity Costs ....................................................................................... 8

                a.    No Significant Distortions ........................................................... 8

                b.    Proper Comparison of Normal Value with Export Price ............. 12

                c.    Calculation Errors ....................................................................... 13

        2.    Ferrochrome Costs ................................................................................. 16

                a.    No Significant Distortions ........................................................... 16

                b.    Proper Comparison of Normal Value with Export Price ............. 20

                c.    Calculation Errors ....................................................................... 21

II.    CONCLUSION.................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

BGH Edelstahl Siegen GmbH v. United States,
  600 F. Supp. 3d 1241 (CIT 2022) ............................................................................ 10

BGH Edelstahl Siegen GmbH v. United States,
  No. 21-00080, slip op. 23-159 (Nov. 14, 2023) ....................................................... 16

Borusan Mannesmann Boru Sanayi Ve Ticaret A.S .v. United States,
  426 F. Supp. 3d 1395 (CIT 2020) .............................................................................. 2

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
  468 U.S. 837 (1984) .................................................................................................... 6

Colautti v. Franklin,
  439 U.S. 379 (1979) .................................................................................................... 5

Consol. Edison Co. v. NLRB,
  305 U.S. 197 (1938) ................................................................................................ 7, 9

Corus Staal BV v. United States,
  502 F.3d 1370 (Fed. Cir. 2007) .................................................................................. 4

Dong-A Steel Co. v. United States,
  475 F. Supp. 3d 1317 (CIT 2020) .............................................................................. 2

Ellwood City Forge Co. v. United States,
  600 F. Supp. 3d 1281 (CIT 2022) .............................................................................. 2

Garg Tube Exp. LLP v. United States,
  569 F. Supp. 3d 1202 (CIT 2022) .................................................................... 7, 8, 20

Hyundai Steel Co. v. United States,
  483 F. Supp. 3d 1273 (CIT 2020) .............................................................................. 2

Hyundai Steel Co. v. United States,
  19 F.4th 1346 (Fed. Cir. 2021) .................................................................................. 3

Husteel Co. v. United States,
  426 F. Supp. 3d 1376 (CIT 2020) ...................................................................... *passim*

Husteel Co. v. United States,
  471 F. Supp. 3d 1349, 1362 (CIT 2020) .................................................................... 7

Husteel Co. v. United States,
  476 F. Supp. 3d 1363 (CIT 2020) .......................................................................... 2

Mittal Steel Point Lisas Ltd. v. United States,
  548 F.3d 1375 (Fed. Cir. 2008) ............................................................................. 4

Montclair v. Ramsdell,
  107 U.S. 147 (1883) ............................................................................................... 6

Nexteel Co. v. United States,
  28 F.4th 1226 (Fed. Cir. 2022) ................................................................. 8, 12, 20

Prime Time Commerce, LLC v. United States,
  2022 U.S. App. LEXIS 17726 (Fed. Cir. 2022) .................................................... 4

Saha Thai Steel Pipe Pub. Co. v. United States,
  422 F. Supp. 3d 1363 (CIT 2019) .......................................................................... 2

Saha Thai Steel Pipe Pub. Co. v. United States,
  476 F. Supp. 3d 1378 (CIT 2020) .......................................................................... 2

Saha Thai Steel Pipe Public Co. v. United States,
  87 F.4th 1328 (Fed. Cir. 2023) .......................................................................... 3, 4

SeAH Steel Corp. v. United States,
  513 F. Supp. 3d 1367 (CIT 2021) .......................................................................... 8

Suramerica de Aleaciones Laminadas, C.A. v. United States,
  44 F.3d 978 (Fed. Cir. 1994) ............................................................................. 7, 9

United States v. Menasche,
  348 U.S. 528 (1955) ............................................................................................... 5

Vicentin S.A.I.C. v. United States,
  404 F. Supp. 3d 1323 (CIT 2019) ........................................................... 13, 14, 15

Vicentin S.A.I.C. v. United States,
  466 F. Supp. 3d 1227 (CIT 2020) ................................................................. 14, 15

Vicentin S.A.I.C. v. United States,
  42 F.4th 1372 (Fed. Cir. 2022) ..................................................................... 14, 15

Wilmar Trading Pte Ltd. v. United States,
  No. 18-00121, slip op. 23-165 (Nov. 21, 2023) ................................................... 14

**Statutes**

19 U.S.C. § 1677(15) ................................................................................................7

19 U.S.C. § 1677(15)(C) .......................................................................................7, 8

19 U.S.C. § 1677b(a)(1)(B)(ii)(III), .........................................................................7

19 U.S.C. § 1677b(a)(1)(C)(iii) ............................................................................1, 7

19 U.S.C. § 1677b(b) ................................................................................................1

19 U.S.C. § 1677b(e) .............................................................................................1, 8

19 U.S.C. § 1677b(e)(1) ...........................................................................................7

19 U.S.C. § 1677b(f)(1)(A)...............................................................................*passim*

**Administrative Determinations**

<u>Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination,</u> 85 Fed. Reg. 80011 (Dec. 11, 2020) ................................ 10

<u>Forged Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination,</u> 85 Fed. Reg. 31454 (May 26, 2020).................................... 16

**Other Authorities**

<u>Statement by President Trump on the Paris Climate Accord</u> (June 1, 2017) ............................ 11

<u>Statement of Administrative Action,</u> H.R. Rep. No. 103-316(1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4172 .................................................................................................. 4

Pursuant to the Court's opinion of July 24, 2023 (ECF 78), BGH Edelstahl Siegen GmbH ("BGH"), defendant-intervenor and plaintiff in the companion consolidated case BGH Edelstahl Siegen GmbH v. United States, Court No. 21-00079 (CIT), hereby submits these comments on the final results of redetermination filed by the U.S. Department of Commerce ("Commerce") in this case on November 21, 2023 (ECF 80) ("Second Redetermination").

## I.   ARGUMENT

### A.   The Coalition Failed to Raise Its Arguments Concerning Section 1677b(f)(1)(A) During the Original Investigation

It is beyond dispute that the Coalition failed to raise any of its current arguments concerning what it now terms as "Pathway #3" during the original investigation.  In its comments on the second remand determination, the Coalition lists the following three proposed pathways for applying a cost-based PMS adjustment:

> (1) finding a PMS that affects costs and adjusting the sales below cost test directly (the "1677b(e) to 1677b(b)" approach); (2) finding a PMS that affects costs, concluding that said PMS renders sales price comparisons inappropriate, resorting to constructed value ("CV"), and adjusting CV calculations (the "1677b(a)(1)(C)(iii) to 1677b(e)" approach); and (3) . . . finding that cost distortion renders a respondent's records not "reasonably reflect{ive of} the costs associated with the production and sale of the merchandise," and adjusting the sales below cost test (the "1677b(f)(1)(A) to 1677b(b)" approach).

Pet. Comments, 24 (FCF 82).

Despite the fact that the statutory provisions for each of these pathways existed at the time of the original investigation, the Coalition chose to resort only to Pathway #1, and it raised no arguments concerning Pathways #2 or #3 during the original investigation.  In fact, the Coalition decided to rely only on Pathway #1 even though there was already a significant line of cases from this Court that the antidumping statute did not authorize a PMS adjustment to the cost

of production when applying the sales-below-cost test. (*i.e.*, Pathway #1).[1]  Indeed, in the Issues and Decision Memorandum to its final determination, Commerce addressed these statutory challenges and acknowledged the contrary precedent from this Court.  Issues & Decision Memorandum for Final Determination, 15-16 (Dec. 7, 2020) (hereinafter, "IDM") (Appx002292-002293).

The Coalition therefore had every opportunity to raise alternative statutory pathways for PMS adjustments during the original investigation.  However, despite the extensive and clear precedent of this Court, the Coalition chose only to argue that "the issue of whether Commerce can apply a PMS adjustment to cost in making sales below cost calculations remains live, and is currently pending before the U.S. Court of Appeals for the Federal Circuit."  Petitioners Inv. Rebuttal Br., 33 (Nov. 18, 2020) (footnotes omitted) (P.R. 329).  The Coalition went on to state that "Commerce has recognized in applying PMS adjustments to sales below cost calculations in recent cases, the CIT's apparently restrictive interpretation does not govern this proceeding."  Id. at 33-34 (footnotes omitted).

Thus, despite the clear and extensive court precedent striking down Commerce's cost-based PMS adjustments, the Coalition chose not to raise any alternative bases for the adjustment and relied solely upon this Court being overturned by the Federal Circuit, which did not happen.[2]

---

[1] These cases included Hyundai Steel Co., 483 F. Supp. 3d 1273, 1279 (CIT 2020) (citing Saha Thai Steel Pipe Pub. Co. v. United States, 422 F. Supp. 3d 1363, 1368-70 (CIT 2019); Husteel Co. v. United States, 426 F. Supp. 3d 1376, 1383-89 (CIT 2020); Borusan Mannesmann Boru Sanayi Ve Ticaret A.S .v. United States, 426 F. Supp. 3d 1395, 1411-12 (CIT 2020); Dong-A Steel Co. v. United States, 475 F. Supp. 3d 1317, 1337-41 (CIT 2020); Husteel Co. v. United States, 476 F. Supp. 3d 1363, 1370-73 (CIT 2020); Saha Thai Steel Pipe Pub. Co. v. United States, 476 F. Supp. 3d 1378, 1382-86 (CIT 2020)).

[2] In its November 8, 2022 opinion in this case, the court characterized the extensive prior precedent as follows: "This Court has stridently disagreed with Commerce's non-textual approach to statutory interpretation."  Ellwood City Forge Co. v. United States, 600 F. Supp. 3d 1281, 1302 (CIT 2022) (citations omitted).

Rather, in *Hyundai*, the Federal Circuit affirmed this Court's prior precedent on the issue, showing that Pathway #1 was no pathway at all.  *See* Hyundai Steel Co. v. United States, 19 F.4th 1346, 1352 (Fed. Cir. 2021).

Moreover, with the Federal Circuit's decision in *Saha Thai*, Pathway #2 is also shown not to exist.  Pet. Comments, 24-25 (citing Saha Thai Steel Pipe Public Co. v. United States, 87 F.4th 1328, 1330-31 (Fed. Cir. 2023)).  BGH agrees with the Government that *Saha Thai* should properly be interpreted to also foreclose Pathway #3, which references 19 U.S.C. § 1677b(f)(1)(A).  Gvt. Comments, 5 (ECF 85).  In any event, it is important to understand that all the alternative theories for the PMS adjustment raised by the Coalition are not based upon any intervening legal precedent.  Rather, they are based upon statutory provisions, such as 19 U.S.C. § 1677b(f)(1)(A) for Pathway #3, that have long been part of the antidumping statute.  Therefore, the Coalition could have raised these arguments during the original investigation.

There is nothing in the Federal Circuit's *Hyundai* decision that provides any new legal precedent for the Coalition's alternative legal theories.  *Hyundai* did nothing more than affirm this Court's prior precedent on the issue.  *See* Hyundai Steel Co. v. United States, 19 F.4th 1346, 1352 (Fed. Cir. 2021).  In fact, in *Hyundai*, the Federal Circuit specifically refused to address arguments concerning alternative statutory provisions, such as 19 U.S.C. § 1677b(f)(1)(A), because they had not been raised or considered during the original investigation.  *See* Hyundai Steel, 19 F.4th at 1356.  This is precisely the situation in which the Coalition finds itself in this case.  It failed to raise any alternative statutory provisions during the original investigation, and it is now precluded from doing so in this case.

As the U.S. Court of Appeals for the Federal Circuit has stressed, this Court "typically takes a 'strict view' of the exhaustion requirement in trade cases," and the "exhaustion

3

requirement applies equally in remand proceedings." Prime Time Commerce, LLC v. United States, 2022 U.S. App. LEXIS 17726, at *10-11 (Fed. Cir. 2022) (citing Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007); Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1383-84 (Fed. Cir. 2008)).

### B. Commerce Properly Rejected the Coalition's Arguments Concerning Section 1677b(f)(1)(A)

Although BGH urges the Court to dismiss the Coalition's arguments on the basis of failure to exhaust, BGH also supports Commerce's substantive determination that section 1677b(f)(1)(A) does not provide a basis for making a cost-based PMS adjustment. First, as stated above, BGH agrees with the Government that *Saha Thai* should properly be interpreted to foreclose the use of section 1677b(f)(1)(A) as a vehicle for making PMS adjustments. Gvt. Comments, 5 (ECF 85). Commerce is also correct in determining that section 1677b(f)(1)(A) relates only to the proper reporting of actual costs in a respondent's records. Section 1677b(f)(1)(A) was added to the antidumping statute in 1994 as part of the Uruguay Round Agreements Act. The Statement of Administrative Action ("SAA") accompanying that Act states:

> In determining whether a company's records reasonably reflect costs, Commerce will consider U.S. generally accepted accounting principles employed by the industry in question. For example, a company's records might not fairly allocate the cost of an asset if a firm's financial statements reflect an extremely large amount of depreciation for the first year of an asset's life, or if there is no depreciation expense reflected for assets that have been idle. In such a situation, it would be appropriate for Commerce to adjust depreciation expenses. Costs shall be allocated using a method that reasonably reflects and ***accurately captures all of the actual costs*** incurred in producing and selling the product under investigation or review.

Statement of Administrative Action, H.R. Rep. No. 103-316, at 869 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4172 (emphasis added).

4

Thus, it is clear that Congress intended section 1677b(f)(1)(A) to apply to whether a respondent's records accurately reported the **actual costs** incurred in producing the product under investigation.  There is no word in the statute or legislative history even suggesting that actual reported costs should be altered in order to reflect alleged market distortions.  The reference to U.S. generally accepted accounting principles ("GAAP") in the legislative history is also instructive.  The cornerstone of GAAP reporting is historic cost (*i.e.*, the costs actually paid), and the adjustment of actual costs to account for alleged market distortions is not permitted.

Indeed, had Congress intended that section 1677b(f)(1)(A) be used as a general vehicle for addressing alleged market distortions, it would not, years later, have added the specific statutory provisions covering particular market situations.  Moreover, the specific PMS provisions that Congress did later adopt make no reference to section 1677b(f)(1)(A) or change section 1677b(f)(1)(A) in any way to make it applicable to PMS adjustments.

The Coalition's strained interpretation that 19 U.S.C. § 1677b(f)(1)(A) provides an independent mechanism to make wholesale alterations in the statutorily prescribed dumping margin calculations to account for alleged particular market situations finds no support in the statute, case law or legislative history.  To accept the Coalition's strained interpretation would undermine the carefully crafted statutory provisions Congress added to specifically address particular market situations and render these provisions meaningless.  Any interpretation making a statutory clause either "redundant or largely superfluous," is a "violation of the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative."  Colautti v. Franklin, 439 U.S. 379, 392 (1979); *see also* United States v. Menasche, 348 U.S. 528, 538 (1955).  As stressed by the U.S. Supreme Court, it "is the duty of

the court to give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."  Montclair v. Ramsdell, 107 U.S. 147, 152 (1883).

Because Commerce's determination represents a proper interpretation of the express language and statutory history of section 1677b(f)(1)(A), it should be given deference by this Court.  See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 468 U.S. 837 (1984)

### C. Commerce's Cost-Based PMS Adjustments Are Not Supported by Substantial Evidence on the Administrative Record

In its second redetermination, Commerce continues to make a PMS adjustment related to electricity and ferrochrome for comparisons based on constructed value.  See Second Redetermination, 17-18.  BGH challenged these PMS adjustments during the original investigation and in its briefs in this court action.  See, e.g., BGH Rule 56.2 Memorandum in Support of Motion for Judgment Upon the Agency Record, 7-19 (Aug. 9, 2021) (ECF No. 23-2) ("BGH Rule 56.2 Memorandum").

Although BGH reiterated these arguments in its comments on Commerce's draft results of redetermination, Commerce refused to address the issues stating that they were not within the scope of the current remand.  Second Redetermination, 17.  Because BGH has properly raised and preserved these issues both before Commerce and before this Court, the Court should now proceed to adjudicate these issues.

Commerce's cost-based PMS adjustments for comparisons based on constructed value fail to meet the necessary requirements of the antidumping statute and are not supported by substantial evidence on the administrative record.  As the Court stated in Husteel I,:

To establish the existence of a PMS, Commerce must demonstrate both that there

are distortions present in the market and that those distortions prevent a proper comparison of normal value with export price or constructed export price.  *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(III), (C)(iii) (stating that home market or third market prices that Commerce determines are affected by a PMS which prevents a proper comparison with export price or constructed price cannot be used to calculate normal value).  Those determinations must be supported by substantial evidence. The evidence must be sufficient that a reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence. *See* Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938); *see also* Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994).

Husteel Co. v. United States, 426 F. Supp. 3d 1376, 1390 (CIT 2020) ("Husteel I"); *see also*

Husteel Co. v. United States, 471 F. Supp. 3d 1349, 1362 (CIT 2020) (stating that to "establish

the existence of a PMS, Commerce must demonstrate both that there are distortions present in

the market and that those distortions prevent a proper comparison of normal value with export

price or constructed export price") ("Husteel II"); Garg Tube Exp. LLP v. United States, 569 F.

Supp. 3d 1202, 1211 (CIT 2022) (stating that the "TPEA, in providing Commerce the alternative

to use any other methodology to calculate costs under 19 U.S.C. § 1677b(e)(1), adopts both a

comparative requirement and a causal requirement").

In *Garg*, the Court also stressed that:

The use of the causal phrase "such that" requires that in addition to finding unique market phenomena, Commerce must demonstrate that those market phenomena prevent the cost of materials and fabrication from accurately reflecting the cost of production.  Commerce must therefore identify what unique facts render the cost of materials and fabrication an inaccurate reflection of the cost of production in the ordinary course of trade.

Garg, 569 F. Supp. 3d at 1211 (footnote omitted).  The Court also noted:

Ordinary course of trade "means the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind."  19 U.S.C. § 1677(15).  Commerce shall consider sales and transactions to be outside of the ordinary course of trade where "the particular market situation prevents a proper comparison with the export price or constructed export price."  19 U.S.C. § 1677(15)(C).  However, the language of

7

> 19 U.S.C. § 1677(15)(C) does not negate 19 U.S.C. § 1677b(e)'s causal
> requirement.  To suggest otherwise would render the inclusion of "such that the
> cost of materials and fabrication or other processing of any kind does not
> accurately reflect the cost of production" meaningless.  19 U.S.C. § 1677b(e).

Id. at 1211 n.9.

In *Nexteel*, the Federal Circuit explained that "the circumstances supporting a 'particular' market situation also must be 'particular' to producers of the subject merchandise during the relevant period."  Nexteel Co. v. United States, 28 F.4th 1226, 1234 (Fed. Cir. 2022) (citing SeAH Steel Corp. v. United States, 513 F. Supp. 3d 1367, 1393 (CIT 2021)).  The Federal Circuit also explained that an "ongoing global phenomenon would not alone constitute a deviation from the 'ordinary course of trade.'"  Nexteel, 28 F.4th at 1234.

Thus, according to these legal authorities, Commerce must establish by substantial evidence each of the following elements:

(1)     there are distortions present in the market,

(2)     the circumstances supporting a particular market situation are "particular" to producers of the subject merchandise during the relevant period,

(3)     the circumstances supporting a particular market situation prevent the cost of materials and fabrication from accurately reflecting the cost of production in the ordinary course of trade, and

(4)     the distortions prevent a proper comparison of normal value with export price or constructed export price.

Commerce's imposition of a PMS adjustment for comparisons based upon constructed value in its results of redetermination does not fulfill these necessary legal criteria.

## 1.     Electricity Costs

### a.     No Significant Distortions

Commerce's determination that a particular market situation exists with respect to the German electricity market is not supported by substantial evidence on the administrative record

8

of the antidumping proceeding.  In fact, the only "evidence" cited by Commerce in support of its determination was the final determination in the concurrent countervailing duty investigation on forged steel fluid end blocks.  *See* IDM at 20-22 (Appx002297-002299).  The only item from the countervailing duty investigation that Commerce placed on the record of the antidumping investigation was the one-page benefit calculation.  *See* Final Margin Calculation Memorandum, Attachment V (Appx002895, Appx086810).  Commerce refused to place any other part of the record of the countervailing duty investigation on the record of the antidumping investigation despite BGH's specific request for Commerce to do so.

> For example, in its case brief, BGH specifically requested:
>
> To the extent that Commerce bases its decision on the countervailing duty rate, it must place the documents from the countervailing duty investigation, including those referenced in this paragraph, on the record of this antidumping duty investigation.  Respondents must be given an opportunity to challenge the basis of the countervailing duty rate within this investigation and any subsequent judicial appeals.

BGH Case Br. at 12 (Appx002852).  Not only did Commerce refuse this request, it required BGH to redact all references to information from the record of the countervailing duty investigation in its case brief and rebuttal brief.  *See* Commerce Case Brief NFI Rejection Letter (Nov. 20, 2020) (Appx002832-002833); Commerce Rebuttal Brief 2nd NFI Rejection Letter (Nov. 23, 2020) (Appx002856-002857).

Thus, contrary to its statutory obligations, Commerce refused to consider contradictory evidence in making its determination.  *See* Husteel I, 426 F. Supp. 3d at 1390 (stating that evidence supporting Commerce's determination "must be sufficient that a reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence") (citing Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938); Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir.

9

1994)).

When all evidence is objectively considered, it is clear that no significant market distortions exist with respect to the German electricity market.  The factual information shows that electricity costs in Germany were far above those in the United States and other industrialized countries.  *See* <u>BGH Response to PMS Allegation</u>, 2-4 & Attachment 5 (Jul. 24, 2020).  This factual information was never disputed by Commerce or the petitioners.  In denying petitioners' PMS allegations concerning natural gas, Commerce found determinative similar evidence that the price of natural gas in Germany was higher than in the United States and other industrialized countries.  *See* <u>IDM</u> at 27 (Appx002304).  Commerce also based its PMS determination regarding ferrochrome exclusively on a comparison with U.S. prices.  *See* <u>Post-Preliminary Determination</u>, 14 (Oct. 14, 2020) (Appx002777).  Commerce provides no explanation as to why with respect to natural gas and ferrochrome evidence showing that German prices exceeded those in the United States was determinative while the same evidence regarding electricity was treated as irrelevant.  Here, Commerce has failed to consider contradictory evidence and has acted in an arbitrary and capricious manner.

There is no evidence that there is government control over pricing in the German electricity market to such an extent that home market prices cannot be considered to be competitively set.  In Germany, electricity is produced, sold and distributed by a network of private companies and, in the concurrent countervailing duty investigation, there was no allegation or finding that the respondents were receiving electricity at less than adequate renumeration.  *See* <u>BGH Edelstahl Siegen GmbH v. United States</u>, 600 F. Supp. 3d 1241 (CIT 2022); *see also* <u>Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination</u>, 85 Fed. Reg. 80011 (Dec. 11, 2020) and

accompanying <u>Issues & Decision Memorandum</u> at 23-24 ("<u>CVD IDM</u>").  Electricity prices in Germany are set in accordance with market principles and cover the costs of producing the electricity.

All of the subsidy allegations raised in the concurrent countervailing duty investigation involved additional taxes and surcharges on electricity and not the underlying cost of electricity, itself.  As stated above, the undisputed factual information shows that electricity costs in Germany were far above those in the United States and other industrialized countries.  *See* <u>BGH Response to PMS Allegation</u>, 2-4 & Attachment 5 (Jul. 24, 2020) (Appx002516-002518 & Appx002596-002633).  None of the programs that Commerce determined to be countervailable in its countervailing duty determination provide German companies with any advantage with respect to electricity costs as compared to the United States and other industrialized countries.  Rather, these programs represent additional taxes, surcharges and other costs that have been imposed upon German companies in order to reduce the emission of greenhouse gases and meet the targets agreed to in the Paris Agreement on the mitigation of greenhouse gas emissions.  *See* <u>CVD IDM</u> at 9.  These environmental measures in no way provide any benefit to companies but rather substantially increase a company's production costs.[3]

These environmental measures are also not "particular" to producers of the subject merchandise.  Rather, the environmental measures are broadly applicable to enterprises manufacturing a wide-range of products.  *See* <u>BGH</u>, 600 F. Supp. 3d at 1255-56.

Commerce has also failed to establish that these environmental measures prevent the cost of materials and fabrication from accurately reflecting the cost of production in the ordinary

---

[3] In fact, the burden on U.S. manufacturers, including specifically the U.S. iron and steel industry, was the stated reason for the United States' withdrawal from the Paris Climate Accord. *See* <u>Statement by President Trump on the Paris Climate Accord</u> (June 1, 2017).

course of trade.  As stated above, it is undisputed that electricity costs in Germany are far above those in the United States and other industrialized countries.  *See* BGH Response to PMS Allegation, 2-4 & Attachment 5 (Appx002516-002518 & Appx002596-002633).  These environmental measures have also been present for many years and therefore represent the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind.

In *Nexteel*, the CAFC rejected similar PMS findings made by Commerce with respect to electricity prices in the Korean market.  The court specifically determined that Commerce failed to establish that electricity "prices are any different from what they would be in the ordinary course of trade."  Nexteel, 28 F.4th at 1237.  In reaching this decision, the court noted that while Korean electricity prices were lower than Japanese prices, they were comparable to median prices among all countries studied.  Id.  The same is true in this case, regardless of the effect of the environmental measures, it is undisputed that electricity costs in Germany are far above those in the United States and other industrialized countries.  *See* BGH Response to PMS Allegation, 2-4 & Attachment 5 (Jul. 24, 2020).

### b.    Proper Comparison of Normal Value with Export Price

Commerce has also failed to show how the alleged distortions prevent a proper comparison of normal value with export price or constructed export price.  As the court noted in *Husteel I*,:

> A PMS that affects costs of production would presumably affect prices for domestic sales and export sales so there would be no reason to adjust only the home market prices.

Husteel I, 426 F. Supp. 3d at 1388.  Discussing the facts presented in *Husteel I*, the court further

12

explained:

> Chinese overcapacity may affect the COP by lowering the price of HRC,
> however, it is unclear how that finding alone would support the determination that
> the home market price and export price (or constructed export price) cannot be
> compared because Commerce does not address whether costs would be lowered
> on both sides of the less than fair value equation.  Therefore, Commerce's PMS
> finding is unsupported by substantial evidence.

Id. at 1391-92 (citation omitted).

In the present case, it is beyond dispute that there is no difference in electricity costs for

the production of subject merchandise for domestic and export sale.  The same electricity is used

to manufacture all products and the environmental measures discussed above do not vary in any

way between domestic and export sales.  Accordingly, Commerce has failed to substantiate that

the claimed distortions in electricity costs prevent a proper comparison of normal value with

export price or constructed export price, and the cost-based PMS adjustment on electricity must

therefore be rejected.

### c.    Calculation Errors

Commerce's calculation of the cost-based PMS adjustment on electricity also suffers

from several problems.  First, Commerce simply attempts to apply the full *ad valorem*

countervailing duty rates calculated in the countervailing duty investigation without explaining

why the countervailing duties imposed in the CVD investigation do not already remedy the

alleged distortion in electricity costs.  As the court found in *Vicentin I*, Commerce cannot simply

apply countervailing duty rates in an antidumping investigation as a cost-based PMS adjustment

without first explaining how the "CVD investigation and the resulting CVDs have not remedied

the distortion."  Vicentin S.A.I.C. v. United States, 404 F. Supp. 3d 1323, 1340 (CIT 2019)

("Vicentin I").  In the absence of such an explanation, Commerce's PMS adjustment must be

rejected as unsupported by substantial evidence.  Id. (stating that "{u}nless and until Commerce

explains why its CVD investigation does not remedy the distortion found here, its determination that a PMS warrants rejection of Argentine soybean prices is unsupported by substantial evidence").  Moreover, in *Vicentin II*, the court found that Commerce's explication of the different purposes of the ADD and CVD regimes did not address the court's concerns regarding the reasonableness of Commerce remedying the effects of a domestic subsidy that may have already been cured in the concurrent CVD proceeding.  Vicentin S.A.I.C. v. United States, 466 F. Supp. 3d 1227, 1244 (CIT 2020) ("Vicentin II").

In the present case, Commerce has again failed to explain how the CVD investigation on fluid end blocks and the resulting CVDs have not remedied the alleged distortion in electricity costs.  Importantly, this is not a situation where Commerce's PMS adjustment is based upon an international benchmark price for the applicable input and the export price of the end product is also set based upon international prices.  *See* Vicentin S.A.I.C. v. United States, 42 F.4th 1372, 1381 (Fed. Cir. 2022) (stating that Commerce relied upon "an international market price for soybeans in place of the Argentinian cost" and "biodiesel export prices are set based on international prices for heating oil with a fixed premium") ("Vicentin IV").  Rather, Commerce simply takes the full *ad valorem* countervailing duty rates calculated in the countervailing duty investigation and uses them to increase the costs reported for electricity in the antidumping investigation by the exact same amount.  In fact, Commerce ignores the undisputed evidence of international market prices for electricity, which shows that electricity costs in Germany are far above those in the United States and other industrialized countries.  *See*, BGH Response to PMS Allegation, 2-4 & Attachment 5 (Jul. 24, 2020).

In *Wilmar Trading*, this Court also recently followed the *Vicentin* line of cases and remanded the matter back to Commerce to explain why imposing a PMS adjustment for a

program that was already subject to countervailing duties did not result in a double remedy.

Wilmar Trading Pte Ltd. v. United States, No. 18-00121, slip op. 23-165 at 26-32 (Nov. 21, 2023).

Accordingly, as established in the *Vicentin* line of cases, Commerce has failed to properly explain how the countervailing duties on fluid end blocks have not remedied the alleged distortion in electricity costs.

A second problem is that Commerce fails to adequately explain its calculation of the cost-based PMS adjustment to electricity costs. In its original calculation of the PMS adjustment, Commerce's overall adjustment to total costs of manufacture ("COM") was less than 2%, with the amount applicable to electricity being less than 0.5%. *See* PMS Cost Adjustment Calculation, Attachment 1 (Oct. 14, 2020) (Appx086340). However, in Commerce's final determination, the overall adjustment to COM shot up to nearly 10%, with the amount applicable to electricity being almost 7%. Final Margin Calculation Memorandum, Attachment IV (Dec. 8, 2020) (Appx086811).

In its calculation memorandum, Commerce explains that it is trying to adjust the benefit in the countervailing duty investigation to the period of investigation ("POI") of the antidumping case and adjust the countervailing duty rate from a percentage of total sales to a percentage of COM. Id. at Attachment III (Appx002892, Appx086807). However, the result is nonsensical. According to Commerce's calculations, the benefit to be added to the actual electricity costs is more than the costs themselves. Id. at Attachment IV (Appx086811) (compare POI Total Electricity-Related Benefit (EUR) with Total Electricity Cost Per Trial Balance - POI (EUR)). In essence, Commerce is claiming that a non-distorted cost of electricity in the German market should have additional environmental taxes, fees and surcharges of more than 100% of the actual

15

costs of electricity, and this despite the fact that German electricity costs are already far above those in the United States and other industrialized countries.  *See*, BGH Response to PMS Allegation, 2-4 & Attachments 4-5 (Jul. 24, 2020) (Appx002521-002523, Appx002544-002554 & Appx002593-002603).  Such a result strains all credibility and is clearly unreasonable.

A third problem is that Commerce includes programs in its benefit calculation that have nothing to do with electricity.  For example, Commerce includes alleged benefits from sections 51, 54 and 55 of the Energy Tax Act even though the Energy Tax Act does not cover electricity but rather is limited to other energy products such as heating oil and natural gas.  *See* Forged Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination, 85 Fed. Reg. 31454 (May 26, 2020) and accompanying Preliminary Decision Memorandum at 21.  Commerce's calculations also include alleged benefits to a related company, RPS, that does not produce subject merchandise.

In addition, the Court has found that Commerce erred in treating the KAV Program, which Commerce has included in its PMS adjustment, as countervailable.  *See* BGH Edelstahl Siegen GmbH v. United States, No. 21-00080, slip op. 23-159 at 12-13 (Nov. 14, 2023). Commerce has just recently issued a draft remand determination acquiescing in the Court's decision and finding that the KAV Program is not countervailable.  Draft Results of Redetermination Pursuant to Third Court Remand, 5-6 (Jan. 16, 2024) (Barcode:4491357-01 (C-428-848 REM - Remand 1/1/18 - 12/31/18 Slip Op 23-159)).

For all of these reasons, Commerce's PMS adjustment on electricity must be rejected as not supported by substantial evidence on the administrative record.

2. **Ferrochrome Costs**

a. **No Significant Distortions**

Commerce's determination that a particular market situation exists with respect to ferrochrome in Germany is not supported by substantial evidence on the administrative record of the antidumping proceeding. Commerce's determination is based solely upon information that ferrochrome from Kazakhstan is imported into Germany and that the Kazakh producer Kazachrome is state-controlled. *See* IDM at 24-25 (Appx002301-002302).

However, data on imports of ferrochrome into industrialized countries show that the unit values for ferrochrome imported into Germany are consistent with the unit values for ferrochrome imported into other industrialized G20 countries. BGH Response to PMS Allegation, 7-10 & Attachments 4 & 6 (Jul. 24, 2020) (Appx002526-002529, Appx002544-002546 & Appx002634-002658). Additionally, data on exports of ferrochrome from Kazakhstan shows that unit values for exports to Germany are consistent with the unit values for exports of ferrochrome from Kazakhstan to other countries. Id.

Commerce simply ignores this international data and uses only the "benchmark USGS price" based on U.S. import prices. *See* IDM at 24-25 (Appx002301-002302). Thereby, Commerce seems to impose an irrebuttable presumption that input prices in a foreign market that are lower than U.S. input prices represent *per se* a particular market situation. No such *per se* rule exists in the antidumping statute, and the statute was never intended to impose U.S. input prices throughout the world. Rather, Commerce must give due weight to the entirety of the evidence and consider evidence of prices in other countries. This evidence shows that German ferrochrome prices are on a par with prices in other G20 countries. As such, German prices cannot be seen as "particular."

17

Moreover, BGH submitted full invoices for all purchases of ferrochrome during five months of the POI selected by Commerce.  BGH Response to Section D Supplemental Questionnaire, at App. SD-2 (Jun. 16, 2020) (Appx084083-084171).  These invoices show that all of the ferrochrome purchased by BGH was purchased from private companies in the EU or Switzerland.  BGH did not purchase any ferrochrome directly from Kazakhstan.  These invoices also show that almost all the ferrochrome purchased by BGH came from countries other than Kazakhstan.  Thus, BGH's purchases of ferrochrome represented arm's length transactions with private European companies in the ordinary course of trade.  These transactions therefore do not meet the definition of a particular market situation.

While Commerce acknowledges that the information submitted by BGH shows that BGH "did not purchase any ferrochrome directly from Kazakhstan, and that almost all the ferrochrome it purchased came from countries other than Kazakhstan," Commerce then completely ignores this evidence, stating categorically that "PMS findings are market-based and not respondent-specific."  IDM at 24 (Appx002301).  Commerce cites to no authority for this statement, and it is incorrect that PMS findings are categorically always market-based and cannot consider respondent-specific information.  As the Court explained in *Husteel I*, Commerce has made both market-based and respondent-specific PMS findings depending upon the facts presented in each case.  Husteel I, 426 F. Supp. 3d at 1392 n.20 (citations omitted).  Commerce's discretion in determining its methodology cannot be exercised in an arbitrary and unlawful manner.  Id.  In this present case, BGH has presented extensive and uncontroverted evidence that it purchases no significant amounts of ferrochrome originating in Kazakhstan.  Commerce cannot simply ignore this record evidence.

In addition, Commerce's exclusive reliance on the information supplied by petitioners is

18

unsupportable. Petitioners' estimates concerning German ferrochrome requirements sourced

from imports, the percentage of total ferrochrome imports from Kazakhstan and the alleged

undervaluation of Kazakh ferrochrome prices are wildly inaccurate. First, petitioners ignore that

the European Union is a customs union where all goods produced in or imported into any

Member State can be freely circulated in any EU country. Therefore, calculations of

ferrochrome consumption and imports with respect to Germany alone do not accurately portray

the market for ferrochrome to which German companies have free access. Moreover, because

Germany has large seaports, much of the ferrochrome imported into Germany is not destined for

consumption in Germany but for circulation within the European Union. BGH Case Br. at 14

(Appx002854). While Commerce acknowledges BGH's comments regarding the European

Union in its Issues & Decision memorandum, it provides no response to these comments. *See*

IDM at 23-25 (Appx002300-002302). Rather, Commerce simply continues to state that

"Kazakhstan is Germany's largest source of ferrochrome imports," completely disregarding that

ferrochrome imported into German seaports does not remain in Germany but circulates freely

throughout the European Union. IDM at 24 (Appx002301).

Commerce has also failed to establish that the circumstances relating to ferrochrome from

Kazakhstan are "particular" to producers of the subject merchandise. Rather, as Commerce

readily admits, "almost all the ferrochrome {BGH} purchased came from countries other than

Kazakhstan." IDM at 24 (Appx002301). Moreover, it is undisputed that ferrochrome imported

into German seaports does not remain in Germany but circulates freely throughout the European

Union. The ferrochrome used by German producers of forged steel fluid end blocks amounts to

only a miniscule amount of the ferrochrome imported into German. *See* BGH Section D

Questionnaire Response, Appendix D-3 (Apr. 27, 2020) (showing BGH consumption of high-

carbon ferrochrome) (Appx0081070-081072; Appx001634-001635).

Commerce has also failed to establish that the circumstances relating to ferrochrome from Kazakhstan prevent the cost of materials and fabrication from accurately reflecting the cost of production in the ordinary course of trade. As stated above, Commerce readily admits that "almost all the ferrochrome {BGH} purchased came from countries other than Kazakhstan." IDM at 24 (Appx002301). Any ferrochrome from Kazakhstan imported into Germany is the result of market transactions. Companies in any country may import ferrochrome from Kazakhstan, and ferrochrome from Kazakhstan is indeed exported throughout the world. There is nothing unique about ferrochrome from Kazakhstan to the German market that would constitute a PMS. *See* Garg, 569 F. Supp. 3d at 1214 (stating that "Commerce fails to explain how the cumulative and collective impact of the market phenomena upon which it relies are unique to the Indian market and therefore constitute a PMS"); *see also* Nexteel, 28 F.4th at 1234 (stating that an "ongoing global phenomenon would not alone constitute a deviation from the 'ordinary course of trade'").

The circumstances relating to ferrochrome from Kazakhstan have also been present for many years and therefore represent the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind.

Accordingly, Commerce's determination that a particular market situation exists with respect to ferrochrome in Germany is not supported by substantial evidence on the administrative record.

### b.    Proper Comparison of Normal Value with Export Price

Commerce has also failed to show that any alleged distortions with respect to

ferrochrome would prevent a proper comparison of normal value with export price or constructed export price as required by statute.  *See* Husteel I, 426 F. Supp. 3d at 1390.  As with electricity discussed above, ferrochrome is used without distinction in the production of subject merchandise for both domestic and export sale, and Commerce has made no claim that costs would not be similarly impacted on both sides of the less than fair value equation.  Id. at 1388 (stating that a "PMS that affects costs of production would presumably affect prices for domestic sales and export sales so there would be no reason to adjust only the home market prices").  Accordingly, Commerce has failed to substantiate that the claimed distortions in ferrochrome costs prevent a proper comparison of normal value with export price or constructed export price, and the cost-based PMS adjustment on ferrochrome must therefore be rejected.

### c.    Calculation Errors

Commerce's calculation of the cost-based PMS adjustment on ferrochrome also suffers from several problems.  First, the source referenced by Commerce in its calculations for BGH's POI Ferrochrome Purchases Value (EUR) and BGH's POI Ferrochrome Purchases Quantity (KG) is "Exhibit D-3" to BGH's April 27, 2020 Section D questionnaire response.  Final Margin Calculation Memorandum, Attachment IV (Appx086811).  However, neither of the figures listed in Commerce's calculations can be found in Appendix D-3 to that questionnaire response.  *Compare* Final Margin Calculation Memorandum, Attachment IV (Appx086811) *with* BGH Section D Response at App. D-3 (Apr. 27, 2020) (Appx081070-081072).

Second, Commerce compares BGH actual purchases of ferrochrome with the general "Ferrochromium" figure listed by the U.S. Geological Survey ("USGS").  Final Margin Calculation Memorandum, Attachment IV (Appx086811).  However, the USGS figure does not list any identifying information about the product or sales covered.  *See* Petitioner's PMS

Allegations, Ex. 48 (June 15, 2020) (Appx003633-003635).  As shown by BGH's purchasing documentation, ferrochrome varies in chromium and carbon content, and the relative content of these and other materials affects the purchase price.  Delivery terms (*e.g.*, EXW, DDP, *etc.*) will also affect the product's end price.  *See* BGH Response to Section D Supplemental Questionnaire, at App. SD-2 (Appx084083-084171).  Commerce's PMS calculation makes no account for these price differences.  Comparing actual prices of specific grades to a general average of non-descript grades will always result in a difference.

Third, Commerce's calculation is based exclusively on the USGS price of general ferrochrome in the United States, and Commerce has rejected without explanation other evidence on world ferrochrome prices placed on the record by BGH and the other mandatory respondent, Schmiedewerke Gröditz GmbH ("SWG").  *See* BGH Response to PMS Allegation, 7-10 & Attachments 4 & 6 (Appx002526-002529, Appx002544-002546 & Appx002634-002658); SWG PMS Rebuttal Comments, 6-7 & Ex. 10 (Jul. 24, 2020) (Appx002667-002668).  As discussed above, Commerce must give due weight to the entirety of the evidence and consider evidence of prices in other countries.  There is no requirement in the antidumping statute that input prices in a foreign market may not be lower than U.S. input prices.

For all of these reasons, Commerce's PMS adjustment on ferrochrome must be rejected as not supported by substantial evidence on the administrative record.

## II.   CONCLUSION

For the reasons stated above, the Court should (1) sustain Commerce's final results of redetermination with respect to its determination that 19 U.S.C. § 1677b(f)(1)(A) cannot be used as a basis for PMS adjustments and (2) proceed to adjudicate the issue of Commerce's PMS adjustments related to electricity and ferrochrome.

Respectfully submitted,

 /s/ Marc E. Montalbine
Marc E. Montalbine*
Gregory S. Menegaz
Alexandra H. Salzman
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1156 Fifteenth Street, N.W.
Suite 1101
Washington, DC 20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  montalbine@dhlaw.de
Date: January 22, 2024                           *Counsel to BGH Edelstahl Siegen GmbH*
*Defendant-Intervenor/Plaintiff*

_____

\* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word for Microsoft 365 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court, the undersigned certifies that these comments comply with the word limitations set forth in section 2(B)(1)(b) of the Chambers Procedures.  Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1)(c) of the Chambers Procedures, I hereby certify that these comments contain **6,468** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Marc E. Montalbine
Marc E. Montalbine
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth Street, N.W.
Suite 1101
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email:  montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*