**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

_____

|  |  |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ) | |
| ELLWOOD QUALITY STEELS COMPANY, ) | |
| ELLWOOD NATIONAL STEEL COMPANY, ) | |
| and A. FINKL & SONS, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| BGH EDELSTAHL SIEGEN GMBH, ) | |
| ) | |
| Consolidated Plaintiff, ) | |
| ) | |
| v. ) | Consol. Court No. 21-00077 |
| ) | PUBLIC VERSION |
| UNITED STATES, ) | Confidential information redacted |
| ) | on pages 5 and 15 |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| BGH EDELSTAHL SIEGEN GMBH, ) | |
| ) | |
| Defendant-Intervenor, ) | |
| ) | |
| and ) | |
| ) | |
| ELLWOOD CITY FORGE COMPANY, ) | |
| ELLWOOD QUALITY STEELS COMPANY, ) | |
| ELLWOOD NATIONAL STEEL COMPANY, ) | |
| and A. FINKL & SONS, ) | |
| ) | |
| Defendant-Intervenors. ) | |

_____

**DEFENDANT'S SUR-REPLY TO CONSOLIDATED PLAINTIFF'S COMMENTS ON COMMERCE'S REMAND REDETERMINATION**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL
ALEXANDER FRIED
Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C. 20230

KARA M. WESTERCAMP
Trial Counsel
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 305-7571
E-mail:  Kara.M.Westercamp@usdoj.gov

February 20, 2024

Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITES ................................................................................................... ii

BACKGROUND .................................................................................................................. 2

ARGUMENT .......................................................................................................................3

     I.    Substantial Evidence Supports Commerce's Particular Market Situation Findings
................................................................................................................................ 3

          A.    Substantial Evidence Supports Commerce's Particular Market Situation
Finding On Electricity .................................................................................4

               1.    Substantial evidence Supports Commerce's Finding That There Is
A Particular Market Situation In The Electricity Market .............. 6

               2.    Commerce Reasonably Found That The Particular Market
Situation  Prevents A Proper Comparison With The Export Price
...................................................................................................8

               3.    Commerce's Particular Market Situation Adjustment Did Not
Result In A Double Remedy ...........................................................8

          B.    Substantial Evidence Supports Commerce's Particular Market Situation
Finding On Ferrochrome........................................................................ 13

CONCLUSION................................................................................................................. 18

**TABLE OF AUTHORITIES**

**CASES**                                                                          **PAGE(S)**

*BGH Edelstahl Siegen GmbH v. United States,*
    663 F. Supp. 3d 1378 (Ct. Int'l Trade 2023) ............................................................ 12, 13

*Boomerang Tube LLC v. United States,*
    856 F.3d 908 (Fed. Cir. 2017)........................................................................................ 13

*Corus Staal BV v. United States,*
    502 F.3d 1370 (Fed. Cir. 2007)...................................................................................... 14

*Ellwood City Forge Co. et. al. v. United States,*
    Consol. Ct. No. 21-00077, 2023 WL 4703309 (Ct. Int'l Trade July 24, 2023)................. 2

*Floral Trade Council v. United States,*
    41 F. Supp. 2d 319 (Ct. Int'l Trade 1999) ...................................................................... 12

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996)........................................................................................ 11

*GPX Int'l Tire Corp. v. United States,*
    666 F.3d 732 (Fed. Cir. 2011)........................................................................................ 12

*Int'l Trading Co. v. United States,*
    110 F. Supp. 2d 977 (Ct. Int'l Trade 2000) .................................................................... 12

*Itochu Bldg. Prods. v. United States,*
    733 F.3d 1140 (Fed. Cir. 2013)...................................................................................... 15

*Nexteel Co. v. United States,*
    28 F.4th 1226 (Fed. Cir. 2022) ................................................................................... 7, 8

*Qingdao Sea-Line Trading Co. v. United States,*
    766 F.3d 1378 (Fed. Cir. 2014)............................................................................ 14, 15, 16

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States,*
    87 F. 4th 1328 (Fed. Cir. 2023) ...................................................................................... 3

*Seah Steel Vina Corp v. U.S.,*
    950 F.3d 833 (Fed. Cir. 2020).......................................................................................... 16

*Stupp Corp. v. United States,*
    5 F. 4th 1341 (Fed. Cir. 2021) .................................................................................... 5, 11

*Turtle Island Restoration Network v. Evans*,
  284 F.3d 1282 (Fed. Cir. 2002) .......................................................... 12

*U.S. Steel Corp. v. United States*,
  34 C.I.T. 1193 (2010) ......................................................................... 16

*Vicentin S.A.I.C. v. United States*,
  42 F. 4th 1372 (Fed. Cir. 2022) ........................................................... 9

*Vicentin S.A.I.C. v. United States*,
  404 F. Supp. 3d 1323 (Ct. Int'l Trade 2019) ...................................... 8, 11, 12

*Vicentin S.A.I.C. v. United States*,
  466 F. Supp. 3d 1227 (Ct. Int'l Trade 2020) ........................................ 9

*Vicentin S.A.I.C. v. United States*,
  503 F. Supp. 3d 1255 (Ct. Int'l Trade 2021) ........................................ 9

*Yama Ribbons Co. Ltd. v. United States*,
  865 F. Supp. 2d 1294 (Ct. Int'l Trade 2012) ........................................ 9

## STATUTES

19 U.S.C. § 1516a(b)(2)(A) ........................................................................... 5, 6

19 U.S.C. § 1677(15) ......................................................................... passim

19 U.S.C. § 1677b ................................................................................. 8, 10

19 U.S.C. § 1677b(e) ............................................................................ 8, 10

19 U.S.C. § 1677b(e)(3) ........................................................................ 3, 4

19 U.S.C. § 1677b(f) ............................................................................... 17

19 U.S.C. § 1677f-1(f) ............................................................................ 12

19 U.S.C. § 1671(a)(1) ............................................................................ 10

19 U.S.C. § 1673(1) ................................................................................. 10

19 U.S.C. § 351.309(c)(2) ........................................................................ 14

28 U.S.C. § 2637(d) ................................................................................. 13

**<u>REGULATIONS</u>**

19 C.F.R. § 351.302(d)(1)...........................................................................................5

19 C.F.R. § 351.104 ...................................................................................................5

**<u>OTHER AUTHORITIES</u>**

Statement of Administrative Action (SAA),
    H.R. Rep. No. 103-316, vol. 1, (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040............ 3

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

_____
                                                          )
ELLWOOD CITY FORGE COMPANY,          )
ELLWOOD QUALITY STEELS COMPANY,    )
ELLWOOD NATIONAL STEEL COMPANY,    )
and A. FINKL & SONS,                                )
                                                          )
                Plaintiffs,          )
                                                          )
                and             )
                                                          )
BGH EDELSTAHL SIEGEN GMBH,             )
                                                          )
          Consolidated Plaintiff,     )
                                                          )
      v.                                       )          Consol. Court No. 21-00077
                                                          )          PUBLIC VERSION
UNITED STATES,                                      )
                                                          )          BPI on pages 5 and 15
               Defendant,         )
                                                          )
              and             )
                                                          )
BGH EDELSTAHL SIEGEN GMBH,             )
                                                          )
          Defendant-Intervenor,      )
                                                          )
              and             )
                                                          )
ELLWOOD CITY FORGE COMPANY,          )
ELLWOOD QUALITY STEELS COMPANY,    )
ELLWOOD NATIONAL STEEL COMPANY,    )
and A. FINKL & SONS,                                )
                                                          )
          Defendant-Intervenors.      )
_____)

**DEFENDANT'S SUR-REPLY TO CONSOLIDATED**
**PLAINTIFF'S COMMENTS ON COMMERCE'S REMAND REDETERMINATION**

      Defendant, the United States, respectfully submits this sur-reply to the comments filed by

consolidated plaintiff BGH Edelstahl Siegen GMBH (Plaintiff or BGH), Pl.'s Cmnts. on

Commerce's Second Remand Redetermination, ECF No. 87 (Pl. Cmts.), concerning the Department of Commerce's (Commerce) second remand redetermination in this matter. *See Final Results of Redetermination Pursuant to Court Remand (Second Remand Redetermination)*, Appx012192-012210. On February 2, 2024, consolidated defendant-intervenors filed a motion (ECF No. 86) that urged the Court to either strike BGH's January 22, 2024 filing or allow the parties to file a sur-reply to Section I.C of BGH's comments in opposition to Commerce's Second Remand Results. In a paperless order issued that same day, the Court granted the motion, and directed the United States to file its sur-reply by February 20, 2024. As set forth below, the Court should sustain Commerce's second remand redetermination because it is supported by substantial evidence and in accordance with law.

## BACKGROUND

In its July 24, 2023, opinion and order, the Court granted the United States's request for a voluntary remand to address alleged errors in the calculation of the dumping margin for BGH and remanded for Commerce to either further explain its decision not to consider plaintiffs' arguments regarding alternative pathways to a particular market situation adjustment or to address those arguments. *See Ellwood City Forge Co. et. al. v. United States*, Consol. Ct. No. 21-00077, 2023 WL 4703309 (Ct. Int'l Trade July 24, 2023) (*Ellwood II*). On remand, Commerce reversed its particular market situation adjustment for purposes of the sales-below-cost test, but declined to revisit its prior finding that a particular market situation existed in Germany with respect to the cost of electricity and ferrochrome. Second Remand Redetermination at 17, Appx012208. As it did in its opening brief in this litigation, BGH continues to contest Commerce's particular market situation finding in its response to remand comments.

## ARGUMENT

### I.     Substantial Evidence Supports Commerce's Particular Market Situation Findings

In the original investigation, out of the alleged six particular market situation allegations, Commerce found only two particular market situations in the German electricity market (due to German control of prices and subsidization) and in the German ferrochrome market (due to the distortive impact of a Kazakh state-controlled producer of ferrochrome constituting the largest source of ferrochrome in Germany).  IDM at 20-34, Appx002297-002311.  The two particular market situation findings align with what Congress envisioned when describing a particular market situation as where "government control over pricing (exists) to such an extent that home market prices cannot be considered to be competitively set."  Statement of Administrative Action (SAA), H.R. Rep. No. 103-316, vol. 1, at 822 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4162.

The Trade Preferences Expansion Act amendments allow Commerce to consider a particular market situation affecting costs in calculating normal value based on constructed value.  19 U.S.C. § 1677b(e)(3) ("If a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology."); *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States,* 87 F. 4th 1328, 1330 (Fed. Cir. 2023).  While the Federal Circuit has held that the statute does not permit applying a particular market situation adjustment when calculating the cost of production for purposes of the sales below cost test, such an adjustment is permitted in the calculation of constructed value.  *Id.*  Here, so long as the Court rejects Ellwood City's "alternative statutory sources" argument to reaching a particular market

situation adjustment to cost of production, all that remains for this Court to consider is whether Commerce's particular market situation finding as it was applied to adjust costs for sales based on constructed value is supported by substantial evidence.

The term "ordinary course of trade" used in 19 U.S.C. § 1677b(e)(3), is defined as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind."  19 U.S.C. § 1677(15).  Certain sales and transactions are considered outside the ordinary course of trade, including "situations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or constructed export price."  *Id.*  In the Statement of Administrative Action, Congress stated "{a} particular market situation . . . might exist . . . where there is government control over pricing to such an extent that home market prices cannot be considered to be competitively set."  SAA at 822.  Thus, so long as home market prices cannot be considered competitively set, they are outside the ordinary course of trade.  That is precisely what Commerce found in the underlying investigation and, as set forth below, Commerce's determination should be sustained.

A.    **Substantial Evidence Supports Commerce's Particular Market Situation Finding On Electricity Because There Are Distortions In The Market**

As an initial matter, BGH argues that Commerce refused to consider certain contradictory evidence in finding that a particular market situation exists in Germany with respect to the price of electricity.  Pl. Cmnts. at 9.  However, this argument is premised on untimely factual information included in its case brief that Commerce rejected from the record of the anti-dumping investigation.  Commerce's Rejection of New Factual Information in BGH Brief, Appx002832-002833; Commerce's Rejection of New Factual Information in BGH Rebuttal Brief, Appx002856-002857.  BGH had an opportunity to submit this evidence in its particular

market situation rebuttal comments but failed to do so.  Because Commerce will not consider untimely filed new factual information, Commerce properly rejected and declined to consider this untimely new factual information.  *See* 19 C.F.R. §§ 351.302(d)(1), 351.104.  As the Federal Circuit has recognized, "Commerce is entitled to broad discretion regarding the manner in which it develops the record in an antidumping investigation . . . {and the Court} will not second-guess Commerce's application of the procedural requirements governing the submission of factual information in case briefs."  *Stupp Corp. v. United States*, 5 F. 4th 1341, 1350 (Fed. Cir. 2021).  Moreover, because the Court's review is limited to evidence on the record before Commerce, this Court should not now consider this untimely factual evidence in rendering a determination.  *See* 19 U.S.C. § 1516a(b)(2)(A).

In any event, as set forth below, Commerce's electricity particular market situation finding is supported by substantial evidence reflecting government intervention through a price setting regime that distorts the actual cost of electricity and through a complex regulatory scheme that is manifested in several electricity-related subsidy programs.  *See* IDM at 20, Appx002297 (citing Petitioner Particular Market Situation Narrative (Allegation Narrative), Appx002459-002461).  BGH makes three arguments in turn.  First, it argues that no distortions exist in the German electricity market, Pl. Br. 8-12, despite record evidence showing that it received [███████] euros in benefits from German electricity schemes.  Final Margin Calc. Memo. (Att. IV), Appx086811.  Second, BGH argues that if a distortion is found, Commerce has not shown that the distortion prevents a proper comparison of normal value with export price or constructed export price.  Pl. Cmnts. at 12.  Third, BGH argues that the particular market situation adjustment is an impermissible double remedy and contains other errors.  *Id.* at 13-16.

As we explain below, the Court should reject BGH's arguments because they rely on an incorrect reading of the statute and record.

       1.      Substantial evidence Supports Commerce's Finding That There Is A Particular Market Situation In The Electricity Market

First, BGH claims that there is no evidence of government control over pricing in the German electricity market such that the costs are not reflective of the ordinary course of trade. Pl. Cmnts. at 10. However, Commerce cited record evidence that showed Germany created an artificial price floor in its 2018 Special Equalization Scheme for all electricity produced from renewable sources (36.6 percent of its entire electricity market) and an *even lower* artificial floor for industrial electricity users, such as BGH. IDM at 20, Appx002297 (citing Allegation Narrative, Appx002459-002460). This type of "price-setting regime" is exactly what Congress envisioned when explaining the need for a particular market situation, explaining that "where there is government control over pricing to such an extent that home market prices cannot be considered to be competitively set," Commerce may adjust for these distortions in calculating normal value. SAA at 822. BGH also ignores the "sheer number" of electricity-related subsidies identified in the parallel countervailing duty investigation that Commerce cited as further evidence of government control in the sector. IDM at 20, Appx002297. Thus, Commerce reasonably found that there is government control of the German electricity market, such that home market prices for Germany cannot be in the ordinary course of trade as they are not competitively set. *Id.*; 19 U.S.C. § 1677(15). Additionally, contrary to BGH's contentions, Pl. Cmnts. at 11, because these programs are particularly geared towards BGH, in that the German artificial price floor is *particularly* low for them, this further supports a particular market situation finding. Allegation Narrative, Appx002460.

The Court should reject BGH's suggestion, Pl. Cmnts. at 12, that the Federal Circuit rejected a similar particular market situation finding in *Nexteel Co., Ltd. v. United States*, 24 F. 4th 1226 (Fed. Cir. 2022). Although in *Nexteel*, the Federal Circuit stated that Commerce failed to establish that the "electricity prices are any different from what they would be in the ordinary course of trade," the Federal Circuit also noted that the evidence was "mixed" on whether the Korean government controlled electricity prices "to such an extent that home market prices cannot be considered to be competitively set." 28 F.4th at 1237 (citing SAA at 822). In contrast, here, Commerce cited evidence supporting a determination that electricity prices are not competitively set. IDM at 24, Appx002301.

In arguing there are no significant distortions, BGH claims that information on the record shows that electricity costs in Germany were higher than in other select countries, and thus they had no advantage as compared to other countries during the period of investigation. Pl. Cmnts. at 10-12. This is meritless. First, BGH's arguments about the reported cost of electricity rely on charts they put on the record with no methodological explanation. BGH Resp. to Particular Market Situation Allegation at Attachment 5, Appx002596-002633. The only insight Commerce has about BGH's data is that it "excludes {value added tax} and other recoverable taxes and levies" without any indication of whether the costs account for electricity rebate programs that Commerce found contributed to the particular market situation in Germany. *Id.*, Appx2599; *see also* IDM at 20, Appx002297 (discussing countervailing duty determination). In any event, even accepting that German electricity prices were higher relative to other countries, that would not disturb Commerce's finding, based on record evidence, that the electricity prices are not competitively set prices in Germany and, thus, are outside the ordinary course of trade. IDM at 20-22, Appx002297-002299.

2.    Commerce Reasonably Found That The Particular Market Situation
Prevents A Proper Comparison With The Export Price

Second, BGH argues that the distortions in the German electricity market do not prevent

a proper comparison with export price and thus Commerce's particular market situation finding

runs afoul of the requirements of 19 U.S.C. § 1677(15).  As Commerce explained in the final

determination, the statute "requires Commerce to determine (normal value) based on the rules in

{19 U.S.C. § 1677b} to achieve a fair comparison with U.S. price."  IDM at 21, Appx002298.

Commerce then interpreted 19 U.S.C. § 1677b(e), explaining that "where a {particular market

situation} exists such that the price of certain input materials does not accurately reflect the cost

of manufacture, it is within Commerce's discretion to use another calculation methodology to

calculate a {normal value} that reflects production costs in the ordinary course of trade,"

including adjusting for subsidization distortions in home market calculations.  *Id.*  As Commerce

has shown, the prices in the German electricity market are not competitively set and are distorted

by multiple subsidy programs "undertaken by the German government to control the German

market for electricity."  *Id.* at 20-21, Appx002297-002298.  The Court should reject BGH's

argument that Commerce must quantify the distortion precisely.  *Nexteel*, 28 F.4th at 1234

("Nothing in the statute requires Commerce to quantify the distortion precisely.").

3.    Commerce's Particular Market Situation Adjustment Did Not Result In A
Double Remedy

Finally, BGH alleges that Commerce's particular market situation adjustment is

unreasonable and unlawful because it results in a double remedy.  *See* Pl. Cmnts. at 13-15 (citing

*Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d 1323 (Ct. Int'l Trade 2019) (*Vicentin I*);

*Vicentin S.A.I.C. v. United States*, 466 F. Supp. 3d 1227 (Ct. Int'l Trade 2020) (*Vicentin II*);

*Vicentin S.A.I.C. v. United States*, 503 F. Supp. 3d 1255 (Ct. Int'l Trade 2021) (*Vicentin III*);

*Vicentin S.A.I.C. v. United States*, 42 F. 4th 1372 (Fed. Cir. 2022) (*Vicentin IV*)).  The *Vicentin* line of cases concern Commerce's particular market situation finding in its less-than-fair-value investigation of biodiesel from Argentina.  This Court found that while the law does not require accounting for remedies imposed in countervailing duty proceedings when adjusting for a particular market situation, Commerce must explain why the remedy imposed in the countervailing duty investigation does not remedy the particular market situation distortion. *Vicentin II*, 466 F. Supp. 3d at 1244.

BGH, thus, mischaracterizes Commerce's particular market situation cost adjustment here as a double remedy.  In the final determination, Commerce explained that antidumping and countervailing duty investigations proceed under two separate statutes and involve individual determinations based on independent records.  IDM at 27, Appx002304; *Yama Ribbons Co. Ltd. v. United States*, 865 F. Supp. 2d 1294, 1300 (Ct. Int'l Trade 2012) (discussing separate nature of countervailing and antidumping duty investigations).  Accordingly, although they may be conducted concurrently, antidumping and countervailing duty investigations are "entirely separate proceedings," each with its own calculated margins.  IDM at 20-22, Appx002297-002299.  Indeed, contrary to BGH's claim that Commerce's findings in separate proceedings amount to the imposition of double remedies—once in the context of the antidumping proceeding and once in the context of the countervailing duty proceeding—for the same government programs, countervailing duty and antidumping duty proceedings remedy different behaviors.  *See, e.g.*, *Yama Ribbons*, 865 F. Supp. 2d at 1300 (rejecting claim that countervailing duty proceeding "should be seen as one combined proceeding with the simultaneous antidumping investigation").  Countervailing duty proceedings measure and remedy countervailable subsidies; in contrast, antidumping duty proceedings measure and remedy price

discrimination for merchandise sold at less than fair value. 19 U.S.C. §§ 1671(a)(1), 1673(1). That is true even if the separate behaviors allegedly relate to the same policy, such as the German subsidization of electricity. Just because a product is subsidized does not require companies also to sell it in the United States at less than fair value. Therefore, as Commerce explained, there is no "reason to assume that the countervailable subsidy necessarily results in lower U.S. prices and thus contributes to the difference between {normal value} and U.S. price." IDM at 21, Appx002298.

Further, the statute instructs that Commerce "shall consider" sales and transactions to be outside the ordinary course of trade in "{s}ituations in which {Commerce} determines that the particular market situation prevents a proper comparison with the export price or constructed export price." 19 U.S.C. § 1677(15). As discussed above, this is precisely what Commerce found in this case. The statute relatedly requires Commerce in antidumping proceedings to determine normal value based on the rules set forth in 19 U.S.C. § 1677b, including the particular market situation provisions, to achieve a "fair comparison" between normal value and export price. *Id.* § 1677b(a). And if a particular market situation exists such that the price of input materials does not accurately reflect the cost of production, Commerce has the authority to use another calculation methodology for normal value that reflects production costs in the ordinary course of trade. *See id.* § 1677b(e).

This Court accords Commerce "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996); *Stupp*, 5 F.4th at 1352. Here, Commerce lawfully exercised its statutory discretion to adjust the

constructed value to achieve a more accurate measure of normal value, and thereby ensure an

appropriate comparison because substantial record evidence indicates that a particular market

situation existed affecting German electricity prices.  *See* IDM at 20-22, Appx002297-002299.

Thus, contrary to the claim that no such adjustment is necessary, comparing United States price

to a distorted normal value would not produce a proper comparison and would be contrary to

statute.  *Id.*; 19 U.S.C. § 1677(15).

BGH also argues that Commerce merely applied the countervailing duty rate as the

particular market situation adjustment.  Pl. Cmnts. at 13.  This is not true.  As explained in the

final determination, Commerce changed course from the preliminary determination to the final

determination and based the electricity adjustment on the total electricity related *benefit*

calculated in the countervailing duty investigation, not just merely applying the countervailing

duty rate.  IDM at 22, Appx002299.  Commerce then took the total amount of benefit received

from the subsidies and incorporated that into its constructed value equation.  Final Margin Calc.

Memo, Appx002885-002895; Am. Final Margin Calc. Memo, Appx002896-002900.

In other words, Commerce did not blindly adopt the companion case's countervailing

duty subsidy; rather, "for the final determination, {it} revised the electricity adjustment based on

the total electricity-related subsidies (*i.e.*, benefit) for 2018 calculated in the final determination

of the companion {countervailing duty} investigation, equalized to the {period of

investigation}."  *Id.* at 22, Appx002299.  "To calculate an estimate of the amount of the 2018

subsidy attributable to the {period of investigation}, {Commerce} relied on BGH's electricity

costs," and "calculated the percentage BGH's {period of investigation} electricity costs represent

of BGH's 2018 electricity costs and applied the resulting rate to the total 2018 electricity-related

subsidies."  *Id.*  It "then applied the subsidy attributable to the {period of investigation} as a

percentage of {cost of manufacturing}." *Id.* Thus, there was no double remedy. *Id.*

Moreover, the statute does not require that Commerce account for remedies imposed in countervailing duty proceedings when adjusting for a particular market situation. BGH's contrary argument relies on a misreading of *Vicentin I.* The Court in that case recognized that there is no statutory prohibition against adjusting constructed value based on a particular market situation just because Commerce found in a separate proceeding under a different statutory provision that a government has provided a countervailable subsidy with respect to the same cost element. *See id.* at 20-22, Appx002297-002299 (discussing *Vicentin I,* 404 F. Supp. 3d at 1337). As Commerce explained, Congress has provided for specific statutory offsets in instances of potential double-counting—most notably when applying both antidumping and countervailing duty remedies in non-market economy proceedings, which would potentially result in double counting. *See id.*; *see also* 19 U.S.C. § 1677f-1(f). Yet Congress, in expanding the particular market situation concept to incorporate costs involved in calculating normal value, neither provided an offset for an alleged double remedy nor expressed a concern about potential double counting stemming from the amended section 1677b(e). *See* 19 U.S.C. § 1677f-1(f); *cf. GPX Int'l Tire Corp. v. United States,* 666 F.3d 732, 737 (Fed. Cir. 2011) (declining to adopt double counting theory "both because the extent to which the statute may prohibit double counting is unclear, and because Commerce has determined that it is far from clear that double counting has in fact occurred"). Contrary to BGH's claims, Commerce's reasoning comports with statutory interpretation. *See, e.g., Turtle Island Restoration Network v. Evans,* 284 F.3d 1282, 1296 (Fed. Cir. 2002) (stating "when Congress omits from a statute a provision found in similar statutes, the omission is typically thought deliberate"); *Int'l Trading Co. v. United States,* 110 F. Supp. 2d 977, 988 (Ct. Int'l Trade 2000) (quoting *Floral Trade Council v. United States,* 41 F. Supp. 2d

319, 329 (Ct. Int'l Trade 1999) ("Where Congress has included specific language in one section of a statute but has omitted it from another, related section of the same Act, it is generally presumed that Congress intended the omission.")).

BGH also argues that Commerce made certain calculation errors in calculating a particular market situation adjustment, such as erring by including Konzessionsabgabenverordung (KAV Program) benefits in its particular market situation adjustment. Pl. Cmnts. at 15-16 (citing *BGH Edelstahl Siegen GmbH v. United States*, 663 F. Supp. 3d 1378 (Ct. Int'l Trade 2023)). However, that litigation concerned whether KAV Program benefits are *de jure* specific and not whether they conferred benefits on recipients. As explained in the second remand redetermination, *de jure* specificity is a requirement of finding a subsidy countervailable. Second Remand Redetermination at 18, Appx012209. It is not a requirement of finding a particular market situation. Moreover, Commerce explained in its second remand redetermination that its "{particular market situation} finding is neither directly tied to that program alone, nor is it based entirely on the {countervailing duty} determination." *Id.* Instead, Commerce's determination is based on "*multiple* electricity program . . . which *further* supports the petitioner's allegation that the German market for electricity is distorted by virtue of government subsidization." *Id.* (emphasis in original).

### B.    Substantial Evidence Supports Commerce's Particular Market Situation Finding On Ferrochrome

In the underlying investigation, Commerce found that a particular market situation existed in Germany with respect to the cost of ferrochrome. *Id.* at 24-25, Appx002301-002302. Because Kazakhstan was the largest source of ferrochrome imports for Germany and Kazchrome, the state-controlled producer of ferrochrome in Kazakhstan, does not make pricing decisions solely based on commercial considerations, Commerce made a particular market

situation adjustment to ferrochrome to adjust for this distortion. *Id.* But BGH's arguments were either not exhausted before Commerce or lack merit. Therefore, the Court should sustain Commerce's particular market situation finding with respect to this input.

This Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). "This statutory mandate 'indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies.'" *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). By regulation, interested parties must raise in their case brief all arguments that remain "relevant" to Commerce's "final determination or final results." *Corus Staal*, 502 F.3d at 1378 (citing 19 U.S.C. § 351.309(c)(2)). This "is the prescribed administrative remedy for challenging aspects of the preliminary results with which a party disagrees." *Id.* "{A} party's failure to raise an argument before Commerce constitutes a failure to exhaust its administrative remedies." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1388 (Fed. Cir. 2014).

In BGH's administrative case brief, BGH Admin. Case Br. at 13-14, Appx002853-002854, it made three arguments. First, it alleged that the cost of imports of ferrochrome into industrial countries are consistent with Germany's costs of ferrochrome. *Id.* Second, it claimed that the European Union is a customs union wherein the imported ferrochrome could freely travel to another country and claimed, without an evidentiary basis, that "much of the ferrochrome imported into Germany is not destined for consumption in Germany." *Id.* Finally, BGH asserted that all of its invoices on record for ferrochrome were purchased from private companies in the European Union or Switzerland and not from Kazakhstan. *Id.* Thus, BGH reasoned that its ferrochrome costs are within the ordinary course of trade. *Id.*

Before this Court, BGH continues to argue these points, but also makes several new arguments regarding how the distortion prevents a proper comparison with export price and alleges that Commerce made certain calculation errors in its final determination. Pl. Cmnts. at 20–22. In particular, BGH argues that Commerce failed to show how the distortions prevent a proper comparison with export price and how this distortion has existed for a reasonable time prior to the exportation of the subject merchandise and, therefore, is normal in the trade under consideration. *Id.* at 20. Because these arguments were not exhausted, and because none of the exceptions to the exhaustion doctrine apply,[1] the Court should not consider them. *See Qingdao*, 766 F.3d at 1388.

With respect to arguments that BGH preserved before Commerce, these arguments are meritless. First, BGH argues that the cost of ferrochrome in Germany is consistent with other countries it had identified. Pl. Cmnts. at 24-25. But Commerce explained that while the ferrochrome import prices BGH placed on the record are consistent with those from certain other countries, they are lower than the benchmark U.S. Geological Survey price that petitioner put on the record. IDM at 24, Appx002301. Commerce found this evidence to be more persuasive because the U.S. Geological Survey price is "based on U.S. import prices largely from countries other than Kazakhstan{}." *Id.* While BGH claims there is no distortion in this commodity price, record evidence shows that there is a [ ▮▮▮▮▮ ] difference between BGH's reported ferrochrome purchase price and the U.S. Geological Survey's benchmark price. *Id.* at 25, Appx002302 (citing Final Margin Calc. Memo (Att. IV), Appx086811).

---

[1] None of the exceptions to the exhaustion requirement are applicable in this case. The exceptions include futility, pure question of law, lack of timely access to the confidential record, no administrative procedure to exhaust, or new interpretation from an intervening judicial decision. *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013).

BGH nonetheless argues that Commerce ignored the data it submitted and effectively has imposed an "an irrebuttable presumption" that where input prices are lower in the foreign market than in the United States, it is a particular market situation. Pl. Cmnts. at 17. BGH misunderstands what U.S. Geological Survey benchmark prices are: U.S. Geological Survey benchmark prices are not merely United States input prices, but instead are based on the prices of imports from *all other countries* as collected by the United States. IDM at 24, Appx002301 (citing Allegation Narrative at Exh. 18, Appx003094-003116) (showing the U.S. import prices from more than 30 countries). Commerce did not impose an irrebuttable presumption that if German prices are different than U.S. prices there must be a distortion. Rather, Commerce compared the price of ferrochrome in the German market, coupled with the evidence on Kazchrome's ownership, its non-commercial cost structure, and its involvement in criminal investigations conducted by foreign governments with the price of ferrochrome in over 30 countries. *Id.* After analyzing the evidence, Commerce concluded that, although the prices of ferrochrome are consistent across the countries BGH identified, the fact that they are lower than the broader U.S. Geological Survey benchmark price is sufficient to conclude there is a distortion in the German ferrochrome market. *Id.*

Second, BGH argues that Germany is part of the European Union and the distortive ferrochrome could freely travel to other European Union member states thereby mitigating the distortive impact. Pl. Cmnts. at 19. This point is speculative. BGH had an opportunity to submit evidence that the distortive effects of ferrochrome were mitigated by the European Union common market but failed to do so. *See* BGH Resp. to Particular Market Situation Allegation, Appx002506-002661. Thus, BGH's argument is based on conjecture, not record evidence. BGH Admin. Case Br. at 14, Appx002854 (arguing this point without a single citation to the

record).  While Commerce has an obligation to respond to evidence that detracts from its

decision, it does not need to respond to unsupported allegations.  *Seah Steel Vina Corp v. United*

*States*, 950 F.3d 833, 840 (Fed. Cir. 2020) (explaining that agencies must consider only

detracting evidence on the record); *U.S. Steel Corp. v. United States*, 34 CIT 1193, 1194 (2010)

(explaining that Commerce must connect its conclusions to the record before it).  Instead of

engaging with BGH's speculation, Commerce based its conclusion on record evidence showing

that there is distortion in the relevant market under investigation, Germany.  IDM at 24,

Appx002301.

Finally, BGH argues that it did not purchase the distortive ferrochrome, and instead

purchased ferrochrome from European Union countries and Switzerland.  Pl. Cmnts. at 18.  This

relies on a misunderstanding of what a particular market situation finding entails.  As Commerce

has repeatedly explained, particular market situation findings are market based and are not

respondent specific.  IDM at 24, Appx002301; Second Remand Redetermination at 12,

Appx012203.  For the same reasons that Ellwood City's argument surrounding its 19 U.S.C.

§ 1677b(f) alternative pathway fails, so too does BGH's argument fail here.  The relevant fact is

*not* that BGH does not purchase any ferrochrome from the state-owned enterprise in Kazakhstan,

but instead that a Kazakh state-owned enterprise is the primary source of ferrochrome in the

German market and that the enterprise did not make pricing decisions based on commercial

considerations (in other words, outside the ordinary course of trade).  IDM at 24, Appx002301.

Thus, substantial evidence supports Commerce's determination that the distortive Kazakh

pricing *lowers* the overall price of ferrochrome in the German market such that ferrochrome

costs must be adjusted whether the respondents purchase directly from the state-owned enterprise

or from a different company within the distorted German market.  *See id.*

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's second remand redetermination, and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:
ALEXANDER FRIED
Attorney
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce
Washington, D.C. 20230

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7571
E-mail:  Kara.M.Westercamp@usdoj.gov

February 20, 2024

*Attorneys for Defendant United States*

18

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

_____
                                                              )
ELLWOOD CITY FORGE COMPANY,          )
ELLWOOD QUALITY STEELS COMPANY,    )
ELLWOOD NATIONAL STEEL COMPANY,    )
and A. FINKL & SONS,                             )
                                                              )
                        Plaintiffs,                       )
                                                              )
                        and                                 )
                                                              )
BGH EDELSTAHL SIEGEN GMBH,             )
                                                              )
                        Consolidated Plaintiff,     )
                                                              )
            v.                                                )        Consol. Court No. 21-00077
                                                              )
UNITED STATES,                                      )
                                                              )
                        Defendant,                       )
                                                              )
                        and                                 )
                                                              )
BGH EDELSTAHL SIEGEN GMBH,             )
                                                              )
                        Defendant-Intervenor,       )
                                                              )
                        and                                 )
                                                              )
ELLWOOD CITY FORGE COMPANY,          )
ELLWOOD QUALITY STEELS COMPANY,    )
ELLWOOD NATIONAL STEEL COMPANY,    )
and A. FINKL & SONS,                             )
                                                              )
                        Defendant-Intervenors.     )
_____)

## ORDER

Upon consideration of the Department of Commerce's final results of redetermination

pursuant to remand, defendant's response in support thereto, and all other pertinent papers, it is

hereby

     ORDERED that the second remand redetermination are sustained in their entirety; and

further

     ORDERED that final judgment is entered in favor of the United States.


Dated:_____, 2024               _____

New York, NY                        STEPHEN A. VADEN, JUDGE

<u>CERTIFICATE OF COMPLIANCE</u>

     I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 4,910 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/ Kara M. Westercamp</u>
KARA M. WESTERCAMP
Trial Attorney
Department of Justice
Civil Division
