**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, <br><br> Plaintiffs and Consolidated Defendant-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br> and <br><br> BGH EDELSTAHL SIEGEN GMBH, <br><br> Defendant-Intervenor and Consolidated Plaintiff. | Consol. Ct. No. 21-00077 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> Proprietary Information Subject to Protective Order Contained In Brackets on Pages 13-14. |

### CONSOLIDATED DEFENDANT-INTERVENORS' SUR-REPLY TO SECTION I.C OF CONSOLIDATED PLAINTIFF'S JANUARY 22, 2024 SUBMISSION

Myles S. Getlan
Thomas M. Beline
James E. Ransdell
Nicole Brunda
**CASSIDY LEVY KENT (USA) LLP**
900 19th Street NW
Suite 400
Washington, DC 20006
(202) 567-2300

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

March 6, 2024

# Table of Contents

Page

I.   SUMMARY OF ARGUMENT ................................................................................ 2

II.  ARGUMENT ...................................................................................................... 2

    A.  Commerce Need Not Show an Improper Comparison Between
Constructed Normal Value and U.S. Price before Applying a PMS
Adjustment to Costs Used in Calculating Constructed Normal
Value .......................................................................................................... 2

    B.  Commerce's Finding that the German Electricity Market Is
Distorted by a PMS and its Correction of that Distortion Were
Supported by Substantial Evidence ............................................................ 5

        1.  Commerce's Finding of Significant Distortions in the German
Electricity Market Was Supported by Substantial Evidence ............. 5

        2.  BGH Failed to Exhaust its "Particularity" Challenge ........................ 9

        3.  Commerce's PMS Adjustment for Electricity Was Reasonable ........ 9

    C.  Commerce's Finding that the German Ferrochrome Market Is
Distorted by a PMS Was Supported by Substantial Evidence ................. 12

        1.  Commerce's Identification of Significant Distortions in the
German Ferrochrome Market Is Supported by Substantial
Evidence ......................................................................................... 12

        2.  Commerce's PMS Adjustment for Ferrochrome Was
Reasonable ..................................................................................... 14

III. CONCLUSION ................................................................................................ 17

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1677(5)(B)(iii)................................................................8

19 U.S.C. § 1677a(c)(1)(C)..............................................................10

19 U.S.C. § 1677b(b)........................................................................4

19 U.S.C. § 1677b(e).................................................................2, 3, 4, 5

19 U.S.C. § 1677f-1(f)......................................................................10

19 U.S.C. § 1677(15)........................................................................5

19 U.S.C. § 1677b(a)(1)....................................................................3

19 U.S.C. § 1677b(a)(1)(B)(ii)(III)..............................................3, 4, 5

19 U.S.C. § 1677b(a)(1)(C)(iii) ...................................................3, 4, 5

19 U.S.C. § 1677b(a)(4)....................................................................4

19 U.S.C. § 1677b(e)(3)....................................................................3

28 U.S.C. § 2637(d) ..............................................................7, 9, 11, 15


Court Decisions

*Hyundai Steel Company v. United States*, 19 F.4th 1346 (Fed. Cir. 2021) ..............................3

*Husteel Co. v. United States,* 426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) .....................4, 14

*Garg Tube Exp. LLP v. United States*, 569 F. Supp. 3d 1202
(Ct. Int'l Trade 2022)....................................................................4, 5

*BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241
(Ct. Int'l Trade 2022).......................................................................6

*NEXTEEL Co., Ltd. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022) ...........................7, 8, 9

*Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322 (Fed. Cir. 2017).....................9

*Apex Frozen Foods Priv. Ltd. v. United States*, 37 F. Supp. 3d 1286
(Ct. Int'l Trade 2014).......................................................................9

*GPX Intern. Tire Corp. v. U.S.,* 678 F.3d 1308 (Fed. Cir. 2012) ...........................................10

*Cf. Russello v. United States*, 464 U.S. 16 (1983) ................................................................10

*Vincetin S.A.I.C. v. United States*, 42 F.4th 1372 (Fed. Cir. 2022) .........................................10

*Intercargo Ins. Co. v. United States*, 83 F.3d 391 (Fed. Cir. 1996)........................................15

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (2010) .............................................................15

QVD *Food Co. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011)..........................................16

Administrative Determinations

*Forged Steel Fluid End Blocks From the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dec. 11, 2020)............................9

Other Legislative Materials

*Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,* H.R. Doc. 103-316, Vol. 1 (1994)...................................................................................................7

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS,　　　　　　　) ) ) ) ) ) | |
| 　　　　Plaintiffs and Consolidated 　　　　Defendant-Intervenors,　) ) ) | Consol. Ct. No.  21-00077 |
| 　　　v.　　） | |
| UNITED STATES,　　） ) | **NON-CONFIDENTIAL VERSION** |
| 　　　　Defendant,　） ) | |
| 　　and　　） ) | Proprietary Information Subject to Protective Order Contained In Brackets on Pages 13-14. |
| BGH EDELSTAHL SIEGEN GMBH,　） ) ) | |
| 　　　　Defendant-Intervenor and 　　　　Consolidated Plaintiff.　） ) ) | |

<u>**CONSOLIDATED DEFENDANT-INTERVENORS' SUR-REPLY TO
SECTION I.C OF CONSOLIDATED PLAINTIFF'S JANUARY 22, 2024
SUBMISSION**</u>

　　　　Consolidated Defendant-Intervenors Ellwood City Forge Company, Ellwood Quality

Steels Company, Ellwood National Steel Company, and A. Finkl & Sons (collectively, the

"Petitioners") respectfully submit this sur-reply to section I.C of the January 22, 2024

comments submitted by Consolidated Plaintiff BGH Edelstahl Siegen GMBH ("BGH"), *see*

BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85).[1]  This sur-reply is timely filed

in accordance with the Court's paperless order of February 2, 2024.

---

[1] Petitioners concur with the arguments contained in the sur-reply of the United States submitted on February 20, 2024 and incorporate those arguments by reference.  *See* United States' Sur-Reply (Feb. 20, 2024) (ECF 89).  Petitioners' comments in this sur-reply are intended to augment the United States' submission.

## I.     SUMMARY OF ARGUMENT

The Petitioners herein address three issues regarding Section I.C of BGH's January 22, 2024 comments. *First*, in Section II.A, Petitioners rebut BGH's erroneous claim that before making a cost-based PMS adjustment under 19 U.S.C. § 1677b(e) Commerce must first demonstrate that identified distortions prevent a proper comparison of constructed normal value with U.S. price. As Petitioners explain, neither the statute nor the legal precedent cited by BGH support any such requirement. *Second*, in Section II.B, Petitioners respond to BGH's incorrect assertions that Commerce's finding of a PMS in the German electricity market is unsupported by substantial evidence. To the contrary, Commerce's finding of distortion in the German electricity market is fully supported by record evidence and its calculated PMS adjustment is reasonable. *Finally*, in Section II.C, Petitioners address BGH's related contention that Commerce's finding of a PMS in the German ferrochrome market is unsupported by substantial evidence. Here too, Commerce's identification of distortion particular to the German ferrochrome market is well-founded in the record and Commerce reasonably and lawfully corrected for this PMS by adjusting constructed value under 19 U.S.C. § 1677b(e).

## II.     ARGUMENT

### A.  Commerce Need Not Show an Improper Comparison Between Constructed Normal Value and U.S. Price before Applying a PMS Adjustment to Costs Used in Calculating Constructed Normal Value

Throughout its comments, BGH repeatedly asserts that legal authorities mandate that Commerce demonstrate that the identified PMS distortions "prevent a proper comparison of normal value with export price or constructed export price," *see e.g.,* BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 8, and that Commerce failed to make such a showing in this case, *see id.* at 12-13 (with respect to electricity); *id.* at 20-21 (with respect to ferrochrome). Such arguments reflect a fundamental misunderstanding of the statute, which

separates a sales-based PMS affecting the home market or third country <u>prices</u> used to calculate normal value from a cost-based PMS affecting <u>costs of production</u> used to calculate constructed value.  *Compare* 19 U.S.C. §§ 1677b(a)(1)(B)(ii)(III), 1677b(a)(1)(C)(iii) (sales-based PMS for normal value based on home market and third country prices, respectively), *with id.* § 1677b(e)(3) (cost-based PMS for constructed value).

While BGH conflates the two, the Federal Circuit has affirmed that a sales-based PMS and a cost-based PMS are two statutorily distinct inquiries:

> The PMS provisions in section 1677b(a)(1) require a finding that a PMS exists such that there cannot be "a proper comparison with the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(C)(iii). By contrast, under section 1677b(e), Commerce may adjust constructed value when a PMS exists "such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade." *Id.* § 1677b(e). These are different standards, so in order to trigger the provisions in 1677b(a)(1), Commerce would need to find that the PMS prevents a proper comparison to the export price, not just that the exporter's actual costs do not accurately reflect the costs of production.  *Hyundai Steel Company v. United States*, 19 F.4th 1346, 1355, n. 10 (Fed. Cir. 2021).

Commerce's remand redetermination did not find any sales-based PMS, and limited cost-based PMS adjustments to those comparisons where normal value was based on <u>constructed value</u> (*i.e.*, under 19 U.S.C. § 1677b(e)).[2]  *See* First Remand Redetermination (Mar. 14, 2023) at 4 (Appx012108).[3]  As Commerce did not apply a sales-based PMS adjustment to any comparison in which normal value was based on home market prices, the statute does not require that Commerce demonstrate that the PMS prevents a proper comparison of normal value with export price or constructed export price.

---

[2] Commerce was unable to rely on price-to-price comparisons for certain U.S. sales because all available home market sales concerned products with variable cost differences exceeding 20% of the average total cost of manufacture of the U.S. model.  Consistent with Commerce's usual practice (and uncontested here), it rejected such comparisons as unreasonable, and instead constructed the normal value for these comparisons.  *See* Petitioners' Comments on First Remand (Apr. 13, 2023) (ECF 63) at 2-7.

[3] This was unchanged in Commerce's Second Remand Redetermination.  *See* Second Remand Redetermination (Nov. 21, 2023) (Appx012192-012193).

BGH's reliance upon this Court's decisions in *Husteel* and *Garg* is misplaced. *See* BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 6-8, 12-13, 20-21 (citing *Husteel Co. v. United States*, 426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020); *Garg Tube Exp. LLP v. United States*, 569 F. Supp. 3d 1202 (Ct. Int'l Trade 2022)). *Husteel* concerned Commerce's application of a cost-based PMS adjustment (under Section 1677b(e)) to the sales below cost test (under Section 1677b(b)).[4] 426 F. Supp. 3d at 1389. This Court found that Commerce had "misappropriated the language of 19 U.S.C. § 1677b(e)," which applies only to calculations of constructed value, in adjusting the sales below cost test in a way that was not permitted by the statutory scheme. *Id*. at 1387-1389. However, *Husteel* acknowledged, as it must, that the plain language of 19 U.S.C. § 1677b(e) "provides that when Commerce is using constructed value and encounters a PMS that it may resort to 'any other calculation methodology.'" *Id*. at 1386. That is precisely what Commerce did here.

BGH's arguments fail to recognize that the various references to a "proper comparison" finding in *Husteel*'s summary of the statutory scheme exclusively cite the sales-based PMS provisions but did <u>not</u> cite 19 U.S.C. § 1677b(e), implicitly recognizing that no "proper comparison" finding is necessary for cost-based PMS findings. *See id.* at 1386-87 (citing 19 U.S.C. §§ 1677b(a)(1)(B)(ii)(III), (a)(1)(C)(iii), (a)(4)). Because Commerce's second redetermination applied only Section 1677b(e), it is consistent with *Husteel* on this point as well. Indeed, BGH's contrary reading is nonsensical, insofar as cost distortion would directly affect the cost values used to construct normal value under Section 1677b(e), whereas sales prices would only be indirectly impacted, if at all, yielding a necessarily distorted comparison absent adjustment.

---

[4] The sales below cost test is one of the filtering mechanisms by which Commerce determines which home market or third country sales may be used for normal value comparisons. *See* 19 U.S.C. § 1677b(b).

In *Garg*, the Court dealt with the use of a cost-based PMS adjustment to constructed value. As in *Hyundai*, to the extent a "proper comparison" was mentioned, it was in connection with the <u>sales</u>-based PMS provisions. *See Garg*, 569 F. Supp. 3d at 1211 (citing 19 U.S.C. §§ 1677b(a)(1)(B)(ii)(III), (a)(1)(C)(iii)); *see also id.* at 1211 n.9 (concluding that the definition in 19 U.S.C. § 1677(15) does not supplant the language of Section 1677b(e) itself). Contrary to BGH's assertions, *see e.g.,* BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 7-8, the Court did not require that Commerce demonstrate that the PMS prevented a proper comparison between normal value and U.S. price in order to adjust constructed value. Instead, the Court stated that "{a} finding of a PMS in the constructed value context requires Commerce to identify what unique fact or set of facts in the market prevents a respondent's reported 'costs of materials and fabrication or other processing' from 'accurately reflecting the cost of production in the ordinary court of trade.'" *Garg*, 569 F. Supp. 3d at 1210. As discussed further in Sections II.B and II.C below, this is precisely the analysis Commerce provided.

**B.  Commerce's Finding that the German Electricity Market Is Distorted by a PMS and its Correction of that Distortion Were Supported by Substantial Evidence**

**1.  Commerce's Finding of Significant Distortions in the German Electricity Market Was Supported by Substantial Evidence**

BGH erroneously claims that "the only 'evidence' cited by Commerce in support of its determination was the final determination in the concurrent countervailing duty investigation on forged steel fluid end blocks." *See* BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 4. This is simply untrue. Commerce's Final Determination supported its PMS finding by reference to Petitioners' PMS Allegation, which included evidence surrounding the German Government's significant interventions in the German electricity market. *See* Final IDM (Dec. 7, 2020) at 20, n.95 (Appx002297) (citing Petitioners' PMS Allegation (Jun. 15, 2020) at 39-41 (Appx084458-084460)).

Commerce appropriately referenced its findings in the companion CVD investigation as corroborating other record evidence of market distortion.  In particular, Commerce noted that in the companion CVD investigation it had made the separate factual determination that BGH benefitted from multiple countervailable electricity-related subsidies during the POR. Final IDM (Dec. 7, 2020) at 20 (Appx002297).  In the AD investigation, Commerce found that the "{t}he sheer number and extent of these {subsidy} programs, when considered collectively, demonstrate the efforts undertaken by the German government to control the German market for electricity, thereby creating a PMS."  *Id*.

Contrary to BGH's assertions, Commerce's reference to the number of programs and size of subsidies it found countervailable in the companion CVD proceeding did not obligate it to place all evidence underlying that determination on the AD record.  *See* BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 8-9.  Commerce's CVD determination was based on the robust factual record established in that proceeding, which BGH has already unsuccessfully challenged before this Court.  *See BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241 (Ct. Int'l Trade 2022) (affirming Commerce's findings with respect to all but one subsidy program).  Moreover, as explained in Petitioners' Rebuttal Brief, BGH had every opportunity to timely place relevant information from the CVD investigation on the record of the AD proceeding as rebuttal to Petitioner's PMS allegation. *See* Petitioners' Rebuttal Brief (Dec. 17, 2021) (ECF 33) at 21.  That BGH failed to do so within the deadlines established by Commerce was a failure of BGH's own making and Commerce appropriately rejected BGH's subsequent untimely efforts to reference such information in its case brief.  *Id.*

BGH's comments otherwise fail to demonstrate that Commerce's conclusion that a PMS exists with respect to the German electricity market was unsupported by substantial evidence.

*First*, BGH argues that the fact "electricity costs in Germany were far above those in the United States" precludes the existence of a PMS.  *See* BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 10-12.  But the U.S. market is not the German market and BGH's bare price comparisons for a locally supplied input such as electricity have little bearing upon the PMS inquiry.  More importantly, the Statement of Administrative Action ("SAA") is clear that a PMS exists, *inter alia*, "where there is government control over pricing to such an extent that home market prices cannot be considered to be competitively set."  Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) at 822; *see also* NEXTEEL Co., Ltd. v. United States, 28 F.4th 1226, 1234 (Fed. Cir. 2022) (noting that this Congressionally-provided example is a "situation{} in which some circumstance distorts costs so that they are not set based on normal market forces or do not move with the rest of the market").  Commerce correctly found that the German government's extensive subsidy schemes, which permit privileged companies like BGH to pay considerably lower electricity rates than they otherwise would absent the government intervention, is evidence of such government control of the marketplace.  Final IDM (Dec. 7, 2020) at 20-21 (Appx002297-002298).

*Second*, BGH contends that the fact electricity is ostensibly produced, sold, and distributed by private companies negates any PMS finding.  *See* BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 10.  As an initial matter, this factual argument was absent from BGH's administrative case brief, *see* BGH Admin. Case Br. (Nov. 23, 2020) at 10-11 (Appx086408-086409), and the Court should decline to consider it given the requirement to, "where appropriate, require the exhaustion of administrative remedies," 28 U.S.C. § 2637(d).  In any event, government intervention need not be direct to be distortive.  The SAA references price controls, not full-blown communism.  *See* SAA at 822.  And the CVD statute likewise provides that subsidization can exist whether a government provides

the subsidy directly or entrusts or directs a private entity to achieve the same effect.  19 U.S.C. § 1677(5)(B)(iii).  This Court has affirmed that the German Government provided countervailable electricity benefits to companies through legal mandates governing the price private electricity providers can charge certain customers.  *See generally BGH*, 600 F. Supp. 3d at 1241-1269.  Such intervention is substantial evidence of non-market government control over pricing—and thus a PMS.

 *Finally*, BGH claims that the Federal Circuit's determination in *NEXTEEL* requires a contrary finding.  *See* BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 12.  This is incorrect.  *NEXTEEL* acknowledged that "{g}overnment control of electricity prices is a type of distortion expressly contemplated by Congress" but noted in that case that Commerce's "countervailing duty determinations have consistently found that <u>Korean</u> electricity prices are set in accordance with market principles and that <u>Korean</u> steel producers have not benefited from government involvement in Korean electricity pricing."  *See NEXTEEL,* 28 F.4th at 1237 (emphasis supplied).  The Federal Circuit found that Commerce had not adequately reconciled its PMS findings with prior CVD findings that Korean electricity prices are "set in accordance with market principles."  *Id.*

 The opposite is true here.  In its AD investigation, Commerce determined that the German Government's "regulatory regime distorts the costs of electricity such that a PMS exists."  Final IDM (Dec. 7, 2020) at 20 (Appx002297).  Commerce found that this was supported not only by Petitioner's PMS allegation, which described and documented the German government's multi-level price floors intended to benefit the country's industrial electricity users, but also by Commerce's own findings in the parallel CVD investigation, in which Commerce found that the German Government directly or indirectly provided a range of subsidies to companies like BGH.  *See id*. at 20, n.95 (Appx002297) (citing Petitioners' PMS Allegation (Jun. 15, 2020) at 39-41 (Appx084458-084460)); *see also Forged Steel*

*Fluid End Blocks From the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dec. 11, 2020), and accompanying Issues and Decision Memorandum.  Unlike *NEXTEEL*, Commerce's contemporaneous AD and CVD determinations with respect to the German market are entirely consistent with one another.  Commerce's PMS finding with respect to electricity is reasonable and supported by substantial evidence.

### 2.  BGH Failed to Exhaust its "Particularity" Challenge

BGH offhandedly contests the particularity of the electricity subsidies, *see* BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 11, but this too is misplaced as BGH made no such argument administratively.  *See* BGH Admin. Case Br. (Nov. 23, 2020) at 10-13 (Appx086408-086411).  Thus, consistent with 28 U.S.C. § 2637(d), this Court should decline to entertain BGH's belated challenge to a fact-specific determination like "particularity."  *See Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322, 1332 (Fed. Cir. 2017) ("{The exhaustion} rule gives the agency the opportunity to correct its own mistakes, including fact-specific shortfalls in its analysis, before it is haled into federal court. Commerce had no such opportunity to correct the alleged flaw…") (quoting *Apex Frozen Foods Priv. Ltd. v. United States*, 37 F. Supp. 3d 1286, 1297 (Ct. Int'l Trade 2014) in affirming the same).

### 3.  Commerce's PMS Adjustment for Electricity Was Reasonable

BGH additionally argues that, even if Commerce correctly applied a cost-based PMS adjustment, it erred in calculating that adjustment.  BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 13-16.  But the Federal Circuit has stated that "{n}othing in the statute requires Commerce to quantify the distortion precisely," *NEXTEEL*, 28 F.4th at 1234, and BGH has failed to show that Commerce's calculation methodology is unreasonable.

*First*, BGH claims that Commerce unlawfully applied a "double remedy" by failing to explain why the countervailing duties imposed have not remedied the distortions in electricity costs. BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 14.  But as the United States explained in its comments, Commerce fully explained why Commerce's decision was not a double remedy.  *See* United States' Sur-Reply (Feb. 20, 2024) (ECF 89) at 9-10.  As the United States also explained, there is no statutory provision prohibiting double-counting in such circumstances.  *See id*. at 12-13.  Indeed, the statute requires Commerce to make adjustments to avoid double-counting in assessing antidumping and countervailing duties only in the two narrow circumstances outlined in 19 U.S.C. § 1677a(c)(1)(C) (export subsidies) and 19 U.S.C. § 1677f-1(f) (certain non-export subsidies in non-market economy countries), neither of which is applicable here.

In evaluating the latter of these provisions, the Federal Circuit has held that prior to the introduction of the express language in 19 U.S.C. § 1677f-1(f) in 2012 the "pre-existing statute did not contain a prohibition against double-counting" in the non-market economy context.  *GPX Intern. Tire Corp. v. U.S.*, 678 F.3d 1308, 1311-12 (Fed. Cir. 2012).  By similar logic, the fact Congress has not enacted any additional restrictions on double-counting in the PMS context means that no such prohibitions exist.  *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.").  Indeed, the Federal Circuit's opinion in *Vicentin*—on which BGH relies for support—expressly left open this possibility.  *Vicentin S.A.I.C. v. United States*, 42 F.4th 1372, 1382 (Fed. Cir. 2022) (expressly declining to address the "argument that the statute does not allow Commerce to make an adjustment that results in a double remedy or that creates a risk of a double remedy").

*Second*, BGH claims that Commerce "fail{ed} to adequately explain its calculation of the cost-based PMS adjustment to electricity costs." BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 15. As the United States correctly explained, *see* United States' Sur-Reply (Feb. 20, 2024) (ECF 89) at 11-12, this is simply untrue. Indeed, BGH's sole argument in this regard is that Commerce's calculations must be in error because BGH paid less than half the cost for electricity that it would have in a non-distorted market. *See* BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 15-16. However, rather than highlighting any evidence-based error in Commerce's calculations, BGH merely underscores the substantial price distortions in the German market and the necessity of a PMS adjustment.

*Third*, BGH argues that Commerce includes programs in its benefit program that "have nothing to do with electricity" or were received by its affiliate, RPS, "which does not produce subject merchandise." BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 16. As an initial matter, this factual argument was absent from BGH's administrative case brief, *see* BGH Admin. Case Br. (Nov. 23, 2020) at 10-11 (Appx086408-086409), and the Court should decline to consider it given the requirement to, "where appropriate, require the exhaustion of administrative remedies," 28 U.S.C. § 2637(d). In any event, BGH is incorrect. Commerce explained that in determining the appropriate PMS adjustment it examined all of BGH's "2018 electricity-related subsidies." Final IDM (Dec. 7, 2020) at 22 (Appx002299). Among these, Commerce reasonably included subsidies for other energy products such as heating oil and natural gas, which can be used as alternatives to electricity or to generate electricity itself. BGH points to no record evidence that these subsidies are unrelated to BGH's manufacturing costs. Moreover, subsidies received by an affiliate such as RPS benefit BGH's overall manufacturing costs, which directly implicate constructed normal value. Commerce's PMS adjustment reasonably accounted for these electricity programs.

### C. Commerce's Finding that the German Ferrochrome Market Is Distorted by a PMS Was Supported by Substantial Evidence

#### 1. Commerce's Identification of Significant Distortions in the German Ferrochrome Market Is Supported by Substantial Evidence

BGH erroneously claims that Commerce's finding of a PMS in the German ferrochrome market "is based solely upon information that ferrochrome from Kazakhstan is imported into Germany and that the Kazakh producer Kazachrome is state-controlled." BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 17. As Petitioners previously explained, such statements are belied by the substantial factual record underpinning Commerce's conclusion that the significant presence of low-priced, non-market Kazakh ferrochrome affected prices in the German market (*i.e.*, by driving down ferrochrome prices in the German market writ-large, regardless of source). *See* Petitioners' Rebuttal Brief (Dec. 17, 2021) (ECF 33) at 14-15.

As the United States explained, BGH's challenges to Commerce's PMS finding lack merit. United States' Sur-Reply (Feb. 20, 2024) (ECF 89) at 13-17. BGH first suggests that fCommerce "seems to impose an irrebuttable presumption that input prices in a foreign market that are lower than U.S. input prices represent per se a particular market situation." BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 17 (emphasis supplied). Commerce neither said nor did any such thing. Rather, Commerce determined the German ferrochrome market was distorted by the significant presence of Kazakh ferrochrome imports, which record evidence demonstrates were not commercially priced. *See* Final IDM (Dec. 7, 2020) at 24 (Appx002301). After identifying this distortion, Commerce explained why USGS data provided a reasonable benchmark for a PMS-adjustment here, given the available record evidence. Commerce stated that USGS prices are "based on U.S. import prices largely from countries other than Kazakhstan" and given the lack of significant head-to-head competition with low-priced Kazakh imports, the U.S. market price was free from such

distortions.  *See id*. (Appx002301).  In other words, Commerce reasonably identified USGS prices as an appropriate benchmark <u>in this instance</u> because—unlike the German ferrochrome market—they are insulated from the specific distortion at issue.

BGH next claims that invoices it provided in Appendix SD-2 demonstrate that "almost all the ferrochrome purchased by BGH came from countries other than Kazakhstan." BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 18 (citing BGH Supp. DQR (Jun. 16, 2020) at Appendix SD-2 (Appx084083-084171)).  Such claims are belied by the evidentiary record.  Indeed, the purchases reflected on the invoices in question [

].[5]

Moreover, whether BGH purchased ferrochrome directly from Kazakhstan is ultimately irrelevant.  Commerce found a <u>market-wide</u> PMS wherein ferrochrome commodity prices are distorted across the German market, regardless of source.  Kazakh ferrochrome may be the point of origin of the distortion, but the distortion affects ferrochrome prices across the German market.  Thus, all that is relevant in BGH's sales documentation is that BGH purchased ferrochrome in the distorted market, *i.e.*, Germany.  This Court has found

---

[5] Appendix SD-2 of the BGH Supp. DQR contains both: (a) invoices [
], *see, e.g.,* Appx084085-084086, and (b) [                    ] invoices [                                            ], *see, e.g.,* Appx084087-084088.  These [    ] invoices show that [

].  *See* Appx084087-084088, Appx084091, Appx084094-084095, Appx084098-084099, Appx084102-084103.  [

].  *See* Appx084083-084171.  Additionally, invoices [

].  *See* Appx084114, Appx084118, Appx084144-084145, Appx084148, Appx084163. Either way, the invoices included in this Appendix thus do not support BGH's claim that "almost all of the ferrochrome purchased by BGH came from countries other than Kazakhstan." BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 18.

that Commerce may reasonably and lawfully make "both market-based or respondent-specific PMS findings depending on the facts presented in each case." *Husteel*, 426 F. Supp. 3d at 1392 n.20.  Here, Commerce explained its market-based PMS analysis, stating the "relevant fact is the importance of Kazakhstan as a source of ferrochrome in the German market and the distortive impact Kazakh pricing may have on the German ferrochrome market as a result."  Final IDM at 24 (Appx002301).  This is a simple function of supply and demand economics: when Kazakh ferrochrome—which represents a significant portion of the German market—is priced unfairly low, other suppliers of this commodity product must either reduce their own prices or lose market share.  As a buyer of commodity ferrochrome in the German market, BGH reported costs impacted by these artificially low prices, whether the ferrochrome it bought was sourced from Kazakhstan or another country.

### 2.  Commerce's PMS Adjustment for Ferrochrome Was Reasonable

BGH additionally argues that Commerce's PMS adjustment to correct for distorted German ferrochrome costs was unsupported by substantial evidence because Commerce allegedly made three "calculation errors."  BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 21-22.  First, BGH claims that record evidence does not support Commerce's conclusions because Commerce erroneously referenced "Exhibit D-3" rather than [                    ] as the source of its figures for BGH's POI ferrochrome purchase value and quantity.  *Id*.  As the Petitioners already explained, *see* Petitioners' Rebuttal Brief (Dec. 17, 2021) (ECF 33) at 29, [                    ] clearly shows that BGH's various ferrochrome purchases [                                        ],[6] *see* BGH DQR (Apr. 27, 2020) at [                        ], the precise figures Commerce used in its calculations, *see* Final Margin Calc. Memo (Dec. 7, 2020) at Attachment IV (Appx086811).

---

[6] These figures [

                                                ].  BGH DQR (Apr. 27, 2020)
at Appendix D-4 (Appx081074).

Commerce's reference to the wrong exhibit is thus harmless error that resulted in no prejudice to BGH. *See generally Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996) (noting that to determine whether an error in an agency proceeding is harmless a court must examine whether the error was the result of a violation of a statute or regulation and whether there was prejudice to any party).

Second, BGH claims that Commerce's calculations are erroneous because "Commerce compare{d} BGH actual purchases of ferrochrome with the general 'Ferrochromium' figure listed by the U.S. Geological Survey ('USGS')" and did not account for alleged price differences. BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 21. Such an argument is both improper and unsupported by record evidence. BGH failed to raise this issue in its administrative case brief. *See generally* BGH Admin. Case Br. (Nov. 23, 2020) at 13-14 (Appx086411-086412). Therefore, under the doctrine of administrative exhaustion, BGH should be precluded from raising such arguments for the first time on appeal. *See, e.g., Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (finding that a party's "failure to raise its issue in its administrative case brief {before Commerce} constituted a failure to exhaust administrative remedies" and precluded the complaining party from raising the argument on appeal); 28 U.S.C. § 2637(d) ("require{ing}" exhaustion of administrative remedies "where appropriate").

Even setting exhaustion of the argument aside, BGH waived its opportunity to establish a supporting factual basis in the administrative record. In calculating a PMS adjustment for distortions in the German ferrochrome market, Commerce took BGH's average purchase price for various ferrochrome grades and compared it to the average reported in the USGS. *See generally* Final Margin Calc. Memo (Dec. 7, 2020) at Attachments III (Appx086807) and IV (Appx086811). BGH asserts an <u>absence</u> of details associated with the USGS price but has identified no <u>evidence</u> that the USGS figures concern

meaningfully different "product{s} or sales." *See* BGH Comments on Second Remand (Jan.

22, 2024) (ECF 85) at 21-22.  The USGS price was included in the Petitioners' PMS

Allegation.  *See* Petitioners' PMS Allegation (Jun. 15, 2020) at Ex. 48 (Appx085237-

085249).  BGH submitted rebuttal factual information, but failed to include any information

concerning the USGS figures themselves.  *See* BGH's PMS Rebuttal (Jul. 24, 2020) at ii-iii

(Appx086070-086072).  It is axiomatic that the parties bear responsibility for creating the

administrative record.  *See QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir.

2011) (internal quotations, brackets, and citations omitted) ("Although Commerce has

authority to place documents in the administrative record that it deems relevant, the burden of

creating an adequate record lies with interested parties and not with Commerce.").

Commerce cannot be faulted for not accounting for a theoretical problem after BGH waived

its opportunity to substantiate the problem's existence with factual information.  Absent

contrary evidence, it was reasonable for Commerce to conclude that the USGS average

represented an appropriate benchmark for comparison to BGH's ferrochrome costs.

Finally, BGH claims that Commerce erred in relying "exclusively on the USGS price

of general ferrochrome in the United States" and "reject{ing} without explanation other

evidence on world ferrochrome prices placed on the record by BGH and the other mandatory

respondent."  BGH Comments on Second Remand (Jan. 22, 2024) (ECF 85) at 22.  Such

claims too are inaccurate.  As explained *supra*, Commerce relied on USGS prices for

ferrochrome in the United States—rather than the data provided by respondents—because

record evidence established that USGS data are "based on U.S. import prices largely from

countries other than Kazakhstan."  Final IDM (Dec. 7, 2020) at 24 (Appx002301).  While the

two respondents (including BGH) placed data on the record concerning ferrochrome imports

into selected countries, *see* BGH Br. (Aug. 9, 2021) (ECF 23) at 18-19 (citing BGH's PMS

Rebuttal (Jul. 24, 2020) at 7-10 (Appx086084-086087) and Attachments 4 (Appx086102-

086104) and 6 (Appx086192-086216); SWG PMS Rebuttal (Jul. 24, 2020) at 6-7

(Appx086225-086226) and Exhibit 10 (Appx086311-086315)), neither provided any

evidence demonstrating that these import prices were not similarly distorted by a high

proportion of non-commercial, low-price ferrochrome from Kazakhstan.  Under such

circumstances, Commerce reasonably relied on record evidence demonstrating that USGS

data are "based on U.S. import prices largely from countries other than Kazakhstan."  Final

IDM (Dec. 7, 2020) at 24 (Appx002301).  Moreover, Commerce explained that additional

data provided by BGH showing that unit values for Kazakh exports of ferrochrome to

Germany are consistent with unit values of Kazakh exports to other countries "do not refute

evidence that the German ferrochrome market is distorted."  PMS Memo (Oct. 14, 2020) at

14 (Appx086335).  This is because Kazchrome's anti-competitive pricing would logically

"affect the price of Kazakh ferrochrome sold in Germany, Italy, or any other country."  *Id.*

(Appx086335).  Indeed, it underscores the rationale for Commerce's rejection of

respondents' prices.

## III.    CONCLUSION

As detailed above, Commerce's PMS findings and adjustments with respect to both

electricity and ferrochrome were supported by substantial evidence and otherwise in

accordance with law.  This Court should therefore affirm Commerce's PMS findings and

adjustments.

*          *          *

NON-CONFIDENTIAL VERSION

Respectfully submitted,

/s/ Myles S. Getlan

Myles S. Getlan
Thomas M. Beline
James E. Ransdell
Nicole Brunda

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street NW, Suite 400
Washington, DC 20006
T: (202) 567-2313
F: (202) 567-2301
Email: mgetlan@cassidylevy.com

Dated:  March 6, 2024

*Counsel to Ellwood City Forge Company,*
*Ellwood National Steel Company, Ellwood*
*Quality Steels Company, and A. Finkl & Sons*

## <u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>

The undersigned hereby certifies that the foregoing sur-reply contains 5,232 words, exclusive of the caption block, table of contents, table of authorities, signature block, certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

By:    <u>/s/ Myles S. Getlan</u>
Myles S. Getlan

- 2 -